UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BISHOP GEORGE BLOOMER, *et al.*,

Plaintiffs,

Case No. 2:22-cv-12433-NGE-DRG
Hon. Nancy G. Edmunds
Magistrate Judge David R. Grand

v.

THE WORD NETWORK OPERATING COMPANY, INC., *et al.*,

Defendants.

---

**MORGAN & MORGAN, P.A.**
Michael N. Hanna (P81462)
2000 Town Center, Ste. 1900
Southfield, MI 48076
Telephone: (313) 251-1399
mhanna@forthepeople.com

**HKM EMPLOYMENT ATTORNEYS LLP**
J. Corey Asay
312 Walnut Street, Suite 1600
Cincinnati, OH 45202
casay@hkm.com

*Attorneys for Plaintiffs*

**BODMAN PLC**
John T. Below (P48677)
Rebecca Seguin-Skrabucha (P82077)
Amanda McSween Empey (P84594)
201 W. Big Beaver Road, Ste. 500
Troy, MI 48084
Telephone: (248) 743-6000
Facsimile: (248) 743-6002
jbelow@bodmanlaw.com
rseguin-skrabucha@bodmanlaw.com
aempey@bodmanlaw.com

*Attorneys for Defendants*

---

# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56, Defendants The Word Network Operating Company, Inc. ("TWN"), Church of the Word ("WNC"), and Kevin Adell ("Adell")

(collectively, “Defendants”) move for summary judgment as to all claims asserted by Plaintiffs George Bloomer and G.G. Bloomer Ministries (collectively, “Plaintiffs”). For the reasons stated in the attached brief, Defendants respectfully request their motion be granted, and judgment entered in their favor. Pursuant to E.D. Mich. L.R. 7.1, Defendants sought concurrence on their motion. Undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief, and three business days have lapsed without opposing counsel expressly agreeing to the relief, orally or in writing.

Respectfully submitted,

**BODMAN PLC**

*/s/ John T. Below*

John T. Below (P48677)
Rebecca Seguin-Skrabucha (P82077)
Amanda McSween Empey (P84594)
201 W. Big Beaver Road, Ste. 500
Troy, MI 48084
Telephone: (248) 743-6000
Facsimile: (248) 743-6002
Email: jbelow@bodmanlaw.com
Email: rseguin-skrabucha@bodmanlaw.com
Email: aempey@bodmanlaw.com

*Attorneys for Defendants*

Dated: October 25, 2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BISHOP GEORGE BLOOMER, *et al.*,

Plaintiffs,

v.

THE WORD NETWORK OPERATING COMPANY, INC. *et al.*,

Defendants.

Case No. 2:22-cv-12433-NGE-DRG
Hon. Nancy G. Edmunds
Magistrate Judge David R. Grand

---

**MORGAN & MORGAN, P.A.**
Michael N. Hanna (P81462)
2000 Town Center, Ste. 1900
Southfield, MI 48076
Telephone: (313) 251-1399
mhanna@forthepeople.com

**HKM EMPLOYMENT ATTORNEYS LLP**
J. Corey Asay
312 Walnut Street, Suite 1600
Cincinnati, OH 45202
casay@hkm.com

*Attorneys for Plaintiffs*

**BODMAN PLC**
John T. Below (P48677)
Rebecca Seguin-Skrabucha (P82077)
Amanda McSween Empey (P84594)
201 W. Big Beaver Road, Ste. 500
Troy, MI 48084
Telephone: (248) 743-6000
Facsimile: (248) 743-6002
jbelow@bodmanlaw.com
rseguin-skrabucha@bodmanlaw.com
aempey@bodmanlaw.com

*Attorneys for Defendants*

---

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


TABLE OF AUTHORITY ........................................................................ iv

STATEMENT OF ISSUES PRESENTED..................................................... vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................ ix

INTRODUCTION .......................................................................................1

STATEMENT OF MATERIAL FACTS ........................................................2

STANDARD OF REVIEW ..........................................................................11

ARGUMENT ..............................................................................................12

I. TWN cannot be liable because it was neither a party to any contract with Plaintiffs nor was it involved in any of the alleged discriminatory actions. ..12

II. Adell cannot be liable in his individual capacity because he was not a party to any alleged contract with Plaintiffs. ...........................................................13

III. Plaintiffs cannot prevail on their § 1981 claims because they did not have any contractual rights, and they cannot demonstrate that racial discrimination drove any decision to interfere with those alleged rights. .............................15

A. Plaintiffs did not have any contractual rights. ..........................................16

i. There was no legal consideration. ...................................................... 17

ii. There was no mutuality of agreement. ................................................ 18

iii. There was no mutuality of obligation. .............................................. 21

B. Bloomer cannot show that his non-existent contractual rights were intentionally interfered with based upon racial animus. .............................21

i. There is no evidence of racial animus, and, therefore, Bloomer cannot prevail on his race discrimination claim (Count I). ............................ 22

ii. There is no evidence of racial harassment, so Plaintiffs cannot prevail on their race harassment claim (Count II)........................................... 24

iii. Bloomer did not suffer any materially adverse action, and, therefore, he cannot prevail on his retaliation claim (Count III). 29

IV. There was no contract, and there were no damages, so there could be no breach (Count IV). ..........................................................................31

V. Defendants did not receive any benefit that resulted in inequity, so Bloomer's quantum meruit/unjust enrichment claims fail (Counts V- VI).....................32

CONCLUSION ........................................................................................................33

# TABLE OF AUTHORITY

## Cases

*Alexander v. UDV N. Am. Inc.*, 78 F. Supp.2d 614, 624 (E.D. Mich. 1999)..... ix, 13
*Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006).................... 12, 16, 22
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...........................................12
*Barber v. SMH (US)*, 202 Mich. App. 366, 509 N.W.2d 791, 796 (Mich. App. 1993) ...........................................................................................................33
*Bell v. Liberty Nat'l Life Ins.*, Case No. 2:19-cv-01335-ACA, 2022 WL 610173, 2022 U.S. Dist. LEXIS 35698 at *22-23 (N.D. Al. Mar. 1, 2022).......................25
*Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) ..................................... ix, 29
*Burton v. Plastics Research Corp.*, 134 F. Supp. 2d 881, 885 (E.D. Mich. 2001)..16
*Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001) ............ ix, 23
*Comcast Corp. v. NAAAOM*, 140 S.Ct. 1009, 1019 (2020) ...................................21
*Daimler-Chrysler Servs. v. Summit Nat'l*, 289 Fed. App'x 916, 925 (6th Cir. 2008) ...................................................................................................................32
*Devoy v. Hutzel Hosp.*, No 181868, 1996 Mich. App. LEXIS 2207 at *13 (Mich. Ct. App. Dec. 6, 1996)...........................................................................19
*Doe v Henry Ford Health Sys*, 308 Mich App 592; 865 NW2d 915 (2014)...........32
*Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003).........................................14
*Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)........................ 16, 22
*Dumas v. Auto Club*, 437 Mich. 521, 473 N.W.2d 652, 663 (Mich. 1991) ............33
*Felton v. Polles*, 315 F.3d 470, 480 (5th Cir. 2002)................................................15
*Gottlieb v. Arrow Door Co.*, 364 Mich. 450, 452, 110 N.W.2d 767 (Mich. 1961).14
*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)....................................28
*Herman v. Bridgewater Park Apts*, Case No. 15-cv-12203, 2016 WL 826050, 2016 U.S. Dist. LEXIS 29569 at *14 (E.D. Mich. Mar. 3, 2016)................................12
*Higgins v. Monroe Evening News*, 404 Mich. 1, 20; 272 N.W. 2d 537 (1977) ix, 17
*Innovation Ventures, LLC v. Liquid Mfg., LLC*, 499 Mich. 491, 508; 885 N.W. 2d 861 (2016)..................................................................................................17
*Int'l Union, UAW v. Aguirre*, 410 F.3d 297, 302-303 (6th Cir. 2005)....................14
*Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 2001)................................22
*Kamalnath v. Mercy Mem. Hosp. Corp.*, 194 Mich. App. 543, 548, 487 N.W.2d 499 (1992)..................................................................................................19
*Kewin v Massachusetts Mutual Life Ins Co*, 409 Mich 401; 295 NW2d 50 (1980)32
*Kraus v. Gerrish Twp.*, 205 Mich. App. 25, 45; 517 N.W.2d 756 (1994)..............18



4875-1615-3842_1

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994).................................. ix, 26
*Logan v. Denny's, Inc.*, 259 F.3d 558, 568-569 (6th Cir. 2001) .............................30
*Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).....12
*McMillon v. City of Kalamazoo*, 983 N.W.2d 79, 81 (2023) ..................................18
*Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986) ............................................29
*Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161; 848 NW2d 95 (2014)........31
*Moore v. Kuka Welding, Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)................. ix, 30
*Olympic Forest Prods. v. Cooper*, 148 Fed. App'x 260, 263 (6th Cir. 2005).........13
*S.K. Servs. V. FedEx Ground Package Sys.*, 663 F. Supp. 2d 619, 626 (E.D. Tenn. Sept. 30, 2009) ...........................................................................................25
*Sayed v. Sayed*, No. 275293, 2008 WL 3157456, 2008 Mich. App. LEXIS 1603 at *6 (Mich. Ct. App. Aug. 7, 2008)..............................................................................19
*SCD Chem. Distribs. Inc., v. Medley*, 203 Mich. App. 374, 512 N.W.2d 86, 90 (Mich. Ct. App. 1994)...................................................................................14
*Schechner v. Whirlpool Corp.*, 237 F.Supp.3d 601, 608 (E.D. Mich. 2017) .... ix, 31
*Solomon v. Carite Corp. LLC*, 837 Fed. App'x 355, 361-62 (6th Cir. 2020) ... ix, 21
*Strong v. Hercules Life Ins. Co.*, 284 Mich. 573, 280 N.W. 55 (1938)...................16
*Thomas v. Leja*, 187 Mich. App. 418, 422; 468 N.W.2d 58 (1991).................. ix, 16
*Watkins v. Genesh, Inc.*, 2021 WL 1238270, 2021 U.S. Dist. LEXIS 64693 at *7, Case No. 2:19-cv-2486 (D. Ka. Apr. 2, 2021)....................................................24
*White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)...................21
*Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)..................... ix, 26
*Williams v. Richland County Children Servs.*, 489 Fed. App'x 848, 851 (6th Cir. 2012) ...................................................................................................... ix, 16
*Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998)...........................26
*Yates v. Avco*, 819 F.2d 630, 637 (6th Cir. 1987)....................................................30

**Statutes**

M.C.L. § 600.5807(8) ..........................................................................................31

**Rules**

E.D. Mich. L.R. 7.1......................................................................................................2
FED. R. CIV. P. 56 ........................................................................................ 1, ix, 11

## STATEMENT OF ISSUES PRESENTED

1. Should TWN be dismissed from this lawsuit because it is neither a party to any contract with Plaintiffs, nor was it involved in any of the alleged discriminatory conduct?

Defendants Answer: "Yes."

2. Should Adell be dismissed in his individual capacity when Plaintiffs did not bring contract-based claims against him, when he was acting in his official capacity as CEO & President of WNC, and there is no basis to pierce WNC's corporate veil, and when he was not party to the alleged contracts with which Defendants supposedly interfered?

Defendants Answer: "Yes."

3. Are Defendants entitled to summary judgment on Plaintiffs' claims under § 1981 when there were no contractual rights that could be subject to interference because the gratuitous relationship among the parties was not supported by legal consideration, and there was no mutuality of agreement or mutuality of obligation?

Defendants Answer: "Yes."

4. Are Defendants entitled to summary judgment on Plaintiffs' race discrimination claim under § 1981 when Plaintiffs admit that they voluntarily exited the gratuitous relationship for reasons unrelated to alleged racial animus, and when Plaintiffs were treated no differently than any similarly situated individuals?

Defendants Answer: "Yes."

5. Are Defendants entitled to summary judgment on Plaintiffs' race harassment claim under § 1981 when no such claim exists in the commercial context, and when the alleged racial animus was not severe or pervasive?

Defendants Answer: "Yes."

6. Are Defendants entitled to summary judgment on Plaintiffs' retaliation claim under § 1981 when Plaintiffs suffered no materially adverse action?

Defendants Answer: "Yes."

7. Are Defendants entitled to summary judgment on Plaintiffs' breach of contract claim when there was no contract (oral or written) because the gratuitous relationship among the parties was not supported by legal consideration, there was no mutuality of agreement or mutuality of obligation, and the alleged damages are purely speculative?

Defendants Answer: "Yes."

8. Are Defendants entitled to summary judgment on Plaintiffs' unjust enrichment/quantum meruit claims when Defendants did not receive any benefit that resulted in inequity?

Defendants Answer: "Yes."

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

FED. R. CIV. P. 56

*Alexander v. UDV N. Am. Inc.*, 78 F. Supp.2d 614, 624 (E.D. Mich. 1999).

*Barber v. SMH (US), Inc.*, 202 Mich. App. 366, 509 N.W.2d 791, 796 (Mich. App. 1993).

*Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019).

*Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001).

*Comcast Corp. v. NAAAOM*, 140 S. Ct. 1009, 1019 (2020).

*Higgins v. Monroe Evening News*, 404 Mich. 1, 20; 272 N.W. 2d 537 (1977).

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994).

*Moore v. Kuka Welding, Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

*Schechner v. Whirlpool Corp.*, 237 F.Supp.3d 601, 608 (E.D. Mich. 2017).

*Solomon v. Carite Corp. LLC*, 837 Fed. App'x 355, 361-62 (6th Cir. 2020).

*Thomas v. Leja*, 187 Mich. App. 418, 422; 468 N.W.2d 58 (1991).

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).

*Williams v. Richland County Children Servs.*, 489 Fed. App'x 848, 851 (6th Cir. 2012).

**INTRODUCTION**

Plaintiff George Bloomer ("Bloomer") became a fairly well-known televangelist by hosting Rejoice in the Word, a television program produced by Church of the Word, d/b/a The Word Network Church ("WNC"), for almost nine years. He was friends with Kevin Adell ("Adell"), founder of The Word Network Operating Company, Inc. ("TWN"), the largest African American religious broadcasting network in the world and owner of WNC. Adell and Bloomer had a mutually beneficial arrangement – WNC allowed Bloomer to host Rejoice in the Word, which afforded Bloomer free publicity and airtime to advertise the products sold through his non-profit organization, G.G. Bloomer Ministries ("GGB").

After nearly nine years together, in the Fall of 2019, this mutually beneficial arrangement was breaking down. Bloomer became dissatisfied because WNC was late in shipping his books to donors, and he wanted more airtime to build a larger following. At the same time, WNC observed a decline in Rejoice in the Word as donations and calls during the show decreased. Shortly thereafter, a meme circulated around the Internet, which depicted Adell as a rotund "pimp" in a white fur coat and silly hat with Bloomer (and others) near him, wearing white tuxedos and appearing much shorter. Bloomer and Adell joked about the meme at first, but when Bloomer asked Adell to stop, he did. Days later, Bloomer continued his complaints about

WNC's business practices and wanting more air time and, ultimately, decided to "take a break from television" and leave WNC altogether.

More than three years later, Bloomer filed this lawsuit because, without Rejoice in the Word, his business was hurting. Now, in a desperate attempt to re-write history, Bloomer alleges TWN, WNC, and Adell (collectively, "Defendants") discriminated against him in September 2019, and he fabricates a whole new component to their arrangement: Bloomer or GGB (Bloomer doesn't know which) is somehow owed a commission on WNC owned products sold during Rejoice in the Word from March 2016 to September 2019. However, there was no contract – oral or written. The parties had a gratuitous relationship, but there was no bargained-for exchange binding the parties to any duty or action. This is ruinous to both Plaintiffs' contract-based claims and §1981 claims, which require a real contractual relationship. Plaintiffs' Amended Complaint should be dismissed in its entirety.

## STATEMENT OF MATERIAL FACTS

Adell is the founder of TWN, the largest African American religious broadcasting network in the world. **Exhibit 1**, *Lameti Transcript* at 10:17-23; **Exhibit 2**, *Adell Transcript* at 13:11-15:19. TWN sells time slots to ministers and other non-profit entities, but it does not produce its own programming. **Ex. 2** at 16:1-17:13. WNC is an ecclesiastical non-profit, which produces religious programming. **Exhibit 3**, *WNC Transcript* at 12:3-19. Bloomer is a televangelist and sole owner of

GGB, through which he coordinates his commercial speaking engagements and sells his products ("GGB Products"). **Exhibit 4**, *Bloomer Transcript* at 44:8-12.

**Bloomer Hosts Rejoice in the Word**

In 2011, Bloomer connected with Adell, who offered Bloomer the opportunity to host WNC's production, "Rejoice in the Word." **Ex. 4** at 20:16-21:9. This was an informal arrangement, and there was no commitment by either WNC or Bloomer to continue it for any set period of time. **Ex. 4** at 28:20-29:3. WNC and Bloomer operated on a show-by-show basis, and Bloomer paid nothing for the show. *Id*. WNC could pull Rejoice in the Word off the air at any time. **Ex. 4** at 59:8-64:12. And Bloomer could refuse to come in to host Rejoice in the Word without any recourse by WNC. *Id.* Importantly, the parties agree that there is no document (or group of documents) that constitutes the "contract" referenced in Plaintiffs' Amended Complaint. **Exhibit 5**, *Plaintiffs' Responses to Requests for Admission*.

Significantly, <u>Bloomer was not paid for hosting Rejoice in the Word</u>. **Ex. 4** at 22:1-6. Instead, Bloomer benefited through the exposure he gained from the show. In Bloomer's words, he "was given an unbelievable platform to stand on to share [his] testimony and to minister the people." **Ex. 4** at 115:13-25. As Adell put it, "as a preacher, that's like gold, because you're not paying for it, and so you get a whole half hour to sell your books, tapes, CDs, and so that's where he was compensated." **Ex. 3** at 57:22-11. "Exposure. That was the deal." **Ex. 3** at 60:9-10.

**GGB and WNC Products**

During Rejoice in the Word, Bloomer promoted his own GGB-produced products, the GGB Products, and as the show evolved, he also promoted WNC-owned products, including bibles. **Ex. 4** at 39:21-40:1; 53:18-54:7 ("WNC Products"). Regarding the GGB Products, "the agreement was [WNC] gives [GGB] $10 for the book." **Ex. 4** at 39:21-40:21. Once GGB received an order from WNC, GGB would issue an invoice to WNC, buy the books from the printer for $1.50-$3.00, and then GGB would ship them to WNC. **Ex. 4** at 39:21-40:21; 82:16-83-13; **Exhibit 6**, *Temelia Daniel Deposition* at 70:3-18. According to Bloomer "the only way [GGB] could get paid" was to hold shipments of GGB Products until WNC paid its invoices. **Ex. 4** at 83:9-13. WNC would then deliver the books, etc., to donors. **Ex. 4** at 39:21-40:21; 82:16-83-13. Neither WNC nor GGB bought or delivered GGB Products without an <u>advance</u> sale commitment from donors. *Id.*

Regarding the WNC Products, as distinct from GGB Products, Bloomer alleges that Adell "told [him] when we sell the [WNC] bibles, [Bloomer] was going to get $10 off of the bibles." **Ex. 4** at 83:14-11. Adell vehemently denies this conversation occurred and denies Bloomer was owed any money for the sale of WNC Products. **Ex. 3** at 59:18-60:23. Tellingly, Bloomer could not articulate what the terms of this supposed agreement were:

- He does not know *when the supposed contract was made*, i.e., when Adell told him about the alleged WNC bible commission (**Ex. 4** at 83:14-84:19);
- He does not know *who the parties to the agreement were* (**Ex. 4** at 31:8-33:23);
- He does not know *the structure of payment*, including *when the payments were supposed to start* or *when payments were due*, but when pressed, he said that he believed he was owed money from 2013 onward (**Ex. 4** at 54:8-19, 94:8-18, 19-99:18); and
- He does not know *what WNC owed him*, and he does not have *any record of the WNC Products he sold* (**Ex. 4** at 87:15-91:25). In his words, he "couldn't keep track of what was owed to [him.]" (**Ex. 4** at 95:3-18).

In a candid moment, Bloomer admitted, "there's no agreement or anything like that" regarding the WNC Products. Ex. 4 at 113:21-114:1.

Moreover, there is zero documentation of Bloomer or GGB trying to collect payment for any commission on the sale of WNC Products. Bloomer testified the *only* way he tried to collect payment was by verbally "talk[ing] to [Adell] from time to time." **Ex. 4** at 99:7-14. This stands in stark contrast to his (or GGB's) collection efforts on the GGB Products, pursued by Bloomer at the same time, for which GGB issued invoices (**Exhibit 7**, *Invoices*), Bloomer texted Adell to ask him to pay the outstanding amounts (**Exhibit 8**, *Collection Text Messages*), and GGB even withheld shipments until WNC paid for them (**Ex. 4** at 83:1-13). Yet, despite

alleging he was owed for WNC Products starting in 2013, Bloomer did not issue any invoices regarding WNC Products, did not text Adell for payment on WNC Products, and continued to promote WNC Products on the air until he left WNC in 2019. **Ex. 4** at 105:14-106:5; 112:25-113:25. Bloomer and Adell regularly texted for years, and Bloomer never even mentioned these alleged commissions for WNC Products.[1] When asked why he did not do more to collect, Bloomer stated that he "wasn't just there to get paid, [he] was ministering." **Ex. 4** at 107:10-11. But even under this theory – that Bloomer did not try to collect because he did not want to lose his opportunity to minister – he still had the opportunity to push WNC for payment. In May 2017, other religious networks were trying to lure Bloomer away from WNC, and instead of using this as a unique opportunity to leverage payment on the alleged commissions, Bloomer texted Adell, "you have taken great care of me and I love you and appreciate you" and re-iterated that "I'm here with you until you let me go and I hope that's never." **Exhibit 9**, *May 16, 2017 Text*; **Ex. 4** at 108:3-110:15. This is *wholly* incompatible with Bloomer's new claim that WNC owed him commission for an unknown quantity of WNC Products sold or pledged for the five years prior to that point. It is clear – no such agreement ever existed.

**Breakdown Of Relationship**

---

[1] Defendants will spare the Court from reading the 722 text messages between Adell and Bloomer. Plaintiffs have the text messages and can respond accordingly if they disagree.

Between 2011 and September 2019, Adell and Bloomer maintained a casual, friendly relationship, and they frequently joked with one another. **Ex. 4** at 73:20-74:10; **Ex. 2** at 83:22-84:5. In September 2019, a Radio 910 employee, Denise Johnson, showed Adell and Bloomer a digitally created image of Adell, Bloomer, and other preachers (the "meme").[2] **Ex. 2** at 68:15-70:19. In the meme, Adell's face was superimposed on a body wearing a white fur coat and hat. Bloomer and other preachers were pasted near him, and their bodies were scaled-down in size, making Adell look larger than the preachers. *Id*. Bloomer appeared especially short, and he was wearing a white tuxedo with a black bowtie. *Id*.



This was a popular meme format at the time.[3] Adell and Bloomer "laughed at it, and [Adell] thought it was over. It wasn't done to hurt [Bloomer's] feelings." **Ex. 2** at 69:5-8. As Adell noted, he was the one who looked bad in the meme. *Id*. Adell joked about it on the phone later with Bloomer, "[Bloomer] brought it up that he wished he was the pimp and he looked big and strong, and so, you know, I think I made fun

[2] Neither Adell, TWN nor WNC had any involvement in authoring the article in which the meme was published or creating the meme. The source remains unknown.
[3] For instance, one version depicted former Detroit Lions quarterback, Matthew Stafford, in the white coat and hat. **Exhibit 10**, *Matthew Stafford Meme*.

of it. I didn't mean to, but I didn't know it bothered him. It didn't bother him at the time, and so we joked about it." **Ex. 2** at 79:6-23.

Bloomer was bothered by how short he looked in the meme and referred to himself as a "midget." **Ex. 2** at 84:11-85:7. So, during their joking, Adell referred to Bloomer as Tattoo – the short, white-appearing, and famously French character from the popular television series, *Fantasy Island*, who wore a white tuxedo with a black bowtie (*Id*.):



During a text exchange on September 4, 2019, Adell joked with Bloomer about the similarity between Bloomer's meme wardrobe and that of Tattoo. **Exhibit 11**, *September 2019 Text Messages*. Though Bloomer primarily focused on the connotations related to the pimp characterization, Adell entirely focused on Bloomer's Tattoo resemblance. *Id*. Bloomer stated, "that pimp thing get rid of that as quickly as you possibly can[.] [I]t's not funny," and Adell responded with a picture of Tattoo before Bloomer changed the topic. *Id*. Adell and Bloomer exchanged multiple <u>unrelated</u> text messages over the course of the following week. *Id*. Then, on September 11 and 12, 2019, Adell sent cropped versions of the meme to Bloomer, showing only Bloomer and his white tuxedo, accompanied by the captions, "Ok [thumbs up emoji]," "Got it Tat[t]oo," and "Hi !!! We did great on the

[prayer shawls] last night." *Id*. Bloomer responded, "Not funny!!!!!" and "I told you I don't like that tattoo business." *Id*. Bloomer further said that "it was highly offensive," that he "would see that as being [racist]," and that he "do[es] not play games with [his] name or [his] character . . . ." *Id*. Bloomer asked Adell to "stop playing with [him] like that," and Adell complied. *Id*. Bloomer sent several additional and unrelated text messages in the days thereafter. *Id*.

**Bloomer's Decision To Leave WNC**

On September 15, 2019, Bloomer sent Adell a very long text message regarding a recent "low revenue night" and the "serious problems that no one [was] telling [Adell] about," including: (1) someone complained that WNC treated book gospel artists poorly; (2) "preachers [were] telling folks over the pulpit that the network is like a plantation"; (3) customers were waiting six months for the shipment of products; and (4) Bloomer paid for late packages to be sent out. *Id*. Bloomer also pushed Adell for more airtime, saying, "if the pastor shows up to the church once every other month when he gets there no one is going to be there[.] [C]onsistency is going to be our key to success[.]" *Id*. Adell replied with the following:

> It seems like you're very unhappy there
> At the Word network
> I tried calling you and your facts are all correct
> Not all correct
> And stop saying it's a plantation
> You're making me mad
> If [sic] you're trying to make me mad you're doing a very good job
> If you don't wanna be on the Word tell me

> That's a conversation you say about me over the phone not on text
> And then you're not even available to discuss it
> And I told you that I give you two shows a month
> But I guess you're not happy with that
> Why are you bugging me on a Sunday
> What's wrong with u
> U received a lot of time on the Network
> I don't think u are appreciative
> Will look tomorrow on how much time u are on Network
> I am very disturbed by you tonight

*Id*. Bloomer responded, "I'm not disrespecting you [or] ignoring your call I just have nothing else to say[.] I apologize for the call and long text on a Sunday night[.] Thanks for everything and I do mean everything that you've done for me[.]" *Id*. The next day, Bloomer decided that he no longer wanted to continue his relationship with WNC and texted Adell:

> Good afternoon sir after our conversation last and prayerful consideration I've decided to take some time off of television at The Word Network to take a break from television at the Network and my reason for that is [I'm] not OK with how you have forgotten my loyalty[,] my commitment[,] and my contribution that I had made to the station in the network[.] [S]econdly[,] I do not like or appreciate how that you tried to put me in the other house in competition with one another[.] [T]his is not a game. [T]his is ministry and it's [not] acceptable. [A]lso have a problem with my integrity being questioned by ministry partners for not receiving their products on time[.] [W]e take [people's] money and don't give them the product in a timely fashion[.] [I]n the most painful this is the way I hear people talking about you and your station behind your back in church circles that I took the bullet for and then hear you called me out of my name[.] [Y]ou told me last night and I quote that Jeff and Dave [have] lost confidence in me[,] that Taketa Williams raise[s] $25,000 in Precious[,] that my show is not effective and it's old and stale[.] [Y]ou never stated thousands and hundreds of thousands of dollars that I brought in for you

> through those Bibles[,] warfare Bible[,] woman's Bible[,] deliverance Bible[,] thousands of books and DVDs[.] [T]he money[.]

*Id*. Bloomer relied upon a litany of complaints[4] about WNC as his rationale for leaving, but conspicuously discrimination or harassment were not among them. *Id*.

Later, Bloomer testified that he quit because the late payments and shipment delays were "the straw that broke the camel's back. It's all the stuff piled up on top of each other"; "The big part of my quitting was this whole everything." **Ex. 4** at 182:15-185:15. He further testified that the alleged commissions owed for the WNC products were also a part of why he quit. **Ex. 4** at 194:10-24. As Bloomer put it, "It's not about one thing. It's about a bunch of things." **Ex. 4** at 196:16-17. This is consistent with the multiple public statements he made in Fall 2019. **Exhibit 12**, *Transcript of 9.23.19 Video*; **Exhibit 13**, *Transcript of 11.03.19 Video.* Neither discrimination, harassment, nor, specifically, the meme are mentioned in Bloomer's various statements after quitting. As abundantly evidenced by his own words on multiple occasions, Bloomer concluded his relationship with WNC of his own volition because of "a bunch of things,"[5] including late shipment of GGB Products.

## STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56, summary judgment should be granted where

---

[4] Bloomer did not mention any outstanding commissions for WNC Products.

[5] Only at his deposition did Bloomer cite commissions owed on WNC Products as among those "bunch of things."

there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ARGUMENT

### I. TWN cannot be liable because it was neither a party to any contract with Plaintiffs nor was it involved in any of the alleged discriminatory actions.

"It is well settled law that one must be a party to a contract in order to be held liable for its breach." *Herman v. Bridgewater Park Apts,* Case No. 15-cv-12203, 2016 WL 826050, 2016 U.S. Dist. LEXIS 29569 at *14 (E.D. Mich. Mar. 3, 2016) Similarly, a party cannot be liable under § 1981 if they did not engage in discriminatory conduct. *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006). TWN is neither a party to any alleged agreement nor did it engage in any alleged discriminatory conduct. As such, it should be dismissed from this case.

At Bloomer's deposition, he clarified that Plaintiffs allege the existence of three separate agreements: (1) Bloomer is an employee of WNC by hosting Rejoice in the Word (**Ex. 4** at 20:16-21:9), (2) Bloomer and/or GGB were owed $10.00 for each GGB Product ordered by WNC (**Ex. 4** at 39:21-40:21), and (3) Bloomer and/or GGB were owed $10.00 for each WNC Product he sold (**Ex. 4** at 83:14-11). Even if these agreements did occur, TWN could not have been a party to any of them because TWN is not in the business of producing shows or selling any products. **Ex.**

**2** at 16:1-17:13. Moreover, Bloomer did not know with whom he was allegedly contracting (**Ex. 4** at 31:8-34:20, **Ex. 14** at 57:12-22) and has not produced any evidence TWN was a party to any of the alleged agreements. Similarly, Plaintiffs have not alleged (much less produced evidence) that TWN engaged in any discriminatory behavior under § 1981.[6] Plaintiffs named TWN as a defendant because of their ignorance, but they cannot keep TWN in this lawsuit past a motion for summary judgment without some evidence that it was a party to a contract with Plaintiffs or involved in the alleged race discrimination in some way. As such, TWN requests that it be dismissed as a party in this case.

## II. Adell cannot be liable in his individual capacity because he was not a party to any alleged contract with Plaintiffs.[7]

It is a "well-established principle under Michigan law that corporate officers who execute a contract on behalf of their corporation typically cannot be held liable for any breach of contract." *Alexander v. UDV N. Am. Inc.*, 78 F. Supp.2d 614, 624 (E.D. Mich. 1999). Generally, "[t]he law treats a corporation as an entirely separate entity from its stockholders[.]" *Olympic Forest Prods. v. Cooper*, 148 Fed. App'x 260, 263 (6th Cir. 2005). This means that "shareholders, directors, and officers of a

[6] The Amended Complaint vaguely refers to "Defendants." *See* ECF No. 17.

[7] Counts IV (Breach of Contract), V (Quantum Meruit), and VI (Unjust Enrichment) are only alleged against Defendants TWN and WNC, not Adell in his individual capacity. *See* ECF No. 17, PageID.291-294. Defendants provide this analysis to the extent Plaintiffs nonetheless attempt to proceed with allegations of breach of contract, quantum meruit, and/or unjust enrichment against Adell individually.

corporation cannot be held personally liable for the corporation's acts or debts, unless unusual circumstances justify disregarding the corporate entity." *Id*. Even "one-man" corporations are valid corporate entities, and they may "properly enter into a contractual relationship[.]" *Gottlieb v. Arrow Door Co.*, 364 Mich. 450, 452, 110 N.W.2d 767 (Mich. 1961). For a court to disregard the corporate form and "pierce the corporate veil," a plaintiff must show that: (1) "the corporate entity must be a mere instrumentality of another entity of individual"[8]; (2) "the corporate entity must be used to commit a fraud or wrong"; and (3) "an unjust loss or injury to the plaintiff." *SCD Chem. Distribs. Inc., v. Medley*, 203 Mich. App. 374, 512 N.W.2d 86, 90 (Mich. Ct. App. 1994). Importantly, piercing the corporate veil "is the rare exception, applied in the case of fraud or certain other exceptional circumstances." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). There is no evidence that the Court should disregard WNC's corporate form and hold Adell personally liable for WNC's actions. WNC is registered with the State of Michigan as a domestic nonprofit organization, engages in its own activities, maintains its own finances and bank accounts, and annually files the necessary licensing documentation. **Ex. 3**, at 12:3-24; 27:23-28:11; 21:23-22:7. Moreover, Bloomer testified that he only ever

[8] Relevant factors include: "undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham." *Int'l Union, UAW v. Aguirre*, 410 F.3d 297, 302-303 (6th Cir. 2005).

dealt with Adell in his capacity as President of WNC. **Exhibit 14**, *GGB Deposition Transcript* at 49:24-50:12. Adell cannot be held liable in his individual capacity for any claims based upon an alleged contract between Plaintiffs and WNC, which Plaintiffs implicitly admit by bringing their contract-based claims against only TWN and WNC.

Following this same logic, Adell cannot be held liable in his individual capacity for any claims based upon supposed interference with an alleged contract between Plaintiffs and WNC because Adell is not a party to the alleged contract. The Fifth Circuit recognized this inherent tension in *Felton v. Polles*, 315 F.3d 470, 480 (5th Cir. 2002) ("[I]t is not clear whether a § 1981 claim lies against an individual defendant not a party to the contract giving rise to the claim").[9] Adell should be dismissed as an individual defendant as to all claims.

**III. Plaintiffs cannot prevail on their § 1981 claims because they did not have any contractual rights, and they cannot demonstrate that racial discrimination drove any decision to interfere with those alleged rights.**

"Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing relationship, so long as the plaintiff has or would have rights under the existing or

[9] Though the Sixth Circuit has permitted plaintiffs to proceed with Section 1981 claims against third-party individuals in the employment context, the parties' interactions here were commercial in nature, and neither WNC nor Adell can be compared to "employers" in the case law.

proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 476 (2006). There are two major elements of a § 1981 claim: (1) "the plaintiff must possess some contractual right that the defendant blocked or impaired"; and (2) "the plaintiff must demonstrate that racial discrimination drove the decision to interfere with these contractual rights." *Williams v. Richland County Children Servs.*, 489 Fed. App'x 848, 851 (6th Cir. 2012); *Amini*, 440 F.3d at 358.

**A. Plaintiffs did not have any contractual rights.**

The requisite foundational element of a § 1981 claim is that the alleged discrimination "concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Burton v. Plastics Research Corp.*, 134 F. Supp. 2d 881, 885 (E.D. Mich. 2001). Here, Plaintiffs allege Defendants denied their "right to make and enforce contracts[.]" However, there was no contractual relationship between the parties. Therefore, Plaintiffs have no claim for relief under § 1981.

In Michigan, the requisite elements of a valid contract are: (1) parties competent to enter into a contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Thomas v. Leja*, 187 Mich. App. 418, 422; 468 N.W.2d 58 (1991). A party relying on the contract has the burden of proving that the contract exists. *Strong v. Hercules Life Ins. Co.*, 284 Mich. 573, 280 N.W. 55 (1938). Plaintiffs have not met this burden

because there is no legal consideration, mutuality of agreement, or mutuality of obligation for any of the three alleged agreements.

**i. There was no legal consideration.**

"To have consideration there must be a bargained-for exchange; there must be a benefit on one side, or a detriment suffered, or service done on the other." *Innovation Ventures, LLC v. Liquid Mfg., LLC*, 499 Mich. 491, 508; 885 N.W. 2d 861 (2016). "Valid consideration for a contract cannot be presumed merely because two parties receive benefit from each other. Rather, a bargained-for exchange is required." *Higgins v. Monroe Evening News*, 404 Mich. 1, 20; 272 N.W. 2d 537 (1977). "Gratuitous promises" within social relationships are insufficient. *Id*. There was no bargained-for exchange for any of the three alleged agreements:

- *Bloomer hosting Rejoice in the Word* – Bloomer gratuitously hosted the show to boost his own profile. **Ex. 4** at 115:13-25. As Bloomer admitted, WNC did not agree to pay Bloomer for hosting Rejoice in the Word. **Ex. 4** at 22:1-6. Bloomer did not pay WNC either. The parties merely created a flexible, no-strings arrangement which could end or change at any time - without recourse. Bloomer continued the relationship for as long as he considered it economically advantageous, and, when he voluntarily left the relationship, he did so without consequence. (WNC certainly has no basis to force Bloomer to appear again on WNC or TWN!) This is evident by Bloomer's text message that he decided to "take

a break from television" without any advanced warning. **Ex. 11**. Bloomer was not obligated to appear on WNC, and WNC was not obligated to give him a show.

- *Alleged commission for WNC Products* – The only evidence Bloomer has of this alleged agreement is his own self-serving testimony that is contradicted by years of his conspicuous silence and inaction on the matter. If he had bargained to get paid $10.00 for each of the WNC Products he sold, why did he <u>never</u> try to collect on six years' worth of debt prior to this lawsuit (which was filed more than three years after Bloomer quit WNC)?
- *Sale of GGB Products* – The arrangement was limited to an order-by-order basis. There was no agreement that WNC would continue to order GGB products, or that GGB would make products available to WNC for order. **Ex. 4** at 39:21-40:21; 82:16-83-13; **Ex. 6**, at 70:3-18.

**ii. There was no mutuality of agreement.**

"Mutuality of agreement requires a valid offer and acceptance." *McMillon v. City of Kalamazoo*, 983 N.W.2d 79, 81 (2023). "An acceptance sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for the purpose." *Kraus v. Gerrish Twp.*, 205 Mich. App. 25, 45; 517 N.W.2d 756 (1994). Importantly, "[i]n order to form a valid contract, there must be a meeting of the minds on all

essential terms." *Kamalnath v. Mercy Mem. Hosp. Corp.*, 194 Mich. App. 543, 548, 487 N.W.2d 499 (1992). "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Id*. at 548. The essential terms can vary, but there needs to be a "clear manifestation of what was required of [the parties] to perform under the alleged agreement." *Sayed v. Sayed*, No. 275293, 2008 WL 3157456, 2008 Mich. App. LEXIS 1603 at *6 (Mich. Ct. App. Aug. 7, 2008). This includes "the identity of the persons with whom they are dealing." *Devoy v. Hutzel Hosp.*, No 181868, 1996 Mich. App. LEXIS 2207 at *13 (Mich. Ct. App. Dec. 6, 1996).

Based on Bloomer's own testimony, there was no meeting of the minds on essential terms for any of the three alleged agreements. Significantly, Bloomer did not know who the parties were to any of the agreements. **Ex. 4** at 31:8-34:2. He was not only confused by the identities of TWN and WNC, but he also could not distinguish whether he personally entered into these alleged agreements or whether he entered into them on behalf of GGB. **Ex. 14** at 46:2-49:23. To this day, he does not know which entity allegedly owes him money or how much money he is supposedly owed. **Ex. 14** at 57:12-22.

Even if Bloomer knew the identities of the parties, Plaintiffs have not presented any evidence that they agreed upon enough essential terms for the parties to perform under the alleged agreements.

- *Bloomer hosting Rejoice in the Word* – This was on a show-by-show basis, and, again, Bloomer was not paid for hosting. Tellingly, WNC could (and did) pull Rejoice in the Word off the air at any time. **Ex. 4** at 59:8-64:12. Bloomer could refuse to come in to host Rejoice in the Word without any recourse by WNC. *Id.*
- *Alleged commission for WNC Products* – Bloomer cannot identify when this alleged agreement was made, when the commissions were supposed to start, or the exact nature of how or under what calculation he was supposed to receive the commissions.[10] Despite now alleging WNC owed him for six years' of commission on WNC Products sold, Bloomer did not ever issue an invoice, text Adell seeking payment, or initiate any other written demand for payment – even when he had leverage to do so while being wooed by other networks. **Ex. 4** at 105:14-106:5; 112:25-113:25. Bloomer's current version of events is pure fiction or, at least, shows there is no evidence of a mutual intent to be bound.
- *Sale of GGB Products* **–** This was on an order-by-order basis. **Ex. 4** at 39:21-40:21; 82:16-83-13; **Ex. 6**, at 70:3-18. WNC has paid all open invoices to GGB of which it is aware.

[10] It is still unclear to Defendants whether Plaintiffs are alleging that Bloomer was supposed to receive a commission for products sold while Bloomer was on the air or anytime WNC sold any products, regardless of Bloomer's promotional efforts.

In short, there was no meeting of the minds on essential terms for any of the three alleged agreements, which is why Bloomer cannot articulate what he or GGB is allegedly owed (or who owes it to them).

**iii. There was no mutuality of obligation.**

Inherently, there can be no mutuality of obligation where there is no consideration. *Solomon v. Carite Corp. LLC*, 837 Fed. App'x 355, 361-62 (6th Cir. 2020). As established above, except for the GGB Products for which WNC already paid, there was no consideration exchanged between the parties, so, consequently, there can be no mutuality of obligation.

In short, there was no contract – written or oral – between the parties, and Counts I – III fail for this reason alone. Bloomer cannot prevail on his § 1981 claims because there existed no contractual rights subject even to hypothetical interference.

**B. Bloomer cannot show that his non-existent contractual rights were intentionally interfered with based upon racial animus.**

Upon the establishment of the existence of a "contractual" right, which Bloomer cannot do here, the plaintiff must prove the defendant intentionally interfered with their contractual right because of their race. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). The "but for" standard of causation applies to § 1981 claims. *Comcast Corp. v. NAAAOM*, 140 S.Ct. 1009, 1019 (2020). Race, therefore, must be the *actual cause* – not just a motivating factor – of the loss of a legally protected right. *Id*. Though § 1981 claims require proof of

*intentional* discrimination, a standard that exceeds that which is applied to race discrimination claims brought under Title VII, courts still utilize the same *McDonnell Douglas* burden-shifting framework. *Jackson v. Quanex Corp*., 191 F.3d 647, 658 (6th Cir. 2001). All three of Bloomer's § 1981 claims fail because there were no contractual rights[11] and because there was no intentional discrimination.

#### i. There is no evidence of racial animus, and, therefore, Bloomer cannot prevail on his race discrimination claim (Count I).

In Count I, Plaintiffs allege that Adell, WNC, and TWN discriminated against them because of Bloomer's race, which must be proven with direct[12] or circumstantial evidence.

As here, where there is no direct evidence, and where the alleged discrimination occurred in the commercial context, "a plaintiff must prove: (1) plaintiff is a member of a protected class; (2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and (3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual

---

[11] To the extent there were any contractual rights for the GGB Products, those were very limited in time and scope. GGB has not produced any invoices that were outstanding during the alleged discriminatory actions in September 2019, and, therefore, they cannot be the basis for Bloomer's § 1981 claims.

[12] Direct evidence, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. Evidence of discrimination is not considered direct evidence unless racial motivation is explicitly expressed." *Amini*, 440 F.3d at 359. There is no evidence that Defendants "explicitly expressed" racial motivation to interfere with Bloomer's (non-existent) contractual rights.

relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001). Plaintiffs cannot establish a prima facie case of race discrimination under § 1981 because: (1) they were not denied a contractual privilege by WNC; and (2) they were treated no differently than any similarly situated individuals.

Plaintiffs could not have been denied any contractual privileges because none existed, and, even if contractual privileges could be demonstrated, Bloomer was the one who voluntarily chose to leave WNC for reasons entirely unrelated to any alleged race-based animus. In his own words, "the big part of my quitting was this whole everything," referring to untimely payments, late shipments, and supposed commissions. **Ex. 4** at 185: 13-15. Bloomer quit – at least in part – because of the untimely payments and late shipment of products to viewers and because he perceived WNC to owe him for WNC Products he sold. **Ex. 4** at 182:15-185:15, 194:10-24. In fact, he testified that the late shipments were "the straw that broke the camel's back." **Ex. 4** at 184:12-185:5. <u>This admission is fatal to Bloomer's § 1981 claims because he admitted that race discrimination was not the but-for cause for the termination of the supposed contractual relationship</u>. *Comcast*, 140 S. Ct. at 1019.

Even without Bloomer's admission, the analysis is undeniably simple: there was no contract; Bloomer willingly and freely chose to conclude his utilization of WNC's platform, so there was no deprivation; and, Bloomer cannot identify any non-Black preachers who were treated better because virtually all preachers who broadcast on WNC are Black. Bloomer is asking the Court to believe the unbelievable – that a church network that serves the Black community by amplifying the voices of Black religious leaders chose to discriminate against *only him* on the basis of race.

Plaintiffs primarily rely on the meme to support their discrimination claims, but the meme was created as propaganda by a third party to dramatize a false narrative. Adell's only comments about the meme were to point out what he considered to be a comical resemblance between Bloomer and a television character. Such "conclusory allegations about perceived racial and sexual stereotypes" are not enough to establish a § 1981 claim. *Watkins v. Genesh, Inc*., 2021 WL 1238270, 2021 U.S. Dist. LEXIS 64693 at *7, Case No. 2:19-cv-2486 (D. Ka. Apr. 2, 2021). As such, Count I must be dismissed.

**ii. There is no evidence of racial harassment, so Plaintiffs cannot prevail on their race harassment claim (Count II).**

Plaintiffs cannot prevail on a harassment claim under § 1981 because they were not employees of any Defendants. **Ex. 4** at 22:1-6. While courts have applied Title VII's hostile work environment analysis to employees' claims under § 1981,

the comparison to Title VII becomes unsuitable when the plaintiffs are not employees of the defendant. *Bell v. Liberty Nat'l Life Ins.*, Case No. 2:19-cv-01335-ACA, 2022 WL 610173, 2022 U.S. Dist. LEXIS 35698 at *22-23 (N.D. Al. Mar. 1, 2022) ("the court has doubts about the viability of this legal standard in this context because the framework falls short when applying it to the requirement that a plaintiff prove a basis for holding some entity affiliated with the harasser liable"); *S.K. Servs. v. FedEx Ground Package Sys.*, 663 F. Supp. 2d 619, 626 (E.D. Tenn. Sept. 30, 2009) (supporting dismissal of, at a minimum, GGB's harassment claim because "a plaintiff bringing a hostile work environment claim must show he is a member of a protected class and was subject to unwelcome racial harassment," so "it is hard to fathom a company succeeding on a hostile work environment claim"). An employer has a duty to provide its employees with a work environment that is free from harassment. This duty is derived of federal law's recognition that there is an inherent possibility of imbalance in power in the employer-employee dynamic, and that employees are oftentimes disproportionately reliant upon continuation of the employer-employee dynamic. Federal law sensibly extends no such protection to contracting parties because the commercial dynamic creates no such imbalance or disproportionate reliance. Contracting parties must only ensure that racial animus does not serve as the but-for cause for the termination of their underlying contracts. For this reason alone, Count II should be dismissed.

Even if Bloomer could proceed with a race harassment claim as a matter of law, he cannot meet the severe or pervasive standard. To succeed on a claim of a racially hostile work environment under § 1981, a plaintiff must demonstrate that "(1) [he] belonged to a protected group, (2) [he] was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). "[T]he third element limits the scope of this analysis: only harassment *based on the plaintiff's race may be considered*." *Williams*, 643 F.3d at 511. Furthermore, "[p]ervasiveness and severity are independent and equal grounds on which to support violations of § 1981." *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998). The comments by Adell to which Plaintiffs now object were neither pervasive nor severe, and, as such, Plaintiffs are unable to establish a race harassment claim.

To meet the pervasiveness standard, the "plaintiff must show more than a few isolated incidents of racial enmity." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994). "[T]here must be a steady barrage of opprobrious racial comments."[13] *Id.*

[13] Notably, Defendants produced 1,286 of Adell's text messages, including all of his text messages with Bloomer, and none contained any racial comments.

Here, Bloomer considers Adell to be a "moral" individual who could also be "obnoxious," at times, because he made certain comments in poor taste, some of which Bloomer characterized as comparable to "dog whistle racism." **Ex. 4** at 175:11-176:24. Bloomer testified that Adell never used "the N word," but Adell's comments "felt" like racism because Bloomer "know[s] what the feel is like and what have you." **Ex. 4** at 176:15-177:4. However, the examples of unprofessionalism cited by Bloomer are either altogether unrelated to race or too ambiguous or attenuated in their alleged reliance upon race-based stereotypes to evidence Adell's supposed race-based animus:

- Bloomer alleges that "pussy," "suck my [dick]," and "scumbag" are words and phrases utilized by Adell. **Ex. 4** at 233:25-234:3.
- In an isolated, unwitnessed, and undated interaction, Adell allegedly noted that the watermelon he purchased went unconsumed. **Ex. 4** at 234:21-235:6.
- In claiming that the meme was "the cherry on the cake that [Adell] had been building for a long time," Bloomer described the metaphorical "cake" in a nonsensical flurry – "Black preachers with the crack -- what you call it -- we got guests coming in from -- what you call it -- he shuts down the -- because he put in the new boardroom, he has white chairs, he shuts the boardroom down, because he doesn't want any guests to sit in there because he doesn't want them to dirty up his chairs. And when I say to him, where they going to sit? Have them sit on the floor.

There's only black people coming in there. Watermelon things. That's a lot of stuff." **Ex. 4** at 194:24-195:16.

- When pushed by Plaintiffs' counsel, Bloomer incoherently alleged that Adell said something to the effect of "I put your black ass in my Rolls Royce" but in the next breath he changed the quote to "I'll put you in my Rolls Royce and I'll drive your black ass over there." **Ex. 4** at 245:19-247:22.

Even if Adell made such comments, which is vehemently denied, this is insufficient to establish pervasive race-based harassment. Section 1981 does not provide a remedy for such sporadic and tenuous comments over a nine years.

To fulfill his burden under the severe standard, the plaintiff must demonstrate that the harassment was severe under both an objective and subjective component. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). Bloomer demonstrates neither. In order to meet the subjective prong, Bloomer must subjectively believe that Adell's conduct was so severe that it created an abusive or hostile environment based on race. *Id*. Bloomer testified he left WNC for many reasons, including late shipment of and payment on products, no payment on his sale of WNC products, and because Adell made certain unprofessional comments. **Ex. 4** at 251:25-3. When Bloomer informed Adell that he was leaving WNC, Bloomer explicitly evidenced his subjective perception because he provided a long list of complaints that prompted his departure, and <u>not a single allegation of race-based harassment was included</u>. **Ex.**

**11**. As to the objective component, Adell's alleged and miscellaneous comments and comparison of Bloomer to a (white) television character are not sufficient to establish an abusive or hostile environment based on race. When pressed to explain how the Tattoo comments were racial, Bloomer had no explanation, asserting only that a white person "may not understand it." **Ex. 4** at 251:8-252:3. Statements that merely "engender[] offensive feelings in an employee would not affect the conditions of employment to a sufficiently significant degree[.]" *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). Bloomer cannot establish that he was intentionally harassed, nor that the alleged harassment was severe or pervasive, so Count II must be dismissed.

**iii. Bloomer did not suffer any materially adverse action, and, therefore, he cannot prevail on his retaliation claim (Count III).**

"The elements of a retaliation claim under § 1981 are the same as those under Title VII." *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019). Bloomer must demonstrate that: (1) he engaged in protected activity; (2) his exercise of that activity was known by Adell and/or WNC; (3) Adell and/or WNC took an action that was materially adverse to him; and (4) there was a causal connection between the protected activity and the materially adverse action. *Id*.

Bloomer did not suffer any materially adverse action because it was his decision to leave WNC. **Ex. 4** at 185: 13-15. Furthermore, he cannot utilize his

allegation of constructive discharge to establish a materially adverse action. "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Moore v. Kuka Welding, Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999). "Both the employer's intent and the employee's objective feelings must be examined." *Id*. Plaintiffs must demonstrate not only intent, but also "other aggravating factors," exhibiting a "continuous and severe pattern of discrimination." *Yates v. Avco*, 819 F.2d 630, 637 (6th Cir. 1987). As to the "continuous and severe pattern of discrimination," the following factors are considered indicative of intolerable working conditions:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's, Inc.*, 259 F.3d 558, 568-569 (6th Cir. 2001). Aside from Plaintiffs' generalized allegation of race-based harassment, <u>none</u> of these factors (all of which occur exclusively in the employer-employee dynamic (missing here)) are alleged here. Notably, the standard for constructive discharge is higher than for a hostile work environment claim. *Moore*, 171 F.3d at 1080. As established, Bloomer cannot establish a hostile work environment claim, much less constructive discharge.

## IV. There was no contract, and there were no damages, so there could be no breach (Count IV).

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014).

To recover on a breach of contract claim, there must be privity of contract, which only "exists between contracting parties and intended beneficiaries." *Schechner v. Whirlpool Corp.*, 237 F.Supp.3d 601, 608 (E.D. Mich. 2017). As established, there was no contract – oral or written – between the parties on hosting of Rejoice in the Word or any commission on the sale of WNC Products.[14] Bloomer has admitted there was no express contract, and he cannot sufficiently demonstrate an oral contract. There was no offer, no acceptance, no consideration, and no meeting of the minds as to any terms or duties, so Count IV must be dismissed.[15]

Bloomer cannot prove his breach-of-contract claim because he is entirely incapable of quantifying or even describing with any specificity his alleged damages. "[T]he damages recoverable for breach of contract are those that arise naturally from

---

[14] Even if there were an agreement between WNC and GGB regarding GGB Products, which there was not, Bloomer has never produced any unpaid invoices to substantiate any damages he or GGB is seeking for such products. Nothing.

[15] Breach-of-contract claims based in actions prior to October 12, 2016 are time-barred by the six-year statute of limitations. M.C.L. § 600.5807(8).

the breach or those that were in the contemplation of the parties at the time the contract was made," and damages are generally limited "to the monetary value of the contract had the breaching party fully performed under it." *Kewin v. Massachusetts Mutual Life Ins. Co.*, 409 Mich. 401, 414-415; 295 N.W.2d 50 (1980). "The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach . . . Thus, in contrast, the damages must not be conjectural or speculative in their nature, or dependent upon the chances of business or other contingencies." *Doe v. Henry Ford Health*, 308 Mich. App. 592, 601-602; 865 N.W.2d 915 (2014) (finding alleged damages "speculative" because they derive from "a possible future harm that might or might not occur"). Bloomer still does not know which entity allegedly owes him money or how much money he is supposedly owed, so he cannot prove damages with reasonable certainty and cannot prove breach of contract. **Ex. 15** at 57:12-22.

## V. Defendants did not receive any benefit that resulted in inequity, so Bloomer's quantum meruit/unjust enrichment claims fail (Counts V- VI).

In the absence of an express contract, a plaintiff may bring a quantum meruit or unjust enrichment claim to ask the court to imply a contract-in-law. *Daimler-Chrysler Servs. v. Summit Nat'l*, 289 Fed. App'x 916, 925 (6th Cir. 2008). To succeed on such a claim, a plaintiff must show that there was: (1) "receipt of a benefit by the defendant from the plaintiff"; and (2) "an inequity resulting to plaintiff

because of the retention of the benefit by defendant." *Barber v. SMH (US)*, 202 Mich. App. 366, 509 N.W.2d 791, 796 (Mich. App. 1993). If the elements are met, the court will "imply a contract in order to prevent unjust enrichment." *Id*. However, "[e]ven where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it." *Dumas v. Auto Club*, 437 Mich. 521, 473 N.W.2d 652, 663 (Mich. 1991). Implying a contract-in-law to prevent unjust enrichment "should be approached with some caution." *Id*. Adell, WNC, and TWN did not receive any benefit from Bloomer that resulted in an inequity. As established, the parties did not agree to exchange any money for Bloomer's airtime on WNC, there was no agreement for WNC to compensate Bloomer for promoting WNC Products, and WNC has paid in full all invoices from Bloomer Ministries for the GGB Products. There is no evidence of unjust enrichment.

## CONCLUSION

Defendants respectfully request that the Court enter an Order dismissing Plaintiffs' Amended Complaint in its entirety and award all other appropriate relief.

Respectfully submitted,

**BODMAN PLC**
*/s/ John T. Below*
John T. Below (P48677)
*Attorneys for Defendants*

Dated: October 25, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on October 25, 2024, *Defendants' Motion for Summary Judgment* and this *Certificate of Service* were e-filed using the ECF system which will send notification of such filing to the attorneys of record via the Court's e-file system.

*/s/ John T. Below*
JOHN T. BELOW (P48677)