UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BISHOP GEORGE BLOOMER, *et al.*,

Plaintiffs,

v.

THE WORD NETWORK OPERATING COMPANY, INC., *et al.*,

Defendants.

Case No. 2:22-cv-12433-NGE-DRG
Hon. Nancy G. Edmunds
Magistrate Judge David R. Grand

---

**MORGAN & MORGAN, P.A.**
Michael N. Hanna (P81462)
2000 Town Center, Ste. 1900
Southfield, MI 48076
Telephone: (313) 251-1399
mhanna@forthepeople.com

**HKM EMPLOYMENT ATTORNEYS LLP**
J. Corey Asay
312 Walnut Street, Suite 1600
Cincinnati, OH 45202
casay@hkm.com

*Attorneys for Plaintiffs*

**BODMAN PLC**
John T. Below (P48677)
Rebecca Seguin-Skrabucha (P82077)
Amanda McSween Empey (P84594)
201 W. Big Beaver Road, Ste. 500
Troy, MI 48084
Telephone: (248) 743-6000
Facsimile: (248) 743-6002
jbelow@bodmanlaw.com
rseguin-skrabucha@bodmanlaw.com
aempey@bodmanlaw.com

*Attorneys for Defendants*

---

## APPENDIX OF PROVIDED CASES

**Unpublished Cases:**

1. *Bell v. Liberty Nat'l Life Ins.*, Case No. 2:19-cv-01335-ACA, 2022 WL 610173, 2022 U.S. Dist. LEXIS 35698 at *22-23 (N.D. Al. Mar. 1, 2022)

2. *Devoy v. Hutzel Hosp.*, No 181868, 1996 Mich. App. LEXIS 2207 at *13 (Mich. Ct. App. Dec. 6, 1996).
3. *Herman v. Bridgewater Park Apts*, Case No. 15-cv-12203, 2016 WL 826050, 2016 U.S. Dist. LEXIS 29569 at *14 (E.D. Mich. Mar. 3, 2016).
4. *Sayed v. Sayed*, No. 275293, 2008 WL 3157456, 2008 Mich. App. LEXIS 1603 at *6 (Mich. Ct. App. Aug. 7, 2008).
5. *Watkins v. Genesh, Inc.*, 2021 WL 1238270, 2021 U.S. Dist. LEXIS 64693 at *7, Case No. 2:19-cv-2486 (D. Ka. Apr. 2, 2021).

**Main Cases:**

1. *Olympic Forest Prods. v. Cooper*, 148 Fed. App'x 260, 263 (6th Cir. 2005).
2. *Williams v. Richland County Children Servs.*, 489 Fed. App'x 848, 851 (6th Cir. 2012).
3. *Higgins v. Monroe Evening News*, 404 Mich. 1, 20; 272 N.W. 2d 537 (1977)
4. *Kamalnath v. Mercy Mem. Hosp. Corp.*, 194 Mich. App. 543, 548, 487 N.W.2d 499 (1992).
5. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).
6. *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).
7. *Moore v. Kuka Welding, Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).
8. *Doe v. Henry Ford Health*, 308 Mich. App. 592, 601-602; 865 N.W.2d 915 (2014).
9. *Dumas v. Auto Club*, 437 Mich. 521, 473 N.W.2d 652, 663 (Mich. 1991).

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BISHOP GEORGE BLOOMER, *et al.*,

Plaintiffs,

v.

THE WORD NETWORK OPERATING COMPANY, INC., *et al.*,

Defendants.

Case No. 2:22-cv-12433-NGE-DRG
Hon. Nancy G. Edmunds
Magistrate Judge David R. Grand

---

**MORGAN & MORGAN, P.A.**
Michael N. Hanna (P81462)
2000 Town Center, Ste. 1900
Southfield, MI 48076
Telephone: (313) 251-1399
mhanna@forthepeople.com

**HKM EMPLOYMENT ATTORNEYS LLP**
J. Corey Asay
312 Walnut Street, Suite 1600
Cincinnati, OH 45202
casay@hkm.com

*Attorneys for Plaintiffs*

**BODMAN PLC**
John T. Below (P48677)
Rebecca Seguin-Skrabucha (P82077)
Amanda McSween Empey (P84594)
201 W. Big Beaver Road, Ste. 500
Troy, MI 48084
Telephone: (248) 743-6000
Facsimile: (248) 743-6002
jbelow@bodmanlaw.com
rseguin-skrabucha@bodmanlaw.com
aempey@bodmanlaw.com

*Attorneys for Defendants*

---

## APPENDIX OF PROVIDED CASES

**Unpublished Cases:**

1. *Bell v. Liberty Nat'l Life Ins.*, Case No. 2:19-cv-01335-ACA, 2022 WL 610173, 2022 U.S. Dist. LEXIS 35698 at *22-23 (N.D. Al. Mar. 1, 2022)

2. *Devoy v. Hutzel Hosp.*, No 181868, 1996 Mich. App. LEXIS 2207 at *13 (Mich. Ct. App. Dec. 6, 1996).
3. *Herman v. Bridgewater Park Apts*, Case No. 15-cv-12203, 2016 WL 826050, 2016 U.S. Dist. LEXIS 29569 at *14 (E.D. Mich. Mar. 3, 2016).
4. *Sayed v. Sayed*, No. 275293, 2008 WL 3157456, 2008 Mich. App. LEXIS 1603 at *6 (Mich. Ct. App. Aug. 7, 2008).
5. *Watkins v. Genesh, Inc*., 2021 WL 1238270, 2021 U.S. Dist. LEXIS 64693 at *7, Case No. 2:19-cv-2486 (D. Ka. Apr. 2, 2021).

**Main Cases:**

1. *Olympic Forest Prods. v. Cooper*, 148 Fed. App'x 260, 263 (6th Cir. 2005).
2. *Williams v. Richland County Children Servs.*, 489 Fed. App'x 848, 851 (6th Cir. 2012).
3. *Higgins v. Monroe Evening News*, 404 Mich. 1, 20; 272 N.W. 2d 537 (1977)
4. *Kamalnath v. Mercy Mem. Hosp. Corp.*, 194 Mich. App. 543, 548, 487 N.W.2d 499 (1992).
5. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).
6. *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).
7. *Moore v. Kuka Welding, Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).
8. *Doe v. Henry Ford Health,* 308 Mich. App. 592, 601-602; 865 N.W.2d 915 (2014).
9. *Dumas v. Auto Club*, 437 Mich. 521, 473 N.W.2d 652, 663 (Mich. 1991).

# Bell v. Liberty Nat'l Life Ins.

United States District Court for the Northern District of Alabama

March 1, 2022, Decided; March 1, 2022, Filed

Case No.: 2:19-cv-01335-ACA

**Reporter**

2022 U.S. Dist. LEXIS 35698 *; 2022 WL 610173

BRAEONDA BELL, Plaintiff, v. LIBERTY NATIONAL LIFE INSURANCE and CLINT MCCLAIN AGENCY, Defendants.

**Subsequent History:** Affirmed by Bell v. Liberty Nat'l Life Ins. Co., 2023 U.S. App. LEXIS 23180, 2023 WL 5624535 (11th Cir. Ala., Aug. 31, 2023)

**Prior History:** Bell v. Torchmark Liberty Nat'l, 2020 U.S. Dist. LEXIS 256316, 2020 WL 10139367 (N.D. Ala., Mar. 3, 2020)

**Counsel:** **[*1]** For Braeonda Bell, Plaintiff: Bobby Lendell Davis, LEAD ATTORNEY, THE LAW OFFICE OF BOBBY L DAVIS, Birmingham, AL; Byron R Perkins, LEAD ATTORNEY, PERKINS LAW, Birmingham, AL.

For Torchmark Liberty National, a corporation, Defendant: Thomas A Davis, LEAD ATTORNEY, Shannon L Miller, JACKSON LEWIS P.C., Birmingham, AL.

For Clint McClain Agency of Liberty National, Defendant: Daniel S Wolter, LEAD ATTORNEY, DANIEL WOLTER LAW FIRM LLC, Birmingham, AL.

**Judges:** ANNEMARIE CARNEY AXON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ANNEMARIE CARNEY AXON

## Opinion

**MEMORANDUM OPINION**

Plaintiff Braeonda Bell is an African-American woman. She sold life insurance for Liberty National Life Insurance ("Liberty National") for several months in 2018, working out of the Clint McClain[1] Agency ("TCMA") office in Homewood, Alabama. Ms. Bell claims that another Liberty National agent, Scott Pritchett, a Caucasian male, sexually and racially harassed her while the two worked together.

Ms. Bell filed suit against Liberty National and TCMA. Specifically, she claims that Liberty National and TCMA subjected her to a sexually hostile work environment in violation of Title VII and a racially hostile work environment in violation of Title VII and 42 U.S.C. § 1981. She also **[*2]** claims that Liberty National and TCMA are liable for intentional infliction of emotional distress and negligent and malicious training, supervision, and retention.

Currently before the court are Liberty National's and TCMA's motions for summary judgment. (Doc. 41; Doc. 43).

The court **GRANTS** Liberty National's motion for summary judgment on all of Ms. Bell's Title VII claims against it because Ms. Bell was an independent contractor and not an employee entitled to protection under Title VII.

Ms. Bell concedes the Title VII claims against TCMA fail a matter of law. (Doc. 54 at 17-18). Therefore, the court **GRANTS** TCMA's motion for summary judgment on Ms. Bell's Title VII claims and will not address them further.

The court **GRANTS** Liberty National's and TCMA's motion for summary judgment on Ms. Bell's § 1981 claim for a racially hostile work environment because Ms. Bell has not created a triable issue of fact about whether Liberty National or TCMA is liable for Mr. Pritchett's conduct.

Finally, in the absence of an independent basis for jurisdiction over Ms. Bell's state law claims, the court will decline to exercise supplemental jurisdiction over those

[1] In the amended complaint and in Mr. McClain's deposition, his name and that of his agency is spelled "McClain." (Doc. 29; Doc. 44-3). In Ms. Bell's deposition, Mr. McClain's name is spelled "McLain." (Doc. 44-1 at 6-7). For clarity and consistency, the court will spell McClain as it is spelled in the second amended complaint and in Mr. McClain's deposition.

claims.

**I. BACKGROUND**

On a motion for summary judgment, **[*3]** the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012)* (quotation marks omitted).

Liberty National and TCMA argue that the court should disregard statements in Ms. Bell's declaration and those of other Liberty National agents to the extent they refer to themselves as "employees" of Liberty National. (Doc. 57 at 2, n.1; Doc. 58 at 3, n.2). Liberty National and TCMA argue that this testimony does not comply with *Federal Rule of Civil Procedure 56(c)(4)* and *Federal Rule of Evidence 701* because it consists of opinions embracing legal definitions and conclusions. (Doc. 57 at 2, n.1; Doc. 58 at 3, n.2). In Title VII cases, the question of whether an individual is an "employee" is a question of federal law that the court may decide at summary judgment. *Cobb v. Sun Papers, Inc., 673 F.2d 337, 339 (11th Cir. 1982)*. Accordingly, the court's description of the facts does not incorporate any improper lay opinion testimony that provides nothing more than a legal conclusion that Ms. Bell or any other Liberty National agent was an employee of the company.

1. The Parties and Their Relationship

Liberty National is a Texas-based company that sells life insurance and supplemental health insurance products. (Doc. 44-5 at 5-6). Liberty National uses what it calls a "field **[*4]** force" of independent agents across the country to sell its insurance. (*Id.*). Clint McClain is one of Liberty National's independent insurance agents. (Doc. 44-3 at 7-8). Mr. McClain also is an independent agency owner; he operates TCMA, a corporation that leases office space and owns office equipment that he and other Liberty National agents may use. (*Id.* at 7). Mr. McClain personally has a contract with Liberty National to sell its products. (*Id.* at 10). But TCMA and Liberty National have no legal relationship and TCMA does not receive compensation from Liberty National. (Doc. 44-3 at 8-10; Doc. 44-5 at 7).

Ms. Bell began working as a Liberty National insurance agent in early May 2018. (Doc. 44-1 at 5, 9; Doc. 44-2 at 1). Someone from TCMA contacted Ms. Bell in response to an online resume posting. (Doc. 44-1 at 5). Ms. Bell interviewed with two other Liberty National agents, Scott Pritchett and Phillip Nichols, at TCMA's Homewood, Alabama office. (*Id.* at 6).

Mr. Pritchett conducted a second interview with Ms. Bell during which she paid $60 to purchase a temporary state insurance license and signed an independent agent's contract with Liberty National. (Doc. 44-1 at 7; Doc. 44-2 at **[*5]** 2-6). The agreement states that Ms. Bell's relationship with Liberty National was that of an independent contractor only and that nothing contained" in the agreement "shall be construed to create the relationship of employer and employee." (*Id.* at 2). In her deposition, Ms. Bell testified that she understood that she would work as an independent agent and that she would receive commissions from Liberty National only if she sold an insurance policy. (Doc. 44-1 at 7, 30-31).

Liberty National did not set sales quotas for Ms. Bell. (Doc. 44-5 at 8). To keep her independent agent contract active, Liberty National required Ms. Bell to produce one premium application every eight weeks. (*Id.* at 7-8). But Liberty National did not require Ms. Bell to spend a certain number of hours a day selling insurance or to report her sales to Liberty National on a particular basis. (Doc. 42-1 at 10; Doc. 44-2 at 2). During the relevant period, Ms. Bell earned between $1,500 and $2,000 in commission payments from Liberty National and Liberty National issued Ms. Bell 1099 tax forms for that income. (Doc. 44-1 at 25, 31, 33).

Liberty National provided Ms. Bell with a business card template from which she printed **[*6]** the cards at her own expense. (Doc. 44-7 at ¶ 3). Liberty National did not reimburse her for any expenses or mileage, did not provide her with a computer, did not require her to maintain an office, did not require her to have an automobile, and did not pay her for training hours or hours spent discussing leads. (Doc. 44-1 at 7, 11, 22, 24-25, 30-31; Doc. 44-5 at 7-9). But Ms. Bell testified that Liberty National did provide her with a desk and conference room from which she could work at TCMA's office. (Doc. 53-2 at 3, ¶ 4).

During the four to six months Ms. Bell held her position, Mr. Pritchett set her hours and approved her sales leads. (Doc. 44-1 at 10-11, 33-34; Doc. 53-2 at ¶¶ 1, 3). He also led weekly meetings on Monday afternoons at the TCMA Homewood office. (Doc. 44-1 at 11-12). Ms. Bell testified that she understood that Mr. Pritchett was an Assistant Director with Liberty National and her immediate supervisor. (*Id.* at 7; Doc. 53-2 at ¶ 1).

2. Alleged Hostile Work Environment

Shortly after signing her contract with Liberty National, Ms. Bell attended a three-day training in Jasper, Alabama about how to sell Liberty National insurance. (Doc. 44-1 at 8; Doc. 44-7 at ¶ 5). After **[*7]** this training, Ms. Bell spent several weeks riding with Mr. Pritchett in his car, observing him in the field as he went door-to-door soliciting business. (Doc. 44-1 at 8-9).

Around the end of May—about two or three weeks into Ms. Bell's ride-alongs with Mr. Pritchett—Mr. Pritchett began making sexually inappropriate comments toward her and twice used the term "nigga." (Doc. 44-1 at 34). The first incident occurred while the two were in Mr. Pritchett's car. (*Id.* at 13). Mr. Pritchett, a white male, told Ms. Bell that he grew up around black people. (Doc. 44-1 at 11; Doc. 53-2 at ¶ 1). He then told Ms. Bell that "your nigga won't eat your pussy the way I would." (*Id.*). Ms. Bell responded that the comment was inappropriate, and Mr. Pritchett stated, "I'm a real nigga." (*Id.*). After this incident, Ms. Bell continued riding in Mr. Pritchett's vehicle, and Mr. Pritchett made no other inappropriate comments to her while they were in the car together. (Doc. 44-1 at 13).

But the sexually inappropriate comments continued at the office. Approximately three weeks after the incident in car, Mr. Pritchett told Ms. Bell that her "butt sits up nice in her pants," during an office meeting with other **[*8]** agents. (Doc. 44-1 at 12). Another time, when Ms. Bell was wearing a skirt during a private meeting in Mr. Pritchett's office, Mr. Pritchett commented that Ms. Bell needed to shave her legs. (*Id.*). During meetings with Ms. Bell and other agents in the office, Mr. Pritchett "talked about the way" Ms. Bell's dresses fit her body and said that he wanted to have sex with Ms. Bell. (*Id.* at 13). On another occasion, as Ms. Bell walked to the restroom, she overheard Mr. Pritchett tell another agent that her "breasts sit up nice." (Doc. 44-1 at 13).

Ms. Bell testified that Mr. Pritchett liked what he called "black folks music" and "a couple of times" Mr. Pritchett rapped a song to her about "how good you can make a woman come." (Doc. 44-1 at 13-14). On one occasion after rapping the song, he called her over to his car and asked, "so you're not going to let me eat it?" (*Id.* at 14).

Mr. Pritchett also sent Ms. Bell text messages referring to her as "babe." (Doc. 44-1 at 21). And he once commented to Ms. Bell, "that's why I need to marry you" after his wife became intoxicated and called Ms. Bell a "bitch." (Doc. 44-1 at 19).

Finally, Ms. Bell testified that Mr. Pritchett touched her inappropriately **[*9]** twice. During a client meeting, Mr. Pritchett put his hands down the back of Ms. Bell's skirt because he said he wanted to "fix her tag." (Doc. 44-1 at 13-14). On a different occasion, Mr. Pritchett pulled up Ms. Bell's bra strap while they were standing outside the office. (*Id.* at 14).

According to Ms. Bell, Mr. Pritchett also used the word "nigger" numerous times in her presence. (Doc. 44-4 at 3, ¶ 5). He referred to himself as a "real nigga," sang words to music without omitting "racially offensive language such as 'nigger,'" and used "the term 'nigger' during [the] weekly Team Meetings at the McClain Agency office." (Doc. 53-2 at ¶ 3).

After nearly four and a half months selling insurance, Ms. Bell told Mr. Pritchett that she was going to report him Mr. McClain. (Doc. 44-1 at 15). According to Ms. Bell, Mr. Pritchett called Mr. McClain that night, and Mr. McClain came to the Monday morning meeting the next day. (Doc. 44-1 at 15, 35; Doc. 44-3 at 16). Mr. McClain met with Mr. Pritchett, Ms. Bell, and four other agents who worked out of TCMA's Homewood office to learn about issues that Ms. Bell and other agents were having with Mr. Pritchett. (Doc. 44-1 at 15; Doc. 44-3 at 16).

During **[*10]** the meeting, Ms. Bell and the other agents[2] told Mr. McClain that they believed it was inappropriate for Mr. Pritchett to use "nigger slurs" and to call them "niggers." (Doc. 44-1 at 16). They also generally complained about how he was performing as a supervisor. (*Id.*). At the end of the meeting, Mr. McClain asked Ms. Bell and the other agents if "he fixed these problems and these issues would everyone around the table want to stay with the company." (*Id.*). Some agents said yes; Ms. Bell said she did not want to stay with the company. (Doc. 44-1 at 16-17).

Mr. McClain then held a second meeting with Ms. Bell and Mr. Nichols. (Doc. 44-1 at 17). That is when Ms. Bell told Mr. McClain that Mr. Pritchett was sexually harassing her, including her belief that Mr. Pritchett was coming onto her. (Doc. 44-1 at 17; Doc. 44-3 at 17). This is the first time Mr. McClain learned about Mr. Pritchett's alleged harassment. (Doc. 44-1 at 17, 37). Mr. McClain asked Ms. Bell if she wanted to report Mr.

[2] Ms. Bell initially testified that the discussion at the initial meeting addressed "how inappropriate Scott was to the guys, some of the guys as far as the nigger slurs." (Doc. 44-1 at 16). She later testified that they discussed Mr. Pritchett "calling us niggers or saying nigger." (*Id.*).

Pritchett to Liberty National, but she declined. (Doc. 44-3 at 17).

After this meeting, Ms. Bell told Mr. McClain that she wanted to continue working because she enjoyed job. (Doc. 44-1 at 18). Mr. McClain **[*11]** offered Ms. Bell two options: (1) she could transfer to another agency office closer to her home in Anniston, Alabama or (2) she could work directly with Mr. Nichols, instead of Mr. Pritchett. (Doc. 44-1 at 17-18, 35). Ms. Bell chose to work with Mr. Nichols. (*Id.* at 18).

No one at TCMA asked Ms. Bell to work with Mr. Pritchett again, and she never did. (Doc. 44-1 at 18, 35). Ms. Bell testified that Mr. Pritchett never harassed her or said anything inappropriate to her after the meeting with Mr. McClain and Mr. Nichols. (Doc. 44-1 at 18, 36). Ms. Bell only came to TCMA's Homewood office about two or three more times to meet with Mr. Nichols after the meeting, and she never made another complaint about Mr. Pritchett. (*Id.* at 36). About three to four weeks after Ms. Bell told Mr. McClain about Mr. Pritchett's conduct, she stopped selling insurance with Liberty National and did not take the exam for her permanent insurance license. (Doc. 44-1 at 21, 35). Her last sale took place in September 2018. (*Id.* at 35).

While she worked as a Liberty National insurance agent, neither Liberty National nor TCMA gave Ms. Bell an anti-harassment policy or conducted anti-harassment training. (Doc. 44-1 **[*12]** at 8, 32; Doc. 53-2 at ¶ 2).

## II. DISCUSSION

Liberty National and TCMA move for summary judgment on all of Ms. Bell's claims.

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*; *see also* *Hamilton, 680 F.3d at 1318*. "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore, 886 F.3d 1058, 1062 (11th Cir. 2018)* (quotation marks omitted).

### 1. Title VII Claims Against Liberty National

In Counts One and Two of her amended complaint, Ms. Bell claims that Liberty National subjected her to a sexually hostile work environment based on Mr. Pritchett's alleged sexual harassment, in violation of Title VII. (Doc. 29 at ¶¶ 16-25). In Counts Three and Four, Ms. Bell claims that Liberty National subjected her to a racially hostile work environment based on Mr. Pritchett's alleged racial harassment, in violation of Title VII. (Doc. 29 at ¶¶ 29-44).

Liberty National argues that it is entitled to summary judgment on all of Ms. Bell's Title VII claims because Ms. Bell was an independent contractor and not an **[*13]** "employee" entitled to protection under Title VII. (Doc. 46 at 10-13). Title VII's protection against various forms of discrimination extends only to employees, not independent contractors. *Cobb, 673 F.2d at 337-340*. Employment status is a question of federal law that the court may decide at summary judgment. *Id. at 338-339, 342*. If the court determines that Ms. Bell was not Liberty National's employee, the Title VII claims fail as a matter of law.

Title VII defines "employee" as "an individual employed by an employer." *42 U.S.C. § 2000e(f)*. Given the limited statutory definition, the Eleventh Circuit applies a hybrid "economic realities test" to determine whether an individual is an employee or an independent contractor. *Cobb, 673 F.2d at 341*. Under this test, "the economic realities of the relationship viewed in light of the common law principles of agency and the right of the employer to control the employee [ ] are determinative." *Id.* To determine whether Ms. Bell is Liberty National's employee, the court will first examine the common law principles of agency and Liberty National's right to control Ms. Bell. Then, the court will consider the economic realities of Ms. Bell's work for Liberty National in light of the first two factors.

#### a. Common Law Principles of Agency [*14]

The Eleventh Circuit uses eleven common law principles to determine whether an individual is an employee for purposes of Title VII or an individual contractor. They include:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the

method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Cobb, 673 F.2d at 340*.

Based on the undisputed evidence, factors two, three, five, six, seven, nine, ten, and eleven all weigh in favor of a finding that Ms. Bell was Liberty National's independent contractor. **[*15]** Ms. Bell's occupation was selling insurance. Although she went through a three-day training on Liberty National products at her own expense, the evidence demonstrates that Ms. Bell applied for and worked under her own temporary insurance license from the State of Alabama. (Doc. 44-1 at 7, 22). In order to continue selling insurance, she was required by the State to obtain her own permanent license; she could not work under someone else's license. (*Id.* at 21). And to obtain her own permanent license, Ms. Bell had to pass a State examination, which demonstrates that Ms. Bell was required to have independent skill and knowledge to perform her occupation. (*Id.*).

Liberty National did not require Ms. Bell to have a car or to maintain an office. (Doc. 44-5 at 9). With the exception of a desk and a conference room through TCMA's office which also bore Liberty National's name, Liberty National did not provide Ms. Bell with any other equipment to do her job. (Doc. 44-1 at 7; Doc. 44-5 at 9; Doc. 53-2 at 3). For example, Liberty National did not give Ms. Bell a computer; she had to provide her own. (Doc. 44-1 at 7).

Liberty National did not provide Ms. Bell annual leave, retirement benefits, or **[*16]** a salary. Ms. Bell's sole compensation was a commission for each Liberty National product she sold and this income was reflected by Liberty National on a 1099; Liberty National did not pay employment taxes. (Doc. 44-1 at 31). As for termination, the independent agent agreement that Ms. Bell executed explicitly states that each party had at the ability to terminate their relationship for any reason or without cause. (Doc. 44-2 at 6).

Finally, the contract between Liberty National and Ms. Bell expressly states that the contract created an independent contractor relationship only and that nothing in the agreement would be construed as creating an employer/employee relationship. (Doc. 44-2 at 2).

Ms. Bell does not argue that these factors suggest she was an employee and not an independent contractor. (*See generally* doc. 54). Indeed, Ms. Bell testified that she understood she would work as an independent contractor insurance agent. (Doc. 44-1 at 7, 31).

Ms. Bell argues that questions of fact exist about whether she was an employee or independent contractor because Mr. Pritchett, acting in his capacity as a Liberty National supervisor, set her schedule, determined the customers from whom she **[*17]** could solicit business, and ran the weekly Monday sales team meetings. (Doc. 54 at 29). There are two problems with Ms. Bell's argument. First, the record contains no evidence suggesting that Liberty National employed Mr. Pritchett or gave him any supervisory role; that Liberty National knew that Mr. Pritchett supervised some aspect of Ms. Bell's work; or that Liberty National itself controlled Ms. Bell's work in any manner. Second, even accepting as true that Mr. Pritchett supervised Ms. Bell for Liberty National to a degree, this one factor is not dispositive. *See* *Cobb, 673 F.2d at 341*. And as explained above, the overwhelming majority of the common law agency principles favor a determination that Ms. Bell was an independent contractor.

Accordingly, the court finds that the majority of the common law agency principles demonstrate that Ms. Bell is an independent contractor.

**b. Right to Control**

"[T]he extent of the employer's right to control the 'means and manner' of the employee's performance is the most important factor to review." *Cobb, 673 F.2d at 340* (quoting *Spirides v. Reinhardt, 613 F.2d 826, 831, 198 U.S. App. D.C. 93 (D.C. Cir. 1979)*). "If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that **[*18]** result is achieved, an employer/employee relationship is likely to exist." *Id.* (quoting *Spirides v. Reinhardt, 613 F.2d at 831-32*).

Here, Ms. Bell's independent agent agreement with Liberty National allowed Ms. Bell to: (1) develop clients by any lawful means; (2) select her own hours and work days, with no obligation to account to Liberty for her

time; and (3) exercise her own judgment as to the time, routine, place, and method, and manner that she solicited business. (Doc. 44-2 at 2). In addition, Liberty National did not have minimum sales requirements for agents, including Ms. Bell. (Doc. 42-1 at 8).

Ms. Bell does not dispute the terms of the parties' agreement or that she was not subject to any sales quotas imposed by Liberty National. Instead, Ms. Bell appears to argue that questions of fact exist about Liberty National's right to control and direct her work based on Mr. Pritchett's supervision over her. (*See* doc. 54 at 29). Ms. Bell testified that Mr. Pritchett set her hours, approved or disapproved certain leads, and ran weekly sales agent meetings. (Doc. 44-1 at 10-12, 33-34; Doc. 53-2 at ¶¶ 1, 3). Construing this evidence in the light most favorable to Ms. Bell, Mr. Pritchett controlled some aspects of Ms. Bell's **[*19]** work while they worked together. But the only evidence Ms. Bell cites that links Mr. Pritchett's supervision to Liberty National is her declaration in which she states that Mr. Pritchett was "an Assistant Director with Liberty National." (Doc. 53-2 at ¶ 1). Accepting as true that Mr. Pritchett held that title, that evidence alone does not suggest that Liberty National put Mr. Pritchett in some supervisory position over Ms. Bell or that it condoned the hierarchy in place at the TCMA office, much less that Liberty National knew it even existed. In fact, as explained above, *see supra* p. 14, the record is devoid of any evidence creating a question of fact about whether Liberty National, as opposed to Mr. Pritchett, had the right to control Ms. Bell's work performance.

Accordingly, Ms. Bell has not shown that Liberty National controlled the manner or means by which Ms. Bell completed her work, indicating that Ms. Bell was an independent contractor, not an employee.

**c. Economic Realities**

Finally, the court must consider the economic realities. Under this test, "an individual is an employee if economically dependent on the business to which he or she renders service." *Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1495 (11th Cir. 1993)*.

The record contains no **[*20]** evidence that Ms. Bell held another job while she sold insurance for Liberty National, which suggests that she was economically dependent on her commissions. But "the economic realities with respect to the dependence of an individual on the employment" is not dispositive. *Daughtrey, 3 F.3d at 1495*. And Ms. Bell does not address economic realities in her opposition to summary judgment and fails to cite admissible evidence in support of the economic realities factor. Given that both the common law agency principles and the right of the employer to control demonstrate that Ms. Bell was an independent contractor, the court concludes that no question of fact exists concerning Ms. Bell's status as an independent contractor.

Because Ms. Bell was an independent contractor, her Title VII claims against Liberty National fail as a matter of law. *See Cobb, 673 F.2d at 338, 342* (affirming district court's dismissal of plaintiff's Title VII action upon a finding that the plaintiff was an independent contractor and therefore not protected by Title VII). Therefore, the court **GRANTS** Liberty National's motion for summary judgment on Ms. Bell's Title VII claims.

2. *§ 1981* Race Discrimination (Count Three) and *§ 1981* Racially Hostile Work Environment (Count Four)

In **[*21]** Count Three of her amended complaint, Ms. Bell claims that Liberty National and TCMA discriminated against her because of her race in violation of *§ 1981*. (Doc. 29 at ¶¶ 29-33). In Count Four of her amended complaint, Ms. Bell claims that Liberty National and TCMA subjected her to a racially hostile work environment in violation of *§ 1981*. (*Id.* at ¶¶ 35-44).

Although Count Three is titled "race discrimination" instead of "racially hostile work environment," based on the face of the amended complaint, the court finds that Count Three advances a hostile work environment theory of liability. In Count Three, Ms. Bell claims that she "was denied the right to work in an environment free of racial discrimination and racial slurs." (*Id.* at ¶ 29). The amended complaint then cites *Miller v. Kenworth of Dothan Inc., 277 F.3d 1269 (11th Cir. 2002)* and *Adams v. Austal, 754 F.3d 1240 (11th Cir. 2014)*, both of which are cases examining hostile work environment claims. (*Id.*). To the extent Ms. Bell intended to assert a claim for disparate treatment based on her race, neither the amended complaint nor Ms. Bell's brief identifies any discrete adverse employment action that Liberty National or TCMA took against her because of her race. (*See generally* doc. 29; doc. 54). Accordingly, the court construes Count Three to raise **[*22]** a claim based on a racially hostile work environment as opposed to a discrete discriminatory act.

As the Eleventh Circuit has stated, and as the parties agree (*see* doc. 45 at 22; doc. 46 at 10, n.1; doc. 54 at 18, 20-21), "discrimination claims, including hostile work environment claims, brought under" *§ 1981* "are subject to the same standards of proof and employ the same analytical framework" as claims brought under Title VII. *Bryant v. Jones, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009)*. Thus, to establish a claim for a racially hostile work environment claim under *§ 1981*, a plaintiff must demonstrate that: "(1) [s]he belongs to a protected group; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was based on h[er] membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability." *Edwards v. Prime, Inc., 602 F.3d 1276, 1300 (11th Cir. 2010)*.

The court notes that it has not located, and the parties have not cited, an Eleventh Circuit decision analyzing a *§ 1981* hostile work environment claim brought by an independent contractor under this framework. And the court has doubts about the **[*23]** viability of this legal standard in this context because the framework falls short when applying it to the requirement that a plaintiff prove a basis for holding some entity affiliated with the harasser liable. Nevertheless, in the absence of different guidance from the Eleventh Circuit and because the parties agree that this framework controls, the court applies it here.

Liberty National and TCMA challenge only the fourth and fifth elements of Ms. Bell's *§ 1981* racially hostile work environment claim which requires Ms. Bell to point to evidence creating questions of fact about whether Mr. Pritchett's harassment was sufficiently severe and pervasive to alter the terms and conditions of her employment and whether Liberty National and TCMA are responsible for Mr. Pritchett's harassment. (*See* doc. 45 at 25-29; doc. 46 at 13-16).

Assuming that Ms. Bell has created triable issues of fact about whether Mr. Pritchett's racial harassment was severe and pervasive, her claim fails a matter of law because even accepting all of Ms. Bell's evidence as true, a reasonable jury could not find that Liberty National or TCMA is liable for Mr. Pritchett's conduct.

The fifth element of a hostile work environment **[*24]** claim requires a plaintiff to "demonstrate a basis for holding the employer liable for the harassment." *Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000)*. An employer's liability depends on whether the harassing employee is a co-worker or supervisor of the plaintiff. *Vance v. Ball State Univ., 570 U.S. 421, 424, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013)*. If the harasser is a co-employee of the victim, "the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action." *Miller, 277 F.3d at 1278*. If the harasser is supervisor, the employer "is subject to vicarious liability to a victimized employee for an actionable hostile work environment." *Id.* (quotations omitted). In that case, "the employer is strictly liable" if the supervisor takes a tangible employment action against the victim or if the employer cannot establish what is known as the *Faragher-Ellerth* affirmative defense. *Vance, 570 U.S. at 424*; *see also* *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633, (1998)*; *Faragher v. Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*.

Liberty National and TCMA argue they are entitled to judgment as a matter of law on Ms. Bell's racially hostile work environment claim because Mr. Pritchett was an independent agent like Ms. Bell, and once Ms. Bell complained of the harassment, they took prompt remedial action. (Doc. 45 at 28-29; Doc. 46 at 16). In the section of Ms. Bell's brief that addresses her racially hostile **[*25]** work environment claim, she does not challenge Liberty National's and TCMA's proffered legal standard for imposing liability on them. (Doc. 54 at 19-24). In the section of Ms. Bell's brief that addresses her sexually hostile work environment claims, Ms. Bell contends that that Liberty National and TCMA are vicariously liable for Mr. Pritchett's harassment because he was her supervisor. (Doc. 54 at 21, 24-27). To the extent Ms. Bell claims that those arguments apply to her racially hostile work environment claim, the arguments fall short.

Ms. Bell appears to argue that Liberty National and TCMA are strictly liable under a tangible employment action theory. (*See* Doc. 54 at 26). But neither Ms. Bell's amended complaint nor her brief identifies a tangible employment action that Mr. Pritchett, Liberty National, or TCMA took as a result of the harassment. (*See generally* doc. 29; doc. 54). And she has pointed to no evidence showing as much. (*See* doc. 54 at 21). Therefore, this argument is not persuasive.

Ms. Bell next argues that Liberty National and TCMA are not entitled to judgment as a matter of law on the *Faragher-Ellerth* affirmative defense because the

evidence is undisputed that she did **[*26]** not receive an anti-harassment policy or anti-harassment training. (Doc. 54 at 25-27). But Liberty National and TCMA have not asserted the affirmative defense to liability at this stage. Rather, they argue that Mr. Pritchett was an independent sales agent, not Ms. Bell's supervisor.

So then, the question becomes whether the evidence creates triable issues of fact with respect to whether Mr. Pritchett was a "supervisor" as the law defines that term with respect to vicarious liability for a hostile work environment. The Supreme Court had held that "an employee is a 'supervisor' for purposes of vicarious liability . . . if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance, 570 U.S. at 424*. Tangible employment actions include those "effect[ing] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). *Id. at 431* (quotations omitted). Neither the Supreme Court nor the Eleventh Circuit has addressed whether this list is exclusive, and neither court has elaborated further on what evidence creates triable issues of fact on whether **[*27]** an individual is a supervisor.

In her brief, Ms. Bell makes no argument and cites no evidence suggesting that Mr. Pritchett was a supervisor for TCMA. (*See* doc. 53 at 24-25). She claims that Mr. Pritchett was "the Assistant Director for Liberty National in Birmingham" and "her immediate supervisor." (Doc. 54 at 24-25). Even if true, these titles alone do not demonstrate that Liberty National empowered Mr. Pritchett to take tangible employment actions against Ms. Bell. Ms. Bell also cites evidence that she could not make a sale to anyone unless Mr. Pritchett gave her permission and that he denied her the opportunity to make sales on occasion. (Doc. 42-2 at 33-34; Doc. 53-2 at 3, ¶ 3). Assuming that Mr. Pritchett's approval of Ms. Bell's sales leads constitutes a tangible employment action, she has not cited any evidence demonstrating that Liberty National *empowered* Mr. Pritchett to control her sales in that manner. *See* *Vance, 570 U.S. at 424*.

Therefore, as *Vance* defines the term, Mr. Pritchett is not a supervisor for TCMA or Liberty National. Accordingly, TCMA and Liberty National are liable for Mr. Pritchett's conduct only if they "knew or should have known of the harassment in question and failed to take prompt **[*28]** remedial action," *Henson v. City of Dundee, 682 F.2d 897, 905 (11th Cir. 1982)*. With respect to TCMA, Ms. Bell does not dispute that after she notified Mr. McClain of Mr. Pritchett's conduct, she never had to work with him again and the harassment stopped. (Doc. 44-1 at 17-18, 35-36; *see also generally* doc. 54). Therefore, Ms. Bell has cited no evidence creating triable issues of fact about whether TCMA took appropriate remedial action once it knew of the harassment.

With respect to Liberty National, the undisputed evidence is that Ms. Bell declined Mr. McClain's invitation to report Mr. Pritchett to Liberty National. (Doc. 44-3 at 19). The record contains no evidence indicating that Liberty National knew or should have known of Mr. Pritchett's conduct. Therefore, Ms. Bell has not established a basis for holding Liberty National liable for Mr. Pritchett's racial harassment. *Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1278 (11th Cir. 2002)* (plaintiff must show that employer had actual or constructive knowledge to hold the employer liable for coworker harassment).

Without citing any evidence, Ms. Bell's brief states in a conclusory fashion that "a reasonable jury could find that both defendants failed to take reasonable steps to prevent a racially hostile working environment." (*Id.* at 23). But this is insufficient **[*29]** to carry her summary judgment burden.

Because Ms. Bell has not shown that Liberty National and TCMA are liable for Mr. Pritchett's alleged racial harassment, her racially hostile work environment claims fail as a matter of law. Accordingly, the court **GRANTS** Liberty National's and TCMA's motion for summary judgment on Ms. Bell's *§ 1981* racially hostile work environment claims.

**III. CONCLUSION**

For the reasons explained above, the court **GRANTS** Liberty National's and TCMA's motions for summary judgment on Ms. Bell's Title VII and *§ 1981* claims. The court will enter judgment as matter of law in favor of Liberty National and TCMA on those claims.

The remaining claims are Ms. Bell's state law claims for outrage and negligent retention, supervision, and training against Liberty National and TCMA. Ms. Bell has not alleged a basis for this court's jurisdiction over these claims. (*See* doc. 1). She has not alleged that the court has diversity jurisdiction, and she has not properly alleged her citizenship or that of Liberty National or TCMA. (*See id.* at 2-3). Nor does the complaint allege

that the amount in controversy exceeds $75,000. (*See id.*).

In the absence of an independent basis for jurisdiction over Ms. **[*30]** Bell's state law claims, the court will dismiss the claims without prejudice pursuant to *28 U.S.C. § 1367(c)(3)*. **On or before March 8, 2022**, Ms. Bell shall show cause in writing why the court has original jurisdiction over her state law claims.

**DONE** and **ORDERED** this March 1, 2022.

/s/ Annemarie Carney Axon

**ANNEMARIE CARNEY AXON**

UNITED STATES DISTRICT JUDGE

**ORDER**

Consistent with the memorandum opinion entered contemporaneously with this order, the court **ENTERS SUMMARY JUDGMENT** in favor of Defendants Liberty National Life Insurance and The Clint McClain Agency, Inc. and against Plaintiff Braeonda Bell on Ms. Bell's Title VII and *§ 1981* claims (Counts One, Two, Three, and Four).

**DONE** and **ORDERED** this March 1, 2022.

/s/ Annemarie Carney Axon

**ANNEMARIE CARNEY AXON**

UNITED STATES DISTRICT JUDGE

End of Document

# DEVOY v. HUTZEL HOSP.

Court of Appeals of Michigan

December 6, 1996, Decided

No. 181868

**Reporter**
1996 Mich. App. LEXIS 2207 *

TODD DEVOY, a/k/a TODD MALINOWSKI, a minor, by his next friend, BOBBIE ANN DEVOY, Plaintiff-Appellant, v HUTZEL HOSPITAL, a Michigan Non-Profit Corporation, DEXTER ARRINGTON, M.D., and YOLANDA RENFROE, M.D. jointly and severally, Defendants-Appellants.

**Notice:** **[*1]** IN ACCORDANCE WITH THE MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** LC No. 94-402118-NH.

**Disposition:** Reversed and remanded.

**Judges:** Before: White, P.J., and Smolenski and R.R. Lamb, * JJ. Helene N. White, J., dissenting.

## Opinion

PER CURIAM.

Plaintiff Todd Devoy, a minor, by his next friend and mother, Bobbie Ann Devoy, appeals as of right an order granting defendants' motion to dismiss plaintiff's medical malpractice claim, and to compel arbitration of that claim pursuant to a June 16, 1992 arbitration agreement signed pursuant to the medical malpractice arbitration act (MMAA), *MCL 600.5040 et seq.*; MSA 27a.5040 *et seq.*, repealed by 1993 PA 78. We reverse.

Plaintiff's mother and defendant hospital's admitting interviewer signed the arbitration agreement under dispute. This agreement identified the patient whose claims plaintiff's mother agreed to submit to arbitration only as "Devoy Baby" and "Minor." Plaintiff's mother then proceeded to deliver twins, one of whom is plaintiff.

An evidentiary **[*2]** hearing was held below. See *MCR 2.116(I)(3)*. Thus, on appeal, we will not set aside the trial court's factual findings unless they are clearly erroneous. *MCR 2.613(C)*.

Plaintiff argues that the trial court erred in granting defendants' motion to dismiss and to compel arbitration. In this case, the trial court found that the arbitration agreement conformed to the statutory requirements of the MMAA. See, generally, *McKinstry v Valley Obstetrics-Gynecology Clinic, PC, 428 Mich. 167; 405 N.W.2d 88 (1987)*. This finding is not clearly erroneous. *Id. at 188*. Thus, the agreement is presumed valid. *Id. at 181*. This presumption will stand unless rebutted by evidence demonstrating one or more defenses, such as coercion, mistake, duress or fraud. *Id.*

Plaintiff argues that the arbitration agreement purporting to bind "Devoy Baby" and "Minor" is invalid because of coercion or mutual mistake. We disagree. Plaintiff has failed to adequately address his defense of coercion on appeal. Thus, we deem this issue abandoned. *Singerman v Municipal Service Bureau, Inc, 211 Mich. App. 678, 684; 536 N.W.2d 547 (1995).* **[*3]** In addition, the trial court did not clearly err in finding that plaintiff failed to establish the defense of mutual mistake. Plaintiff alleges no mutual mistake, but rather alleges different mistakes committed by his mother and the admitting interviewer in executing the arbitration agreement. See *Gortney v Norfolk & W R Co, 216 Mich. App. 535, 542; 549 N.W.2d 612 (1996)*. Moreover, the conduct alleged by plaintiff as constituting his mother's mistake does not constitute a mistake, but rather simply constitutes a failure to read the arbitration agreement she was signing on plaintiff's behalf. A party to a contract is precluded from avoiding the enforcement of a contract based upon his failure to read the contract. *Nieves v Bell Inds, Inc, 204 Mich. App. 459, 463; 517 N.W.2d 235 (1994)*.

Plaintiff further argues that the terms "Devoy Baby" and "Minor" render the agreement ambiguous concerning which twin the parties intended to be covered by the

* Circuit judge, sitting on the Court of Appeals by assignment.

agreement. Although plaintiff raised the issue of ambiguity below, the trial court did not specifically address this issue. Rather, after finding that the arbitration agreement conformed to the **[*4]** statutory requirements of the MMAA and rejecting plaintiff's defense of mutual mistake, the trial court stated as follows:

> And the fact that it says baby, as Ms Hobbs [defendants' counsel] points out, she knew she was in there for multiple births. I find that the arbitration agreement is valid, not only as to her but as to the two minor children.

Defendants rely on the principle that "arbitration clauses should be liberally construed with all doubts about the arbitrability of an issue to be resolved in favor of arbitration." *Ewald v Pontiac General Hosp, 121 Mich. App. 793, 797; 329 N.W.2d 495 (1982)*. However, although compliance with the statutory requirements raises a presumption that the arbitration agreement in this case is valid, we believe that the relevant question is not "the arbitrability of a particular issue where a concededly binding contract between the parties to arbitrate exists. Instead we are confronted with the problem of whether an arbitration contract even exists with respect to" plaintiff. *Brown v Considine, 108 Mich. App. 504, 510; 310 N.W.2d 441 (1981)*.

As stated in *Horn v Cooke, 118 Mich. App. 740; **[*5]** 325 N.W.2d 558 (1982)*:

> An arbitration agreement is a contract whereby all the parties thereto agree to forego their rights to proceed with a court and, instead, to submit their disputes to a panel of arbiters. . . . The first inquiry into the arbitrability of a dispute is to determine whether an arbitration agreement has been reached by the parties. . . . No contract to arbitrate can arise except upon the expressed mutual assent of the parties. . . . A party cannot be required to arbitrate an issue he has not agree to submit to arbitration. . . .
>
> The determination of whether an arbitration contract exists is for the courts to decide, applying general contract principles. . . . [*118 Mich. App. at 744-745* (citations omitted).]

And, as stated in *Heritage Broadcasting Co v Wilson Communications, Inc, 170 Mich. App. 812; 428 N.W.2d 784 (1988)*:

> In order to form a valid contract, there must be a meeting of the minds on all the material facts. . . . A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind. [*Id. at 818* (citations **[*6]** omitted).]

If contract language is clear and unambiguous, its construction is a question of law and the parties' intent will be ascertained according to the plain sense and meaning of the language. *Port Huron Ed Ass'n v Port Huron Area School Dist, 452 Mich. 309; 550 N.W.2d 228 (1996)*; *Haywood v Fowler, 190 Mich. App. 253, 258; 475 N.W.2d 458 (1991)*.

If contract language is subject to two or more reasonable interpretations or is inconsistent on its face, the contract is ambiguous. *Port Huron, supra*; *Petovello v Murray, 139 Mich. App. 639, 642; 362 N.W.2d 857 (1984)*. The fact that the parties dispute the meaning of a contract does not, in itself, establish an ambiguity. *Gortney, supra at 540*. The initial question whether contract language is ambiguous is a question of law.. *Port Huron, supra.* If the contract is ambiguous, factual development is necessary to determine the intent of the parties. *Id. Petovello, supra.*

In support of their argument that the arbitration agreement is binding on plaintiff, defendants rely on *McKinstry, supra.* **[*7]** However, unlike this case, the arbitration agreement at issue in *McKinstry* stated "Baby or babies McKinstry." Defendants also rely on *Crown v Shafadeh, 157 Mich. App. 177; 403 N.W.2d 465 (1986)*, in which this Court held that an arbitration agreement was enforceable against the minor plaintiff even though the agreement did not specifically identify the minor because the minor's mother knew the form related to the minor and admitted signing the agreement on the minor's behalf, and the minor's name and patient number were stamped across the top of the agreement. However, in *Crown*, only one child was admitted to the hospital. Therefore, when the child's mother signed the arbitration agreement it could only have applied to this child.

In this case, the only language identifying the patient to be bound by the arbitration agreement was presented in the singular terms "Devoy baby" and "Minor." The agreement does not clearly imply or suggest that a reference to "babies" was omitted. Thus, we will not supply such a term by construction. *North West Michigan Construction, Inc v Stroud, 185 Mich. App. 649, 653; 462 N.W.2d 804 (1990).* **[*8]** Accordingly, on its face, the plain sense and meaning of the agreement's language is a reference to one baby.

However, this language becomes susceptible to more than one interpretation, and, therefore, ambiguous, when applied to the facts of this case, i.e., the agreements refers to one Devoy baby but two Devoy babies were born. [1]

**[*9]** If the language of a contract is ambiguous, the court's duty is to look beyond the language of the contract to determine its meaning. *Stine v Continental Casualty Co, 419 Mich. 89, 112; 349 N.W.2d 127 (1984)*. Extrinsic evidence is admissible to clarify the meaning of the contract. *Id.* Ambiguity in a contract focuses and intensifies the court's duty to ascertain the intent of the parties in order that the agreement be carried out. *Id.* In no case is ambiguity, patent or latent, to result in a declaration that the contract is void. *Id.* Where a contract is prepared on behalf of one of the parties, any ambiguity therein will be strictly construed against that party. *Brown, 108 Mich. App. at 508*. In this case, the arbitration agreement was a form document supplied by defendant hospital with the terms "Devoy baby" and "Minor" added by defendant hospital's admitting interviewer. Where the language contained in a contract raises doubt or uncertainty in construing a contractual provision, the parties' interpretation is given great, if not controlling weight. *North West, supra.* The promise must be interpreted in the sense in which **[*10]** the promisee knew or had reason to know that the promisor understood it. *Redinger v Standard Oil Co, 6 Mich. App. 74, 79; 148 N.W.2d 225 (1967)*. A party will be held to that meaning which he knew the other party to the contract supposed the words to bear. *Ardis v Grand Rapids & I R Co, 200 Mich. 400, 414; 167 N.W. 5 (1918)*.

In this case, the record reveals that plaintiff's mother knew she was carrying twins as early as November 1991. Beginning in January 1992, plaintiff's mother visited defendant hospital several times before plaintiff's birth and signed arbitration agreements each time. These agreements were similar or identical to the agreement at issue in this case. However, the only patient identified on these agreements was plaintiff's mother. Plaintiff's mother did not recall signing on June 16, 1992, the arbitration agreement identifying a patient with the terms "Devoy baby" and "Minor."

Defendant hospital's admitting interviewer testified at the evidentiary hearing that she did not remember plaintiff's mother. The admitting interview testified that upon observing a pregnant patient her habit was to offer one arbitration **[*11]** agreement for the mother and one arbitration agreement for the baby. The admitting interviewer testified that when she received information either from the mother or the triage nurse that the mother was expecting twins she provided separate arbitration agreements for each of the unborn children. The admitting interviewer testified that it was not her habit to ask the mother whether the mother was expecting twins. The admitting interviewer testified that the arbitration agreement containing the terms "Devoy baby" and "Minor" concerned an arbitration agreement for one child. When asked whether "as of June 16 of 1991 [sic 1992], had anyone at the hospital told you that by utilizing the term 'baby minor' or Baby Devoy/minor, that this was to bind twins who may be born from a mother who is admitted to the hospital?", the admitting interviewer answered "No, it would have -- it would say twins. Twin A, Twin B."

In analyzing these facts, we note that, although plaintiff's mother did not recall signing the agreement on plaintiff's behalf, plaintiff's mother is presumed to have understood that she was signing an agreement to arbitrate any claims of a patient identified as "Devoy baby" and **[*12]** "Minor." *McKinstry, 428 Mich. at 184*. Plaintiff's mother knew that she was pregnant with twins. However, the promise must be interpreted in the sense in which the promisee (the admitting interviewer) knew or had reason to know that the promisor (plaintiff's mother) understood the promise. *Redinger, supra.* In this case, the admitting interviewer had no reason to know that plaintiff's mother understood the sense of the promise to arbitrate as other than a promise to arbitrate the claims of a single child.

---

[1] This case appears to presents an example of a latent ambiguity. See Black's Law Dictionary (6th ed), defining "latent ambiguity," in part, as follows:

> That species of uncertainty or ambiguity in an instrument which is not apparent from a reading of it but which is revealed when the terms of the instrument are applied or made operative; *e.g.* in a bill of lading goods are to be delivered at "Essex Railroad Wharf", and there are two such wharfs with the same name.

See also Calamari & Perillo, Contracts (3d ed), § 3-11, p 169, discussing as a good example of latent ambiguity a case in which the seller agreed to sell cotton to the buyer, with shipment to be made from Bombay on the ship Peerless. However, there were two ships named Peerless, one to sale from Bombay in October, the other in December. Our Supreme Court has noted that the distinction between latent and patent ambiguity is "fast fading and now observed by few courts." *Stine v Continental Casualty Co, 419 Mich. 89, 112, n 7; 349 N.W.2d 127 (1984)*.

In addition, a party will be held to that meaning which he knew the other party to the contract supposed the words to bear. *Ardis, supra.* In this case, although knowing that she was pregnant with twins, we cannot say that plaintiff's mother knew that the admitting interviewer supposed that the disputed language referred to multiple babies. Moreover, even if we make this assumption, and therefore hold plaintiff's mother to this meaning, the same cannot be said of the admitting interviewer, i.e., it cannot be said that the admitting interviewer knew that plaintiff's mother supposed the disputed language to refer to multiple babies. Thus, **[*13]** defendant hospital will not be held to this meaning. Moreover, the admitting interviewer's own interpretation of the agreement's language was that but a single baby was bound by the agreement.

Thus, in objectively viewing the express words of the parties as well as their visible acts, we can conclude only that the parties intended to submit the claims of *a baby* but not *this plaintiff* to arbitration. "The rule that there must be a meeting of the minds to form a contract involves a common understanding of the identities of the parties." *17A Am Jur 2d, Contracts, § 22*, p 50. "To constitute a valid contract, the minds of the parties must have met on the identity of the persons with whom they are dealing." Am Jur, § 70, p 95.

Accordingly, we conclude that the trial court erred in enforcing the arbitration agreement and dismissing plaintiff's claim. Therefore, we reverse and remand. We do not retain jurisdiction.

/s/ Michael R. Smolenski

/s/ Richard R. Lamb

**Dissent by:** Helene N. White

## Dissent

White, J. (dissenting).

Under the circumstances that 1) plaintiff's mother signed an arbitration agreement for "Devoy Baby" and "Minor" knowing she was at the hospital to deliver twins, 2) **[*14]** the hospital admitting interviewer's practice was to offer pregnant women two arbitration agreements, one for themselves and one for the baby, and, if informed by the patient or triage nurse that the patient is expecting twins, separate arbitration agreements for Twin A and Twin B, and 3) the admitting interviewer would have filled out separate arbitration agreements for the twins had she known plaintiff's mother was carrying twins, I conclude that the circuit court did not err in concluding that the admitting interviewer offered a single agreement not knowing that a multiple birth was expected, that plaintiff's mother signed a separate form specifically referring to "Baby" and "Minor" knowing "she was signing away the rights to go to court for the minor children," and that because the statute does not require separate forms for each child, the agreement is valid as to the two children. In sum, I conclude that where plaintiff's mother signed a separate arbitration agreement knowing she was carrying twins, and the admitting interviewer provided the separate agreement intending that it apply to the delivery, but only provided one such agreement because she did not know that the delivery **[*15]** was expected to result in a multiple birth, the agreement is properly construed to apply to both children.

I would affirm.

/s/ Helene N. White

---

End of Document

# Herman v. Bridgewater Park Apts.

United States District Court for the Eastern District of Michigan, Southern Division

March 3, 2016, Decided; March 3, 2016, Filed

Case No. 15-cv-12203

**Reporter**
2016 U.S. Dist. LEXIS 29569 *; 2016 WL 826050

LISA HERMAN and WALTER HERMAN, Plaintiffs, v. BRIDGEWATER PARK APARTMENTS and CONCORD MANAGEMENT, LTD., Jointly and Severally, Defendants.

**Prior History:** *Herman v. Bridgewater Park Apts., 2016 U.S. Dist. LEXIS 29852 ( E.D. Mich., Mar. 3, 2016)*

**Counsel:** **[*1]** For Lisa Herman, Walter Herman, Plaintiffs: Kendell D. Lott-Tucker, LEAD ATTORNEY, Southfield, MI.

For Bridgewater Park Apartments, Concord Management, Ltd., Defendants: Matthew James Consolo, Bruce A. Truex, Secrest Wardle, Troy, MI.

**Judges:** HON. GERSHWIN A. DRAIN, United States District Judge. MONA K. MAJZOUB, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** GERSHWIN A. DRAIN

## Opinion

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR JOINDER OF ADDITIONAL DEFENDANTS [33]

### I. INTRODUCTION

Plaintiffs Lisa and Walter Herman (collectively "Plaintiffs") commenced this action on March 11, 2015 in the Oakland County Circuit Court. *See* Dkt. No. 1 (Complaint). Plaintiffs filed suit against Bridgewater Park Apartments of Clarkson LLC, Bridgewater Park Apartments and Concord Management, Ltd., and "John Does 1-5" (collectively "Defendants") claiming six Counts: (I) Negligent Maintenance and Repair; (II) Breach of Implied Warranty of Habitability; (III) Unjust Enrichment; (IV) Constructive Eviction; (V) Exemplary Damages; and (VI) Breach of Contract. *Id.* On June 17, 2015, the matter was removed to Federal Court. *See* Dkt. No. 1. On July 14, 2015, the parties stipulated to the dismissal of Bridgewater Park Apartments **[*2]** of Clarkston LLC.

Before the Court is Plaintiffs' Motion for Joinder of Additional Defendants. *See* Dkt. No. 33. Plaintiffs seek to join Oakland Bridgewater Park Housing Associates Limited Partnership, Oakland Concord Park Housing Associates Limited Partnership, and CED Capital Holdings III, Ltd. (collectively "Proposed Defendants") as defendants. *Id.* The matter is fully briefed. After reviewing the briefing, the Court concludes that oral argument will not aid in the resolution of this matter. Accordingly, the Court will resolve the Motion on the briefs as submitted. *See* *E.D. Mich. L.R. 7.1(f)(2)*. For the reasons discussed below, the Court will **GRANT** the Plaintiffs' Motion **IN PART**.

### II. FACTUAL BACKGROUND

Plaintiffs' claims arise out of a rental of an apartment unit located at 5832 Marsh Bank Lane, Apt. 102, in Clarkston, Michigan. Both Walter and Lisa Herman signed the lease agreement with Defendant Concord Management on October 29, 2012. *See* Dkt. No. 35 (Exhibit B, Lease Agreement). Following their move-in, several incidents occurred within the apartment. The following is an account of the facts as alleged in the Complaint.

On or about December 14, 2012, the bedroom hall closet shelf collapsed inside **[*3]** Plaintiffs' apartment. Plaintiffs notified Defendants' office manager, who in turn sent maintenance workers to make repairs.

On January 3, 2013, Plaintiffs discovered a leak in their sink. Maintenance workers were sent, and the seal to the sink was replaced. While there, the maintenance workers noticed that the area underneath the sink was soaking wet. The maintenance workers attempted to dry the area with towels provided by Plaintiffs.

On February 1, 2013, Plaintiffs' children began complaining about a greenish, furry substance on their shoes, clothes, and bags inside the apartment. Soon after, the family broke out in rashes and had difficulty breathing. In mid-February, the Plaintiffs informed the office manager about the green, brownish colors appearing on their clothes, shoes and other personal property. The office manager stated that she would schedule a maintenance inspection of Plaintiffs' apartment. The maintenance workers never came to inspect the unit.

On March 4, 2013, Plaintiffs' refrigerator began leaking on the interior, causing everything inside to become wet. Plaintiffs notified the Defendants, who in turn immediately sent maintenance to fix the refrigerator.

On April 13, **[*4]** 2013, Plaintiffs sent maintenance requests, to presumably the office manager, to address heating problems within the apartment. Maintenance arrived and subsequently repaired the furnace.

In May of 2013, Plaintiffs observed that the window screens to the bedroom windows were missing, the dishwasher was not secure in its place, and that the closet doors in two of the three bedrooms were off the hinges. Maintenance workers repaired the screens and dishwasher. However, no repairs were made to the closet doors, and the dishwasher continued to malfunction.

On or about August 19, 2013, the shelves in one of the bedrooms completely fell to the floor. Plaintiffs asked that the shelves be repaired. At this time, the Plaintiffs also reminded the office manager that there were still green spots on the walls. The same day, maintenance arrived to fix the shelves and closet door. Maintenance also cleaned the greenish area on the master bedroom walls, and applied a fresh coat of paint.

The next day, Plaintiffs discovered an infestation of ants along the baseboards of the master bedroom. The maintenance manager sprayed the apartment with bug repellant. He also informed Plaintiffs that there was mold in **[*5]** the apartment and instructed Plaintiffs to keep running the A/C in order to keep the humidity down and prevent mold buildup.

Plaintiffs made several more requests to have the apartment cleaned and for repairs to be made, to no avail. Plaintiffs then asked to be immediately relocated. By the end of 2013, Plaintiffs decided to vacate.

Plaintiffs filed the present action against Defendants and several "John Does." Plaintiffs assert that they have discovered that the Proposed Defendants were the true owners of the apartment building at the time they signed their lease until their eventual departure. Thus, Plaintiffs wish to hold them as jointly and severally liable.

### III. LEGAL STANDARD

The Plaintiffs have moved to join Oakland Bridgewater Park Housing Associates Limited Partnership, Oakland Concord Park Housing Associates Limited Partnership, and CED Capital Holdings III, Ltd., under *Federal Rule of Civil Procedure 19(a)(1)(A)* and *Rule 20(a)(2)*. Dkt. No. 33 at 3 (Pg. ID No. 514). However, these rules are the "tool[s] of the defendant, as the plaintiff has the power to choose which parties [he] wishes to sue and generally has ample freedom to amend [his] complaint to add a party." *Bullwinkel v. U.S. Dept. of Energy, No. 11-01082-JDB-EGB, 2012 U.S. Dist. LEXIS 113639, 2012 WL 3526829 at *1 (W.D. Tenn. 2012)* (quoting *Glancy v. Taubman Ctrs., Inc., 373 F.3d 656, 664 (6th Cir. 2004))*. "Thus, the **[*6]** Court will analyze the motion as one to add a party by amending the complaint." *Id.*

Amendments of a plaintiff's complaint are governed by *Rule 15 of the Federal Rules of Civil Procedure*. "The court should freely give leave" to amend the complaint "when justice so requires." *Fed. R. Civ. P. 15(a)(2)*. "A motion to amend a complaint should be denied if the amendment would be futile, that is, if it would not survive a motion to dismiss for failure to state a claim under *Rule 12(b)(6) of the Federal Rules of Civil Procedure*." *Hanner v. City of Dearborn Heights, 450 F. App'x 440, 448 (6th Cir. 2011)*.

*Federal Rule of Civil Procedure 12(b)(6)* allows the court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted. *See Fed. R. Civ. P. 12(b)(6)*. "*Federal Rule of Civil Procedure 8(a)(2)* requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (citing *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*. Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough 'to raise a right to relief above the speculative level' on the assumption that all of the allegations in the complaint are true." *Ass'n of*

Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007) (quoting Bell Atlantic, 550 U.S. at 555).

The court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether the plaintiff's factual allegations present plausible **[*7]** claims. To survive a *Rule 12(b)(6)* motion to dismiss, a plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations and quotations omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id. at 678*. "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id. at 679*.

### IV. Discussion

Plaintiffs argue that Proposed Defendants are actually at fault because they owned the apartment complex at issue. Defendants argue that the assertion of ownership "without a showing of possession or control, is an insufficient basis upon which to impose liability for the defective **[*8]** condition of the premises." Dkt. No. 35 at 9 (Pg. ID No. 600) (quoting *Merritt v. Nickelson, 407 Mich. 544, 549, 287 N.W.2d 178 (1980))*. Defendants further argue that the negligence claims are barred by the statute of limitations, and that Plaintiffs' breach of implied warranty of habitability, breach of contract, and unjust enrichment claims as to Proposed Defendants should be dismissed.

### A. Basis for Finding Premises Liability

To recover under a claim of premises liability, "the plaintiff must show that the defendant was in possession and control over the premises." *Hogan v. Northwest Airlines, Inc., No. 11-CV-14888, 2013 U.S. Dist. LEXIS 21962, 2013 WL 607852, at *3 (E.D. Mich. 2013)*.

Defendants point to the fact that "Plaintiffs have presented no evidence that the proposed defendants had possession and control over the premises or had anything more than mere ownership in the land during the relevant time period." Dkt. No. 35 at 10 (Pg. ID No. 601). However, the Plaintiffs are not required to provide such evidence. The analysis is limited to the four corners of the Complaint. *Twombly, 550 U.S. at 555*.

In the Complaint, Plaintiffs allege that Proposed Defendants owned and controlled the premises at the time of the alleged injury. Complaint at 3-6, ¶¶ 3, 6, 18, 19, 23, 27, 31-33; *see* Dkt. No. 33 at 3-4 (Pg. ID No. 514-15) ("each held ownership interest, management, and staffing control for **[*9]** the subject apartment complex."). It would be unreasonable to interpret the Complaint to allege that the Proposed Defendants somehow owned, managed and staffed the apartment complex without being in possession. Therefore, Plaintiffs have alleged facts that, when taken as true, are sufficient to impose liability.

### B. Statute of Limitations

Defendants next argue that the proposed amendment is futile "because Plaintiffs' negligence claims are barred by the three-year Statute of Limitations." Dkt. No. 35 at 10 (Pg. ID No. 601).

In order for an amendment substituting or adding a new party to relate back to the original filing of the complaint, (1) the claim against the new party must have arisen out of the same transaction or occurrence; (2) the party must have had adequate notice within the time provided by law for actions to commence; and (3) the party to be added must be chargeable with knowledge that, but for a mistake as to the identity of the proper party, the action would have been brought against it. *Ringrose v. Engelberg Huller Co., Inc., 692 F.2d 403, 410 (6th Cir. 1982)*. However, while *Rule 15(c)* "would allow the correction of misnomers, it will not allow the addition or substitution of new parties after the expiration of the statute of limitations." *Id.* (citing **[*10]** *Forest v. Parmalee, 60 Mich. App. 401, 231 N.W.2d 378, 383 (1975))*. In cases where new parties are being added or substituted, the "amendment . . . creates a new cause of action and there is no relation back to the original filing for purposes of limitations." *In re Kent Holland Die Casting & Plating, Inc., 928 F.2d 1448, 1449 (6th Cir. 1991)*.

Here, Plaintiffs are not correcting a misnomer, but

instead are substituting John Doe Defendants. Dkt. No. 33 at 2 (Pg. ID No. 513). Substituting a named defendant for a "John Doe" is considered a change in parties. *Cox v. Treadway, 75 F.3d 230, 240 (6th Cir. 1996)*. Therefore, the amendment will not relate back to the Complaint. Thus, the question becomes whether or not the amendment was filed before the expiration of the limitations period.

The Statute of Limitations begins to run "at the time the claim accrues." *Mich. Comp. Laws § 600.5827*. "The claim accrues at the time . . . the wrong upon which the claim is based was done regardless of the time when damage results." *Id.* The term "wrong" in *§ 600.5827*, "refers to the date on which the plaintiff was harmed by the defendant's negligent act, not the date on which the defendant acted negligently." *Trentadue v. Gorton, 479 Mich. 378, 388, 738 N.W.2d 664 (2007)*. The period of limitations for the negligence claim is three years. *Mich. Comp. Laws § 600.5805(10)*.

Defendants argue that the claim should have accrued on January 3, 2013, the first date that the Plaintiffs noticed a leak in their sink. Dkt. No. 35 at 11 (Pg. ID **[*11]** No. 602). This argument is misguided. Plaintiffs' claim would not have accrued the first day they noticed the leak. As stated above, under *Trentadue,* the clock begins to run from the date of harm. Plaintiffs are not bringing a claim for the damages suffered from a wet floor. Plaintiffs have filed a claim for having to live in what allegedly became a petri-dish. Therefore, the relevant harm is not what initially resulted from the defective sink—presumably wet socks—but instead what manifested after an alleged negligent repair of the sink. *See* *Colaianni v. Stuart Frankel Development Corp., Inc., No. 282587OAKL, 2009 Mich. App. LEXIS 1365, 2009 WL 1717388 at *3 (Mich. Ct. App. June 18, 2009)* (affirming, in a mold case, that the statute of limitations begins to run when Plaintiff first becomes sick).

The Complaint states that the repairs took place "shortly after" January 3, 2013. Complaint at 4, ¶ 7. On or about February 1, 2013, Plaintiffs' children began asking about a greenish, furry substance on their shoes, clothes, and bags inside the apartment. Around the same time, Plaintiffs' family began to observe breakouts and rashes on their bodies. This appears to be the earliest sign that damage had been inflicted on Plaintiffs' person and property. Therefore, the statute **[*12]** of limitations began running on February 1, 2013, and it was set to expire on February 1, 2016. The current motion was filed on January 13, 2016. Accordingly, the limitations period had not expired at the time of the motion.

### C. Implied Warranty of Habitability

Plaintiffs' claim for breach of implied warranty of habitability is brought under *Mich. Comp. Laws § 554.139*. A breach of the duty to maintain the premises under *§ 554.139* would be "construed as a breach of the terms of the lease between the parties and any remedy under the statute would consist exclusively of a contract remedy." *Allison v. AEW Capital Management, L.L.P., 481 Mich. 419, 425-26, 751 N.W.2d 8 (2008)*. "The covenants created by the statute establish duties of a lessor or licensor of residential property to the lessee or licensee of the residential property, most typically of a landlord to a tenant." *Mullen v. Zerfas, 480 Mich. 989, 990, 742 N.W.2d 114 (2007)*. "By the terms of the statute, the duties exist between the contracting parties." *Id.*

Defendants argue that Plaintiffs' claim should fail because Proposed Defendants were not parties to the lease agreement. Dkt. No. 35 at 12 (Pg. ID No. 603). Defendants have provided evidence that none of Proposed Defendants were privy to the lease agreement. Dkt. No. 35 (Exhibit B). The evidence has not been disputed by the Plaintiff. Accordingly, because **[*13]** the plaintiffs do not have a "reasonably founded hope" of succeeding on this claim, this claim is futile as to proposed defendants. *Twombly, 550 U.S. at 555*.

### D. Unjust Enrichment

In order to sustain a claim of unjust enrichment, the plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant. *Belle Isle Grill Corp. v. City of Detroit, 256 Mich. App. 463, 478, 666 N.W.2d 271 (2003)*. "If this is established, the law will imply a contract in order to prevent unjust enrichment." *Id.* "However, a contract will be implied only if there is no express contract covering the same subject matter." *Id.* Accordingly, a plaintiff may not file a claim for unjust enrichment over benefits expressly covered by the contract. *Id. at 479* ("Because the lease expressly contemplated and covered capital improvements in lieu of rent, plaintiff cannot recover the costs of improvement by implied contract and, therefore, the trial court properly granted summary disposition of this claim as a matter of law.").

Here, Plaintiffs' unjust enrichment claim is to recover rent money paid to Defendants. However, terms regarding rent money were expressed in the lease agreement itself. Dkt. No. 35 (Exhibit B, ¶ 3). **[*14]** Therefore, the explicit terms of the lease prevent a claim of unjust enrichment from being recognized. Accordingly, this claim is futile as to proposed defendants.

#### E. Breach of Contract

Plaintiffs allege in the complaint that the Defendants have "breached their contractual duties by failing to adequately repair the property, rendering it uninhabitable." Complaint at 16, ¶ 128.

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party." *Miller-Davis Co. v. Ahrens Constr., Inc., 495 Mich. 161, 178, 848 N.W.2d 95 (2014)*. It is well settled law that one must be a party to a contract in order to be held liable for its breach. *Coletta v. Citizens First Mortgage, L.L.C., No. 313353, 2014 Mich. App. LEXIS 1253, 2014 WL 2971717, at *2 (Mich. Ct. App. July 1, 2014)* ("It goes without saying that a contract cannot bind a nonparty.").

As stated above, proposed defendants are not parties to the lease agreement, and therefore are not bound by its terms. Thus, this claim against proposed defendants is futile.

### V. Conclusion

For the reasons discussed above, the Court **GRANTS** Plaintiffs leave to Amend the Complaint **IN PART**, and **DISMISSES** Counts II, III and VI as to Proposed Defendants as futile.

IT IS SO ORDERED.

Dated: March 3, 2016

Detroit, MI

/s/ Gershwin A Drain

Hon. Gershwin A. Drain **[*15]**

United States District Court Judge

End of Document

# *Sayed v. Sayed*

Court of Appeals of Michigan

August 7, 2008, Decided

No. 275293

**Reporter**
2008 Mich. App. LEXIS 1603 *; 2008 WL 3157456

JAMES P. SAYED, Plaintiff-Appellant, v PATRICIA J. SAYED, Defendant-Appellee.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History: [*1]** Macomb Circuit Court. LC No. 2005-002655-CK.

**Disposition:** Affirmed.

**Judges:** Before: White, P.J., and Hoekstra and Schuette, JJ.

## Opinion

PER CURIAM.

Plaintiff brought this action against defendant, his former wife, for breach of contract and unjust enrichment after he allegedly loaned her $ 25,000 that she failed to repay. At the conclusion of plaintiff's case at a bench trial, the trial court granted defendant's motion for a directed verdict. Plaintiff thereafter filed a motion for a new trial, which the court denied. Plaintiff now appeals as of right. We affirm.

I. FACTS

Plaintiff was unavailable on the day of trial. Therefore, defendant was the only witness who testified. Defendant admitted that on May 21, 2002, she sent plaintiff an email that stated:

> Jim,
> I have a favor to ask . . . . . . . . can you spare $ 20,000.00? I don't know when I'd be able to pay you back . . . . . not for a long while.
> Pat

Plaintiff responded to the email by answering, "yes." Defendant admitted that when she sent the email, it was her intent to pay plaintiff back and believed from plaintiff's response that he had accepted her offer on those terms. Defendant testified that she needed the money because she incurred a lot of debt because **[*2]** of her divorce from plaintiff, of which plaintiff was aware, and that she was considering filing for bankruptcy. A few days after defendant sent the email, she saw plaintiff at their son's baseball game and plaintiff gave her a check for $ 20,000. According to defendant, plaintiff told her that the check was "for you and the kids. It's a gift. I don't want it back. It's your money to begin with."

Approximately a year later, defendant received an additional $ 5,000 from plaintiff that she neither expected nor asked for. Defendant testified that plaintiff arrived at her house one evening, handed her an envelope, and told her that it was for her and the children and to open it only after he left. Plaintiff later asked defendant to sign some documents indicating that they had an agreement that she would repay the money to him, but she never signed the documents.

At the conclusion of plaintiff 's case, the trial court granted defendant's motion for a directed verdict, finding that plaintiff failed to prove that a contract for defendant to repay the money she received from plaintiff was ever established.

II. MOTION FOR DIRECTED VERDICT

Plaintiff argues that the trial court erred in granting **[*3]** defendant's motion for a directed verdict. [1] We

---

[1] We limit our analysis to the $ 20,000 payment made in May 2002, as plaintiff does in his brief on appeal. Although plaintiff asserts that it was his position at trial that the $ 5,000 payment was solicited in the same manner and under the same terms as the $ 20,000 payment, no evidence factually supporting this position was presented at trial. Plaintiff does not otherwise address the trial court's dismissal of his claims with respect to the $ 5,000 payment; therefore, we conclude that any issue involving the $ 5,000 payment has been abandoned. *Yee v*

disagree.

A. Standard of Review

In a bench trial, a motion for a directed verdict is properly reviewed as a motion for involuntary dismissal under MCR 2.504(B)(2). "The involuntary dismissal of an action is appropriate where the trial court, when sitting as the finder of fact, is satisfied at the close of the plaintiff 's evidence that 'on the facts and the law the plaintiff has shown no right to relief.'" *Samuel D Begola Services, Inc v Wild Bros, 210 Mich. App. 636, 639; 534 N.W.2d 217 (1995)*, quoting MCR 2.504(B)(2); **[*4]** see also *Sands Appliance Services, Inc v Wilson, 463 Mich. 231, 235- 236 n 2; 615 N.W.2d 241 (2000)*.

MCR 2.504(B)(2) permits a trial court to make findings of fact when ruling on a motion for involuntary dismissal. A trial court's findings of fact in a bench trial are reviewed under the clearly erroneous standard. MCR 2.613(C); *Carrier Creek Drain Drainage Dist v Land One, LLC, 269 Mich. App. 324, 329; 712 N.W.2d 168 (2005)*. A finding of fact is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id. at 329-330*.

B. Analysis

The trial court determined that plaintiff failed to establish a valid, enforceable contract for a loan agreement. The essential elements of a valid contract are "'(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation.'" *Hess v Cannon Twp, 265 Mich. App. 582, 592; 696 N.W.2d 742 (2005)*, quoting *Thomas v Leja, 187 Mich. App. 418, 422; 468 N.W.2d 58 (1991)*. The burden is on the plaintiff to prove the existence of the contract sought to be enforced. *Kamalnath v Mercy Mem Hosp Corp, 194 Mich. App. 543, 549; 487 N.W.2d 499 (1992)*. **[*5]**

A valid contract requires mutual assent or a meeting of the minds on all essential terms. *Kloian v Domino's Pizza, LLC, 273 Mich. App. 449, 453; 733 N.W.2d 766 (2006)*. A meeting of the minds is decided by applying an objective standard by looking at the express words of the parties and their visible acts, not their subjective states of mind. *Id. at 454*. A mere expression of intent does not create a binding contract. *Kamalnath, supra at 549*.

---

*Shiawassee Co Bd of Comm'rs, 251 Mich. App. 379, 406; 651 N.W.2d 756 (2002)*.

In order for an alleged agreement to be enforced as a contract, the elements of the contract must be apparent or capable of ascertainment. *Linnen v Ken Brown Leasing Corp, 5 Mich. App. 394, 397; 146 N.W.2d 719 (1966)*. To be binding, a contract must be definite and certain regarding the material elements. See *Band v Hazel Park Dev Co, 337 Mich. 626, 628; 60 N.W.2d 333 (1953)*. However, courts may still enforce contracts that are indefinite in certain situations. Indefiniteness and uncertainty may be removed by subsequent acts or agreements of the parties. *Id*. In some cases, the court may supply missing terms.

> Even though important terms of the contract were indefinite the trial judge acted properly in supplying the necessary additions. In an appropriate **[*6]** case an agreement may be enforced as a contract even though incomplete or indefinite in the expression of some term, if it is established that the parties intended to be bound by the agreement, particularly where one or another of the parties has rendered part or full performance. Where the price is indefinite, the purchaser may be required to pay and the seller to accept a reasonable price. Where the time of performance is indefinite, performance may be required to be rendered within a reasonable time. Each case will turn on its own facts and circumstances. See 1 Corbin on Contracts, §§ 95, 96, 99, 102; 5 Williston on Contracts, § 1459; 1 Williston on Contracts (3d ed), §§ 36, 36A, 40, 41, 49; *Restatement, Contracts, § 5*. [*J W Knapp Co v Sinas, 19 Mich. App. 427, 430-431; 172 N.W.2d 867 (1969)*.]

The trial court determined that any agreement between the parties was too indefinite and uncertain to establish an enforceable loan agreement. We agree. Even if defendant's email can be viewed as initially manifesting an intent to repay plaintiff $ 20,000, there was no clear manifestation of what was required of defendant to perform under the alleged agreement. There was no evidence establishing **[*7]** a meeting of the minds with regard to repayment terms, such as interest rate, periodic versus lump sum repayment, the amounts, or when repayment would be required. The trial court found that before the final terms of any loan agreement were negotiated or agreed upon, plaintiff told defendant that the money was a gift to her and the children, and he did not want it back.

Although uncertainty regarding time of performance can sometimes be cured by judicially imposing a requirement that performance occur within a reasonable

time, *J W Knapp Co, supra*, the facts and circumstances surrounding the alleged agreement here were too indefinite and uncertain to enable the court to determine what would be reasonable. Defendant's initial email indicated that she was not sure when she would be able to repay the money, and no other evidence manifesting an agreement on a timeframe for repayment, or other terms of repayment, was presented. This case is distinguishable from *J W Knapp Co, supra at 429, 432*, in which the parties agreed to repayment of a debt over 36 months, and the uncertainty involved the appropriate rate of interest. Therefore, we conclude that the trial court did not err in finding **[*8]** that the evidence in this case failed to establish mutuality of assent on all material terms to establish an enforceable contract.

Plaintiff argues that defendant's claim that the money was given to her as a gift involves an alleged modification of their original contract, which is unenforceable because it was not supported by independent consideration. The trial court did not reach this issue, having found that plaintiff failed to establish an enforceable contract in the first instance. We agree that the trial court did not err in finding that an enforceable contract was never established; therefore, it is unnecessary to consider the question of modification.

III. UNJUST ENRICHMENT

Plaintiff alternatively argues that the trial court erred in dismissing his unjust enrichment claim. Again, we disagree.

A. Standard of Review

A trial court's decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion. *Mahrle v Danke, 216 Mich. App. 343, 351; 549 N.W.2d 56 (1996)*. Further, whether a party has been unjustly enriched is generally a question of fact. But whether a claim for unjust enrichment can be maintained is a question of law, which this Court reviews de **[*9]** novo. *Morris Pumps v Centerline Piping, Inc, 273 Mich. App. 187, 193; 729 N.W.2d 898 (2006)*.

B. Analysis

Unjust enrichment consists of (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of defendant's retention of that benefit. *Sweet Air Investment, Inc v Kenney, 275 Mich. App. 492, 504; 739 N.W.2d 656 (2007)*. If unjust enrichment exists, the law will imply a contract in order to prevent the unjust result. *Id.* A contract may be implied under this theory only if there is no express contract. *Martin v East Lansing School Dist, 193 Mich. App. 166, 177; 483 N.W.2d 656 (1992)*.

The trial court found that plaintiff was not entitled to recover under an unjust enrichment theory in light of defendant's testimony that the money was intended as a gift. Defendant was the only witness who testified at trial. She testified that plaintiff gave her a check for $ 20,000 and told her, "It's a gift. I don't want it back. It's your money to begin with." Plaintiff did not testify at trial or present any evidence contradicting this testimony. Therefore, the trial court did not err in accepting defendant's testimony that plaintiff gave her **[*10]** the money and informed her that it was a gift, which he did not want back. Under these circumstances, defendant's retention of the money is not unjust. Accordingly, the trial court did not err in dismissing plaintiff's unjust enrichment claim.

IV. IMPLIED-IN-FACT CONTRACT

Plaintiff also argues that the trial court erred in dismissing his claim for a contract implied in fact. We disagree.

A. Standard of Review

Again, a trial court's decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion. *Mahrle, supra at 351*.

B. Analysis

Plaintiff relies on *Erickson v Goodell Oil Co, Inc, 384 Mich. 207, 211-212; 180 N.W.2d 798 (1970)*, and *Sutton v Cadillac Area Pub Schools, 117 Mich. App. 38, 45; 323 N.W.2d 582 (1982)*, for his implied-in-fact-contract theory:

> A contract implied in fact arises under circumstances which, according to the ordinary course of dealing and common understanding, of men, show a mutual intention to contract. *In re Munro's Estate (1941), 296 Mich. 80 [295 NW 567]*. A contract is implied in fact where the intention as to it is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction **[*11]** from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction. *Miller v. Stevens (1923), 224 Mich. 626 [195 NW 481]*. The existence of an implied contract, of necessity turning on inferences drawn from given circumstances, usually involves a question of fact, unless no essential facts are in

dispute. See 100 CJS, Workmen's Compensation, § 611. [*Erickson, supra.*]

The trial court found that even if defendant originally intended to borrow money from plaintiff, the lack of any mutual agreement regarding the terms of any loan precluded a claim for breach of an implied contract. We find no error. As previously discussed, there was no evidence indicating when and how defendant was expected to pay plaintiff back. Further, the trial court found that when plaintiff gave the money to defendant, he told her that it was a gift and did not need to pay it back. This circumstance negates the existence of an implied contract to repay the money. Accordingly, the trial court did not err in dismissing plaintiff's claim for breach of an implied contract.

V. MOTION FOR SUMMARY DISPOSITION

Finally, we reject plaintiff's argument that the trial **[*12]** court erred in denying his pretrial motion for partial summary disposition under *MCR 2.116(C)(10)*.

A. Standard of Review

We review a trial court's decision on a summary disposition motion de novo. *Spiek v Dep't of Transportation, 456 Mich. 331, 337; 572 N.W.2d 201 (1998)*. A motion under *MCR 2.116(C)(10)* tests the factual support for a claim. *Id*. The court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence. *MCR 2.116(G)(5)*. Summary disposition should be granted if, except as to the amount of damages, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Babula v Robertson, 212 Mich. App. 45, 48; 536 N.W.2d 834 (1995)*.

B. Analysis

The trial court did not err in denying plaintiff's motion. The parties submitted competing affidavits regarding the circumstances under which defendant received the money from plaintiff and whether the parties understood that defendant was expected to repay the money as a loan. "[S]ummary disposition is rarely appropriate in cases involving questions of credibility, intent, or state of mind." *In re Handelsman, 266 Mich. App. 433, 438; 702 N.W.2d 641 (2005)*. The **[*13]** trial court properly determined that there were genuine issues of material fact that precluded summary disposition.

Affirmed.

/s/ Helene N. White

/s/ Joel P. Hoekstra

/s/ Bill Schuette

---

**End of Document**

# Watkins v. Genesh, Inc.

United States District Court for the District of Kansas

April 2, 2021, Decided; April 2, 2021, Filed

Case No. 2:19-CV-2486-JAR-GEB

**Reporter**
2021 U.S. Dist. LEXIS 64693 *; 2021 WL 1238270

KENYA WATKINS, Plaintiff, v. GENESH, INC., Defendant.

**Subsequent History:** Appeal dismissed by Watkins v. Genesh, Inc., 2021 U.S. App. LEXIS 33549, 2021 WL 5231967 (10th Cir., Aug. 3, 2021)

**Prior History:** Watkins v. Genesh, Inc., 2020 U.S. Dist. LEXIS 187521, 2020 WL 5993641 (D. Kan., Oct. 9, 2020)

**Counsel:** **[*1]** For Kenya Watkins, Plaintiff: Aaron C. McKee, McKee Law, LLC, Olathe, KS.

For Genesh, Inc., doing business as Burger King, Defendant: Myndee M. Lee, LEAD ATTORNEY, Lee Law LLC, Overland Park, KS.

**Judges:** JULIE A. ROBINSON, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** JULIE A. ROBINSON

## Opinion

**MEMORANDUM & ORDER**

Plaintiff Kenya Watkins ("Watkins") filed suit against Defendant Genesh, Inc., d/b/a Burger King ("Burger King"), asserting claims of race discrimination, hostile work environment, and retaliation under 42 U.S.C. § 1981. Defendant has filed a Motion to Dismiss (Doc. 41) asserting that Watkins fails to state a claim. The motion is fully briefed, and the Court is prepared to rule. For the reasons stated below, the Court grants Defendant's motion.

### I. Legal Standard

To survive a motion to dismiss brought under *Fed. R. Civ. P. 12(b)(6)*, a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above the speculative level"[1] and must include "enough facts to state a claim to relief that is plausible on its face."[2] Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[3] The plausibility standard does not require **[*2]** a showing of probability that "a defendant has acted unlawfully," but requires more than "a sheer possibility."[4] "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[5]

The Supreme Court has explained the analysis as a two-step process. For the purposes of a motion to dismiss, the Court "must take all of the factual allegations in the complaint as true, [but is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'"[6] Thus, the Court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[7] Second, the Court must determine whether the factual allegations, when

---

[1] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235-36 (3d ed. 2004)).

[2] Id. at 570.

[3] Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).

[4] Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citing Twombly, 550 U.S. at 556).

[5] Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting Twombly, 550 U.S. at 555).

[6] Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

[7] Id. at 678-79.

assumed true, "plausibly give rise to an entitlement to relief."[8] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[9]

## II. Factual Allegations

The following material facts are alleged in the Complaint. **[*3]** Watkins, an African American female, worked for Burger King, as a cashier/crew member between August 14, 2014 and August 23, 2015. Watkins was paid $7.50 an hour. During her interview, the General Manager of the store, Michael Jackson, told her she was a candidate for a managerial position.

After hiring Watkins, Jackson assigned her tasks and responsibilities that put her in close proximity to him, and repeatedly verbally and physically harassed her. On multiple occasions, he attempted to touch Watkins' behind and vagina. Jackson asked Watkins to come to his house for sex, and he told Watkins that she would not be promoted if she did not have sex with him. Jackson would work without his belt on and his pants sagging. He would rub his penis and ask Watkins when he was "going to get some."[10] Jackson repeatedly asked Watkins for sex and tried to touch her.

On or about July 26, 2015, Jackson physically tried to have sex with Watkins. On this same date, Watkins called 911 to report the incident.

On or about July 27, 2015, Jackson forced Watkins into the backroom freezer and again tried to have sex with her. On this same date, Jackson yelled lewd comments to Watkins while she was cleaning the **[*4]** parking lot. And on the same date, Watkins complained verbally, and in writing, to Burger King's corporate office about Jackson's sexual harassment and hostile work environment.

On or about July 28, 2015, Watkins met with corporate representatives who stated that she would no longer have to work with Jackson. Watkins was also advised that Jackson was being replaced.

After Watkins complained to police and corporate headquarters, her hours were reduced. On August 22, 2015, Watkins worked her shift as scheduled. The schedule for the next week had not been posted by the end of her shift. On August 23, 2015, Watkins called Burger King and asked for her schedule for the week. Burger King informed her that she was scheduled for that day and that she was terminated for being a no-show/no-call.

Watkins alleges that Burger King does not treat its male or Caucasian employees in the same manner as it treats its female African American employees. Watkins claims that in the United States, African American women have been negatively stereotyped as aggressive and hyper-sexual. Watkins also asserts that the popular culture in the United States portrays black women as sexual deviants and sexual commodities. **[*5]** In addition, Watkins asserts that studies show that white women are not targeted for sexual harassment as much as Black and Latina women are.

In Watkins' Amended Complaint, she includes allegations regarding five other female employees who were sexually harassed by a district manager, general manager, or shift manager and made complaints about this behavior to the Kansas Human Rights Commission ("KHRC"), the Equal Employment Opportunity Commission ("EEOC"), or Burger King's corporate offices. Three of the employees are Hispanic. Two of the employees are African American. These instances of sexual harassment occurred from the end of 2013 through early 2016 and included instances of touching female employees and propositioning certain of these employees for sex.

Watkins filed her Complaint on August 19, 2019. Burger King filed a Motion for Judgment on the Pleadings in April 2020, and Watkins requested leave to file an Amended Complaint. After Watkins was granted leave, Watkins filed her Amended Complaint in October. Burger King has again filed a Motion to Dismiss.

## III. Discussion

Burger King argues that Watkins fails to state race discrimination and hostile environment/harassment claims **[*6]** under *42 U.S.C. § 1981*.[11] A race discrimination claim brought under *§ 1981* requires "(1)

[8] *Id. at 679*.

[9] *Id. at 678* (citing *Twombly, 550 U.S. at 556*).

[10] Doc. 38 at 10, ¶ 83.

[11] Burger King also asserts that Watkins fails to allege a retaliation claim. Watkins has now withdrawn this claim, and the Court therefore does not address it.

that the plaintiff is a member of a protected class; (2) that the defendant had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in *§ 1981*."[12] In the context of *§ 1981* claims, "a plaintiff bears the burden of showing that race was a but-for cause of its injury."[13] This but-for requirement is different than Title VII's "motivating factor" causation standard.[14] Furthermore, a plaintiff must plausibly allege facts to support this "but for" standard at the outset of the lawsuit.[15] Thus, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."[16]

In this case, Watkins alleges numerous instances of sexual comments, sexual touching, and behavior by her manager towards her based on her sex. She alleges that she made a complaint to the police that her manager attempted to physically have sex with her. Watkins also alleges that she complained of the manager's sexual harassment to the corporate office.

The issue, however, is whether Watkins adequately alleges a claim for race discrimination **[*7]** under *§ 1981*. Other than Watkins stating that she is African American, there are no factual allegations regarding Burger King's treatment of her based on her race. Watkins includes conclusory allegations about perceived racial and sexual stereotypes in the United States, but she does not allege any facts that plausibly support a claim for race discrimination in this case.

Watkins asserts that there is a pattern of a racial harassment through the sexual harassment and directs the Court to *Doe v. Matthew 25, Inc.*, a case from the Middle District of Tennessee.[17] In that case, the court found that the plaintiff plausibly alleged that unwanted sexual comments were the avenue for racial discrimination/harassment under *§ 1981*.[18] In *Doe*, however, the defendant made racial remarks to the plaintiff. Specifically, the defendant noted that the plaintiff reminded him of a black woman he used to date and described sexual acts with the black woman.[19] The court noted that these race-based sexual comments were central to the plaintiff's race discrimination/harassment claim.[20]

Here, there are no allegations of race-based remarks directed towards Watkins, sexual in nature or otherwise. To the extent that Watkins includes **[*8]** harassment allegations about five other employees, two of whom were African American and three of whom were Hispanic, none of these factual allegations relate to discriminatory behavior on the basis of race. Instead, these allegations relate to sexual discrimination and harassment. In sum, there are no plausible allegations that but for Watkins' race, she would not have been sexually harassed.

In addition, to establish a hostile work environment claim under *§ 1981*, a plaintiff must show that "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus."[21] A showing of pervasiveness requires "more than a few isolated incidents of racial enmity."[22]

Here, Watkins' allegations do not plausibly support that the harassment was racial or stemmed from racial animosity. There are simply no allegations of racial harassment. Instead, as noted above, the remarks and behavior directed toward Watkins were sexual in nature. Indeed, from the allegations, it appears that Watkins specifically complained about sexual harassment to both the police and corporate **[*9]** headquarters and perceived the harassment to be sexually motivated. In

---

[12] *Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1102 (10th Cir. 2001)* (citations omitted).

[13] *Comcast Corp. v. Nat'l Assoc. of African American-Owned Media, U.S. , 140 S. Ct. 1009, 1014, 206 L. Ed. 2d 356 (2020)*.

[14] *Id. at 1017-19* (discussing the differences between Title VII's and *§ 1981*'s history and causation standards).

[15] *Id. at 1014, 1019*.

[16] *Id. at 1019*.

[17] *322 F. Supp. 3d 843 (M.D. Tenn. 2018)*.

[18] *Id. at 856*.

[19] *Id. at 847, 856*.

[20] *Id. at 856 n. 3* (stating that the plaintiff's "race appears to have been central to her receiving [the defendant's] sexual attention in the first place.").

[21] *Witt v. Roadway Exp., 136 F. 3d 1424, 1432 (10th Cir. 1998)* (citing *Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994))*.

[22] *Bolden, 43 F.3d at 551* (citation omitted).

addition, Watkins' allegations about the treatment of other employees also relate to sexual harassment. There are no facts related to discriminatory behavior or harassment based on race. Thus, Watkins fails to adequately allege a racially hostile work environment.

In sum, Watkins more than adequately sets forth a claim for sexual discrimination and/or a hostile work environment on the basis of sex.[23] Watkins, however, brings her claim under *§ 1981* which prohibits only racial discrimination. Watkins fails to adequately allege a claim for race discrimination or hostile work environment under *§ 1981*.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Dismiss (Doc. 41) is **granted**, and this case is dismissed with prejudice.

**IT IS SO ORDERED**.

Dated: April 2, 2021

/s/ Julie A. Robinson

JULIE A. ROBINSON

CHIEF UNITED STATES DISTRICT JUDGE

---

End of Document

[23] The Court notes that Watkins stated in her Motion for Leave to Amend the Complaint, filed June 15, 2020, that she has charges pending with the EEOC. Doc. 24 at 2. She asserts that a right to sue letter was issued but then rescinded, and that as a result, she has been unable to file her Title VII claims. *Id.* The Court will not delay ruling on Burger King's motion to dismiss in this *§ 1981* case, which has been pending since August 19, 2019. Once the KHRC/EEOC's proceedings conclude, Watkins can file her claims for sexual discrimination and/or harassment under Title VII.

# Olympic Forest Prods. v. Cooper

United States Court of Appeals for the Sixth Circuit

July 15, 2005, Filed

File Name: 05a0603n.06

No. 04-1819

**Reporter**

148 Fed. Appx. 260 *; 2005 U.S. App. LEXIS 14854 **; 2005 FED App. 0603N (6th Cir.)

OLYMPIC FOREST PRODUCTS, LTD., Plaintiff-Appellant v. JOHNNY COOPER, et al., Defendants-Appellees

**Notice:** **[**1]** CONSULT 6TH CIR. R. 32.1 FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Prior History:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN. 01-74119. Victoria A. Roberts, District Judge.

**Counsel:** For OLYMPIC FOREST PRODUCTS, LTD., Plaintiff - Appellant: Daniel J. McCarthy, Edward G. Lennon, Stephen T. McKenney, Hyman & Lippitt, Birmingham, MI

For JOHNNY COOPER, Defendant - Appellee: Jay A. Schwartz, Schwartz Law Firm, Farmington Hills, MI

For ADESA IMPORTATION, Defendant: Michael J. Lavoie, Butzel Long, Detroit, MI

**Judges:** Before: CLAY and SUTTON, Circuit Judges; REEVES, District Judge. *

**Opinion by:** Danny C. Reeves

## Opinion

**[*261] OPINION**

**DANNY C. REEVES, District Judge.** Plaintiff-Appellant Olympic Forest Products, Ltd. ("Olympic") appeals the district court's final judgment. For the **[**2]** reasons that follow, we **AFFIRM** the judgment of the district court.

**FACTUAL AND PROCEDURAL BACKGROUND**

This case arises out of the alleged tortious acts of Defendant-Appellee Johnny Cooper ("Cooper") and the entities of which he was the former President and sole owner, Wolverine Auto Purchasing, Inc. ("Wolverine") and International Vehicle Importers, Inc. ("IVI"). Wolverine was engaged in the business of buying and reselling vehicles, and IVI was in the business of importing vehicles into the United States. At the time of the transactions involved in this litigation, Cooper ran all operations at Wolverine.

Olympic is the assignee and affiliate of Swathmore Auto Group ("Swathmore"). During the relevant time period, Swathmore was in the business of importing vehicles from Canada to the United States for resale. The business was operated, in part, through a nominee corporation: Dealers Wholesale Depot Company ("DWD").

In April 2000, Cooper represented to DWD and Swathmore that Cooper, Wolverine and/or IVI were able to purchase twenty-three new Harley Davidson Motorcycles and resell them to an Arizona Dealership at a profit of at least $ 400.00 per motorcycle, with a ten **[**3]** day turnaround. Based on these representations, Swathmore and DWD agreed to purchase the motorcycles and complete the proposed resale. Wolverine invoiced Swathmore and DWD for eleven motorcycles (a total of $ 204,750.00) on April 17, 2000, and twelve motorcycles (a total of $ 216,500.00) on April 25, 2000. Pursuant to these invoices, Swathmore transferred $ 421,250.00 to Wolverine's bank account. Subsequently, IVI imported the motorcycles. Wolverine then sold them to an Arizona dealership.

Wolverine did not immediately pay the net proceeds of the motorcycles, plus the agreed profits, to Swathmore or DWD. Instead, some months later, Wolverine paid

* The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Swathmore a total of $ 77,000.00 in four installments (for four motorcycles). Cooper acknowledged that it was his decision not to pay the remainder of the sums due to Swathmore and DWD.

Within six months of the transaction, Wolverine and IVI sold substantially all of their assets to Adesa Importation Services, Inc. ("Adesa"). At closing, which occurred on December 21, 2000, Wolverine and IVI received $ 2.5 million from Adesa. Of this amount, $ 1.4 million was paid to secured creditors and the balance was paid to trade creditors. Olympic **[**4]** contends that approximately $ 500,000.00 of trade debt -- including the monies owed to DWD and Swathmore -- was left unpaid. The Defendants-Appellees concede that Wolverine owes Olympic money.

On October 30, 2001, Olympic filed suit against Cooper, IVI, Wolverine, Adesa and Robert Bolenbaugh (a salesman for Wolverine). Subsequently, Adesa and Bolenbaugh **[*262]** were dismissed by agreement. On July 15, 2002, Cooper moved for summary judgment with respect to all claims asserted against him. He argued that, as a corporate officer, he was shielded from liability and that a statutory conversion claim could not attach to him. On March 14, 2003, the district court granted Cooper's motion. Specifically, it concluded that Olympic had not produced sufficient evidence to hold Cooper personally liable. In addition, the district court found that Olympic had only pled a claim of statutory conversion and had failed to present evidence to support this claim against Cooper. Olympic then filed a motion to reconsider, arguing that the district court improperly applied the corporate shield defense to the claims against Cooper and improperly dismissed its conversion claim. Specifically, Olympic asserted that **[**5]** it had alleged both a statutory *and* common law conversion claim and that the court failed to address the viability of its common law claim. The district court denied this motion.

Based on admissions made by Cooper, Olympic then moved for summary judgment against Wolverine and IVI. The district court ultimately granted this motion after both entities failed to respond. The resulting judgment effectively brought the case to an end below and this appeal followed. [1]

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed *de novo.* *Martin v. Indiana Michigan Power Co., 381 F.3d 574, 578 (6th Cir. 2004)*. Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. In considering such a motion, the court must view the evidence and draw all reasonable **[**6]** inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. The central issue is "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

## DISCUSSION

Olympic contends that the district court erred in finding as a matter of law that Cooper was shielded by the corporate veil. It asserts that this action should be remanded so that it may proceed against Cooper on claims of conversion, fraud and civil conspiracy. [2] In response, the Defendants argue that the district court properly dismissed Cooper because Olympic failed to present sufficient evidence to pierce the corporate veil. Alternatively, they contend that even if the district court erred, this Court should affirm the dismissal of Olympic's claims against Cooper because there is insufficient evidence in the record to create a genuine issue of material fact with respect to the conversion, fraud and civil conspiracy claims.

### **[**7]** *A. Piercing the Corporate Veil*

In dismissing Olympic's claims against Cooper, the district court concluded **[*263]** that Cooper was not liable for the acts of the corporate Defendants. Specifically, the court concluded that Olympic failed to offer evidence that would support piercing the corporate veil and holding Cooper personally liable for the acts of

[1] Olympic's appeal relates only to the dismissal of its claims against Cooper.

[2] Olympic also asserts that the district court improperly dismissed its conversion claim, arguing that the court failed to consider the viability of a common law claim of conversion. The Defendants argue that Olympic did not allege a common law claim in its complaint. Therefore, they assert that the court properly dismissed this claim inasmuch as Olympic failed to present sufficient evidence to sustain the only claim alleged (*i.e.,* the statutory conversion claim).

Wolverine and IVI. In support of its position that the district court erred, Olympic contends that Cooper should not have been dismissed because he personally participated in the wrongful conduct.

The law treats a corporation as an entirely separate entity from its stockholders, even where only one person owns all the corporation's stock. *Foodland Dist. v. Al-Naimi, 220 Mich. App. 453, 559 N.W.2d 379 (Mich. App. 1996)*. As a general rule, shareholders, directors and officers of a corporation cannot be held personally liable for the corporation's acts or debts, unless unusual circumstances justify disregarding the corporate entity. *Bitar v. Wakim, 456 Mich. 428, 572 N.W.2d 191 (Mich. 1998)*. However, where the corporate fiction is used to subvert justice, the corporate identity may be ignored. *Id.* This concept is commonly referred to as piercing the **[**8]** corporate veil and is typically used "to protect a corporation's creditors . . . when there is a unity of interest of the stockholders and the corporation and where the stockholders have used the corporate entity in an attempt to avoid legal obligations." *Allstate Ins. Co. v. Citizens Ins. Co., 118 Mich. App. 594, 325 N.W.2d 505, 508 (Mich. App. 1982)*.

Under Michigan law, the following elements must be satisfied in order to pierce the corporate veil:

> First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the plaintiff.

*SCD Chemical Dist., Inc. v. Medley, 203 Mich. App. 374, 512 N.W.2d 86(Mich. App. 1994)*. It should also be noted that when corporate officials participate individually in fraudulent or tortious conduct, they may be held personally responsible, regardless of whether they are acting on their own behalf or on behalf of the corporation. *Attorney General v. Ankersen, 148 Mich. App. 524, 385 N.W.2d 658 (Mich. App. 1986)*.

Here, the district court held that Olympic failed to present sufficient evidence to pierce **[**9]** the corporate veil. Specifically, the court held that Olympic had not demonstrated that "Cooper used his corporations as a mere instrumentality to suit his own improper purposes." Further, it noted that there was no evidence indicating that Cooper ignored corporate formalities or blurred the distinction between the corporations and himself.

Although the district court did not specifically address whether Cooper personally engaged in fraudulent or illegal activity, it is apparent from the record that the evidence was insufficient regarding this issue. In support of its position that Cooper engaged in fraudulent or wrongful conduct, Olympic states that "Cooper admitted that he personally engaged in the concealment of money he knew to belong to Olympic." (Appellant's Br. at 16-17). However, after examining the portions of the record cited by Olympic, it does not appear that Cooper admitted to *concealing* money that belonged to Olympic. Rather, Cooper acknowledged that a debt was owed to Olympic and that there were insufficient funds to pay it. [3] This is the only **[*264]** evidence cited by Olympic to support its contention that Cooper personally engaged in fraudulent or illegal activity. And, **[**10]** based on this evidence, we cannot conclude that there is sufficient evidence of fraudulent or wrongful conduct to impose personal liability on Cooper. As noted by the district court, "the mere fact that Defendant Cooper made a business decision not to pay a debt does not indicate that he was using his companies as a mere instrumentality." Likewise, the fact that Cooper decided not to pay the monies owed to Wolverine and/or IVI does not indicate that he actively engaged in the concealment of money. Thus, the district court did not err in finding there was insufficient evidence to pierce the corporate veil and impose personal liability on Cooper.

**[**11]** However, even if the district court erred in its piercing the corporate veil analysis, Olympic has not suffered any prejudice inasmuch as there is insufficient evidence to create a genuine issue of material fact with respect to the alleged conversion, fraud and civil conspiracy claims.

*B. Conversion*

The district court concluded that Olympic had only pleaded a claim for statutory conversion and had failed

---

[3] Cooper testified that his initial reason for not paying the debt was that he had intended to sue Olympic for its alleged attempts to "steal" Wolverine's employees. He indicated that he elected to pay other creditors because he believed that the monies owed to Olympic would be offset by the future judgment against it. Although Cooper's rationale for not paying the money may have been unreasonable, it appears that Cooper simply made a business decision to pay other creditors before Olympic. Contrary to the representations made by Olympic, Cooper did not admit that he personally engaged in the *concealment* of money that he knew belonged to Olympic.

to present sufficient evidence to sustain this claim. Olympic contends, however, that it also pleaded a cause of action for common law conversion and that the district court failed to consider the viability of this claim. We agree with the district court's conclusion that Olympic only pleaded a statutory conversion claim and did not produce evidence to create a material issue of fact regarding this issue.

Count II of the Complaint sets forth Olympic's conversion claim. This Count provides, in relevant part, that:

> 22. Olympic hereby incorporates its allegations contained in paragraphs 1 through 21 as if set forth herein in their entirety.
>
> 23. Cooper, Bolenbaugh, Wolverine and/or IVI wrongfully converted and/or stole at least $ 344,250 of funds belonging to Swathmore. **[**12]**
>
> 24. Pursuant to *M.C.L. 600.2919a*, Olympic (as Swathmore's assignee) may recover three times the amount of actual damages sustained . . . plus reasonable costs and fees.

The clear language of the relevant section of the Complaint does not allege a claim for common law conversion. Instead, the Complaint specifically references the statutory section applicable to conversion. Further, in paragraph 24, Olympic demands treble damages, which is derived from *M.C.L. § 600.2919a*.

Additionally, Olympic's failure to address the viability of a common law conversion claim in response to Cooper's motion for summary judgment is a further indication that it never intended to proceed against Cooper under that claim. In his motion, Cooper sought a judgment in its favor on all claims, specifically addressing the issue of statutory conversion. In opposing the motion, Olympic never asserted that Cooper failed to address its separate common law conversion claim. For these reasons, we agree with the district court and conclude that Olympic failed to allege a claim based upon common law conversion.

**[*265]** Apart from the current claim based on **[**13]** Michigan common law, the district court was also correct in concluding that Olympic failed to present sufficient proof to support its claim of statutory conversion. In Michigan, a statutory claim of conversion consists of knowingly buying, receiving, or aiding in the concealment of stolen, embezzled, or converted property. *M.C.L. § 600.2919a*. The Michigan courts have held that simply retaining a particular item or sum does not amount to "buying, receiving or aiding in the concealment of stolen, embezzled or converted property." *Lawsuit Fin., L.L.C. v. Curry, 261 Mich. App. 579, 683 N.W.2d 233 (Mich. App. 2004)* (citing *Hovanesian v. Nam, 213 Mich. App. 231, 539 N.W.2d 557 (Mich. App. 1995))*. In this case, Olympic contends that it gave money to the Defendants-Appellees and they, in turn, failed to give it back in accordance with the terms of the contract. Such allegations are insufficient to support a statutory conversion claim.

*C. Fraud*

Likewise, while the record may support a claim for breach of contract, it does not support a corresponding claim of fraud. In *Crews v. General Motors Corp., 400 Mich. 208, 253 N.W.2d 617 (Mich. 1977)*, the Michigan Supreme **[**14]** Court held that a tort action will not lie based solely on nonperformance of a contractual duty. Under the contract in issue in this case, the parties agreed that Olympic (or its affiliates) would transfer money to the Defendants for the purchase of motorcycles. In turn, the Defendants agreed to resell the motorcycles and pay Olympic the proceeds, plus any net profits. It is undisputed that the sole factual allegation of misconduct supporting Olympic's claims is that the Defendants failed to re-pay all of the money owed to Olympic pursuant to their agreement. As such, the contract between the parties is the sole source of any duty that the Defendants owed to Olympic. Under these circumstances, Olympic cannot maintain an action for fraud separate from the breach of contract claim. [4]

While the dissent asserts that the district court erred in dismissing Olympic's fraud claim against Cooper based on his individual actions, it is apparent that the evidence presented by Olympic does not support such a claim. No evidence was presented that Cooper knew at the time his company contracted with Swathmore/DWD that payments would not be made pursuant to their agreement. And again, while his subsequent **[**15]**

---

[4] Although the Michigan courts have held that a plaintiff may pursue a claim of fraud in the inducement extraneous to an action for breach of contract, Olympic has not alleged that the Defendants-Appellees made misrepresentations to induce Olympic into entering into this contract. *See e.g., Huron Tool and Engineering Co. v. Precision Consulting Services, Inc., 209 Mich. App. 365, 532 N.W.2d 541, 546 (Mich. App. 1995)*.

decision to withhold such payments may constitute a breach of contract on behalf of the company, it is axiomatic that not every breach of contract constitutes a claim for fraud. The fact that Wolverine and IVI used monies received from the subsequent sale of the business to pay secured and trade creditors rather than Swathmore/DWD does not alter this analysis. Here, the fraud claim against Cooper fails for lack of proof under *Rule 56 of the Federal Rules of Civil Procedure.* [5]

**[**16]** **[*266]** *D. Civil Conspiracy*

Inasmuch as Olympic failed to allege facts to support claims for conversion and fraud, the civil conspiracy claim likewise fails. *See* *Magid v. Oak Park Racquet Club Associates, Ltd., 84 Mich. App. 522, 269 N.W.2d 661, 664 (Mich. App. 1978)* (an allegation of conspiracy, standing alone, is not actionable).

**CONCLUSION**

We **AFFIRM** the judgment of the district court.

**Concur by:** CLAY

**Dissent by:** CLAY

## Dissent

**CLAY, Circuit Judge,** concurring in part and dissenting in part. I concur in the majority opinion insofar as it affirms summary judgment in Cooper's favor on Olympic's conversion claim. That claim was properly dismissed because the most reasonable interpretation of Olympic's complaint is that it alleges only a claim of statutory conversion and Olympic does not contest the dismissal of its claim for statutory conversion. As to the fraud and civil conspiracy claims, however, I must respectfully dissent because in my view there are genuine issues of material fact such that a trial on those claims is required. *Fed. R. Civ. P. 56*. In particular, it is my view that Cooper may be held individually liable for the torts of the entities **[**17]** that he represented in an official capacity (Wolverine and IVI). Furthermore, regardless of whether Cooper can be held liable for Wolverine's and IVI's tortious conduct, he can be held liable for tortious conduct in which he actively participated. In other words, the majority's veil-piercing analysis does not, as its opinion suggests, resolve this case.

We review *de novo* a district court's decision to grant summary judgment. *Cockrel v. Shelby County Sch. Dist., 270 F.3d 1036, 1048 (6th Cir. 2001)*. Summary judgment must be granted if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. Civ. P. 56(c)*. A dispute over a material fact is only a "genuine issue" if a reasonable jury could find for the nonmoving party on that issue. *Cockrel, 270 F.3d at 1048* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))*. In reviewing the district court's grant of summary judgment, this Court must view all the facts and the inferences drawn therefrom in the light most favorable **[**18]** to the nonmoving party. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348(1986))*.

Generally, the denial of a motion to reconsider is reviewed for an abuse of discretion. *Northland Ins. Co. v. Stewart Title Guar. Co., 327 F.3d 448, 454 (6th Cir. 2003)* (citing *GenCorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 832 (6th Cir. 1999))*. However, when a *Rule 59(e)* motion seeks reconsideration of a grant of summary judgment, this Court conducts a *de novo* review using the same legal standard employed by the district court. *Id. at 454-55* (citing *Smith v. Wal- Mart Stores, Inc., 167 F.3d 286, 289 (6th Cir. 1999)*; *Columbia Gas Transmission, Corp. v. Limited Corp., 951 F.2d 110, 112 (6th Cir. 1991))*.

The district court granted Defendant Cooper summary judgment on Olympic's claims for breach of contract, conversion, fraud, civil conspiracy, and constructive trust on the ground that Cooper was an officer of Wolverine and IVI, and Olympic had failed to allege facts showing that it was appropriate to pierce these entities' **[*267]** corporate veils in order to hold Cooper

[5] Neither *Citizens Ins. Co. of Am. v. Delcamp Truck Ctr., Inc., 178 Mich. App. 570, 444 N. W.2d 210, 213 (Mich. Ct. App. 1989)*, nor *Trail Clinic, P.C. v. Bloch, 114 Mich. App. 700, 319 N.W.2d 638, 642 (Mich. Ct. App. 1982)*, alters this analysis. Both cases discuss individual liability for conversion. Where, as here, the conversion claim was properly dismissed -- as the dissent concedes -- the claim may not be revived by simply calling it fraud or civil conspiracy. These are separate and distinct claims with separate and distinct elements that must be alleged and supported by relevant evidence if summary judgment is to be avoided.

liable **[**19]** for their actions. The district court, however, construed Plaintiff's complaint too narrowly and the majority has now repeated the error. A fair reading of the complaint shows that Olympic seeks to impose liability not only on Wolverine and IVI, but on Cooper personally for his own actions. The allegations concerning breach of contract, conversion, fraud, civil conspiracy, and constructive trust make no distinction between Cooper's capacity as a representative of Wolverine and IVI and his personal capacity. Accordingly, even accepting the district court's conclusion, adopted by the majority here, that veil-piercing is inappropriate to hold Cooper liable for Wolverine and IVI's actions, this holding would not preclude Olympic from seeking to impose liability on Cooper for his own actions.

Michigan law clearly distinguishes between a corporate officer's liability for his own tortious conduct and the ability to hold a corporate officer liable for the actions of the corporation through veil-piercing. The Michigan Court of Appeals has held that "it is beyond question that a corporate employee or official is personally liable for all tortious or criminal acts in which he participates, regardless **[**20]** of whether he was acting on his own behalf or on behalf of the corporation." *Attorney General v. Ankersen, 148 Mich. App. 524, 385 N.W.2d 658, 673 (Mich. Ct. App. 1986)* (citations omitted); *see also Citizens Ins. Co. of Am. v. Delcamp Truck Ctr., Inc., 178 Mich. App. 570, 444 N.W.2d 210, 213 (Mich. Ct. App. 1989)* ("When conversion is committed by a corporation, the agents and officers of the corporation may also be found personally liable for their active participation in the tort, even though they do not personally benefit thereby.") (citations omitted); *Trail Clinic, P.C. v. Bloch, 114 Mich. App. 700, 319 N.W.2d 638, 642 (Mich. Ct. App. 1982)* ("This Court has held that where a defendant acts on his own behalf or as an officer or agent of a corporation he is personally liable for the torts in which he actively participated.") (citations omitted). The personal liability of a corporate officer "is not a question of piercing the corporate veil." *Ankersen, 385 N.W.2d at 673*.

Thus, in *Citizens,* the court held that a company president, sued by an insurance company for failing to return an overpayment, could be held personally liable for the amount converted because he had actively **[**21]** participated in the conversion. *Citizens Ins., 444 N.W.2d at 213*. Similarly, in *Trail Clinic,* the court held that a director and shareholder of a medical clinic could be held personally liable for converting reimbursement checks, because the evidence established that he had actively assisted with the conversion and "acted either in behalf of one of the companies he was associated with or for his own interest." [6] *Trail Clinic, 319 N.W.2d at 642*. Here, Olympic alleges that Cooper actively participated in the torts of conversion, fraud, and civil conspiracy. Olympic claims that Cooper was personally involved in converting hundreds of thousands of dollars in proceeds from the motorcycle sale and misrepresented that he would pay Swathmore this money within ten days of Swathmore fronting the money for the deal. Indeed, Cooper has admitted that it was his "sole decision" not to pay Swathmore **[*268]** the money it was owed. The record, viewed in the light most favorable to Olympic, reflects that on April 17, 2000, Wolverine and IVI invoiced DWD and Swathmore, via 11 invoices, a total of $ 204,750 for 11 Harley Davidson motorcycles. On April 25, 2000, Swathmore **[**22]** was invoiced for another 12 motorcycles in the amount of $ 216,500. Swathmore wire-transferred payment for these invoices to Wolverine on April 27, 2000.

When Wolverine and/or IVI failed to remit payments owed to Swathmore under the resale agreement, Barrie Kurdzeil, a representative of Swathmore, contacted Johnny Cooper by telephone. Cooper acknowledged that Wolverine and IVI were long overdue in returning these funds to Swathmore and DWD. Cooper also stated that he had used the funds in other deals several times since completing **[**23]** the motorcycle deal. Cooper claimed that, pursuant to a business plan he had developed for Wolverine, DWD agreed to have the proceeds from the motorcycle deal reinvested, although there is nothing in writing to that effect.

Despite Cooper's assurances that the funds would be forwarded, he paid Swathmore/DWD only $ 77,000. Swathmore/DWD is owed over $ 350,000 (the cost of the motorcycles less $ 77,000) plus profits. Cooper claims that he stopped repaying Swathmore/DWD when he began contemplating legal action against DWD, which he believed was "poaching Wolverine's employees and using the business plan developed by Cooper (for Wolverine) to set up a competing business."

---

[6] The majority suggests *Citizens* and *Trail Clinic* are irrelevant to the case at bar because they involved conversion claims. It should be clear from my discussion that I do not point out these cases for their treatment of the plaintiffs' conversion claims, but rather because they illustrate a general principle of Michigan tort law, namely, that a corporate officer's individual liability "is not a question of piercing the corporate veil." *Ankersen, 385 N.W.2d at 673*.

*Def's Br.* at 4. Within six months of the motorcycle transaction, Cooper negotiated the sale of his businesses to Adesa Importation Services, Inc. ("Adesa"). The proceeds that Wolverine and IVI grossed from the sale were used to repay outstanding bank loans and secured creditors, and the remaining monies were used to pay their accounts payable (trade creditors). Cooper was $ 500,000 short in its ability to pay all of the trade creditors, including the debt to Swathmore/DWD. Cooper never received any money from the **[**24]** sale of his businesses to Adesa. Viewed in the light most favorable to Olympic, these facts arguably suggest that Cooper actively participated in the torts of conversion, fraud, and civil conspiracy to defraud, the last of which claims Olympic no longer pursues. In particular, these facts could support a reasonable fact-finder's inference that Cooper had the specific intent to defraud. The majority reaches a contrary conclusion by engaging in fact-finding of its own. It is not for us to decide whether Cooper had the intent to defraud; our charge is limited to determining whether a reasonable jury could so find. Because on this record a reasonable jury could find in Olympic's favor, the fraud and conspiracy claims should proceed to trial.

Accordingly, I submit that the district court erred in dismissing the fraud and civil conspiracy claims with respect to Cooper individually. I therefore part ways with my colleagues; I would reverse the district court's grant of summary judgment to Cooper on Olympic's fraud and civil conspiracy claims and would remand the case for trial on those claims.

---

**End of Document**

# Williams v. Richland County Children Servs.

United States Court of Appeals for the Sixth Circuit

July 13, 2012, Filed

File Name: 12a0764n.06

No. 11-4205

**Reporter**

489 Fed. Appx. 848 *; 2012 U.S. App. LEXIS 14702 **; 2012 FED App. 0764N (6th Cir.); 2012 WL 2874041

ALVERTA L. WILLIAMS, Individually and/or doing business as Mary McLeod-Bethune Intervention and Enrichment Center, Inc., Plaintiff-Appellee, v. RICHLAND COUNTY CHILDREN SERVICES, et al., Defendants; and RANDY J. PARKER, Defendant-Appellant

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. *SIXTH CIRCUIT RULE 28* LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE *RULE 28* BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History: [**1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.

*Williams v. Richland County Children Servs., 861 F. Supp. 2d 874, 2011 U.S. Dist. LEXIS 113762 (N.D. Ohio, Sept. 30, 2011)*

**Counsel:** For ALVERTA L. WILLIAMS, Individually and/or doing business as Mary McLeod-Bethune Intervention and Enrichment Center, Inc., Plaintiff - Appellee: James Hugh Banks, Law Offices, Dublin, OH.

For RANDY J. PARKER, Defendant - Appellant: Matthew Stephen Teetor, Mark D. Landes, Isaac, Brant, Ledman & Teetor, Columbus, OH.

**Judges:** Before: SILER and KETHLEDGE, Circuit Judges; MURPHY, District Judge. *

**Opinion by:** STEPHEN J. MURPHY, III

---

* The Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District of Michigan, sitting by designation.

## Opinion

**[*849] STEPHEN J. MURPHY, III, District Judge.** In July of 2010, Richland County Children Services ("RCCS") removed one of its wards from a residential treatment home operated by Alverta Williams. Williams alleges that the decision to remove the individual from the home was representative of a pattern of racially discriminatory behavior by RCCS in its residential placement decisions. To redress her injuries, she brought a variety of civil rights claims against RCCS; its executive director, Randy J. Parker, in his personal and official capacity; and several other defendants. Parker **[**2]** now appeals the district court's denial of his motion to dismiss the *42 U.S.C. § 1981* claim against him in his personal capacity on qualified immunity grounds. Because the complaint states a violation of clearly established rights under federal law, we **AFFIRM.**

I.

A.

Williams is an African-American woman. She owns and manages the Mary McLeod-Bethune Intervention and Enrichment Center ("Center"). The Center provides "housing, supportive services, education, job search training, skill development, intervention and other programs for at risk low and moderate income individuals." Compl. ¶ 4. In May 2009, the Center accepted as a patient "a very difficult, aggressive, young person with special needs who was a ward of [RCCS] and who was refused placement by other agencies." *Id.* ¶ 19. Before allowing her to accept this individual ("Ward"), RCCS asked Williams to "make extensive changes in her staff, policies and procedures . . . including but not limited to establishing an all-male staff and providing mandatory self-defense classes to her employees." *Id.* ¶ 20. The Ward's treatment was "very successful," and Williams benefitted from "substantial

payment on the youth's behalf from State and local **[**3]** agencies." *Id.* ¶ 21. Beginning in June or July of 2010, the Ward began "acting out" in such a manner that police had to be called to the Center. *Id.* ¶ 22. On July 20, 2010, RCCS removed the Ward from the Center, and placed him in another facility in Columbus operated by a Caucasian. *Id.* ¶¶ 23-24. Williams claims she attempted to meet with Parker to discuss this incident and unspecified "other issues," but that he "refused" to meet with her. *Id.* ¶ 25.

Williams named RCCS, Parker, the Richland Newhope Center (a competing residential treatment facility owned by a Caucasian), the Ohio District 5 Area Agency on Aging ("Agency"), and "Jane/John Doe(s)" as defendants in her complaint in the district court. Alongside the specific facts described above, the complaint makes many general allegations that purportedly apply to the "defendants" as a whole. Williams asserts that the defendants "consistently placed only very difficult client[s]" in her homes, while Caucasian-operated homes like Newhope received easier patients. Compl. ¶ 12. The defendants allegedly hold Williams "to stricter operating and other standards" than Caucasians are held to, "including but not limited to being precluded from **[**4]** owning the homes in which her clients are placed." *Id.* ¶ 14. Williams also claims that the defendants provide her with "less than her share of assignment of services" and patients **[*850]** under their control, undermine her business by removing patients "in violation of standard policy," and "discredit her in the community and among her peers." *Id.* ¶¶ 15, 17-18.

B.

Parker directs our attention to certain features of Ohio law regarding the administration of social services in order to provide a context for Williams's allegations. First, he asserts that RCCS would not need to place an individual in a facility like the Center unless it had custody over "an individual sixteen or seventeen years of age who is eligible for adult services" under Ohio law. *Ohio Rev. Code. Ann. § 5126.01(A)*. Nonetheless, Parker concedes in his brief that he is, "[a]t most . . . responsible for choosing the provider of services for any individual who is under the care and custody of [RCCS] and who is also eligible for 'adult services' pursuant to Chapter 5126." Appellant's Br. at 16. While Parker maintains that such individuals constitute a "very small subset" of individuals under RCCS's care, he acknowledges that they **[**5]** exist. *Id.* Parker also concedes that the Ward was one of the individuals that fell into this group.

Second, Parker points out that he is not responsible for the licensing and regulation of facilities like the Center, and therefore cannot be held responsible for any irregularities in those processes. Under Ohio law, it is the responsibility of the Ohio Department of Developmental Disabilities ("ODDD") to regulate residential facilities like the Center. *See* Ohio Admin. Code 5123:2-16 & 17. This responsibility includes restrictions on the ownership of such facilities. *See id.* 5123:2-16(H), (I)(12), (I)(14)-(15). Williams responds that these state rules were not applied evenhandedly to her, but there is no plausible allegation in the complaint linking that failure to RCCS, which makes use of facilities like the Center, but does not regulate them.

C.

All defendants filed a motion to dismiss the *§ 1981* claim asserted by Williams. Because *§ 1981* does not provide an independent cause of action against units of state government, the district court granted the motion as to RCCS, the Agency, the Richland New Hope Center, and Parker in his official capacity as the executive director of RCCS. *See* *Arendale v. City of Memphis, 519 F.3d 587, 594-99 (6th Cir. 2008)*. **[**6]** But the court denied the motion as to the *§ 1981* claim against Parker in his personal capacity. It held that Williams's complaint adequately alleged that Parker, as one of the "defendants," treated Williams and the Center differently based on her race, and that his treatment of her interfered with her ability to make and enforce contracts. The denial of Parker's motion to dismiss the *§ 1981* claim is the sole issue before us in this appeal.

II.

While an interlocutory order is typically not appealable, the benefit of qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)*. Therefore, an order denying qualified immunity is "deemed a final, appealable order" for purposes of *28 U.S.C. § 1291*. *Phelps v. Coy, 286 F.3d 295, 298 (6th Cir. 2002)*. We review the district court's denial of Parker's motion to dismiss Williams's *§ 1981* claim on qualified immunity grounds de novo. *Rondigo, L.L.C. v. Twp. of Richmond, 641 F.3d 673, 680 (6th Cir. 2011)*. Our review is quite limited. "When the qualified immunity defense is raised at the pleading stage, the court must determine only whether the complaint 'adequately alleges **[**7]** **[*851]** the commission of acts that violated clearly established law.'" *Id. at 681* (quoting *Back v. Hall, 537 F.3d 552, 555 (6th Cir. 2008))*.

The Civil Rules only require Williams to provide "a short and plain statement of the claim showing [she] is entitled to relief" in her complaint. *Fed. R. Civ. P. 8*. Accordingly, when reviewing a district court's ruling on a motion to dismiss, "we construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007)*. But under the pleading regime set forth by *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*, and *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*, "courts may no longer accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action." *New Albany Tractor, Inc. v. Louisville Tractor, Inc., 650 F.3d 1046, 1050 (6th Cir. 2011)*. For Williams's complaint to survive, it must be "plausible," meaning that it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678*. **[**8]** If we cannot identify sufficient facts to "nudge[ ] [Williams's] claim[ ] across the line from conceivable to plausible, [her] complaint must be dismissed." *Twombly, 550 U.S. at 570*.

III.

To determine Parker's entitlement to qualified immunity, we examine "(1) whether, considering the allegations in a light most favorable to the party injured, a [federal] right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit, 408 F.3d 305, 310 (6th Cir. 2005)*. Parker asks us to consider a third prong that appears in some of our qualified immunity decisions — "whether . . . what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right[ ]." *Feathers v. Aey, 319 F.3d 843, 848 (6th Cir. 2003)*. While we are free to consider this factor if it "increase[s] the clarity of the proper analysis," we are not mandated to do so in a case such as this, where "the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable." *Estate of Carter, 408 F.3d at 310 n.2*.

A.

Williams's claim against Parker arises under *§ 1981*, which provides that "[a]ll persons within **[**9]** the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts," regardless of race. *42 U.S.C. § 1981(a)*. The statute defines the phrase "make and enforce contracts" in an open-ended fashion to "include[ ] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id. § 1981(b)*.

The two major elements of a successful *§ 1981* claim follow from the statute's language. First, the plaintiff must possess some contractual right that the defendant blocked or impaired. *See* *Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476, 126 S. Ct. 1246, 163 L. Ed. 2d 1069 (2006)* ("*Section 1981* offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship."). Second, the plaintiff has to demonstrate that racial discrimination drove the decision to interfere with these contractual rights. "We review claims of alleged race discrimination **[*852]** brought under *§ 1981* **[**10]** . . . under the same standards as claims of race discrimination brought under Title VII . . . ." *Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 2001)*.

At this point in the litigation, Williams does not need enough evidence to make out a prima facie case of discrimination as required by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. *See* *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511-12, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*; *Davis v. Prison Health Servs.,679 F.3d 433, 2012 WL 1623216, at *5 (6th Cir. 2012)*. Under our case law, the plaintiff is only required to "allege[ ] the statutory bases for [her] claim[ ] and . . . set forth the factual predicate of [that] claim[ ]" to move a *§ 1981* claim past the pleading stage. *Lindsay v. Yates, 498 F.3d 434, 440 (6th Cir. 2007)*. *Lindsay* did not squarely confront the issue of whether this standard had been changed by *Twombly* and *Iqbal. See* *id. at 440 n.6*. Nonetheless, we acknowledged in *Lindsay* that a complaint alleging racial discrimination must possess "sufficient facts giving rise to 'a reasonably founded hope that the discovery process will reveal relevant evidence' to support [the] claims." *Id.* (quoting *Twombly, 550 U.S. at 559*).

The scope of Parker's argument, **[**11]** both in the district court and on appeal, is narrow. Parker does not quarrel with the district court's conclusion that the actions he and the other defendants are accused of constitute the impairment of contractual rights on the basis of racial classifications, in violation of *§ 1981*. Instead, he argues (1) that he did not have the authority to engage in some of the actions, (2) that the allegations are stated in a "vague" or "conclusory" fashion against

all "defendants," rather than against him specifically, and (3) that Williams did not have a "clearly established" right to be free from the consequences of his allegedly race-motivated decisions. Principals of judicial economy counsel us not to consider legal theories that were neither presented to the district court nor asserted on appeal. *See* McFarland v. Henderson, 307 F.3d 402, 407 (6th Cir. 2002). Therefore, we assume, for purposes of resolving this appeal, that the district court properly concluded the allegations in the complaint satisfy the elements of § 1981, and limit our consideration to the issues Parker raised on appeal.

B.

Williams's complaint is far from a model of clarity. We agree with Parker that at least two aspects **[**12]** of it are contradictory or implausible. First, while Williams claims that Parker engaged in discrimination by assigning her more challenging cases than Caucasian-owned facilities, this sort of discrimination could only have benefitted her. Williams acknowledges that generous state and federal funding typically accompanies such assignments, so a placement system that gave the Center more opportunities to take on high-risk individuals would be enhancing, rather than "blocking" or "impairing," her right to enter or maintain contracts. Second, given the structure of Ohio's system for administering social services, there is no plausible basis on which Parker could be held responsible for setting operating standards for the Center. If Williams does have complaints about the licensing and regulation of the Center, she should direct them at the ODDD, and not at Parker.

But the complaint's flaws only serve to detract attention from its core allegations. Williams alleges, and Parker concedes in his brief, that he has legal authority to assign certain individuals for treatment in facilities like the Center in his **[*853]** role as executive director of RCCS. He asserts that such patients are only a "very **[**13]** small subset" of RCCS's overall case load, but that is much different from a situation over which he has *no* responsibility as a matter of law. Williams goes on to state that she receives fewer of these assignments than similarly situated colleagues from different racial backgrounds. When the Center received such a placement — the Ward — the "defendants," including Parker, removed him from the Center and placed him in a Caucasian-operated home. Compl. ¶¶ 23-24. This was done "to utilize the services provided by [Williams] but preclude her from receiving payment for same on the basis of her race." *Id.* at ¶ 28. Construing the complaint in Williams's favor, this event appears to be representative of a pattern of behavior that dates as far back as 1999. RCCS and Parker allegedly took these actions to discredit the Center's competency as a treatment facility, and deprive it of the ability to compete for residential placements on a racially neutral basis.

Parker complains that the allegations are "conclusory" and "vague" insofar as they allege that the "defendants," generally, committed the unconstitutional acts. [1] *See* Brooks v. Am. Broad. Cos., 932 F.2d 495, 498 (6th Cir. 1991) (dismissing **[**14]** § 1981 complaint because, among other issues, the plaintiff's "allegations were fatally vague and conclusory in omitting any mention of the laws of which he allegedly was denied the full and equal benefit"). It would be helpful if the complaint were more specific in its allegations, but it is not fatally vague. Parker is the executive director of RCCS, which was in charge of the Ward's assignment to the Center, so the accusations in the complaint can reasonably be attributed to him. This is particularly true in light of his concessions regarding his authority to make certain assignments to residential treatment facilities. Moreover, Williams's allegations are not conclusory in the sense that they are question-begged, insusceptible to empirical verification, or a mere parroting of the elements of a § 1981 claim. *See* Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 16 (1st Cir. 1989) (noting that while "the line between 'facts' and 'conclusions' is often blurred," it is generally true that "[c]onclusions . . . are empirically unverifiable" and are "the pleader's reactions to, sometimes called 'inferences from,' the underlying facts"). Finally, the complaint is buttressed by a concrete **[**15]** story about one particular patient, the Ward, whom RCCS assigned to the Center, which greatly alleviates concerns about the level of detail in the complaint.

We find that Williams's complaint, despite its many shortcomings, has enough factual detail to survive the motion to dismiss. The leading case in this circuit on pleading § 1981 claims, *Lindsay*, does not require more detail than what Williams's complaint provides. *See* Lindsay, 498 F.3d at 440 (finding allegations that defendant terminated a purchase agreement with the plaintiffs two weeks after the agreement was signed, and a day after learning plaintiff was African-American, provided a sufficient factual basis to survive a motion to dismiss plaintiffs' § 1981 claim). Read as a whole in the light most favorable to her, the complaint is sufficient to

[1] Parker does concede that the complaint specifically accuses him of refusing to meet with Williams after RCCS removed the Ward from the Center.

entitle Williams to "a shot at additional factual development, which is what discovery is designed to give [her]." *Fabian v. Fulmer Helmets, Inc., 628 F.3d 278, 281 (6th Cir. 2011)*. Accordingly, we conclude that the complaint contains sufficient **[**16]** factual detail to survive a motion to dismiss.

**[*854]** C.

We next examine whether the allegations against Parker constitute a violation of "clearly established" law. It must be "'clear to a reasonable [person] that [Parker's] conduct was unlawful in the situation he confronted.'" *Schreiber v. Moe, 596 F.3d 323, 333 (6th Cir. 2010)* (quoting *Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001))*. While we cannot define "'clearly established' law at a high level of generality," the Supreme Court's qualified immunity precedents do "not require a case directly on point"; they only require that "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083-84, 179 L. Ed. 2d 1149 (2011)*.

Parker first argues that the complaint does not allege specifically that he engaged in a violation of "clearly established" law; he was simply one of many "defendants" Williams accused of engaging in unlawful conduct. We have already explained above that the complaint makes out a factually adequate *§ 1981* claim against Parker. He acknowledged his authority to place individuals like the Ward in treatment facilities, so all of the claims Williams makes about the "defendants'" **[**17]** policies in referring individuals for treatment apply to him with full force. Therefore, we conclude that the complaint is specific enough to determine whether those actions violate "clearly established" federal norms.

Next, Parker argues that, assuming the complaint is not conclusory or vague, the deprivations Williams claims she has suffered are not "clearly established." Williams has no right, Parker asserts, to a particular share of assignments from RCCS, to receive patients of a certain difficulty level, to meet with him, and so forth. This misses the point. The constitutional harm alleged in this case is not the deprivation of any particular benefit, but the deprivation of enjoying "the same right[s]" to "make and enforce contracts" with RCCS "as is enjoyed by white citizens." *42 U.S.C. § 1981(a)*. If any "right" under federal law is "clearly established," it is the constitutional right to be free from racial discrimination. Not only is this obligation "clearly established," but it is evident from the face of the statute under which Williams brought her claim. *Amini v. Oberlin Coll., 440 F.3d 350, 358 (6th Cir. 2006)* ("*[Section 1981]* prohibits intentional race discrimination in **[**18]** the making and enforcing of contracts involving both public and private actors."); *Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 867-68 (6th Cir. 2001)* (same); *see also* *Blackwell v. Laque, 275 F. App'x 363, 367 (5th Cir. 2008)* (affirming district court's denial of qualified immunity on a *§ 1981* claim because "[i]t was clearly established that the *Equal Protection Clause of the Fourteenth Amendment* prohibits racial discrimination of the sort alleged"). Accordingly, we agree with the district court's finding that Williams's rights are "clearly established."

IV.

Williams adequately alleged a violation of her rights under *§ 1981* by Parker, and her rights under that statute were "clearly established" when the events described in the lawsuit took place. We find that Parker is not entitled to qualified immunity, and **AFFIRM** the order of the district court.

---

End of Document

# Higgins v. Monroe Evening News

Supreme Court of Michigan

November 2, 1977, Argued ; December 26, 1978, Decided

Docket No. 58842

**Reporter**
404 Mich. 1 *; 272 N.W.2d 537 **; 1978 Mich. LEXIS 409 ***

HIGGINS v. MONROE EVENING NEWS

**Prior History:** **[***1]** *70 Mich App 407; 245 NW2d 769 (1976)*.

*Higgins v. Monroe Evening News, 70 Mich. App. 407, 245 N.W.2d 769, 1976 Mich. App. LEXIS 863 (1976)*

**Disposition:** Affirmed.

## Syllabus

Daniel S. Higgins, who was then five years old, was injured crossing the street while he was accompanying a substitute paperboy, who worked on a per diem basis, on his **[***10]** paper route. Daniel Higgins was awarded workmen's compensation benefits against the regular paperboy's employer, Monroe Evening News, and its insurer, Michigan Mutual Liability Insurance Company. The Workmen's Compensation Appeal Board affirmed the award of compensation but reduced the amount of benefits awarded. The Court of Appeals, T. M. Burns, P.J., and R. B. Burns and V. J. Brennan, JJ., reversed the award of compensation (Docket Nos. 23605, 23812). Plaintiff appeals. *Held*:

The decision of the Court of Appeals denying the award of compensation is affirmed.

Justice Blair Moody, Jr., joined by Justices Williams and Coleman, wrote:

1. The Worker's Disability Compensation Act expressly provides that minors (without age limitation) are to be considered employees and have the legal power to contract. Age may be considered as one factor among many when determining whether an employment relationship exists. However, once an employer-employee relationship has been established, an employee may not be barred from compensation recovery because of age, nor is the triviality of the consideration or remuneration alone a barrier to granting compensation.

2. The Hittle Juvenile **[***11]** Employment Act creates a "street trade" exemption for newspaper distribution from the general rule that it is illegal to employ a minor who is too young to obtain a work permit. That statutory exemption is not a denial of equal protection because there are rational bases for permitting children under the age of 14 to work as paperboys while generally prohibiting their employment in other occupations. The working hours and conditions, health risks, and employment abuses which existed in other areas of child labor are considerably different from those of newspaper distribution and the benefits from this type of work experience for children support its encouragement. The statutory distinction is reasonably related to the legislative goal of preventing child labor abuse.

3. Although findings of ordinary facts by the Workmen's Compensation Appeal Board are binding upon the Court if supported by any evidence, finding the requisite contract of hire in this case involves reaching a legal conclusion. Therefore, the finding of the Workmen's Compensation Appeal Board that a contract of hire existed between Handler and the plaintiff is reviewable by the Court.

4. The conclusion that a contract **[***12]** of hire existed between the substitute newsboy and the plaintiff ignores a major principle of contract law. Valid consideration for a contract cannot be presumed merely because the parties receive benefit from each other. Rather, a bargained-for exchange is required. The essence of consideration is legal detriment that has been bargained for and exchanged for the promise. The parties must have agreed and intended that the benefits each derived be the consideration for a contract. To reach the conclusion that a contract of hire existed it must be found that the substitute newsboy promised payment to the plaintiff in exchange for his help in delivering papers, and that the plaintiff agreed to help deliver the papers because in exchange he would receive a dime, a bottle of pop, or candy.

5. Under the circumstances of this case, a contract of hire did not exist between the parties. The testimony by the substitute newsboy illustrates a social relationship, wherein he gratuitously promised to give the plaintiff a dime, a bottle of pop, or candy if he helped deliver the newspapers. The substitute newsboy stated that his brother and the plaintiff had gone along to deliver papers because **[***13]** his mother wanted the children out of the house. He repeatedly used the term "give" when referring to the rewards he had promised the other boys, and he did not "give" his brother anything after delivering the papers that day. This testimony illustrates a gratuitous promise rather than a contract of hire.

6. The circumstances of minor children "helping" their neighbors and relatives run errands and do odd jobs while receiving minor *gratuitous* rewards negate the usual implication that payment for services is expected and that a contract of hire is formulated. This distinction is not predicated upon a bias against children but a common sense recognition of the nature of the relationship. Usually these associations are not based upon an employment relationship. The requisite contract of hire is not established in this case.

Justice Ryan agreed with Justice Moody and Chief Justice Kavanagh that the "street trade" exemption of the Hittle Juvenile Employment Act does not constitute an unconstitutional denial of equal protection. He agreed with Justice Moody that the finding of the Court of Appeals that as a matter of law the plaintiff was not employed by either the newspaper **[***14]** or the substitute newsboy must be affirmed, but for a different reason: while the Court is bound by the factual findings of the Workmen's Compensation Appeal Board, there is no evidence in the record of this case or the facts found by the board to sustain the legal conclusion that the plaintiff was employed by either the defendant newspaper or the substitute newsboy.

Chief Justice Kavanagh, joined by Justices Levin and Fitzgerald, would reverse the decision of the Court of Appeals and reinstate the award of compensation:

1. The factual finding of the Workmen's Compensation Appeal Board that the plaintiff was an employee of the substitute paperboy, who was an employee of the regular paperboy, who was an independent contractor hired by the defendant Monroe Evening News, is supported by evidence in the record. Therefore, that finding will not be disturbed on appeal.

2. The plaintiff's employment was legal because it falls within the "street trades" exemption of the Hittle Juvenile Employment Act. That statutory exemption is not a denial of equal protection because there are rational bases for permitting children under the age of 14 to work as paperboys while generally prohibiting **[***15]** their employment in other occupations. The working hours and conditions, health risks, and employment abuses which existed in other areas of child labor are considerably different from those of newspaper distribution and the benefits from this type of work experience for children support its encouragement. The statutory distinction is reasonably related to the legislative goal of preventing child labor abuse.

3. Whether a contract of hire may be inferred from the conduct, language or other pertinent circumstances of a relationship is a matter of fact which may not be prescinded from the fact finder if any of the facts are in dispute. The facts and legitimate inferences from them as to the plaintiff's employment relationship were in dispute here and the Workmen's Compensation Appeal Board resolved the dispute, finding that a contract of employment existed.

4. The statutory definition of an employee is not ambiguous; therefore it is not necessary to consider any unstated legislative intent in construing the statutory language. The statutory direction that minors be considered the same as adult employees with the same power to contract makes age irrelevant. An employment relationship **[***16]** does not turn on whether an employee depends upon the contract for his livelihood or whether his motive in entering into it was to obtain remuneration.

5. The substitute carrier in the instant case was paid approximately $ 1.50 a day by the regular paperboy. It is consistent with that scale of compensation that his helpers would be paid smaller amounts for their less responsible and less time-consuming efforts. A promise of "a dime, bottle of pop or candy bar" could constitute consideration for a contract of employment under these circumstances. The Workmen's Compensation Appeal Board also properly found that the substitute carriers and helpers, such as the plaintiff, were part of defendant newspaper's distribution system. The newspaper could have guarded against the use of very young helpers by limiting or supervising the carrier's authority to hire substitutes and helpers. The factual determination of the Workmen's Compensation Appeal Board that a contract of employment existed between plaintiff and the defendant newspaper warrants the award of workmen's compensation benefits.

Justice Levin signed Chief Justice Kavanagh's opinion for reversal, but wrote separately to express **[***17]** some additional thoughts:

1. Imposing on youngsters a higher burden of proof or persuasion and applying a more stringent standard of review than for adults conflicts with the legislative directive that minors "shall be considered *the same* as" adult employees. Age may not be considered as a factor when determining whether an employment relationship exists.

2. A worker's compensation claimant, adult or minor, need not show either an "agreement" with his employer or that but for promised compensation he would not have performed the work. A contract of hire need not be bilateral, it may be unilateral: an offer of compensation which may be accepted by doing the expected work. If such an offer is made and the expected work is performed, there is a contract of hire although there was no bilateral agreement and although the worker might have performed the work gratuitously, if asked to do so, out of a desire to be helpful or to satisfy some personal desire of participation in the enterprise or other motivation. An employer who has offered compensation may not refuse to pay workmen's compensation benefits to an injured worker who performed expected work because there was no bilateral **[***18]** agreement, nor may he seek to prove that the worker might have performed the work gratuitously if the employer had asked to do so and had not offered or promised compensation for the work.

3. In this case the plaintiff proved to the satisfaction of the Workmen's Compensation Appeal Board that compensation for his work was offered or promised from which it would be reasonable to infer that 1) it was thereby sought to induce him to work, 2) he was thereby so induced, 3) that he worked "because" of such inducement, and 4) that such inducement and work were an intended exchange of "benefits" and "detriments". Assuming that the plaintiff must show that he worked "because" of the offer or promise of compensation, it was for the Workmen's Compensation Appeal Board, not the Supreme Court as a matter of law, to resolve that factual issue.

4. The sense of the Worker's Disability Compensation Act is that where the work of the principal is contracted out to an exempt or uninsured employer, the principal is as liable as if the injured worker had been "immediately employed" by it. Newscarriers are indisputably entitled to the benefits of the act. It is a question of fact, not of law, whether **[***19]** the plaintiff was engaged in the defendant newspaper's work under a contract of hire as part of its distribution system. The newspaper's policy was to encourage the hiring of substitutes when the carrier could not deliver the paper. A practice had developed of using helpers. The newspaper did not limit the authority of its carriers to hire substitutes and helpers, nor did it supervise the hiring. The plaintiff was doing the same work that others who would be entitled to benefits were doing. It is not appropriate to deny benefits as a matter of law because the plaintiff was younger and what he was to receive was of lesser value, or because there would be no workmen's compensation liability had he been doing like work for a friend or neighbor rather than as part of the newspaper's distribution system. Concern about liability being imposed upon parents or neighbors for household chores performed by youngsters is misplaced; exemptions and exclusions in the statute eliminate that.

5. The Court need not today express a view on the scope of workmen's compensation liability for social situations, or where the service is rendered to a charitable or patriotic organization. The implication **[***20]** of broad and undefined exceptions into the jurisprudence of workmen's compensation is inappropriate. The business of publishing a newspaper has none of the earmarks of a social, charitable, or patriotic undertaking. It is not expected that anyone, even if young or very young, will deliver newspapers gratuitously.

**Counsel:** *van Benschoten & van Benschoten, P.C.*, for plaintiff.

*LeVasseur, Mitseff, Egan & Capp, P.C.*, for defendants.

**Judges:** Blair Moody, Jr., J. Williams and Coleman, JJ., concurred with Blair Moody, Jr., J. Ryan, J. *(to affirm)*. Kavanagh, C.J. *(to reverse)*. Levin and Fitzgerald, JJ., concurred with Kavanagh, C.J. Levin, J. *(to reverse)*.

**Opinion by:** MOODY, JR.

## Opinion

**[*11] [**539]** The lengthy history of this case is as follows:

1. On August 24, 1968, a petition for workers'

compensation was filed by the plaintiff.

2. Hearings were held before Referee George Huber on May 6 and 27, 1969.

3. On July 14, 1969, the referee held that plaintiff was not entitled to compensation because he had not been peddling papers or acting as an employee of the newspaper at the time of the accident.

4. The Workmen's Compensation Appeal Board (the board) affirmed **[***21]** the referee's decision on November 10, 1971.

5. The Court of Appeals, in an opinion authored by the now Justice Levin, reversed the board's decision and remanded for further hearing before **[*12]** another referee. *42 Mich App 301; 201 NW2d 665 (1972)*.

6. On July 25, 1973, the new hearing was held before Referee Ray R. Ravary.

7. In a decision filed July 28, 1973, Referee Ravary opined that the plaintiff had suffered a compensable injury and ordered the defendant, Monroe Evening News, to pay compensation at the rate of $ 54 per week.

8. On March 12, 1975, the board, in a 4-to-1 decision, affirmed the awarding of compensation but reduced the amount to $ 27 per week.

9. The Court of Appeals, in a 2-to-1 decision, reversed the board's decision, holding, as a matter of law, that the plaintiff was not employed by either the defendant or the substitute newsboy within the meaning of MCL 418.161(1)(b); MSA 17.237(161)(1)(b). *70 Mich App 407; 245 NW2d 769 (1976)*.

10. We granted leave to appeal on March 24, 1977. *399 Mich 869 (1977)*.

This much-litigated and -appealed case stems from a simple fact situation. On February 4, 1966, Frank Handler was delivering the Monroe Evening News. **[***22]** Frank Handler was not the regular newspaper boy, but he substituted for Robert Edwards, the "owner" of the route, when Edwards participated in school athletic activities.

Two five-year-old youngsters, Daniel Higgins, the plaintiff, and Frank Handler's younger brother, Nicholas, accompanied Frank on a part of the newspaper route that day. While accompanying Frank Handler, the plaintiff sustained serious injuries when struck by a motor vehicle while crossing Elm Street in the City of Monroe.

Throughout this litigation, two major fact questions surfaced: whether the plaintiff was actually **[*13]** delivering defendant's newspapers when the accident occurred and **[**540]** whether he was promised remuneration for his efforts. Within the conceptual framework that defendant's newspaper carriers are independent contractors, [1] the second Workmen's Compensation Appeal Board opinion answered these questions with specific findings of fact:

"Under a contractual arrangement which had existed for approximately one (1) year prior to the injury involved herein, Frank Handler had agreed to act as a regular substitute for Bobby Edwards, a newsboy for defendant. For this service, Handler was **[***23]** paid approximately one dollar and fifty cents ($ 1.50) per day. In performing his end of the bargain, Handler had made use of the services of others, including his little brother and plaintiff, on a number of occasions as helpers in return for which he would buy them pop, candy or give them a dime. This use and hiring of substitutes and helpers by regular newsboys and substitutes was committed to and left within the absolute discretion of the carriers and substitutes by defendant. Indeed, the practice was not only well known to defendant but expected and required. Defendant neither claimed nor assumed any responsibility or control over the manner in which the newspapers were delivered or who delivered them. *On the occasion of plaintiff's injury, February 4, 1966, plaintiff was helping Handler deliver newspapers, as he had in the past, for which assistance he had been promised remuneration in the form of either a bottle of pop, candy or a dime*." (Emphasis added.)

**[***24]**

Findings of fact in workers' compensation proceedings are conclusive in the absence of fraud, **[*14]** thus, we are bound by the board's factual determination. *Const 1963, art 6, § 28* and MCL 418.861; MSA 17.237(861).

The dispositive issue in this case is whether a contract

---

[1] This conceptual framework is adopted in the instant case for two reasons: (1) Throughout the litigation the relationship between the defendant and its newsboys has been treated factually as one of principal -- independent contractor. (2) The issue presented is not the nature of this relationship, the distinction between employees and independent contractors, but the existence of the employment relationship itself.

of hire existed between plaintiff and Frank Handler, the substitute newsboy. However, several related issues have been presented and considered by the board and the Court of Appeals; therefore, before reaching the dispositive question, four other issues will be addressed:

1. Is the applicability of the Worker's Disability Compensation Act (the act) to an employment relationship dependent upon a minimum age requirement?

2. Is the applicability of the act to an employment relationship dependent upon a minimum wage requirement?

3. Assuming an employment relationship between plaintiff and defendant, was there a basis for concluding that plaintiff's employment was illegal under the Hittle Juvenile Employment Act and, therefore, for awarding double compensation?

4. If the employment was not illegal because of the statutory exception created by *MCL 409.14*; MSA 17.714, is that provision of the Hittle Juvenile **[***25]** Employment Act unconstitutional as a denial of equal protection?

We answer all four questions in the negative.

The Worker's Disability Compensation Act defines employee as:

"Every person in the service of another, under any contract of hire, express or implied, including aliens, a person regularly employed on a full-time basis by his spouse having specified hours of employment at a specified rate of pay, working members of partnerships receiving therefrom wages irrespective of [profits,] a person insured for whom and to the extent premiums **[*15]** are paid based on wages, earnings, or profits, *and minors, who shall be considered the same as and have the same power to contract as adult employees*." (Emphasis added.) *MCL 418.161(1)(b)*; MSA 17.237(161)(1)(b).

Thus, the statute expressly provides that minors (without age limitation) are to be **[**541]** considered employees and have the legal power to contract. If the Legislature intended to impose age barriers to compensability it could have expressly inserted such limitations in the appropriate statutory provisions. Nowhere in the act is there even a hint of age limitation, nor is there any judicial authority for such **[***26]** a proposition. Age may be considered as one factor among many when determining whether an employment relationship exists. However, once an employer-employee relationship is established, an employee may not be barred from compensation recovery because of age.

Nor can the triviality of the consideration or remuneration to an employee be used as a barrier to receiving compensation. Neither the statutory provisions nor case law supports such a proposition. In fact, *§ 418.371* which specifically provides for calculation of wage loss compensation for part-time employees refutes any allegation that a minimum wage or number of hours worked per week are necessary in order to receive compensation. *MCL 418.371*; MSA 17.237(371). The statutory provisions dealing with computation of compensation use a sliding scale based upon weekly wage loss with minimum and maximum rates, the maximum rates to be adjusted on an annual basis. *MCL 418.351*; MSA 17.237(351) and *MCL 418.355*; MSA 17.237(355). Therefore, we specifically hold that the amount of employee remuneration alone cannot act as a bar to disability compensation payments.

**[*16]** Hearing Referee Ray Ravary found that the defendant was **[***27]** liable for double compensation because the plaintiff was too young to secure a work permit, thereby making his employment illegal. The act requires that the employment "be shown to be illegal" at the time of the injury for the employee to receive double compensation. *MCL 418.161(1)(b)*; MSA 17.237(161)(1)(b). The board reversed the double compensation award after examining the existing statutes defining illegal juvenile employment.

We agree with the reasoning of the board. Our statutes, *MCL 409.14*; MSA 17.714 [2] **[***28]** and *MCL 409.28*;

---

[2] "Nothing in this act shall apply to or prohibit any minor from engaging in:

"(a) Street trades, except as prohibited under section 23.

"(b) Domestic work or chores in connection with private residences.

"(c) Farm work.

"(d) Employment in a trade in which the parent or duly appointed guardian of such minor is self-employed.

"(e) Employment in a business owned and operated by such parent or guardian. For the purposes of this provision, a business shall be deemed to be owned by such parent or guardian if he is either the sole owner, partner or stockholder

MSA 17.728, [3] create a "street trade" exemption for newspaper distribution from the general **[*17]** rule that it is illegal to employ a minor who is too young to obtain a work permit. Since the employment of minors in "street trades" is not illegal, and the distribution of newspapers is a "street trade", work permit requirements do not apply to paperboys.

Plaintiff argues that this "street trade" exemption of the Hittle Juvenile Employment Act is an unconstitutional denial of equal protection. We adopt Court of **[**542]** Appeals Judge T. M. Burns' succinct and accurate refutation of this argument:

"Legislation is invalid on equal protection grounds if it creates classifications which are without reasonable bases and are purely arbitrary. *Manistee Bank & Trust Co v McGowan, 394 Mich 655; 232 NW2d 636 (1975)*. It is clear to me that there are rational bases for permitting **[***29]** children under the age of 14 to work as paperboys while generally prohibiting their employment in other occupations. The working hours and conditions of children who deliver newspapers are sufficiently distinct from those in other industries in which children were historically employed, and the perceived benefit of this type of work experience for children properly supports its encouragement. It is also reasonable to assume that the health risks and employment abuses which existed in other areas of child labor were considerably different in both kind and degree from that of newspaper distribution.

"The legislative decision to permit children to deliver newspapers while generally prohibiting their employment in other businesses is reasonably related to the legislative goal of preventing child labor abuses. It was certainly not unreasonable for the Legislature to effectuate the distinction by making it an exception to a general rule of prohibition. *MCL 409.14*; MSA 17.714 is valid." *Higgins v Monroe Evening News, 70 Mich App 407, 418-419; 245 NW2d 769 (1976)* (dissent).

The final, dispositive issue in this case is **[*18]** whether the plaintiff was acting under a contract of **[***30]** hire with Frank Handler and, thus, an employee for purposes of the Worker's Disability Compensation Act, at the time he was struck by the automobile and seriously injured. Factually, it was established that Frank Handler promised reward of a dime, bottle of pop, or candy to the plaintiff if he helped deliver the newspapers. Other testimony indicated that the plaintiff had actually delivered at least one newspaper to a house on the day of the accident and that it was not the first occasion on which plaintiff had assisted in delivering defendant's newspapers. Based upon these facts, both Referee Ravary and the board found an assigned task (delivery of newspapers) and consideration offered (a dime, bottle of pop, or candy) amounting to a contract of hire.

However, the Court of Appeals majority reversed the compensation award:

"Certainly a literal reading of the statute in relation to the facts found by the board would incline us to find plaintiff an employee. However, we cannot follow this course where a literal interpretation would lead us to a result clearly contrary to the legislative intent.

* * *

"On balance, we are convinced that the Workmen's Compensation Act was never **[***31]** intended to provide compensation for a person in the position of this plaintiff. Consequently, we hold, as a matter of law, that plaintiff was not employed by either the defendant or the substitute newsboy within the meaning of *MCL 418.161(1)(b)*; MSA 17.237(161)(1)(b)." *Higgins, supra, 413, 415*.

We agree that under the circumstances of this case, an employment relationship did not exist between the parties. Although findings of ordinary facts are binding

---

therein and shall be deemed to be operated by him if he devotes substantially all of his normal working hours to the operation of such business.

"In the event that such minor is required by law to attend school, then such work may only be performed outside of school hours.

"(f) Employment on a camp site of a nonprofit corporation engaged in citizenship training and character building during periods of school vacations." *MCL 409.14*; MSA 17.714.

[3] "The term 'street trade' shall be deemed to refer to any 1 or more of the following occupations:

"(a) Soliciting subscriptions for newspapers, magazines or other periodicals;

"(b) Distributing, selling or offering for sale newspapers, magazines, periodicals, advertising matter;

"(c) Boot blacking;

"(d) Selling or offering for sale of popcorn, peanuts, candy, fruit and soft drinks in concessions owned and operated by a boy scout troop, girl scout troop, or any other youth organization.

"Provided, That the same is conducted in a public place." *MCL 409.28*; MSA 17.728.

upon the Court if supported by **[*19]** any evidence, finding the requisite contract of hire in the instant case involves reaching a legal conclusion. Therefore, the board's finding that a contract of hire existed between Handler and the plaintiff is reviewable by this Court.

The existence or non-existence of the requisite contract of hire can be gleaned from only one source -- Frank Handler, the substitute newsboy. The following testimony is representative of Handler's explanation, on cross-examination, of plaintiff's participation in delivering newspapers:

"*Q*. And before you went out on the route, you didn't make any kind of an arrangement with him or make any kind of a deal where you said if you come on **[**543]** **[***32]** and help me with the papers, I'll pay you so much, did you?

"*A*. Let's see. I was at the house. Nicky and Danny were there.

"*Q*. What were they doing?

"*A*. I guess they were playing.

"*Q*. All right.

"*A*. And I asked them if they wanted to go on the paper route with me. I asked them if they wanted to go and I told them that if they wanted to -- I mean I told them I'd give them a dime or something or I'd buy them something if they went and helped me. That was down by the landing, just by the side door.

"*Q. Now the reason that they were coming along with you is because your mother wanted to get them out of the house, isn't that true*

"*A. Yes, I believe that, yes*.

"*Q*. Do you know why she wanted to get them out of the house?

"*A*. Yes, I think Robin was sick or something.

"*Q*. And who is Robin?

"*A*. My little sister.

"*Q*. So was that your mother's -- it was at your mother's suggestion then that you asked them to get out of the house and come along, isn't that correct?

"*A*. Well, no. I don't think so. *She was going to get* ***[*20]*** *them out of the house and it was -- you know, I'd give them something to do*. She never told me, **[***33]** you know, why don't you take the kids with you, no.

"*Q*. Now what specifically did you tell them you were going to give them at the time, if anything?

"*A*. I told them I'd give them a dime or buy them a pop or something, candy bar.

"*Q*. Did you list all these alternatives or are you saying that you might have offered or discussed one of these things?

"*A*. Do you mean I just asked them? You mean just told them I'd give them a dime or what?

"*Q*. What did you say? Did you give them a whole list of things that you might do?

"*A. I told them if they wanted to go and help me I'd give them a dime or buy them a pop or a candy bar*.

"*Q. And did you then buy a candy bar for Nicky*

"*A. Afterwards*

"*Q. Yes*.

"*A. No*.

"*Q. Did you give Nicky a dime afterwards*

"*A. No*.

"*Q. You didn't give him anything, did you*

"*A. No*." (Emphasis added.)

As previously stated, the referee and the board majority found an assigned task (delivery of newspapers) and consideration offered (a dime, bottle of pop, or candy). From those two fact findings, the board concluded that a contract of hire existed between Handler and the plaintiff. This legal conclusion **[***34]** ignores a major principle of contract law. Valid consideration for a contract cannot be presumed merely because two parties receive benefit from each other. Rather, a bargained-for exchange is required. The essence of consideration, therefore, is legal detriment that has been bargained for and exchanged for the promise. Calamari, Contracts (1st ed), § 53, p 105. The two parties must **[*21]** have agreed and intended that the benefits each derived be the consideration for a contract.

Thus, to reach the conclusion that a contract of hire

existed, we must be able to state that each of the two parties, Handler and the plaintiff, intended to suffer a detriment to receive a benefit, and that they agreed to exchange those detriments and benefits. It must be found that Frank Handler promised payment to the boys in exchange for their help in delivering papers, and that the plaintiff agreed to help deliver the papers because in exchange he would receive a dime, bottle of pop, or candy.

**[**544]** We cannot reach the legal conclusion that a contract of hire existed between Handler and the plaintiff upon accepting the factual findings of the board and reviewing all the testimony. To **[***35]** the contrary, Frank Handler's testimony illustrates a social relationship, wherein he gratuitously promised to give the plaintiff a dime, bottle of pop, or candy if he helped Handler in delivering the papers. Handler stated that the boys went along to deliver the papers because his mother wanted the children out of the house. Handler repeatedly used the gratuitous term "give" when referring to the boys. "I'd give them something to do." "I'd give them a dime or buy them a pop or a candy bar." Handler did not "give" his little brother Nicky anything after delivering the papers on the day of the accident, illustrating a gratuitous promise rather than a contract of hire.

Arthur Larson's classic treatise on workers' compensation law explains that normally the performance and acceptance of valuable service raises the implication that payment for services is expected and a contract of hire is formulated, however, in at least three common situations, circumstances **[*22]** negate the implication. 1A Larson, Workmen's Compensation Law, § 47.41.

The present facts fit within the framework of the second category: "minor children helping their parents or others without an express contract **[***36]** of hire". 1A Larson, Workmen's Compensation Law, § 47.41(b). This distinction is not predicated upon a bias against children but upon a common sense recognition of the nature of the relationship. The rationale for this category is understandable. Children frequently "help" neighbors and relatives run errands and do odd jobs, while receiving minor *gratuitous* rewards. Usually these associations are not based upon an employment relationship.

Although we view this unfortunate injury to the plaintiff sympathetically, we do not find the requisite contract of hire. The Court of Appeals is affirmed. Costs to appellee.

**Concur by:** RYAN

## Concur

Ryan, J. *(to affirm)*.

I agree with both Justices Moody and Kavanagh that the "street trade" exemption of the Hittle Juvenile Employment Act, *MCL 409.14*; MSA 17.714, does not constitute an unconstitutional denial of equal protection.

In addition, I agree with Justice Moody that the Court of Appeals decision in this case, which found as a matter of law that plaintiff was not employed by either defendant or the substitute newsboy, must be affirmed. I reach that conclusion for a different reason, however.

While this Court is bound by the factual **[***37]** findings of the Workers' Compensation Appeal Board, *Const 1963, art 6, § 28* and *MCL 418.861*; MSA 17.237(861), there is no evidence in the record of this case, or the facts found by the board, to **[*23]** sustain the legal conclusion that plaintiff was "* * * in the service of another, under any contract of hire, express or implied * * *". *MCL 418.161(1)(b)*; MSA 17.237(161)(1)(b). Consequently, notwithstanding our compassion for this seriously injured child, there is no entitlement to workers' compensation benefits.

**Dissent by:** KAVANAGH; LEVIN

## Dissent

Kavanagh, C.J. *(to reverse)*.

Facts

This is a workers' compensation case in which plaintiff appeals to this Court from an adverse ruling in the *Court of Appeals. 70 Mich App 407; 245 NW2d 769 (1976)*.

On February 4, 1966, Robert Edwards, the regular newscarrier for defendant Monroe Evening News, arranged for his substitute, Frank Handler, to complete a portion of his paper route. Accompanied by his five-year-old brother, Nicholas, and his brother's five-year-old friend, plaintiff Daniel Higgins, Frank Handler set out to deliver papers. While on the paper route five-year-old plaintiff Higgins was struck by a car and is now, as a

result **[***38]** of his serious injuries, a paraplegic.

**[**545]** On August 24, 1968, plaintiff filed a petition for benefits under the Worker's Disability Compensation Act. After the initial hearing, the referee held that plaintiff was not entitled to compensation because he had not been peddling papers and hence was not an employee of the News at the time of the accident. This decision was affirmed by the Workmen's Compensation Appeal Board. The Court of Appeals reversed and remanded for further consideration. *Higgins v Monroe Evening News, 42 Mich App 301; 201 NW2d 665 (1972)*.

After hearing on remand, the referee held that **[*24]** plaintiff had suffered a compensable injury as an employee of the News and awarded him benefits of $ 54 per week. On appeal, the board affirmed but limited plaintiff's benefits to $ 27 per week. Testimony taken during the hearing conflicted with respect to certain critical facts: (1) whether plaintiff Higgins at the time of the accident or at any other time had actually delivered papers for substitute Handler and (2) whether Handler had promised plaintiff compensation for his assistance. The board found affirmatively on both counts and said in its opinion:

**[***39]** "The testimony establishes that a promise of consideration in the form of remuneration by way of a dime, bottle of pop or some candy was made to plaintiff in return for his help in delivering newspapers and that this had not been the first time that plaintiff had helped." 1975 WCABO 456, 470.

The Court of Appeals again reversed, holding that the Worker's Disability Compensation Act "was never intended to provide compensation for a person in the position of this plaintiff". *Higgins v Monroe Evening News, supra, 70 Mich App 415*.

This Court granted leave to appeal to consider the following three issues.

I

*Are factual findings of the Workmen's Compensation Appeal Board binding on a reviewing court*

Michigan appellate courts will not disturb the factual findings of the Workmen's Compensation Appeal Board unless there is an absence of record support for those findings. *Carter v Kelsey-Hayes Co, 386 Mich 610; 194 NW2d 326 (1972)*, *Braxton v* **[*25]** *Chevrolet Grey Iron Foundry Division of General Motors Corp, 396 Mich 685; 242 NW2d 420 (1976)*.

*Const 1963, art 6, § 28* provides that "[findings] of fact in workmen's compensation proceedings shall be conclusive **[***40]** in the absence of fraud unless otherwise provided by law". *MCL 418.861*; MSA 17.237(861) provides that:

"The findings of fact made by the board acting within its powers, in the absence of fraud, shall be conclusive. The court of appeals and the supreme court shall have power to review questions of law involved in any final order of the board, if application is made by the aggrieved party within 30 days after such order by any method permissible under the rules of the courts of the laws of this state."

In the instant matter the referee found, and the board affirmed the findings, that plaintiff was an employee of Frank Handler, who was an employee of Robert Edwards, who was an independent contractor hired by the defendant to deliver papers. Since there was evidence in the record to support these factual findings we will not disturb them.

II

*Is the "street trade" exemption provision of the Hittle Juvenile Employment Act unconstitutional as a denial of equal protection*

The hearing referee agreed with plaintiff's contention that because plaintiff was too young to secure a work permit, his employment was illegal and he was therefore entitled to double compensation under *MCL 418.161(1)(b)*; **[***41]** MSA 17.237(161)(1)(b).

The Workmen's Compensation Appeal Board reversed that determination, finding **[**546]** plaintiff's employment **[*26]** legal under the "street trade" exemption for newscarriers. *MCL 409.14*; MSA 17.714. Since the majority opinion of the Court of Appeals found as a matter of law no employment relationship between plaintiff and defendant, the remaining issues, including the instant one, were not addressed.

We agree with the appeal board's disposition that plaintiff's employment was legal because it falls within the "street trades" exemption to the Hittle Juvenile Employment Act. Further, we find no merit in the plaintiff's contention that the "street trades" provision works a denial of equal protection by denying all newscarriers the protection afforded other minors under the Hittle Juvenile Employment Act. Because we find his reasoning cogent, we adopt the position taken by Court of Appeals Judge T. M. Burns in his dissenting opinion:

"Legislation is invalid on equal protection grounds if it creates classifications which are without reasonable bases and are purely arbitrary. *Manistee Bank & Trust Co v McGowan, 394 Mich 655; 232 NW2d 636 (1975).* **[***42]** It is clear to me that there are rational bases for permitting children under the age of 14 to work as paperboys while generally prohibiting their employment in other occupations. The working hours and conditions of children who deliver newspapers are sufficiently distinct from those in other industries in which children were historically employed, and the perceived benefit of this type of work experience for children properly supports its encouragement. It is also reasonable to assume that the health risks and employment abuses which existed in other areas of child labor were considerably different in both kind and degree from that of newspaper distribution.

"The legislative decision to permit children to deliver newspapers while generally prohibiting their employment in other businesses is reasonably related to the **[*27]** legislative goal of preventing child labor abuses. It was certainly not unreasonable for the Legislature to effectuate the distinction by making it an exception to a general rule of prohibition. *MCL 409.14*; MSA 17.714 is valid." *70 Mich App 407, 418-419; 245 NW2d 769 (1976)*.

III

*Did the Court of Appeals err in holding as a matter of law there was no* **[***43]** *employment contract between plaintiff and defendant*

The Court of Appeals reversed an award of compensation ordered by the Workmen's Compensation Appeal Board, finding as a matter of law no employment relationship between the parties to this litigation.

Whether a contract of hire may be inferred from the conduct, language or other pertinent circumstances of a relationship is a matter of fact which may not be prescinded from the factfinder if any of the facts are in dispute. See *Chaffee v Stenger, 361 Mich 57; 104 NW2d 805 (1960)*; *Holcomb v Bullock, 353 Mich 514; 91 NW2d 869 (1958)*; and *Erickson v Goodell Oil Co, Inc, 384 Mich 207; 180 NW2d 798 (1970)*.

The facts and legitimate inferences were in dispute here and the board resolved the dispute, finding a contract of employment existed.

The Court of Appeals majority refused to give effect to the literal language of the statute, saying:

"Certainly a literal reading of the statute in relation to the facts found by the board would incline us to find plaintiff an employee. However, we cannot follow this course where a literal interpretation would lead us to a result clearly contrary to the legislative intent." *(Citations* ***[***44]*** *omitted.) 70 Mich App 413*.

Without the assignment of any ambiguity in the **[*28]** portion of the act they construe, the Court of Appeals nevertheless concluded that the Legislature could not have intended coverage of the plaintiff in this case.

As a general rule, statutory language is construed consistent with its plain meaning. Only when statutory language is found to be ambiguous are reviewing courts free to **[**547]** look to legislative intent in an effort to understand and give effect to the words used.

Here the Court of Appeals majority did not state what the "legislative intent" was nor how they determined it. Neither did they point out a basis for their conclusion that the finding of a contract of employment would be clearly contrary to it.

We have carefully considered *People v McFarlin, 389 Mich 557, 563; 208 NW2d 504 (1973)*, cited by the Court of Appeals, and find it inapposite. We do not find the statute's definition of employee ambiguous:

"Every person in the service of another, under any contract of hire, express or implied, including * * * minors, *who shall be considered the same as* and have the same power to contract as adult employees." (Emphasis **[***45]** supplied.) *MCL 418.161(1)(b)*; MSA 17.237(161)(1)(b).

Neither do we find it necessary to consider some unstated legislative intent.

An employment relationship does not turn on whether an employee depends upon the contract for his livelihood or whether his motive in entering into it was to obtain remuneration. Accordingly we reject defendant's argument that because plaintiff here was supported by his parents and was motivated by social rather than monetary considerations no contract of employment existed.

**[*29]** The tender age of plaintiff here should not influence the determination of employment, for the statutory direction that minors be considered the same as adult employees with the same power to contract makes age irrelevant.

Defendant's contention that the promise of "a dime, bottle of pop, or candy bar" cannot constitute consideration for a contract is also unpersuasive. Carriers delivering newspapers deal in pennies. Handler, the substitute carrier, was paid approximately $ 1.50 a day by Edwards for delivering papers. It is consistent with that scale of compensation that Handler's helpers would be paid smaller amounts for their less responsible and less time-consuming **[***46]** efforts.

There are other facts in the record which provide support for the board's finding that plaintiff is an "employee" within the meaning of the act.

The newspaper business relies primarily upon youngsters for door to door delivery. Testimony given at the hearing by the individual who acted as its treasurer, secretary and business manager established that the defendant, Monroe Evening News, required its regular carriers to find substitutes when they were unable to work.

"*Q*. So you do know that Bobbie Edwards is permitted to hire substitutes to go out and take care of his job for him?

"*A*. It is his responsibility to find somebody else to carry his route if he is not there.

"*Q*. You do not exercise any supervision over that activity?

"*A*. That is right.

"*Q*. He can have whoever he wants?

"*A*. That is right, he can have his grandmother.

"*Q*. And age is no bar?

"*A*. No, because we have no responsibility as to who **[*30]** carries the paper. We go into a contract with whoever and it is up to him to find a substitute." 1975 WCABO 472-473.

The board properly found that the substitute carriers and helpers, such as Higgins, were part of defendant **[***47]** newspaper's distribution system. Defendant could have guarded against the use of very young helpers by limiting or supervising the carrier's authority to hire substitutes and helpers. The board observed:

"It is not our function to engage in an exercise in apologetics for the realities of the relationship created between defendant and its carriers. This looseness in method of operation is the creation and responsibility of defendant. Different rules could have been established but were not. Having created the system, defendant must assume responsibility for the legal consequences." 1975 WCABO 471-472.

**[**548]** We do not share the fear expressed by both defendant and the Court of Appeals that affirmance of the award in the instant matter will dangerously extend the act into an "entirely new dimension". *70 Mich App 414*. We share the conviction expressed by the appeal board:

"Given the facts there is nothing astonishing or earthshaking about the result reached herein." 1975 WCABO 472.

The board's factual determination that a contract of employment existed between plaintiff and defendant warrants the award to plaintiff of benefits for injuries sustained in the course of his **[***48]** employment.

The judgment of the Court of Appeals is reversed **[*31]** and the award of the Workmen's Compensation Appeal Board reinstated.

Costs to appellant.

Levin, J. *(to reverse)*. The act defines the term "employee" as meaning

"[every] person in the service of another, under any contract of hire, express or implied, *including* * * * *minors*, who *shall be considered the same as* and have the same power to contract as adult employees." *MCL 418.161(1)(b)*; MSA 17.237(161)(1)(b) (emphasis supplied).

Imposing on youngsters a higher burden of proof or persuasion and applying a more stringent standard of appellate review than for adults, as would the lead opinion, conflicts with the legislative directive that minors "shall be considered *the same* as" adult employees. (Emphasis supplied.)

Although the claimant in the instant case was not an adult, the question is "the same": was the claimant in the service of another under a "contract of hire"?

Age may not be considered as a factor "when determining whether an employment relationship exists".

I

The lead opinion states that there could be no "contract of hire" unless the substitute newsboy and Higgins "agreed" **[***49]** to an exchange of intended benefits and detriments, and unless Higgins so agreed "because" in exchange he would receive a dime, bottle of pop, or candy.

**[*32]** A workers' compensation claimant, adult or minor, need not, however, show either an "agreement" with his employer or that but for promised compensation he would not have performed the work. A contract of hire need not be bilateral, it may be unilateral: an offer of compensation which may be accepted by doing the expected work.

If such an offer is made and the expected work is performed, there is a contract of hire although there was no bilateral agreement and although the worker might have performed the work gratuitously, if asked to do so, out of a desire to be helpful or to satisfy some personal desire of participation in the enterprise or other motivation.

An employer who has offered compensation may not refuse to pay benefits to an injured worker who performed expected work because there was no bilateral agreement, nor may he seek to prove that the worker might have performed the work gratuitously if the employer had asked him to do so and had not offered or promised compensation.

Moreover, Higgins proved to the **[***50]** satisfaction of the WCAB that compensation was offered or promised, from which it would be reasonable to infer i) that it was thereby sought to induce him to work, ii) that he was thereby so induced, iii) that he worked "because" of such inducement, and iv) that such inducement and work were an intended exchange of "benefits" and "detriments".

Assuming that Higgins must show that he worked "because" of the offer or promise of compensation, it was for the WCAB, not this Court as a matter of law, to resolve that factual issue and in so doing draw the inferences in the application of the principles adverted to in the lead opinion to the evidence produced by the parties.

**[*33]** **[**549]** II

The sense of the act [1] is that where the work of the principal (Monroe Evening News) is contracted out to an exempt or uninsured employer it is as responsible as if the injured worker has been "immediately employed" by it. Therefore to focus on the Handler - Higgins relationship is too narrow.

**[***51]** Newspaper publishing is a business that extensively employs youngsters to deliver to the door. Newscarriers indisputably are entitled to the benefits of the workers' compensation act; it is a question of fact, not of law, whether, at the time of injury, Higgins was engaged in such work under a contract of hire as part of the distribution system of the Monroe Evening News.

A newspaper employee testified that if a carrier was absent for a day, "[they] would ask him to either get a substitute or they would replace him". He also said "when they can't deliver the papers, it is up to them to find a substitute". "[He] can have his grandmother." A practice developed of using helpers. The newspaper did not limit carrier authority to hire substitutes and helpers, nor did it supervise the hiring.

In the situations adverted to in the lead opinion, where claimants who contributed their services were denied compensation, the entire class of workers to which the injured worker belonged were regarded as volunteers who worked gratuitously. [2] Higgins, in contrast, was doing the same work that others who would be entitled to benefits **[*34]** were doing. It is not appropriate to deny **[***52]** benefits as a matter of law because Higgins was younger and what he was to receive was of lesser value or because there would be no coverage had he been doing like work for a friend or neighbor rather than as part of the newspaper's distribution system.

The expressed concern about workers' compensation liability being imposed upon parents or neighbors for household chores performed by youngsters is misplaced; under the act "no private employer" is liable to any person who is employed by him as a "household domestic servant for less than 35 hours per week for 13 weeks or longer during the preceding 52 weeks" and a

---

[1] See *MCL 418.171*; MSA 17.237(171), concerning the liability of an employer who contracts with another person.

[2] In *Hall v State Compensation Insurance Fund, 154 Colo 47; 387 P2d 899 (1963)*, where it was held that a Blue Lady "was rendering services as a volunteer", Blue Ladies as a group were held to be exempt, not a particular Blue Lady.

Similarly, see *Enderby v Industrial Commission, 12 Wis 2d 91; 106 NW2d 315 (1960)*.

"wife, child or other member of the employer's family residing in the home" is **[***53]** specifically excluded from the definition of "household domestic servant". [3]

The question whether exceptions should be made to the general scope of coverage for service at charitable or patriotic institutions has been the subject of legislation in a number of states and of judicial opinions reaching varying results in the same and differing factual situations. [4]

**[***54]** The Court need not today intimate a view regarding the scope or legitimacy of exceptions for social situations, or where the service is rendered to a charitable or patriotic organization. The implication of broad and undefined exceptions into the **[*35]** workers' compensation jurisprudence of this state is inappropriate. The business of publishing a newspaper has none of the earmarks of a social, charitable or patriotic undertaking. It is not expected that anyone, even if young or very young, will deliver newspapers gratuitously.

---

End of Document

---

[3] *MCL 418.118*; MSA 17.237(118).

[4] See 81 Am Jur 2d, Workmen's Compensation, §§ 116 *et seq*., pp 801 *et seq*.; 99 CJS, Workmen's Compensation, §§ 69 *et seq*., pp 285 *et seq*.

The exception adverted to in one of the cases cited in the lead opinion is statutory, *Camphill Village USA, Inc v Workmen's Compensation Board, 23 NY2d 202; 243 NE2d 739; 296 NYS2d 129 (1968)*; and in another case the court declared that a *factual finding* that the services were not undertaken pursuant to a contract of hire should be sustained, *Enderby v Industrial Commission, supra.*

# Kamalnath v. Mercy Memorial Hosp. Corp.

Court of Appeals of Michigan

April 8, 1992, Submitted ; June 15, 1992, Filed

No. 128108

**Reporter**
194 Mich. App. 543 *; 487 N.W.2d 499 **; 1992 Mich. App. LEXIS 198 ***

JACINTHA F. KAMALNATH, and PRAKASH J. KAMALNATH, individually and as next friend of ANTHEA J. KAMALNATH, Plaintiffs-Appellants, v MERCY MEMORIAL HOSPITAL CORP., Defendant-Appellee.

**Disposition:** **[***1]** Affirmed. Costs to defendant.

**Counsel:** *Hooper, Hathaway, Price, Beuche & Wallace* (by *David J. Hutchinson*), for the plaintiffs. Ann Arbor

*Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C.* (by *William A. Tanoury*, *Susan Healy Zitterman*, and *Linda M. Garbarino*), for the defendant. Detroit

**Judges:** Before: Weaver, P.J. and Sullivan and Corrigan, JJ.

**Opinion by:** MAURA D. CORRIGAN

## Opinion

**[*544]** **[**501]** CORRIGAN, J.

Plaintiffs appeal a grant of summary disposition of their complaint of breach of contract, wrongful discharge, employment discrimination, fraud, misrepresentation, and intentional infliction of emotional distress. We affirm.

In 1986, defendant decided to open an outpatient family practice clinic in Petersburg in Monroe County. Defendant retained a recruiter to identify a private family practitioner who brought plaintiff Jacintha Kamalnath and defendant together.

In June 1986, plaintiff, an endocrinologist, first visited the area and discussed the clinic plan with John Iacoangeli, defendant's director of planning and development. Plaintiff was unfamiliar with Monroe County and also lacked experience in the "business" aspects of medical practice. Iacoangeli allegedly stated that the hospital would **[***2]** assist plaintiff with marketing.

On June 20, 1986, Iacoangeli wrote plaintiff as follows:

> Thank you for visiting this facility and touring the communities of Monroe and Petersburg on Saturday. As discussed at our meeting, I stated that I would present for your consideration an offer relative to the start-up of a physician office in Petersburg and your retention as a private family practitioner. The following offer is subject to receipt and review of your curriculum vitea [sic].
>
> **[*545]**
>
> 1. The hospital will provide a net salary guarantee before taxes for one year in an amount not to exceed Sixty Thousand **[**502]** [$ 60,000] Dollars. The salary guarantee is determined by subtracting office and equipment rental, insurance, including medical liability, salaries, payroll taxes and workers compensation for office staff, office supplies and medical records, dues to medical organizations (AMA, Michigan State Medical Society), fees associated with normal business operations (legal and accounting), and telephone.
> 2. Underwrite the rental of the physician office for the first year of operation.
>
> 3. Provide a Fifty-Thousand [$ 50,000] Dollar line of credit to **[***3]** be used for operational and professional expenses. The interest rate for using these funds will be seven percent. This line of credit will be available for two years.
> 4. The hospital will assist you with your relocation costs to a home within Monroe County at a cost not to exceed $ 1,500.
>
> As I mentioned, the salary guarantee is associated with the primary care aspect of the Petersburg Physician Office. Consultation and other fees associated with your speciality in

Endocrinology are separate.

This offer is based on your availability to serve the Petersburg market area as a primary care physician and maintain regular office hours four [4] full days and two [2] half-days a week.

If you have any further questions, please feel free to contact me.

/s/ John R. Iacoangeli

Plaintiff did not accept this written offer. Instead, she suggested various changes and additions, principally an increase in the term from one year to three years and a provision that the hospital handle marketing.

On June 30, 1986, Iacoangeli sent plaintiff a second letter, which provided in part:

**[*546]**

It was a pleasure speaking with you again regarding **[***4]** the physician opportunity in Petersburg. As I mentioned, the following revisions to my June 20 letter, are outlined as follows:

1. The net salary-guarantee before taxes in an amount not to exceed Sixty Thousand [$ 60,000] dollars will be offered for three [3] years, subject to an annual performance review.

2. In addition to those expenses that are subtracted from gross receipts as outlined previously, medical education relating to primary care has been added.

3. Cost of relocation will be increased to a cost not to exceed $ 2,750.

4. The hospital administration will assist in providing coverage for the office when you are on vacation.

Also, I have enclosed an application for appointment to the Medical Staff. Please complete this as soon as possible. . . .

Defendant subsequently prepared several drafts of a proposed contract, but none of them proved satisfactory to plaintiff, who testified: "There were so many things that was [sic] not acceptable, I saw it [the contract] as not acceptable and that's the whole thing."

Plaintiff, however, moved to Petersburg and began work, although she had no signed contract and the clinic **[***5]** was not yet completed. Various problems then developed with equipping and staffing the clinic. Defendant allegedly did not provide promised equipment, office staff, and advertising and did not timely bill the patients. In addition, although the hospital arranged a line of credit, plaintiff allegedly was not informed that the "line of credit" was actually a personal loan. [1]

**[*547]**

The Petersburg clinic was not as successful as the parties had hoped. Relations between them deteriorated. A white male physician, who is allegedly less qualified than plaintiff, was added to the clinic staff. In November 1987, defendant formally notified plaintiff to vacate the clinic after a breakdown in their relationship.

In early 1988, plaintiff filed suit, claiming breach of contract, wrongful discharge, **[***6]** **[**503]** sex and race discrimination in employment, fraud and misrepresentation, negligent misrepresentation, and intentional infliction of emotional distress. Defendant sought summary disposition pursuant to *MCR 2.116(C)(8)* and *(10)*, asserting that the statute of frauds barred plaintiff's contract claim, that plaintiff's sex and race discrimination claims had no factual basis, that the alleged fraud and misrepresentation involved matters of opinion and future promises, that the claim of intentional infliction of emotional distress lacked any basis, and that plaintiff was an independent contractor who could not sue for wrongful discharge. The motion was supported by a detailed affidavit from John Iacoangeli.

Plaintiff's response brief lacked any citations to authority. The support filed by plaintiff's counsel consisted of an "Affidavit of Unavailability of Affidavits," the material portions of which read:

2. The Motion was filed while I was on vacation, and my schedule did not permit me to have the necessary communications with potential witnesses that would have been necessary prerequisites to the preparation of specific affidavits.

3. The persons from whom affidavits might **[***7]** have been obtained would include Plaintiffs, who would have been able to support everything contained in the Complaint, as well as the testimony of Dr. Omana Menon relating to damages, the testimony **[*548]** of Dr. Bruce

---

[1] Apparently, plaintiff and her husband did not repay the loan when it became due and the bank brought suit against them. They counterclaimed, alleging fraud and conspiracy. The outcome of that action is not known to this Court.

> Feyz and Dr. Amba Krishnan regarding the discrimination claim.[2]

The court granted defendant's motion, finding that the June 20 and June 30, 1986, letters were mere offers outside the statute of frauds, that plaintiff was not defendant's employee, that no genuine issue of fact existed as to the discrimination claims, that the fraud and misrepresentation claims involved promises and matters of opinion with no evidence of intent to deceive, and that no "outrageous conduct" supported plaintiff's claim of intentional infliction of emotional distress.

Plaintiff sought rehearing, rearguing her earlier points and newly claiming **[***8]** promissory and equitable estoppel. She also sought for the first time recovery in quantum meruit. The court denied the motion for rehearing.

I. There was no Enforceable Contract Between the Parties.

It is hornbook law that a valid contract requires a "meeting of the minds" on all the essential terms.

> In order to form a valid contract, there must be a meeting of the minds on all the material facts. A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind. [Stanton v Dachille, 186 Mich App 247, 256; 463 NW2d 479 (1990), citing Heritage Broadcasting Co v Wilson Communications, Inc, 170 Mich App 812, 818; 428 NW2d 784 (1988).]

"Meeting of the minds" is a figure of speech for **[*549]** mutual assent. Goldman v Century Ins Co, 354 Mich 528, 534; 93 NW2d 240 (1958). See also, e.g., Stark v Kent Products, Inc, 62 Mich App 546, 548; 233 NW2d 643 (1975). **[***9]**

An offer is a unilateral declaration of intention, and is not a contract. Western Michigan Univ Bd of Trustees v Slavin, 381 Mich 23, 31; 158 NW2d 884 (1968); Eastern Michigan Univ Bd of Control v Burgess, 45 Mich App 183, 187; 206 NW2d 256 (1973). A contract is made when both parties have executed or accepted it, and not before. Brown v Considine, 108 Mich App 504, 507; 310 NW2d 441 (1981), citing Holder v Aultman, Miller & Co, 169 US 81, 89; 18 S Ct 269; 42 L Ed 669 (1898). A counter proposition is not an acceptance. Harper Bldg Co v Kaplan, 332 Mich 651, 655; 52 NW2d 536 (1952). Mere discussions and negotiation, including unaccepted offers, cannot be a substitute for the formal requirements of a contract. Kirchhoff v Morris, 282 Mich 90, 95; 275 NW 778 (1937).

**[**504]** A mere expression of intention **[***10]** does not make a binding contract, Hammel v Foor, 359 Mich 392, 400; 102 NW2d 196 (1960):

> The burden is on plaintiffs to show the existence of the contract sought to be enforced, and no presumption will be indulged in favor of the execution of a contract since, regardless of the equities in a case, the court cannot make a contract for the parties when none exists.

In this case, the parties did not have a sufficient "meeting of the minds" regarding the essential terms of the contract. Plaintiff rejected the June 20 offer, as the June 30 offer makes plain. Plaintiff herself admitted that she did not approve any of the proposed contracts after her move to Petersburg. Important differences remained between the **[*550]** parties as to basic contractual duties such as the responsibility for certain major expenses. The parties had exchanged a series of offers and counteroffers, not an offer and an acceptance.

Even if the June 20 and 30 letters were considered a binding contract, defendant reserved the right to terminate plaintiff. She had no guarantee of continuation after the first year. The June 30 letter expressly provided **[***11]** that "the net salary-guarantee . . . will be offered for three [3] years, *subject to an annual performance review*." [Emphasis supplied.] Plaintiff's performance was subjected to an annual performance review and found deficient. Iacoangeli averred that defendant terminated plaintiff's employment "based on her poor performance in operating the Petersburg Clinic in terms of her office hours, patient relations, patient charges, accounting and general management responsibilities." As noted, plaintiff never countered the Iacoangeli affidavit.

Further, under the statute of frauds, MCL 566.132(a); MSA 26.922(a), "an agreement that, by its terms, is not to be performed within 1 year from the making thereof" must be in writing and "signed by the party to be charged." The proposed contract

[2] Plaintiffs' counsel did not initiate any discovery proceedings between filing suit and the filing of defendant's motion. We express no opinion about the wisdom of this strategy.

was for three years. The only document signed by defendant's agent that refers to a three-year term is the June 30 letter. That letter, however, is not a contract; the author refers to "revisions to my June 20 letter." The June 20 letter was merely "an offer relative to the start-up of a physician office in Petersburg and your retention as a private family practitioner." Thus, plaintiff's claim is defeated **[***12]** by the statute of frauds. Plaintiff cannot avoid the effect of the statute by claiming partial performance of the terms of the purported contract. In Michigan, the partial-performance doctrine does not apply to employment contracts **[*551]** for more than one year. *McMath v Ford Motor Co, 77 Mich App 721, 725; 259 NW2d 140 (1977)*.

Plaintiff's alternative argument, seeking compensation under some other theory, was presented to the court below only on plaintiff's motion for rehearing. The trial court did not rule on it. Generally, questions not ruled on below cannot be presented to or considered by a reviewing court, absent a miscarriage of justice. *Bajis v Dearborn, 151 Mich App 533, 536; 391 NW2d 401 (1986)*; *Petrus v Dickinson Co Bd of Comm'rs, 184 Mich App 282, 288; 457 NW2d 359 (1990)*. We see no miscarriage of justice here.

Nevertheless, we find plaintiff's alternative argument to have no merit. Because she *has* been compensated, she cannot seek recovery in quantum meruit. She was paid for her **[***13]** services at the clinic in 1986 and 1987 at the proposed contract rate of $ 60,000 a year. The doctrine of quantum meruit allows a party to recover the reasonable value of services rendered. A contract, though void under the statute of frauds, may be admissible to show the value placed on a plaintiff's services by the parties. *Ordon v Johnson, 346 Mich 38, 49; 77 NW2d 377 (1956)*. Plaintiff is not entitled to any additional payment under a quantum meruit analysis.

Nor does the doctrine of equitable estoppel support plaintiff. "As an equitable remedy, [estoppel] is employed to alleviate an unjust result of strict adherence to established legal principles." *Ass'n of Hebrew Teachers v Jewish Welfare Federation, 62 Mich App 54, 60; 233 NW2d 184 **[**505]** (1975)*. Defendant has not been unjustly enriched at plaintiff's expense.

Even assuming a three-year contract for plaintiff's services, plaintiff's contractual rate of compensation ($ 60,000 a year) was identical to what **[*552]** she was actually paid. Plaintiff's apparent suggestion that clinic revenues increased because of **[***14]** her activity lacks any merit since her compensation was not tied to clinic income. She would not have received any more than $ 60,000 a year from defendant had she remained at the Petersburg clinic longer than she did. Had defendant refused to pay plaintiff at all for services rendered or paid her at a lower rate, the case might be different. But plaintiff herself admitted that she was paid appropriately.

Moreover, to support a claim of estoppel, a promise must be definite and clear. *McMath, supra at 726*, citing *Ass'n of Hebrew Teachers, supra at 59*. The promises upon which plaintiff allegedly relied are certainly not definite and clear. The only promise mentioned in the complaint was defendant's "promise to use business expertise and experience." The doctrine of estoppel should be applied only where the facts are unquestionable and the wrong to be prevented undoubted. *Commercial Union Ins Co v Medical Protective Co, 136 Mich App 412, 421; 356 NW2d 648 (1984)*, rev'd in part on other grounds *426 Mich 109; 393 NW2d 479 (1986)*. This vague promise does not **[***15]** qualify.

II. Plaintiff's Remaining Claims do not Warrant Reversal.

Plaintiff's remaining allegations require minimal discussion.

A. Employment Discrimination

Plaintiff alleges violation of the Civil Rights Act, *MCL 37.2101 et seq*.; MSA 3.548(101) *et seq*., because defendant engaged a white male physician to replace her, a female of Indian origin. *MCL **[*553]** 37.2202*; MSA 3.548(202) prohibits "discrimination . . . because of . . . national origin . . . [or] sex." Plaintiff failed to adduce any evidence whatsoever to support this claim in response to defendant's properly supported motion for summary disposition. As noted, Iacoangeli averred that he terminated defendant's relationship with plaintiff solely on the basis of her poor performance.

> When a motion under subrule (C)(10) is made and supported as provided in this rule, *an adverse party may not rest upon the mere allegations or denials of his or her pleading, but*

> *must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial*. If the adverse party does not so respond, judgment, if appropriate, shall be entered against him or her. [Emphasis **[***16]** supplied; MCR 2.116(G)(4).]

Plaintiff did not come forward with any facts at all. Instead, counsel presented the previously described "Affidavit of Unavailability of Affidavits." A mere promise to offer factual support at trial is insufficient. *McCart v J Walter Thompson USA, Inc, 437 Mich 109, 115, n 4; 469 NW2d 284 (1991)*. Summary disposition was properly granted pursuant to *MCR 2.116(G)(4)*.

Further, plaintiff's employment discrimination claim fails because plaintiff was not defendant's employee. The trial court properly found that plaintiff was an independent contractor, not an employee. [3]

> An independent contractor is one who, carrying on an independent business, contracts to do work without being subject to the right of control by the employer as to the method of work but only as to the result to be accomplished.

**[*554]** *Parham v Preferred Risk Mut Ins Co, 124 Mich App 618, 622-623;* ***[***17]*** *335 NW2d 106 (1983)*, citing *Marchand v Russell, 257 Mich 96; 241 NW 209 (1932)*.

The proposed agreement renders plaintiff an independent contractor rather than an employee. The clinic staff were to be plaintiff's employees, not defendant's. Plaintiff would be required to pay all expenses from clinic receipts, including insurance, **[**506]** supplies, most business expenses, transportation, and depreciation. Plaintiff would also be liable for rent to defendant. We find no error.

B. Fraud and Misrepresentation

We affirm the lower court's dismissal of the counts of fraud and misrepresentation because plaintiff did not comply with *MCR 2.116(G)(4)*. She failed to produce any affidavits or other evidence to counter Iacoangeli's affidavit denying any intent to defraud or mislead plaintiff.

Moreover, an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises cannot constitute actionable fraud. *State Bank of Standish v Curry, 190 Mich App 616, 623; 476 NW2d 635 (1991)*, citing **[***18]** *Hi-Way Motor Co v Int'l Harvester Co, 398 Mich 330, 336; 247 NW2d 813 (1976)*. The actions plaintiff complained of principally relate either to promises of future action (e.g., the division of expenses between plaintiff and defendant) or to matters of opinion (e.g., defendant's business expertise). Although the demographic makeup of Monroe County is a factual matter, plaintiff failed to oppose Iacoangeli's affidavit that he had no intent to defraud her with respect to that fact; as for claimed fraud and **[*555]** misrepresentation about the value of the home plaintiff purchased, plaintiff had the opportunity to inspect it. Representations as to property value are mere expressions of opinion, especially where plaintiff can inspect the property before purchasing it. *Sutton v Benjamin, 231 Mich 153, 155; 203 NW 667 (1925)*. See also, e.g., *Cole Lakes, Inc v Linder, 99 Mich App 496, 505; 297 NW2d 918 (1980)*.

C. Intentional Infliction of Emotional Distress

Finally, the trial court properly granted summary **[***19]** disposition of the claim of intentional infliction of emotional distress. A plaintiff must show "extreme and outrageous" conduct. See *Roberts v Auto-Owners Ins Co, 422 Mich 594, 602-604; 374 NW2d 905 (1985)*, citing *Restatement Torts, 2d, § 46*, p 71. Further, in a contractual setting, a tort action must rest on a breach of duty distinct from contract. *Roberts, supra at 603-604*. Plaintiff nowhere specifically alleged conduct so extreme or outrageous as to establish liability in tort.

Affirmed. Costs to defendant.

**End of Document**

[3] Plaintiff has not responded to this finding in her brief on appeal.

# White v. Baxter Healthcare Corp.

United States Court of Appeals for the Sixth Circuit

March 12, 2008, Argued; July 3, 2008, Decided; July 3, 2008, Filed

File Name: 08a0242p.06

No. 07-1626

**Reporter**
533 F.3d 381 *; 2008 U.S. App. LEXIS 14188 **; 2008 FED App. 0242P (6th Cir.) ***; 103 Fair Empl. Prac. Cas. (BNA) 1121; 91 Empl. Prac. Dec. (CCH) P43,249

TODD A. WHITE, Plaintiff-Appellant, v. BAXTER HEALTHCARE CORPORATION, Defendant-Appellee.

**Subsequent History:** Motion granted by *White v. Baxter Healthcare Corp., 2008 U.S. Dist. LEXIS 107241 ( E.D. Mich., Dec. 17, 2008)*

US Supreme Court certiorari denied by *Baxter Healthcare Corp. v. White, 129 S. Ct. 2380, 173 L. Ed. 2d 1293, 2009 U.S. LEXIS 3567 (U.S., May 18, 2009)*

**Prior History: [**1]** Appeal from the United States District Court for the Eastern District of Michigan at Detroit. No. 05-71201-John Feikens, District Judge.

*White v. Baxter Healthcare Corp., 2007 U.S. Dist. LEXIS 27814 ( E.D. Mich., Apr. 16, 2007)*

**Counsel:** ARGUED: Chrisdon F. Rossi, LAW OFFICES OF GARY ROSSI, Bloomfield Hills, Michigan, for Appellant.

Noah A. Finkel, SEYFARTH SHAW, Chicago, Illinois, for Appellee.

ON BRIEF: Gary A. Rossi, LAW OFFICES OF GARY ROSSI, Bloomfield Hills, Michigan, for Appellant.

Noah A. Finkel, SEYFARTH SHAW, Chicago, Illinois, for Appellee.

**Judges:** Before: KEITH, CLAY, and GILMAN, Circuit Judges. CLAY, J., delivered the opinion of the court, in which KEITH, J., joined. GILMAN, J., delivered a separate opinion concurring in part and dissenting in part.

**Opinion by:** CLAY

## Opinion

**[*384] [***1]** CLAY, Circuit Judge. Plaintiff, Todd A. White ("White"), an African-American, appeals the district court's grant of summary judgment in favor of Defendant, Baxter Healthcare Corporation ("Baxter"), on White's employment discrimination claims brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq. (2000)*, Section 101 of the Civil Rights Act of 1991, *42 U.S.C. § 1981 (2000)*, and Michigan's Elliot-Larsen Civil Rights Act (the "Elliot-Larsen Act"), *Mich. Comp. Laws § 37.2101 et seq.* (2002). **[**2]** In particular, White contends that he has presented sufficient evidence for a jury to conclude that he was discriminated against on the basis of his race when Baxter (1) failed to promote him, and (2) downgraded his 2004 performance evaluation. We agree, and, for the reasons that follow, we **REVERSE** the district court's grant of Baxter's motion for summary judgment and **REMAND** the case for trial.

### [***2] I. BACKGROUND

Baxter, a subsidiary of Baxter International, Inc., produces and sells medical **[*385]** technologies related to the blood and circulatory systems. In April of 1998, Baxter purchased White's former employer, Ohmeda Pharmaceutical Products, Inc. ("Ohmeda"), and merged it into Baxter's Anesthesia, Critical Care, and Oncology ("ACCO") division. Since then, White has been a sales representative at Baxter, selling proprietary and generic pharmaceutical products to anesthesia professionals. [1] In January of 2001, White was promoted to the position

[1] At oral argument, White's counsel **[**3]** indicated that after the district court's ruling was issued in this case, Baxter terminated White's employment. The stated reasons for this termination do not appear in the record and were not explained by counsel at oral argument. However, it is sufficient to note that at all times relevant for this appeal, White was employed by Baxter.

of Teaching Center Specialist ("TCS"), a specialized sales representative who sells products to larger hospitals that run teaching programs and who is held to a higher standard of product knowledge and teaching skills.

During his first six years at Baxter, White was primarily supervised by Baxter Regional Manager Richard Clark ("Clark"), who also served as White's supervisor at Ohmeda prior to its merger with Baxter. White has not alleged, and the record does not reflect, that Clark harbors any discriminatory animus toward African-Americans. Beginning January 1, 2004, White was required to report to Tim Phillips ("Phillips"), Baxter Regional Manager of Northern Teaching Center Specialists, as his primary supervisor. Clark and Phillips, in turn, reported to Carl Gold ("Gold"), the ACCO Area Vice President for Sales for the eastern half of the United States.

Soon after Phillips became his supervisor, White began to notice signs of a discriminatory animus toward African-Americans on the part of Phillips. For example, according to White, when he complained to Phillips **[**4]** about scheduling a work meeting on the Martin Luther King, Jr. holiday, Phillips responded by telling White that "nobody wants to be around a black man." J.A. at 106. Phillips had allegedly made a similar comment -- "no one wants to work with a black man" -- when talking about workforce diversity with another Baxter employee, Jacinta Toland, on a previous occasion. J.A. at 633. White also noted that, during one of their conversations, Phillips had referred to an African-American sales representative as "that black girl," rather than referring to her by her name, Tanisha Gabriel, or by her position title. Likewise, Phillips would occasionally answer White's calls in jest by saying "White, Todd" instead of calling White by just his first name as he would with other employees. Finally, White was disturbed when Phillips circulated an e-mail to Baxter employees which showed an image of Osama Bin Laden morphing into O.J. Simpson and which contained the subject line "I KNEW IT!!! I KNEW IT!!! I KNEW IT!!!"

In contrast to the racially discriminatory comments White heard from Phillips, his experience at Baxter prior to being supervised by Phillips was one in which he generally received positive **[**5]** recognition for his outstanding sales performance. In 2000, White was awarded membership in Baxter's Distinguished Sales Club ("DSC") which is reserved for the top five percent of Baxter sales representatives in the country. Likewise, in 2001, White was placed in a TCS position, the highest sales position within Baxter. Finally, in 2003, White received a Sales Achievement Award and won a company-paid trip for being within the top twenty percent of sales representatives in the country. White was rated as "Meeting Expectations" **[*386]** in the years 2001 and 2002, and achieved the higher "Exceeding Expectations" rating in 2000 and 2003. [2]

**[***3]** Hoping to use his strong sales background to help Baxter's ACCO division perform **[**6]** even better, White applied for the position of ACCO Midwest Regional Manager in September of 2004. This was White's first, and only, application for a Regional Manager position at Baxter. Baxter had never previously hired any African-American managers (either regional or higher-ranked supervisors) within its ACCO division.

Gold was responsible for making the final hiring decision for the Regional Manager position. He enlisted Daryl Martin ("Martin"), Baxter Human Resources Director, and Carl Kunz ("Kunz"), ACCO Vice President for Sales for the western half of the United States, to assist him. Phillips was not formally involved in the Regional Manager selection process. However, according to Phillips, he encouraged White to apply for the position and told Gold that White would be "a good fit" for the job. J.A. at 175. Phillips also testified that he talked to Kunz about White's application, but his testimony does not indicate what was said during the conversation. Gold confirms that he spoke with Phillips about White. Yet, according to Gold, although Phillips had presented White as a potential management candidate in an internal development process called the Organized Talent Review **[**7]** ("OTR"), Phillips had "never really discussed the fact that [White] could move into a manager role." J.A. at 638.

As part of their selection process for the Regional Manager position, Gold, Martin, and Kunz interviewed White and four other candidates: Stacy Hord, Brett Corrick, Carey Redd, and Maggie Freed ("Freed"). White was the only African-American and the only

[2] White's performance in the 2003 fiscal year was so strong that Clark, his supervisor at the time, wrote the following in White's November 25, 2003 field report:

> Todd I could not be happier with your results YTD. You currently rank # 2 on the contest YTD within the Teaching Center Specialists. That is terrific. I know that you will finish the year at # 1!!! You are well on your way to winning a trip once again! You are also on your way of [sic] becoming another DSC winner. J.A. at 627.

applicant with a masters degree. [3] Freed, on the other hand, was the only woman interviewed for the position, and the only applicant who had not previously been a Baxter sales representative. In addition to interviewing the candidates, Gold, Martin, and Kunz also reviewed their resumes and prior performance evaluations and spoke to their regional managers. After the interviews were complete, Gold, Martin, and Kunz each ranked the candidates on their own before proceeding to a group discussion of them. All three interviewers ranked White last among the applicants. By contrast, the interviewers all ranked Freed as the top candidate. Freed was subsequently promoted to the Regional Manager position.

In their depositions, **[**8]** Gold, Martin, and Kunz explained their reasons for ranking White and Freed in the manner that they did. While each interviewer described Freed as enthusiastic, well-prepared, and ready for management, none of them expressed a concern that Freed was the only candidate lacking experience as a Baxter sales representative. Kunz noted that Freed had some prior experience in hiring, training, and managing people. Gold likewise found Freed to be "a person who's **[*387]** extremely energetic, talking about the business in a positive way, talking about the company in a positive way, the great cheerleader for her people." J.A. at 641. Gold also noted that Freed "had done some homework" and "knew the personnel in that central north -- central Midwest region." *Id.* Finally, Gold indicated that he had been impressed by the fact that Freed "had a plan in place to try to move the business forward right out of the gate" with specific goals of where she needed to go in the next thirty, sixty, and ninety days. *Id.* Neither Gold, Martin, nor Kunz commented on Freed's lack of sales experience.

In contrast to Freed, the interviewers viewed White as "extremely aggressive." J.A. at 354. They also expressed concerns about **[**9]** his alleged lack of management experience. They observed that, in his evaluations, White "was not referred to as a team player." J.A. at 638. They further claimed that White interviewed poorly, purportedly coming across as "confrontational" and not **[***4]** focused on the bigger picture of how to "turn the region around" and "move the business forward." J.A. at 640. In particular, Gold noted that White had asked him "what have I [Gold] done to promote cultural diversity within the company," and explained that "I would have rather him told me what he was going to do, you know, what his plan was -- plan of action, where he thought this business was going to do [sic], what he thought he would do in the region to change things because he knew the situation." J.A. at 354.

In late September of 2004, White was informed that he had not received the Regional Manager position. A few months later, White received more bad news in the form of his 2004 performance evaluation.

As a Baxter employee, White was subject to both mid-year and year-end performance reviews. In these reviews, Baxter employees are evaluated in terms of "performance management objectives" ("PMO") and "success factors." Prior to 2004, **[**10]** the ACCO division issued only three types of ratings for its sales representatives: "Exceeds Expectations," "Meets Expectations," or "Does Not Meet Expectations." A representative rated as "Does Not Meet" generally could not receive a pay raise. In 2004, ACCO created, for the first time, the categories of "Meets Plus" and "Meets Minus." The creation of this latter category was designed to permit a sales representative who did not meet his or her sales goals to avoid a "Does Not Meet" rating, and thus still receive a pay raise, albeit a smaller one than would be available for achieving the "Meets," "Meets Plus," or "Exceeds" ratings. The parties dispute the manner in which Baxter company policy dictated how these 2004 ACCO ratings should have been determined.

According to White, a TCS's performance each year was to be evaluated pursuant to the relevant PMO Grid. This PMO Grid is a matrix which includes a list of all products sold by the ACCO division as well as the national averages of sales representatives' sales numbers for each of those products. The grid further specifies which percentage of sales for each product correlates to an "Exceeds," "Meets Plus," "Meets," "Meets Minus," **[**11]** or "Does Not Meet" rating. The 2004 PMO Grid, which was issued in November of 2004, set forth the following standards for evaluating an individual TCS's performance:

> **Exceeds** = Achievement of Suprane 100% plus 2 other categories meeting 100%. Some activity in PSA is necessary.
>
> **Meets** + = 100% in 3 of 4 categories
>
> **Meets** = 100% in 2 of 4 categories [one must be Suprane or Brevibloc]

[3] White earned a Masters in Business Administration ("MBA") from Central Michigan University in April of 1994.

**Meets** - = 100% in 2 of 4 categories

**[*388]** **Does not meet** = anything less

J.A. at 672. The 2004 PMO Grid also specified that "merit raise payouts" would be awarded on the following percentage basis:

Go to table1

J.A. at 673. White claims that his 2004 performance should have been evaluated according to these standards.

**[***5]** Baxter, however, suggests that in addition to considering the 2004 PMO Grid, regional managers were required to consider the directions given by Gold in an e-mail (the "Gold E-Mail") sent on October 22, 2004. This e-mail was directed to all Baxter Regional Managers, including Phillips, and stated:

> After careful review of the Suprane numbers and percent to plan the following reps leave a lot to be desired regarding their Suprane sales number this year. The six reps combined **[**12]** are 89% to plan with Suprane through August 2004. In addition four of the reps are down for the month off their YTD number. Needless to say, this is not a good situation. . . . Our Area cannot afford to keep individuals in a territory who cannot get close to plan on our # 1 detailed product. The reps are as follows:
>
> * * *
>
> Todd White
>
> * * *
>
> Our Area is 99% to plan as a team. As a group these reps are 10 percentage points below that and are killing our Suprane numbers. If these reps cannot bring their numbers up to a minimum of 95% to plan by years [sic] end than [sic] they will receive a DOES NOT MEET on their PMO, receive a "0" and be placed on a PIP [Performance Improvement Plan].

J.A. at 657.

During 2004, White sold four Baxter proprietary products: Suprane, an inhalation agent used for general anesthesia; Brevibloc, a beta-blocker used to help control a patient's heart rate; the Transdermal Delivery System ("TDS"), a drug delivery vehicle which enables rapid absorption of drugs; and the Patient State Analyzer ("PSA"), a device which assesses the response of patients during the admission of anesthesia. White's year-end sales numbers were as follows: Suprane, 92%; Brevibloc, 105%; TDS, 101%; **[**13]** and PSA, unknown. Based on his performance, White claims that he was entitled to a "Meets" evaluation under the 2004 PMO Grid. However, Phillips, as White's supervisor for the 2004 fiscal year, was responsible for evaluating his annual performance. In his year-end performance evaluation of White, which was completed in early 2005, Phillips issued White an overall rating of "Meets Minus" and offered the following explanation:

> Based on Todd's quantitative results, Todd has achieved a rating of "Does Not Meet". However, due to Todd"s [sic] diligence and commitment to the business that has been demonstrated by his focus on Suprane and his consistent work in the Region, I have moved this rating to a Meets(-). This has been a tough and challenging year for Todd White. Todd has had to fight for everything he achieved this year. It is my expectation that Todd will turn his business around in 2005. In 2005, I will expect that all special Marketing programs will be utilized in the designated time frame. In addition, at Mid-year 2005, I will expect that Todd is achieving budget in 2 of 4 categories, one of them being Suprane. Otherwise further corrective action may **[*389]** be needed. Todd has overachieved **[**14]** in the past so I know he is capable with a dedication of more focus on his Baxter ACC franchise.

J.A. at 670. As a result of this "Meets Minus" evaluation, White did receive a pay raise in 2004. This salary increase was not as high as it would have been if White had received a "Meets" evaluation.

**[***6]** Shortly after receiving his 2004 performance evaluation, White filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). On February 3, 2005, the EEOC issued White a Right-To-Sue letter. White then filed the present action against Baxter in the United States District Court for the Eastern District of Michigan, alleging that Baxter had discriminated against him on the basis of his race in violation of Title VII, *42 U.S.C. § 2000e et seq.*, Section 101 of the Civil Rights Act of 1991, *42 U.S.C. § 1981*, and Michigan's Elliot-Larsen Act, *Mich. Comp. Laws § 37.2101 et seq.* In particular, White alleged that Baxter had discriminated against him by: (1) failing to promote him to a number of different positions, including the ACCO Midwest Regional Manager position; (2) denying him company benefits such as an interviewing skills class and stock options; and (3) downgrading his 2004 **[**15]** performance review. In his complaint, White also stated a claim of gender discrimination pursuant to Title

VII and the Elliot-Larsen Act.

On March 31, 2006, Baxter filed a motion for summary judgment on all of White's claims. The district court then referred the case to a magistrate judge, who recommended that Baxter's motion be granted in its entirety. White filed objections to the magistrate judge's report and recommendations. However, on April 16, 2007, after conducting a *de novo* review of the record in light of White's objections, the district court adopted the magistrate judge's report and recommendations in full, granted Baxter's motion for summary judgment, and dismissed the case. *See* White v. Baxter Healthcare Corp., No. 05-71201, 2007 U.S. Dist. LEXIS 27814, 2007 WL 1119881 (E.D. Mich. Apr. 16, 2007).

On May 14, 2007, White filed this timely appeal. On appeal, White has abandoned his gender discrimination claim. He has likewise limited his race discrimination claim to challenging (1) Baxter's failure to promote him to the ACCO Midwest Regional Manager Position, and (2) his "Meets Minus" 2004 performance review.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo.* Mutchler v. Dunlap Memorial Hospital, 485 F.3d 854, 857 (6th Cir. 2007). **[**16]** Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting First Nat. Bank of Arizona v. Cities Servs. Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)).

At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine **[*390]** issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its initial burden by showing "that **[**17]** there is an absence of evidence to support the nonmoving party's case." Id. at 325. When the moving party has carried forward this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.; accord* Fed. R. Civ. P. 56(e)(2).

After the parties have presented the evidence, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In evaluating the evidence, the court must draw all inferences **[***7]** in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587. However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the" non-moving party. Anderson, 477 U.S. at 252.

## III. DISCUSSION

White challenges **[**18]** the district court's dismissal of two distinct race discrimination claims. First, White disputes the grant of summary judgment to Baxter on his claim that Baxter failed to promote him to the ACCO Midwest Regional Manager position on account of his race. Second, White contests the district court's conclusion that he has produced insufficient evidence to show that his race was a motivating factor in Phillips' decision to downgrade his 2004 performance evaluation. We consider each of these arguments in turn.

### A. Failure to Promote Claim

White first alleges that Baxter violated Title VII by failing to promote him on account of his race. White brings this cpallenge pursuant to Title VII's general anti-discrimination provision, 42 U.S.C. § 2000e-2(a)(1), [4] 42

[4] White has presented his failure to promote claim as a single-motive discrimination claim brought pursuant only to 42 U.S.C. § 2000e-2(a)(1). Thus, we do not analyze his claim under the

U.S.C. § 1981, and Michigan's Elliot-Larsen Act. Title VII's antidiscrimination provision makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1)*. Similarly, *§ 1981* guarantees that "[a]ll persons within the **[**19]** jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." *42 U.S.C. § 1981*. Likewise, *§ 202 of the Elliot-Larsen Act* provides that "[a]n employer shall not . . . [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment compensation, **[*391]** or a term, condition or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." *Mich. Comp. Laws § 37.2202(1)(a)*.

Absent direct evidence of discrimination, [5] claims brought pursuant to Title VII's antidiscrimination provision, *§ 1981*, and the Elliot-Larsen Act are subject to the tripartite **[**20]** burden-shifting framework first announced by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, and subsequently modified in *Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*. *See, e.g., Lindsay v. Yates, 498 F.3d 434, 440 n.7 (6th Cir. 2007)* ("The *McDonnell Douglas / Burdine* framework applies only when discrimination plaintiffs rely on circumstantial evidence to prove their claims."); *Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999)* ("We **[***8]** review claims of alleged race discrimination brought under *§ 1981* and the Elliot-Larsen Act under the same standards as claims of race discrimination brought under Title VII."). Under this framework, the plaintiff bears the initial "not onerous" burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Burdine, 450 U.S. at 253*. To establish a *prima facie* case of employment discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected **[**21]** employees. *Arendale v. City of Memphis, 519 F.3d 587, 603 (6th Cir. 2008)*; *accord Clay v. United Parcel Serv., Inc., 501 F.3d 695, 703 (6th Cir. 2007)*; *see also Lind v. City of Battle Creek, 470 Mich. 230, 681 N.W.2d 334, 338 (Mich. 2004)* (confirming that the *McDonnell Douglas* test for a *prima facie* case applies to claims brought pursuant to the Elliot-Larsen Act); *Hazle v. Ford Motor Co., 464 Mich. 456, 628 N.W.2d 515, 521 (Mich. 2001)* (same); *Lytle v. Malady, 458 Mich. 153, 579 N.W.2d 906, 914 & n.19 (Mich. 1998)* (describing the fourth part of the *prima facie* case as requiring the plaintiff to show that he "was discharged under circumstances that give rise to an inference of unlawful discrimination," but explaining that "[t]his four part test is an adaptation of the United States Supreme Court's *McDonnell Douglas* test to prove a prima facie case of discrimination"). Once the plaintiff establishes this *prima facie* case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Burdine, 450 U.S. at 253*; *McDonnell Douglas, 411 U.S. at 802*. Finally, if the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's **[**22]** proffered reason was not its true reason, but merely a pretext **[*392]** for discrimination. *Burdine, 450 U.S. at 253*; *see Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1083 (6th Cir. 1994)* ("[O]nce the employer has come forward with a nondiscriminatory reason for [its actions] the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation."). Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *See Burdine, 450 U.S. at 256*.

---

unique mixed-motive summary judgment analysis that is appropriate for claims brought pursuant to *42 U.S.C. § 2000e-2(m)*. *See infra* section III.B.

[5] In general, a Title VII plaintiff may establish a case of unlawful discrimination through either direct or circumstantial evidence. We have explained the difference between these two types of evidence as follows:

> Direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999)*. Circumstantial evidence, on the other hand, is proof that does not on its face **[**23]** establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred. *Kline [v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997)]*.

*Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003)* (en banc).

In the instant case, Baxter has conceded that White has established a *prima facie* case of race discrimination. *See* White, 2007 U.S. Dist. LEXIS 27814, 2007 WL 1119881, at *14 ("The parties appear to agree that Plaintiff is able to satisfy his *prima facie* case."); J.A. at 81-82 (Defendant Baxter Healthcare Corporation's Memorandum of Law on Its Motion for Summary Judgment) (failing to argue that White has not established his *prima facie* case and instead arguing that White cannot demonstrate pretext); Def. Br. at 22-24 (same). In response, however, Baxter offers an allegedly non-discriminatory reason for its promotion of Freed instead of White to the ACCO Midwest Regional Manager position:

> Baxter selected Freed instead of White because, as Sales Training Manager, Freed had managed direct reports, had dotted-line managerial experience with respect to a very large group of field sales trainers, and performed a large amount of training; she had worked **[**24]** in human resources and performed management and leadership training; she was well-prepared for the interview with specific objectives for turning around the region, and was enthusiastic and demonstrated confidence and a high energy level during her interview. Indeed, as Sales Training Manager, Freed hired, trained, and managed the sales training efforts of 14 to 16 national field trainers for both pharmaceuticals and devices, managed two direct reports, and had developed and implemented training programs. During the course of her employment, she won three trips for sales, and was rated "exceeds expectations" for several years. White lacked this managerial experience and did not interview well: in the view of the interviewers, he was "in-your-face" aggressive, demonstrated an inflexible management style, and did not present a persuasive plan for turning around the region.

Def. Br. at 22-23 (citations to record omitted).

**[***9]** We consider this proffered explanation for the failure to promote White to be facially legitimate and non-discriminatory. Baxter's alleged reason for its promotion decision is "clear and reasonably specific," Burdine, 450 U.S. at 258, and is arguably supported by "admissible **[**25]** evidence which would allow the trier of fact rationally to conclude that the employment decision [was] not motivated by discriminatory animus," id. at 257. Thus, we turn to the final part of the *McDonnell Douglas / Burdine* analysis: White's showing of pretext. Baxter contends, and the district court found, that White has failed to produce sufficient evidence to convince a jury that Baxter's explanation of its reason for not promoting White was merely prextextual. We disagree.

Pretext may be established "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. **[*393]** A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. *See* Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 545 (6th Cir. 2008) (citing Manzer, 29 F.3d at 1084). However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness **[**26]** of the employer's decision "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." [6] Wexler v. White's Fine Furniture,

[6] Contrary to what Judge Gilman maintains, our Circuit has never adopted a "business-judgment rule" which requires us to defer to the employer's "reasonable business judgment" in Title VII cases. Dissenting Op. at 23-24. Indeed, in most Title VII cases the very issue in dispute is whether the employer's adverse employment decision resulted from an objectively unreasonable business judgment, *i.e.,* a judgment that was based upon an impermissible consideration such as the adversely-affected employee's race, gender, religion, or national origin. In determining whether the plaintiff has produced enough evidence to cast doubt upon the employer's explanation for its decision, we cannot, as Judge Gilman does, unquestionably accept the employer's own self-serving claim that the decision resulted from an exercise of "reasonable business judgment." Dissenting Op. at 24. Nor can we decide "as a matter of law" that "an employer's proffered justification is reasonable." Dissenting Op. at 24. The question of whether the employer's judgment was **[**28]** reasonable or was instead motivated by improper considerations is for the *jury* to consider. Our role is merely to assess whether the plaintiff has presented enough evidence for a reasonable jury to accept the plaintiff's claim that the employer made an unlawful business decision. *See* Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

One way in which the plaintiff may raise doubts about the lawfulness of the employer's business decision is by suggesting that the decision itself was unreasonable. Thus, in *Smith v. Chrysler Corp.,* we expressly found that an employee

Inc., 317 F.3d 564, 578 (6th Cir. 2003) (en banc); *see also* Burdine, 450 U.S. at 259 ("The fact that a court may think that the employer misjudged the qualifications of applicants does not in itself expose him to Title VII liability, *although this may be probative of whether the employer's reasons are pretexts for discrimination."* (emphasis added)); Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n.6 (1st Cir. 1979) ("The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose as a pretext, if indeed it is one."). As the D.C. Circuit has aptly observed:

> **[***10]** If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate -- something employers do not usually **[**27]** do, unless some other strong consideration, such as discrimination, enters into the picture.

**[*394]** Aka v. Washington Hosp. Ctr., 332 U.S. App. D.C. 256, 156 F.3d 1284, 1294 (D.C. Cir. 1998).

In the instant case, we find that White has produced enough evidence for a reasonable jury to infer that Baxter's proffered explanation for its hiring decision may be merely a pretext for unlawful discrimination. In particular, we find that the evidence presented could lead a jury to doubt the reasonableness of Baxter's decision to hire Freed instead of White, and thereby to infer that some other impermissible motivation -- such as White's race -- guided the employment decision.

The record undisputedly demonstrates that White possessed some qualifications for managerial work which Freed did not. For example, White was the only applicant for the ACCO Regional Manager position who had gone to graduate school to earn an MBA. Likewise, in stark contrast to Freed, White had several years of experience as an ACCO sales representative and TCS. During these years, White was consistently rated as a high performer **[**30]** and had the opportunity to become very familiar with all of the products sold by the division as well as the challenges faced in selling such products. Finally, White had significant prior sales management experience from a job at Johnson & Johnson, Inc. ("Johnson & Johnson") where he "[m]anaged five sales representatives . . . [p]articipated in initial sales training, conducted district meetings, and [was] responsible for recruitment and interviewing." J.A. at 505.

We find that this evidence of White's arguably superior qualifications for the ACCO regional manager position, in and of itself, could lead a jury to doubt the justifications given for Baxter's hiring decision. At minimum, White has created a genuine issue of material fact concerning the reasonableness of Baxter's decision. Indeed, Baxter itself concedes that "White certainly had several positive aspects to his candidacy, and [that] Freed would have presented an even stronger candidacy if she had experience selling Baxter pharmaceutical products." Def. Br. at 24 n.11. Nevertheless, Baxter argues that it was appropriate for all three interviewers to rank White last among the candidates, and thus eventually deny him the promotion, **[**31]** because of his allegedly poor performance during the interview and because of Freed's allegedly more extensive managerial experience.

Yet, viewing the record in the light most favorable to White, as we must, [7] we find that a jury could reasonably disbelieve both of these proffered explanations. First, any evaluation of White's interview performance is an inherently subjective determination,

---

may demonstrate that the employer's proffered explanation for its decision is a mere pretext for discrimination by showing that "the employer failed to make a reasonably informed and considered business decision, thereby making its decisional process 'unworthy of credence.'" 155 F.3d 799, 807-808 (6th Cir. 1998). Likewise, in *Wexler,* we confirmed that "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light **[**29]** on whether the employer's proffered reason for the employment action was its actual motivation." 317 F.3d at 578. Inasmuch as Judge Gilman reads this precedent as creating an employer-deferent "business-judgment rule," it is he, not us, who is misconstruing the law. Dissenting Op. at 23.

[7] Unlike Judge Gilman, whose analysis seeks to minimize White's objective qualifications for the Regional Manager position while bolstering the subjective views of the Baxter decision-makers, *see* Dissenting Op. at 22-23, we do not waste judicial resources in crafting a reading of the evidence that is most favorable to the defendant-employer and most hostile to the plaintiff-employee. Rather, we follow the Supreme Court's command to view "the inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion" for summary judgment. Matsushita, 475 U.S. at 587 (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)).

and thus easily susceptible to manipulation in order to mask the interviewer's true reasons for making the promotion decision. Indeed, since the very issue in dispute is whether the reasons given by these interviewers for their decision should be believed, it would be highly inappropriate for us to assume, as Judge Gilman does, that their own subjective perceptions of White were accurate. Moreover, **[*395]** we find Gold, Martin, and Kunz's statements indicating that White came across as aggressive and lacking in management vision to be self-serving and conclusory. The only factually based explanation of why White might have appeared aggressive to the interviewers comes from Gold, who recounts how he **[***11]** was disturbed by White's questions about Baxter's lack of workforce diversity, particularly within its management **[**32]** positions. However, in light of White's overall claim that he was discriminated against on the basis of his race, we believe that a reasonable juror could find suspect White's interviewers' perception of such a question as "aggressive."

Second, Baxter's claim that Freed possessed significantly more experience than White appears overblown. Again, it is notable that Freed had no prior experience as a Baxter sales representative and, in all likelihood, was less familiar than was White with the specific challenges faced **[**33]** by the ACCO division in promoting Baxter's products. While the record does reflect that Freed had some prior management experience in Baxter's Medication Delivery division, the record does not support Baxter's self-serving contention that this management experience was significantly more extensive than White's own prior sales management experience at Johnson & Johnson. Moreover, during her interview, Freed admitted that she had previously found it difficult to confront subordinates while in a managerial role. In particular, Freed described an incident in which she feared confronting a Baxter employee about his chronic tardiness. We find that a juror considering such evidence could reasonably conclude that Baxter's claim that Freed was more qualified than White for the ACCO Regional Manager position is not based in fact.

In sum, we find that White has offered sufficient evidence to suggest that Baxter's purported reason for not promoting him -- namely, Freed's better qualifications for the Regional Manager position -- has no basis in fact, did not actually motivate Baxter's decision, or is not sufficient to explain its hiring choice. *See* Imwalle, 515 F3d at 545. Accordingly, we hold **[**34]** that White has met his McDonnell Douglas / Burdine burden of producing enough evidence to convince a reasonable jury that Baxter's proffered reasons for not promoting him may have been a mere pretext for racial discrimination, and thus, Baxter is not entitled to summary judgment on White's failure to promote claim.

### B. Downgraded Performance Evaluation Claim

In his second claim, White alleges that Baxter violated Title VII by intentionally downgrading his 2004 performance evaluation because White is an African-American. In particular, White claims that Phillips' decision to give him a "Meets Minus" rating, as opposed to the "Meets" rating to which White claims he was entitled, was motivated, at least in part, by White's race. In other words, White challenges his allegedly downgraded performance evaluation under a mixed-motive theory pursuant to 42 U.S.C. § 2000e-2(m). This section of Title VII permits a plaintiff to show that the defendant has engaged in an unlawful employment practice by "demonstrat[ing] that race, color, religion, sex, or national origin was a motivating factor for [the] employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

White **[**35]** supports his mixed-motive claim with circumstantial, rather than direct, evidence. Our Circuit, however, has not yet determined the proper summary judgment framework to apply to a Title VII mixed-motive claim supported by circumstantial **[*396]** evidence. [8] *See* Tysinger v. Police Dept. of City of Zanesville, 463

---

[8] In **[**36]** the case of a mixed-motive claim supported by direct evidence of discrimination, the summary judgment analysis is rather simple. To survive a defendant's summary judgment motion, the plaintiff must have produced "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" Desert Palace, Inc. v. Costa, 539 U.S. 90, 101, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003) (quoting 42 U.S.C. § 2000e-2(m)). However, in the case of a mixed-motive claim supported by circumstantial evidence of an employer's discriminatory motive, the question arises whether we should apply the *McDonnell Douglas / Burdine* burden-shifting framework which we use to analyze single-motive Title VII claims supported by circumstantial evidence. *See* Wright v. Murray Guard, Inc., 455 F.3d 702, 712 (6th Cir. 2006) ("[N]ow that such mixed-motive claims can be brought based on circumstantial evidence, the question arises as to the effect of *Desert Palace* on the analysis of mixed-motive claims at the summary judgment stage.").

F.3d 569, 578 (6th Cir. 2006) (refusing to decide "whether the evidence **[***12]** [in a Title VII mixed-motive case] is evaluated in terms of *prima facie* case elements, pretext requirements, or a mixed-motive analysis apart from the *McDonnell Douglas* framework" because "[u]nder any of these constructs, [the plaintiff]'s evidence clearly falls short of creating a genuine issue of material fact"); *Wright v. Murray Guard, Inc., 455 F.3d 702, 713 n.4 (6th Cir. 2006)* ("Because . . . the facts of the instant case do not require resolution of the question, we refrain today from announcing a new or modified framework for evaluation of mixed-motive claims at the summary judgment stage."). Accordingly, we must begin our discussion of White's downgraded performance evaluation claim with a consideration of the appropriate summary judgment framework to apply to mixed-motive claims brought pursuant to *42 U.S.C. § 2000e-2(m)*.

### 1. Summary Judgment Framework for Title VII Mixed-Motive Claims

Since 1964, Title VII has made it an "unlawful **[**37]** employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1)*. Discrimination claims brought pursuant to this section are traditionally categorized as either single-motive claims, *i.e.,* where an illegitimate reason motivated an employment decision, or mixed-motive claims, *i.e.,* where both legitimate and illegitimate reasons motivated the employer's decision. *Wright, 455 F.3d at 711*. This distinction was first recognized by the Supreme Court in *Price Waterhouse v. Hopkins,* when it considered the issue of whether an employment decision is made "because of" a protected characteristic in a "mixed-motive" case. *490 U.S. 228, 240, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)*. A divided Court found that, while Title VII prohibits an employer from taking a protected characteristic into account at all when making an employment decision, an employer could avoid liability under the statute by demonstrating that it would have made the same employment decision even if it had not taken into account the protected characteristic. *See* ***[**38]*** *id. at 242* (plurality opinion).

In response to the *Price Waterhouse* decision and other Title VII decisions, Congress passed the Civil Rights Act of 1991. *See Landgraf v. USI Film Products, 511 U.S. 244, 250, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994)*. Among other things, section 107 of this act created an alternative method of demonstrating an unlawful employment practice:

> **[*397]** Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

*42 U.S.C. § 2000e-2(m)*. The purpose and effect of this section was "to eliminate the employer's ability to escape liability in Title VII mixed-motive cases by proving that it would have made the same decision in the absence of the discriminatory motivation." *Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004)* (en banc); *accord Wright, 455 F.3d at 711*. Under the statute, such proof only enables the employer to limit the remedies available to the plaintiff-employee for the Title VII violation. *See 42 U.S.C. § 2000e-5(g)(2)(B)* (prohibiting **[**39]** damages awards and allowing only the grant of declaratory relief, injunctive relief, and attorney's fees when the defendant-employer proves that it would have taken the same action in the absence of the impermissible motivating factor).

For the first decade after the enactment of *42 U.S.C. § 2000e-2(m)*, many federal courts required a Title VII plaintiff asserting a mixed-motive claim under this section to produce direct, as opposed to circumstantial, evidence that consideration of a protected characteristic was a motivating factor in the challenged employment decision. *See, e.g., Wexler, 317 F.3d at 571* ("Under this mixed-motive analysis, the plaintiff must produce *direct* evidence that the employer considered **[***13]** impermissible factors when it made the adverse employment decision at issue." (emphasis added) (citing *Price Waterhouse, 490 U.S. at 244-46*)); *Taylor v. Virginia Union Univ., 193 F.3d 219, 232 (4th Cir. 1999)* ("A plaintiff qualifies for the more advantageous standard of liability applicable in mixed-motive cases if the plaintiff presents 'direct evidence that decision makers placed substantial negative reliance on an illegitimate criterion.'" (citation omitted)). As mixed-motive **[**40]** plaintiffs were not allowed to demonstrate their claims through circumstantial evidence, these courts did not even consider whether such plaintiffs should be required to satisfy the *McDonnell Douglas / Burdine* burden shifting framework in order to reach a

jury. [9] *See* Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."); Wright, 455 F.3d at 716 (Moore, J., concurring) ("Our *pre-Desert Palace* view that direct evidence was required to establish a mixed-motive case, kept mixed-motive claims distinct from claims analyzed under the *McDonnell Douglas* framework, which was applied **[*398]** when the plaintiff relied on circumstantial evidence.").

In *Desert Place, Inc. v. Costa,* the Supreme Court altered this practice by finding that a plaintiff may prove a Title VII mixed-motive case by either direct or circumstantial evidence. 539 U.S. 90, 92, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). Relying on the plain text of 42 U.S.C. § 2000e-2(m), the Court held that in order to obtain a mixed-motive jury instruction, "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" Id. at 101 (quoting 42 U.S.C. § 2000e-2(m)). However, **[**42]** as the issue in *Desert Palace* concerned a jury-instruction challenge, the Court did not consider whether the *McDonnell Douglas / Burdine* burden-shifting framework should apply to the pretrial summary judgment analysis of mixed-motive discrimination claims based on circumstantial evidence in the same way that it applies to single-motive discrimination claims based on circumstantial evidence. *See* Tysinger, 463 F.3d at 577; Suits v. Heil, 192 F. App'x 399, 408 (6th Cir. 2006) (unpublished).

Since *Desert Palace,* the federal courts of appeals have, without much, if any, consideration of the issue, developed widely differing approaches to the question of how to analyze summary judgment challenges in Title VII mixed-motive cases. *See generally* Wright, 455 F.3d at 716-19 (Moore, J., concurring) (discussing and evaluating the responses of our sister circuits to the Supreme Court's decision in *Desert Palace*). The Eighth Circuit has explicitly held that the *McDonnell Douglas / Burdine* burden-shifting framework applies to the summary judgment analysis of mixed-motive claims after *Desert Palace. See* Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004) ("[W]e conclude that *Desert Palace* **[**43]** had *no* impact on prior Eighth Circuit summary judgment decisions."). The Eleventh Circuit seems to have joined the Eighth Circuit in this regard. *See* Burstein v. Emtel, Inc., 137 Fed. Appx. 205, 209 n.8 (11th Cir. 2005) (unpublished) (suggesting that the *McDonnell Douglas* analysis continues to apply in mixed-motive cases without modification *post-Desert Palace*); Cooper v. Southern Co., 390 F.3d 695, 725 n.17 (11th Cir. 2004) (rejecting an argument that "the *McDonnell Douglas* burden-shifting analysis . . . was radically revised by the **[***14]** Supreme Court in *Desert Palace"* and noting that "after *Desert Palace* was decided, this Court has continued to apply the *McDonnell Douglas* analysis in non-mixed-motive cases").

The Fifth Circuit, in contrast, has adopted a "modified *McDonnell Douglas"* approach, under which a plaintiff in a mixed-motive case can rebut the defendant's legitimate non-discriminatory reason not only through evidence of pretext (the traditional *McDonnell Douglas / Burdine* burden), but also with evidence that the defendant's proffered reason is only one of the reasons for its conduct (the mixed-motive alternative). *See* Machinchick v. PB Power, Inc., 398 F.3d 345, 352 (5th Cir. 2005); **[**44]** Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004).

Adopting a sort of middle ground between these two positions are the Fourth and Ninth Circuits which permit a mixed-motive plaintiff to avoid a defendant's motion for summary judgment by proceeding either under the "pretext framework" of the traditional *McDonnell Douglas / Burdine* analysis or by "presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such

---

[9] As already noted, *see supra* section III.A, under the *McDonnell Douglas / Burdine* framework, a Title VII plaintiff seeking to prove a claim of single-motive discrimination by means of circumstantial evidence must survive a series of shifting burdens of production:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima* ***[**41]*** *facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Burdine, 450 U.S. at 252. In order to survive a defendant's motion for summary judgment, the single-motive Title VII plaintiff must produce sufficient evidence to overcome these burdens of production.

as race motivated **[*399]** [, at least in part,] the adverse employment decision." *Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005)*; *see Hill, 354 F.3d at 284-85*; *McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122 (9th Cir. 2004)* (finding that a mixed-motive plaintiff "may proceed using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the employment decision). The D.C. Circuit appears to have recently joined this middle ground approach. *See Fogg v. Gonzales, 377 U.S. App. D.C. 148, 492 F.3d 447, 451 & n* (D.C. Cir. 2007)* (indicating that "a plaintiff can establish an unlawful **[**45]** employment practice by showing that 'discrimination or retaliation played a "motivating part" or was a "substantial factor" in the employment decision'" but noting that a "plaintiff may also, of course, use evidence of pretext and the *McDonnell Douglas* framework to prove a mixed-motive case").

Failing to adopt any of these views, the First, Third, and Tenth Circuits have refrained from deciding whether the *McDonnell Douglas* framework applies to mixed-motive claims. *See Houser v. Carpenter Tech. Corp., 216 F. App'x 263, 265 (3d Cir. 2007)* (unpublished) (refusing to decide the issue because the plaintiff had failed to produce sufficient evidence to survive summary judgment under any mixed-motive standard); *Furaus v. Citadel Communs. Corp., 168 Fed. Appx. 257, 260 (10th Cir. 2006)* (unpublished) (refusing to decide the issue because the plaintiff failed to properly preserve the argument for appeal); *Rodriguez v. Sears Roebuck de Puerto Rico, Inc., 432 F.3d 379, 380-81 (1st Cir. 2005)*; *Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 31 (1st Cir. 2003)*. Finally, the Second and Seventh Circuits appear not to have even considered this issue.

Our Circuit, like the First, Third, and Tenth Circuits, **[**46]** has yet to resolve the question of the appropriate framework to apply to Title VII mixed-motive claims at the summary judgment stage despite having been presented with the issue in five (two published, three unpublished) prior cases. *See Tysinger, 463 F.3d at 578* (finding it unnecessary to consider whether the *McDonnell Douglas* framework still applies in analyzing mixed-motive summary judgment challenges because the plaintiff's evidence failed to create a genuine issue of material fact on the question of whether discriminatory animus was a motivating factor in the employment decision); *Wright, 455 F.3d at 712-13* (same); *Suits, 192 F. App'x at 408* (finding that "whatever the import of *Desert Palace* . . . [m]ixed motive analysis cannot apply here because plaintiff has failed to come forward with evidence from which a trier of fact could find that discrimination was even partly a motivation for her termination"); *Aquino v. Honda of America, Inc., 158 F. App'x 667, 674-76 (6th Cir. 2005)* (unpublished) (failing to address the impact of *Desert Palace* on Title VII claims, but holding that *"Desert Palace* does not modify *McDonnell Douglas* in employment discrimination lawsuits filed under *§ 1981*"); **[**47]** *Harris v. Giant Eagle, Inc., 133 F. App'x 288, 297 (6th Cir. 2005)* (unpublished) (finding it unnecessary to address "the question of whether the *McDonnell Douglas* burden-shifting framework should be modified in the wake of *Desert Palace"* because the plaintiff had not set forth **[***15]** sufficient evidence from which a jury could reasonably infer that race was a motivating factor in the employment decision). *But see Wright, 455 F.3d at 720-21* (Moore, J., concurring) (proposing that we resolve the issue by finding that the *McDonnell Douglas* framework does not apply to mixed-motive claims based on circumstantial evidence).

**[*400]** This case now presents us with the opportunity to finally clarify how Title VII mixed-motive claims should be analyzed at the summary judgment stage. We do so by holding that the *McDonnell Douglas / Burdine* burden-shifting framework does *not* apply to the summary judgment analysis of Title VII mixed-motive claims. [10] We likewise hold that to survive a defendant's motion for summary judgment, a Title VII plaintiff

---

[10] However, as is clear from section III.A of this opinion, the *McDonnell Douglas / Burdine* framework continues to guide our summary judgment analysis of single-motive discrimination claims brought pursuant only to Title VII's general anti-discrimination provision, *42 U.S.C. § 2000e-2(a)(1)*, and not pursuant to *42 U.S.C. § 2000e-2(m)*. We decline to adopt the view, proposed by some courts and commentators, that the *McDonnell Douglas / Burdine* framework has ceased to exist entirely following *Desert Palace. See, e.g., Dare v. Wal-Mart Stores, Inc., 267 F. Supp.2d 987 (D. Minn. 2003)*; Jeffrey A. Van Detta, *"Le Roi est Mort; Vive le Roi! ": An Essay on the Quiet Demise of* McDonnell Douglas *and the Transformation of Every Title VII Case After* Desert Palace, Inc. v. Costa *Into a "Mixed-Motives" Case*, *52 DRAKE L. REV. 71 (2003)*; William R. Corbett, McDonnell Douglas, *1973-2003: May You Rest In Peace?*, *6 U. PA. J. LAB. & EMP. L. 199 (2003)*. Indeed, post-*Desert Palace,* the Supreme Court has continued to apply the *McDonnell Douglas / Burdine* analysis to summary judgment challenges **[**50]** in single-motive Title VII cases. *See Raytheon Co. v. Hernandez, 540 U.S. 44, 53-54, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003)*.

asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; **[**48]** and (2) "race, color, religion, sex, or national origin was *a* motivating factor" for the defendant's adverse employment action. *42 U.S.C. § 2000e-2(m)* (emphasis added). *See Wright, 455 F.3d at 716* (Moore, J., concurring) ("[A]n employee raising a mixed-motive claim can defeat an employer's motion for summary judgment by presenting evidence -- either direct or circumstantial -- to 'demonstrate' that a protected characteristic 'was a *motivating factor* for an employment practice, even though other factors also motivated the practice.'" (quoting *42 U.S.C. § 2000e-2(m)*)). This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim. *See Anderson, 477 U.S. at 252*. Moreover, as it is irrelevant, for purposes of a summary judgment determination, whether the plaintiff has presented direct or circumstantial evidence in support of the mixed-motive claim, *see Desert Palace, 539 U.S. at 99-100*, we direct that this summary judgment analysis just described, rather than the *McDonnell Douglas / Burdine* burden-shifting **[**49]** framework, be applied in all Title VII mixed-motive cases regardless of the type of proof presented by the plaintiff.

Our refusal to extend the application of the *McDonnell Douglas / Burdine* framework to our summary judgment analysis of Title VII mixed-motive claims is based upon a careful consideration of the Supreme Court's opinions in those cases. In *Burdine,* the Court explained that the purpose of the *"McDonnell Douglas* division of intermediate evidentiary burdens" is "to bring litigants and the court expeditiously and fairly to [the] ultimate question" of whether the defendant intentionally discriminated against the plaintiff. *Burdine, 450 U.S. at 253*. In single-motive Title VII cases, the *McDonnell Douglas* shifting burdens of production effectively accomplish this task by "smok[ing] out the single, ultimate reason for the adverse employment decision." *Wright, 455 F.3d at 720* (Moore, J, concurring). In particular, the *prima facie* case **[*401]** requirement "eliminates the most common nondiscriminatory reasons for" the adverse employment action, and thus creates a presumption that the adverse employment action was not motivated by legitimate reasons, but rather by a discriminatory animus. *Burdine, 450 U.S. at 254*. **[**51]** Likewise, the pretext requirement is designed to test whether the defendant's allegedly legitimate reason was the real motivation for its actions. *Id. at 256*. Such a narrowing of the actual reasons for the adverse employment action is necessary to determine whether there is sufficient evidence to proceed to trial in a single-motive discrimination case because the plaintiff in such a case must prove that the defendant's **[***16]** discriminatory animus, and not some legitimate business concern, was the ultimate reason for the adverse employment action. *See id.*

However, this elimination of possible legitimate reasons for the defendant's action is not needed when assessing whether trial is warranted in the mixed-motive context. In mixed-motive cases, a plaintiff can win simply by showing that the defendant's consideration of a protected characteristic "was *a* motivating factor for any employment practice, *even though other factors also motivated the practice.*" *42 U.S.C. § 2000e-2(m)* (emphasis added). In order to reach a jury, the plaintiff is not required to eliminate or rebut all the possible legitimate motivations of the defendant as long as the plaintiff can demonstrate that an illegitimate discriminatory **[**52]** animus factored into the defendant's decision to take the adverse employment action. As the shifting burdens of *McDonnell Douglas* and *Burdine* are unnecessary to assist a court in determining whether the plaintiff has produced sufficient evidence to convince a jury of the presence of at least one illegitimate motivation on the part of the defendant, we conclude that the *McDonnell Douglas / Burdine* framework does not apply to our summary judgment analysis of mixed-motive claims. The only question that a court need ask in determining whether the plaintiff is entitled to submit his claim to a jury in such cases is whether the plaintiff has presented "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for'" the defendant's adverse employment decision. *Desert Palace, 539 U.S. at 101* (quoting *42 U.S.C. § 2000e-2(m)*).

A Title VII plaintiff may certainly find parts of the *McDonnell Douglas / Burdine* framework to be useful in presenting a mixed-motive claim. As Judge Moore has aptly noted:

> Although the employee need not establish a *McDonnell Douglas* prima facie case to defeat a **[**53]** motion for summary judgment on a mixed-motive claim, setting forth a prima facie case of discrimination under *McDonnell Douglas* can aid the employee in showing that an illegitimate reason

> motivated the adverse employment decision. [Likewise, in] assessing whether an employee has demonstrated that an illegitimate reason was a motivating factor in the employer's adverse decision, the court should also consider evidence presented by the employer that the protected characteristic was *not* a motivating factor for its employment decision.

*Wright, 455 F.3d at 720* (Moore, J., concurring). Nevertheless, we emphasize that compliance with the *McDonnell Douglas / Burdine* shifting burdens of production is *not* required in order to demonstrate that the defendant's adverse employment action was motivated in part by a consideration of the plaintiff's "race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(m)*. **[*402]** The ultimate question for the court in making a summary judgment determination in such a case is not whether the plaintiff has produced sufficient evidence to survive the *McDonnell Douglas / Burdine* shifting burdens, but rather whether there are any genuine issues of material fact **[**54]** concerning the defendant's motivation for its adverse employment decision, and, if none are present, whether the law -- *42 U.S.C. § 2000e-2(m)* -- supports a judgment in favor of the moving party on the basis of the undisputed facts. *See* *Fed. R. Civ. P. 56(c)*. As "[i]nquiries regarding what actually motivated an employer's decision are very fact intensive," such issues "will generally be difficult to determine at the summary judgment stage" and thus will typically require sending the case to the jury. *Wright, 455 F.3d at 721* (Moore, J., concurring) (citing *Singfield v. Akron Metro Hous. Auth., 389 F.3d 555, 564 (6th Cir. 2004))*.

**2. Application of the Mixed-Motive Summary Judgment Framework to White's Case**

Having determined the appropriate pretrial legal framework to apply to mixed-motive Title VII cases, we now proceed to consider whether Baxter is entitled to summary judgment on White's **[***17]** downgraded performance evaluation claim. To survive Baxter's motion for summary judgment, White must be able to point to evidence in the record on which a jury could reasonably conclude that (1) Baxter's took an adverse employment action against White, for which (2) White's race was a motivating factor. **[**55]** Reviewing the record in the light most favorable to White, we find that White is able to meet this minimal burden of production, and thus that Baxter is not entitled to summary judgment.

**a. Adverse Employment Action**

As indicated in the above framework, in order to present a claim, either mixed-motive or single-motive, under Title VII, a plaintiff must demonstrate that he has suffered an "adverse employment action." *See* *White v. Burlington Northern & Santa Fe Ry., 364 F.3d 789, 795 (6th Cir. 2004)* (en banc), *aff'd in relevant part,* *548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)*. An adverse employment action is an action by the employer that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)*. In general, "a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary." *Tuttle v. Metropolitan Gov't of Nashville, 474 F.3d 307, 322 (6th Cir. 2007)*; *see also* *Holt v. Morgan, 79 F. App'x 139, 141 (6th Cir. 2003)* **[**56]** (unpublished); *Primes v. Reno, 190 F.3d 765, 767 (6th Cir. 1999)*; *Hollins v. Atlantic Co., Inc., 188 F.3d 652, 662 (6th Cir. 1999)*. Thus, to characterize a negative performance evaluation as an adverse employment action "the plaintiff must point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation." *Morris v. Oldham County Fiscal Court, 201 F.3d 784, 789 (6th Cir. 2000)*.

In the instant case, we find that White's allegedly downgraded performance evaluation constitutes an adverse employment action. While the performance evaluation is not nearly as negative as White's characterization of it suggests, we find that there is sufficient evidence in the record **[*403]** for a jury to reasonably conclude that White has suffered negative employment consequences as a result of the performance evaluation. In particular, the record indicates that by receiving a "Meets Minus" ranking, White did not receive as a high of a pay increase as he would have if he had received the "Meets" evaluation to which he claims he was entitled. Baxter's own 2004 PMO Grid clearly indicates that a TCS with a "Meets Minus" evaluation will receive only **[**57]** a two percent or less pay raise whereas a TCS with a "Meets" evaluation will receive a three percent pay raise. *See* J.A. at 673. Moreover, at his deposition, White testified that he did not receive as high of a pay raise as he should have for the 2004 fiscal year:

> Q: What are the financial consequences if you get a does not meet [on your performance evaluation]?

A: There's no increase [in your salary].
Q: And if you get a meets, what happens?
A: You get an increase.
Q: If you get a meets minus, what happens, do you get an increase?
A: I believe you get less of an increase that you would if it was a meets.
Q: Did you get an increase from 2004 --
A: I did get an increase.

**[***18]** Q: I'm sorry, you did?
A: I did, but not the increase if it would have been a meets outside those extenuating circumstances that affected my territory.

J.A. at 137. Viewing this evidence in the light most favorable to White suggests that, while White did receive an increase in his salary based upon his 2004 job performance, the increase was not as large as it would have been if White had received a better performance evaluation.

We find this evidence sufficient to convince a reasonable jury that White's allegedly downgraded performance **[**58]** evaluation caused him to suffer "a significant change in benefits." *Ellerth, 524 U.S. at 761*. By receiving a lower salary increase than he would have without the more negative evaluation, White was denied an increase in pay to which he allegedly was entitled. Under our precedent, such a deprivation of increased compensation does constitute an adverse employment action. *See Clay, 501 F.3d at 710* (holding that "deprivation of increased compensation as the result of a failure to train constitutes an adverse employment action"); *Jordan v. City of Cleveland, 464 F.3d 584, 596 (6th Cir. 2006)* ("[D]enial of money would more than amply qualify as a materially adverse action to any reasonable employee for Title VII purposes."); *Nguyen v. City of Cleveland, 229 F.3d 559, 565 (6th Cir. 2000)* (accepting that the denial of the proper pay increase with the plaintiff's promotion constituted an adverse employment action); *see also Fierros v. Texas Dept. of Health, 274 F.3d 187, 193 (5th Cir. 2001)* (finding that denial of a pay increase can constitute an adverse employment action). Thus, White's evidence does suggest that he has suffered a "tangible employment action" as a result of his downgraded **[**59]** performance evaluation. *Morris, 201 F.3d at 798*. At minimum, White has produced enough evidence to create a genuine issue of material fact regarding whether the downgraded performance evaluation in this case had an "adverse impact" on his receipt of "wages or salary." *Tuttle, 474 F.3d at 322*. Accordingly, we hold that White has produced sufficient evidence for a reasonable jury to conclude that he suffered an adverse employment action in the form of his downgraded 2004 performance evaluation.

**[*404] b. Race as a Motivating Factor**

The second issue we must consider with regard to Baxter's summary judgment motion is whether White has presented evidence from which a jury could reasonably infer that White's race was a motivating factor in the issuance of his downgraded 2004 performance evaluation. As Phillips was the Baxter supervisor responsible for evaluating White's 2004 performance, the question becomes whether there is sufficient evidence for a jury to conclude that Phillips' decision to give White a "Meets Minus" rating was motivated by the fact that White is an African-American. We find that White has satisfied his minimal burden of production on this issue.

At the outset, we note that White **[**60]** has produced sufficient evidence to suggest that Phillips harbors a discriminatory animus toward African-Americans. Indeed, the record reflects that Phillips has made several comments -- such as his statement that "nobody wants to be around a black man" -- that a jury could reasonably find to be indicative of racial bias. J.A. at 106. The more difficult question, however, is whether White has produced evidence from which a jury can logically infer that Phillips' racial animus was a motivating factor in his evaluation of White's 2004 job performance. White's evidence in support of such a conclusion stems from his claim that Phillips applied the wrong standard to evaluate his 2004 performance. White argues that he was entitled to have his performance evaluated under the 2004 PMO Grid, as opposed to the criteria in the Gold E-Mail, which Phillips claims he used to evaluate White's performance. White alleges that, while the 2004 PMO Grid was applied across the board to Baxter's other employees, the Gold E-Mail was exclusively applied to him. From Phillips' failure to apply the allegedly correct standard (the 2004 PMO Grid) and his decision to apply a harsher standard (the Gold E-Mail), **[**61]** White argues, a jury can reasonably infer that Phillips was motivated, at least in part, by racial animus when issuing White **[***19]** a "Meets Minus" rating. We agree with White that a jury could draw such an inference from the evidence presented.

White correctly contends that under the terms of the 2004 PMO Grid, which was issued in November of 2004, he was entitled to a "Meets" evaluation. This 2004

PMO Grid specifies that achievement of one hundred percent of the sales target in two of four products, one of which "must be Suprane *or* Brevibloc," equals a "Meets" rating. J.A. at 672 (emphasis added). In 2004, White's year end sales numbers were the following: Suprane, 92%; Brevibloc, 105%; TDS, 101%; and PSA, unknown. Thus, White did achieve over one hundred percent in two of four products, one of them being Brevibloc. Under the plain terms of the 2004 PMO Grid, White should have received a "Meets" evaluation. Accordingly, a jury could reasonably find Phillips' failure to issue such an evaluation suspect, and thus indicative of the presence of an improper motivation -- such as racial animus -- for the performance evaluation decision.

However, Baxter contends that the 2004 PMO Grid must be read **[**62]** in light of the Gold E-Mail which was circulated to all Regional Managers, including Phillips, on October 22, 2004. The Gold E-Mail emphasized the importance of increasing sales numbers for Suprane and directed that if certain sales representatives, including White, did not "bring their numbers up to a minimum of 95% to plan" by the end of the year then they would "receive a 'DOES NOT MEET' on their PMO, receive a '0' and be placed on a [Performance Improvement Plan]." Evaluated under this standard, as Baxter claims **[*405]** it should be, White's 2004 performance would have merited a "Does Not Meet" rating because White ended the year only ninety-two percent to plan on his Suprane sales.

Nevertheless, in response to Baxter's position, White has introduced evidence which might reasonably convince a jury that the 2004 PMO Grid, and not the Gold E-Mail, was the standard Phillips was supposed to use to evaluate the performance of Baxter sales representatives. First, White points to the testimony of Kunz, who explained that the PMQ Grid "matrix" is used to "produce a rating" for a sales representative's performance evaluation. [11] J.A. at 603. Next, White emphasizes that the 2004 PMO Grid was created **[**63]** after the Gold E-Mail and thus should be viewed as controlling. Finally, White provides examples of other Baxter employees whose performance appears to have been evaluated pursuant to the 2004 PMO Grid.

In particular, White points to the performance evaluations of Linda Assoey, Stacey **[**64]** Hord, Peter Moe, Theodore Quinn, Carey Redd, Lawrence Rome, and Melissa Slyvester, who were all supervised by regional managers other than Phillips. [12] Like White, each of these sales **[***20]** representatives achieved less than ninety-five percent of their Suprane goal. However, rather than being given a "Does Not Meet" rating for failing to achieve more than ninety-five percent of their Suprane goal, as would be required under the terms of the Gold E-Mail, these sales representatives received "Meets Minus" ratings. White correctly observes that, in each case, the "Meet Minus rating given was consistent with the 2004 PMO Grid. [13] Such

---

[11] The full context of the above-quoted language from Kunz's deposition is much more illustrative of the role the PMO Grid serves in performance evaluations:

> Q: I guess one thing I'm trying to determine is, does there ever come a time within these PMOs or otherwise where you set a hard and fast number, for instance, if sales representative Y doesn't achieve X percent of budget in a given product, that sales representative is going to receive a meets minus for a given year?
>
> A: Yes. As I said, what we do is put together basically a matrix or a guideline that includes all products based upon their specific goals and their rating and then specific territory would fall somewhere within that and as a result, *it would produce a rating.*

J.A. at 603 (emphasis added). Viewed in the light most favorable to White, this colloquy does suggest that the PMO Grid serves as the basis for a Baxter employee's performance rating.

[12] White also directs our attention to the performance evaluations of Stephen Morris ("Morris") and Theresa Thomas ("Thomas"), who, like White, were supervised by Phillips. Both Morris and Thomas received "Meets" evaluations for 2004. As White correctly notes, these evaluations were consistent with the 2004 PMO Grid because both Morris and Thomas had achieved over one hundred percent in two of the four product categories. **[**65]** However, unlike White, Morris and Thomas each achieved over one hundred percent for Suprane, with their other one hundred percent category being TDS. Thus, while the "Meets" ratings given to Morris and Thomas are consistent with an evaluation of their performance under the 2004 PMO Grid, these ratings are also consistent with an evaluation of their performance under the Gold E-Mail. Accordingly, we agree with Baxter, that Morris' and Thomas' evaluations do not necessarily imply that the 2004 PMO Grid, as opposed to the Gold E-Mail, was the standard actually used to evaluate other Baxter employees' performance.

[13] White also contends that the fact that he was given a "Meets Minus" rating as opposed to the "Does Not Meet" rating that would have been dictated by the Gold E-Mail further undermines Baxter's claim that the Gold E-Mail contained the standard which Baxter Regional Managers were supposed to apply. We are unpersuaded by this argument. A careful reading of Phillips' actual evaluation of White demonstrates

**[*406]** evidence reasonably suggests that the 2004 PMO Grid, rather than the Gold E-Mail, was the standard actually applied for these performance evaluations.

Considering all of this evidence in the light most favorable to White, as we must, we find that there is a genuine issue of fact concerning which standard -- the 2004 PMO Grid or the Gold E-Mail -- Phillips should have used to evaluate White's 2004 performance. If the jury were to conclude, as it reasonably could based on the evidence presented, that the 2004 PMO Grid was the appropriate standard, then it could legitimately infer from Phillips' failure to apply this correct standard that an impermissible factor -- namely White's race -- served as at least a partial motivation for his decision to issue White a "Meets Minus" performance evaluation. Thus, we find this disputed issue of fact to be material, and we hold that Baxter **[**67]** is not entitled to summary judgment on White's downgraded performance evaluation claim.

Because White has produced sufficient evidence for a reasonable jury to conclude in his favor on both his single-motive and mixed-motive race discrimination claims, we find that he is entitled to present these claims to a jury and accordingly remand the case to the district court for trial. As the issue of what damages White may be entitled to should he prevail on his claims at trial has not been briefed by the parties and is not presented in this summary judgment challenge, we express no view with regard to it. [14]

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is **REVERSED,** and the case is remanded to the district court with instructions to permit White to present his race discrimination claims to a jury.

**Concur by:** RONALD LEE GILMAN (In Part)

**Dissent by:** RONALD LEE GILMAN (In Part)

# Dissent

### [***21] CONCURRING IN PART AND DISSENTING IN PART

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part. I concur in the majority's conclusion that White has produced sufficient evidence to survive summary judgment on his performance-review claim and I agree with the majority's articulation of the appropriate standard for evaluating Title VII mixed-motive claims that are raised under *42 U.S.C. § 2000(e)-2(m)*. But I respectfully disagree with the majority opinion to the extent that it permits White's failure-to-promote claim to proceed to trial. In particular, I do not believe that White has raised a genuine issue of material fact as to whether Baxter's proffered reasons for promoting Freed instead of White were pretextual. I will first explain why I reach this conclusion with respect to White's failure-to-promote **[**69]** claim, and will then proceed **[*407]** to make several comments about the mixed-motive claim.

### A. Failure-to-promote claim

The majority acknowledges, and I agree, that (1) White established a prima facie case of race discrimination on his failure-to-promote claim, and (2) Baxter's proffered reason for failing to promote White (i.e., that Freed was more qualified and better suited to the position) is "facially legitimate and non-discriminatory." Maj. Op. at 8-9. I disagree, however, with the majority's conclusion that White sustained his burden of "produc[ing] sufficient evidence from which the jury may reasonably reject" Baxter's explanation for promoting Freed instead of

---

that Phillips was applying the standard enunciated in the Gold E-Mail, but that he chose to depart upward from it. *See* J.A. at 670 ("Based on Todd's quantitative results, Todd **[**66]** has achieved a rating of 'Does Not Meet'. However, due to Todd''s [sic] diligence and commitment to the business that has been demonstrated by his focus on Suprane and his consistent work in the Region, I have moved this rating to a Meets(-).''). Accordingly, we do not find that White's performance evaluation alone would convince a reasonable jury that the Gold E-Mail was not the standard actually being applied to evaluate Baxter sales representatives' performance.

[14] We find Judge Gilman's gratuitous discussion about how Baxter may seek to limit White's remedies in this case to be of questionable propriety. *See* Dissenting Op. at 25-26. Without knowing all of the evidence that will be presented by the parties at trial, or how the case will unfold going forward, no judge, on either this Court or the district court, is in a position to opine as to the merits of Baxter's potential affirmative defense or the likely relief available to White should he prevail on his claims. Moreover, the parties' attorneys in this case are not lacking in talent and certainly **[**68]** do not need supererogatory instructions from this Court as to how to best serve their clients on remand.

White. *See* [Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1083 (6th Cir. 1994)](#).

To carry his burden of demonstrating that Baxter's proffered explanation for promoting Freed was merely a pretext designed to mask discrimination, White must show that this "nondiscriminatory reason: (1) had no basis in fact, (2) did not actually motivate defendant's conduct, or (3) was insufficient to warrant the challenged conduct." [Zambetti v. Cuyahoga Cmty. Coll., 314 F.3d 249, 258 (6th Cir. 2002)](#). White insists that the district court erred **[**70]** in determining that he had not produced sufficient evidence to permit a jury to find that Baxter's justification for promoting Freed was pretextual. He claims that Baxter's proffered reason must be pretextual because "he was easily the most qualified candidate for the management position and should have received the position." In the alternative, he contends that, at a minimum, the question of pretext should be submitted to a jury. He makes three specific arguments in support of his position: (1) that Freed had never actually sold Baxter's proprietary products, while White had seven years of sales experience and a "sterling sales record," (2) that Baxter overstated Freed's management experience because during her interview she described an incident in which she "admittedly feared confronting" a subordinate employee about his chronic tardiness, and (3) that White was the only candidate who had a master's degree.

In response to White's first argument, uncontroverted evidence in the record shows that although Freed did not have experience selling Baxter's proprietary products, she did have extensive prior experience selling proprietary pharmaceuticals for other companies. Freed also attended **[**71]** all of the training classes on Baxter's proprietary products, designed and implemented sales-training programs, and taught new sale representatives about the proprietary products. These undisputed facts, combined with evidence in the record that Freed actually discussed ideas for improving sales in the relevant region during her interview for the position, casts considerable doubt on the majority's unsupported statement that she, "in all likelihood, was less familiar than was White with the specific challenges faced by the ACCO division in promoting Baxter's products." Maj. Op. at 11.

**[***22]** The majority also states that White's master's degree and prior management experience could lead a jury to conclude that Baxter's legitimate nondiscriminatory reason for promoting Freed instead of White was pretextual. Maj. Op. at 10. To the contrary, I do not believe that the evidence on which White and the majority rely in support of this conclusion creates a genuine issue of material fact as to whether Baxter's assertion that Freed was better qualified for the Regional Manager position "has **[**72]** no basis in fact, did not actually motivate Baxter's decision, or is not **[*408]** sufficient to explain its hiring choice." Maj. Op. at 11.

The recognition that White had more experience selling Baxter's products and has a master's degree in business management does not necessarily show either that Freed was less qualified than White or that Baxter's decision was not actually based on a reasonable determination of the candidates' relative qualifications. Baxter in fact put forth an abundance of evidence showing not only that Freed was well qualified for the position, but also that the three interviewers unanimously believed that she better displayed the qualities of a good manager. The interviewers specifically testified that they had considered Freed's lack of experience in selling Baxter's products, but believed that this deficit was outweighed by her general sales background, her participation in numerous training classes, and her experience in teaching sales representatives about the products.

White's contention that he was more qualified than the other candidates because he has a master's degree is likewise unpersuasive, particularly in light of the interviewers' testimony that they found **[**73]** White's personality to be off-putting and incompatible with the type of interactions that a manager would be required to have with sales representatives. Although the majority is surely correct that "any evaluation of White's interview performance is an inherently subjective determination," Maj. Op. at 10, such determinations are also inevitably a part of the hiring and promotion decisions that employers must make in the course of business. To the extent that these subjective determinations may be "easily susceptible to manipulation in order to mask the interviewer's true reasons for making the promotion decision," *id.,* such a concern has no place in the present case, where White himself concedes that he has no reason to believe that any of the interviewers held any discriminatory animus against African-Americans. This concession is all the more significant considering the uncontroverted fact that each interviewer rated Freed first and White last among the five candidates interviewed for the managerial position.

The assertion by White that the interviewers could not have believed that Freed was qualified because she

admitted that she had once been nervous about confronting a subordinate **[**74]** is simply without merit. Not only does such evidence fail to demonstrate that Freed was unqualified for the management position (especially given that Freed went on to explain that she had effectively dealt with the employee in question), but the anecdote does nothing to undermine Baxter's argument that the interviewers acted reasonably in concluding that Freed had substantially more management experience than White.

In short, I do not believe that White has produced any evidence showing that Baxter's choice of Freed over White was anything other than a "reasonably informed and considered" business decision. *See* *Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998)*. I am also troubled by the majority's conclusion that "White's arguably superior qualifications . . . , in and of itself, could lead a jury to doubt the justifications given for Baxter's hiring decision." Maj. Op. at 10. Such a holding ignores this court's decision in *Smith* and goes a long way towards completely eviscerating the business-judgment rule articulated in that case and reaffirmed in *Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576-77 (6th Cir. 2003)* (en banc). This court in *Smith* explained that "the **[**75]** key inquiry" in determining whether an employer's proffered good-faith business decision should be given credence is "whether the employer made a reasonably informed **[*409]** and considered decision before taking an adverse employment action." *155 F.3d at 807*; *see also* *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)* (permitting an employee to establish pretext "by showing that the employer's proferred explanation is unworthy of credence").

**[***23]** Contrary to the majority's mischaracterization of my analysis, I do not think for a minute that we should "unquestionably accept the employer's own self-serving claim that the decision resulted from an exercise of 'reasonable business judgment.'" Maj. Op. at 9 n.6. Rather, the test articulated in *Smith* requires an independent evaluation of whether the employer's determination was in fact reasonable. *See* *Wexler, 317 F.3d at 577* (concluding that genuine issues of material fact precluded a finding that the employer's proffered reason for demoting Wexler was reasonable). But our independent evaluation of the reasonableness of an employer's business judgment does not preclude us from *ever* finding that an employer's proffered justification is reasonable **[**76]** as a matter of law. *See* *Smith, 155 F.3d at 808-09* (affirming the grant of summary judgment in favor of the employer where the employee was unable to raise a genuine issue of material fact to dispute the employer's reasonable reliance on the facts before it when making the decision to terminate the employee).

In the present case, the fact that White has adduced evidence showing that he and Freed were both qualified for the Regional Manager position does not create a genuine issue of material fact as to whether Baxter's decision to promote Freed instead of White was unreasonable or ill-informed. *See* *Vredevelt v. GEO Group, Inc., 145 F. App'x 122, 131 (6th Cir. 2005)* (noting that the plaintiff's allegation that she was more qualified than the male candidate the company hired was unpersuasive because "[a]t best, the comparison in this case is between two qualified employees").

I also believe that the majority's reliance on *Wexler* is misplaced in light of the factual distinctions between that case and the one before us. In *Wexler,* the employer claimed that Wexler's demotion was based on the store's declining sales under his management. *317 F.3d at 576*. This court concluded that application **[**77]** of the business-judgment rule was inappropriate in that case because genuine issues of material fact existed as to the reasonableness of the employer's decision to fault Wexler for the company's declining sales. In particular, this court noted that (1) the company was aware that factors beyond Wexler's control were contributing to the declining revenue, (2) the supervisors who made the decision to demote Wexler had made adverse age-related statements about him, and (3) the company retained one of the employees who eventually replaced Wexler as store manager despite the fact that sales continued to decline under that employee's management. *Id. at 577*.

The recognition by *Wexler* that courts may consider "the reasonableness of an employer's decision" at the pretext stage "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation," *id. at 576*, is of no help to White in the present case. Here the record clearly shows that the choice of Freed over White was based on a reasonable business judgment that Freed was the most qualified of the five candidates for the Regional Manager position. *See* *Smith, 155 F.3d at 807* **[**78]** (permitting employers to make business judgments where those decisions are "reasonably informed and considered").

I believe, in sum, that this court's precedents require

more recognition of such **[*410]** business judgments than the majority's decision permits, and that White failed to produce sufficient evidence for a jury to conclude that Baxter's proffered reasons for hiring Freed over White were pretextual. For these reasons, I would affirm the district court's grant of summary judgment as to White's failure-to-promote claim. I therefore respectfully dissent from the majority's resolution of this issue.

**B. White's downgraded-performance-evaluation claim and the proper summary-judgment framework for mixed-motive claims**

Although I agree with the majority's persuasive and well-reasoned discussion of the appropriate framework for evaluating mixed-motive claims at the summary-judgment stage and concur in the result reached in that portion of the majority opinion, I write separately to comment on the likely effect of the new framework and its application to the specific circumstances of the case before us. In particular, I am wary of the majority's statement that the standard we announce **[***24]** today "will **[**79]** typically require sending the case to the jury." Maj. Op. at 16. In my view, the standard laid out in the majority opinion must be applied with a view towards the more general principle that summary judgment serves an important screening function in our judicial system. *See* *Crawford-El v. Britton, 523 U.S. 574, 600, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998)* ("[S]ummary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial."). District courts reviewing motions for summary judgment on a mixed-motive claim, therefore, must always undertake that analysis with *Rule 56 of the Federal Rules of Civil Procedure* in mind, which directs courts to grant such a motion where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Contrary to the majority's suggestion, I believe that the articulated standard leaves ample room for courts to determine that no reasonable jury could conclude that a protected characteristic was a motivating factor in an adverse employment decision.

I also believe that the evidence favoring White in this case is quite weak and just barely passes muster under the new standard that we have articulated. Indeed, **[**80]** the key evidence in the record that supports White's performance-review claim is the collection of remarks allegedly made by Phillips, which--as the district court properly found--seem to evince a racially discriminatory animus. Those alleged remarks, combined with the factual dispute over which criteria should have governed the evaluation of White's performance (the Gold email or the 2004 PMO grid), could lead a jury to infer that race was at least a motivating factor when Phillips chose to partially follow the more stringent requirements of the Gold email.

That inference is not dispelled by any showing in the record that Phillips applied the Gold email to any nonprotected employees, which would render unreasonable the conclusion that Phillips was motivated by race in determining how to properly evaluate White's performance. *See* Maj. Op. at 16 (noting that "the court should also consider evidence presented by the employer that the protected characteristic was *not* a motivating factor for its employment decision" (quoting *Wright v. Murray Guard, Inc., 455 F.3d 702, 720 (6th Cir. 2006)* (Moore, J., concurring)). Nevertheless, in the absence of Phillips's alleged racist remarks, I would **[**81]** have concluded that there was no basis for a jury to find that race was "a motivating factor" in the downgraded performance review received by White.

**[*411]** White's claim would certainly fail under the more stringent *McDonnell Douglas* framework used to evaluate claims brought under Title VII's general antidiscrimination provision, *42 U.S.C. § 2000e-2(a)(1)*, if for no other reason than that he has failed to show that any similarly situated employee was treated more favorably than he was with respect to performance evaluations. So although I concur in the majority's explanation of why this type of evidence should not be required to survive summary judgment on a mixed-motive claim, there is no question that White would have a much stronger case to present to a jury if there was such evidence in the record. I therefore find myself barely persuaded that a genuine issue of material fact exists as to whether race was a motivating factor in White's performance review, but I would not be at all surprised if a jury ultimately finds to the contrary.

Finally, I would note that the remedy-limitation provision contained in *42 U.S.C. § 2000e-5(g)(2)(B)* may prove to be particularly important in the instant **[**82]** case. That provision provides an employer with a "limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff. The available remedies include only declaratory relief, certain types of injunctive relief, and attorney's fees and costs." *Desert Palace, Inc. v. Costa, 539 U.S. 90, 94, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003)*. In the present case, Baxter may well be able to show that White would have received a downgraded performance review even

in the absence of the impermissible consideration of race, in which case it could successfully assert the § 2000e-5(g)(2)(B) affirmative defense. *See* § 2000e-5(g)(2)(B) (explaining that the limitation-of-remedies provision applies where "an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates **[***25]** that the respondent would have taken the same action in the absence of the impermissible motivating factor").

The evidence in the record relating to the Gold email and White's failure to meet his Suprane sales goals will be highly relevant to this showing. Moreover, the jury could easily conclude that Phillips "split the difference" between the criteria contained in the 2004 PMO Grid and **[**83]** the Gold email, giving White a *more* favorable review than he would have received upon a straightforward application of the criteria set forth in the Gold email. If Baxter chooses to proceed in this way and the jury finds that the company would have downgraded White's performance review even in the absence of any impermissible consideration of White's race, then the remedies available to White will be considerably limited. He would under such circumstances be entitled to declaratory and perhaps limited injunctive relief, and to "attorney's fees and costs demonstrated to be directly attributable only to the pursuit of" the mixed-motive claim. *See* § 2000e-5(g)(2)(B)(i). If this is indeed the ultimate outcome, then the district court would be unable to "award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment." § 2000e-5(g)(2)(B)(ii). Section 2000e-5(g)(2)(B) thus provides an important counterbalance to the relatively lenient summary-judgment standard that we announce today, and may be particularly applicable in the present case.

**Table1 (*Return to related document text*)**

| | |
|---|---|
| Exceeds | 5% |
| Meets + | 4% |
| Meets | 3% |
| Meets - | 2% or less |
| Does not meet | 0 |

**Table1 (*Return to related document text*)**

End of Document

# *Williams v. CSX Transp. Co.*

United States Court of Appeals for the Sixth Circuit

January 13, 2011, Argued; June 28, 2011, Decided; June 28, 2011, Filed

File Name: 11a0165p.06

No. 09-5564

**Reporter**

643 F.3d 502 *; 2011 U.S. App. LEXIS 13120 **; 2011 FED App. 0165P (6th Cir.) ***; 112 Fair Empl. Prac. Cas. (BNA) 961; 94 Empl. Prac. Dec. (CCH) P44,201

STEPHANIE WILLIAMS, Plaintiff-Appellant, v. CSX TRANSPORTATION COMPANY, INC., Defendant-Appellee.

**Subsequent History:** Rehearing denied by *Williams v. CSX Transp. Co., 2011 U.S. App. LEXIS 17006 (6th Cir., Aug. 9, 2011)*

Subsequent appeal at, Decision reached on appeal by *Williams v. CSX Transp. Co., 533 Fed. Appx. 637, 2013 U.S. App. LEXIS 19425 (6th Cir.) (6th Cir. Tenn., Sept. 19, 2013)*

**Prior History: [**1]** Appeal from the United States District Court for the Western District of Tennessee at Jackson. No. 05-01317—J. Daniel Breen, District Judge.

*Williams v. Csx Transp. Co., 2007 U.S. Dist. LEXIS 110452 (W.D. Tenn., June 6, 2007)*

**Counsel:** ARGUED: Justin S. Gilbert, GILBERT, RUSSELL, McWHERTER PLC, Jackson, Tennessee, for Appellant.

Christopher W. Cardwell, GULLETT, SANFORD, ROBINSON & MARTIN, PLLC, Nashville, Tennessee, for Appellee.

ON BRIEF: Justin S. Gilbert, GILBERT, RUSSELL, McWHERTER PLC, Jackson, Tennessee, Gregory G. Paul, MORGAN & PAUL, PLLC, Sewickley, Pennsylvania, for Appellant.

Christopher W. Cardwell, Mary Taylor Gallagher, GULLETT, SANFORD, ROBINSON & MARTIN, PLLC, Nashville, Tennessee, for Appellee.

**Judges:** Before: MERRITT, ROGERS, and WHITE, Circuit Judges. MERRITT, J., delivered the opinion of the court. ROGERS, and WHITE, JJ., delivered separate opinions concurring in part and dissenting in part.

**Opinion by:** MERRITT

## Opinion

**[*505] [***2]** MERRITT, Circuit Judge. Plaintiff, Stephanie Williams, sued her employer, CSX Transportation Company, Inc. ("CSX"), for allegedly subjecting her to both racially and sexually hostile work environments. The district court held that Williams failed to file a document that meets the test for a "charge" with the Equal Employment Opportunity Commission on her claim of a *sexually* **[**2]** hostile work environment and, thus, failed to exhaust her administrative remedies. For that reason, the district court granted summary judgment to CSX on that claim. We disagree and reverse. As for Williams's *racially* hostile work environment claim, the district court granted judgment as a matter of law to CSX at the close of Williams's case in chief. The district court reasoned that her evidence of a racially hostile work environment was not sufficiently "severe" or "pervasive" to create a jury question. On that claim, and on a collateral evidentiary issue, we affirm.

### I. Facts and Procedural Background

Stephanie Williams began working as a clerk for CSX at its Bruceton, Tennessee, facility in April 2002. CSX operates railroad lines. Clerks' duties include, among other things, performing janitorial work. CSX's Bruceton facility was small; there were four clerks, including Williams, and a few supervisors. Conductors and engineers would also pass through the Bruceton facility on a regular basis. Among her coworkers and supervisors at the Bruceton facility, Williams was the only black employee and the only female employee.

Williams alleges that, between 2002 and 2004, her supervisors treated **[**3]** her differently than her white male counterparts. First, she asserts that Ed Anderson, a supervisor, required her once to clean **[*506]** feces off the walls of a restroom and out of a urinal, and that her white male counterparts never had to complete such a task. Second, Williams alleges that Anderson ordered her on four separate occasions to strip the **[***3]** restroom floor using an inappropriate tool. Williams requested a power tool from Anderson, who told her it was not in the budget. A different supervisor, Tim Magargle, once permitted a white male clerk to rent a power tool to complete the same task. Third, Williams alleges that Anderson refused to reimburse her for the mileage expense of driving her personal vehicle twice weekly during 2003 from Bruceton to New Johnsonville, Tennessee — even though corporate policy was to reimburse such mileage and the white male employees in her office received reimbursement. Fourth, Williams asserts that her car was vandalized: the right exterior was "keyed," and the tires on the same wheel were punctured five successive times, resulting in five flat tires.

In addition to these incidents, Williams alleges that a single racist and sexist confrontation occurred **[**4]** at the CSX Bruceton facility. According to Williams, Jeff Wingo and Tim Magargle, two supervisors, were watching the Republican National Convention on television on the evening of September 2, 2004 when Williams entered and indicated she did not want to watch. Wingo allegedly told Williams that she was a Democrat only because she was a black woman; that unmarried women cannot "have the love of God in their heart[s]"; and that this country should "get rid of Jesse Jackson and Al Sharpton because without those two "monkeys" the country "would be a whole lot better." The following day, Williams alleges that Wingo told her that if she returned to school, she would not have to pay for her education because she was a single black mother. Several days later, an anonymous caller, professing to be white, reported Wingo's conduct to a CSX ethics hotline. The caller stated that Wingo "takes delight in harassing employees of other races."

Williams also alleges that Wingo made two racist statements in passing to her between one to six months before the confrontation. Wingo once asked Williams why black people cannot name their children "stuff that people can pronounce, like John or Sue." He also **[**5]** told Williams that black people should "go back to where [they] came from." Notably, Williams does not allege that any of her coworkers or supervisors other than Wingo ever made a single sexist or racist remark.

**[***4]** Two months after the Wingo incident, on November 9, 2004, Williams lost her job at the Bruceton facility through multiple-step process. First, CSX eliminated the position of another one of the Bruceton clerks. That clerk then exercised his right under CSX policy to displace a more junior employee at the Bruceton facility, and that more junior employee in turn exercised his right to displace Williams — who had the shortest tenure of the four Bruceton clerks. After this occurred, Williams exercised her own displacement right to obtain a clerical position at CSX's Nashville facility, which is located approximately one hundred miles from Bruceton.

Williams's dislocation from Bruceton to Nashville precipitated the first of her two relevant administrative filings with the EEOC. In November 18, 2004, Williams filed a so-called "Charge Information Form" with the EEOC. In that filing, which spanned seven pages, Williams recounted the Wingo incident in detail. She alleged that the elimination **[**6]** of the other clerk's position, which led to her dislocation to the Nashville facility, was in retaliation against her for the anonymous call to the CSX ethics hotline reporting the Wingo incident. She also alleged, independently, **[*507]** that her dislocation to the Nashville facility was an act of discrimination based on her race and sex. She expressly stated that the Bruceton facility was "a very hostile work environment." Although Williams provided her signature at the bottom of the seventh page, she did not sign it under oath or penalty of perjury. Nothing on the "Charge Information Form" suggested a need to do so.

The EEOC office then completed for Williams a second filing, a so-called "Charge of Discrimination." In a single page, this filing attempted to lay out the essence of Williams's allegations. The general thrust was that discrimination and retaliation caused Williams's dislocation to the Nashville facility. The allegations mentioned neither Wingo's conduct nor any other indication of a hostile work environment; however, the second sentence stated that Williams was "subjected to unequal terms and conditions of [her] employment." Within a field entitled "discrimination based on," **[**7]** three boxes were marked: "race," "sex," and "retaliation." Within a field entitled "date(s) discrimination took place," the "earliest" date listed was September 2, 2004 (the **[***5]** date of the Wingo incident). Immediately below, the box indicating that the discrimination was a "continuing action" was marked.

Unlike the "Charge Information Form," this form prompted Williams to sign under a line stating that she "declare[d] under penalty of perjury that the above is true and correct." Williams signed the form, under penalty of perjury, on December 30, 2004.[1]

Williams sued CSX in federal district court for discrimination, retaliation, and both sexually and racially hostile work environments. The district court granted summary judgment to CSX on what **[**8]** appeared to be Williams's core claims: that her dislocation to the Nashville facility was the result of discrimination and retaliation. The district court found that Williams's dislocation was caused by an employee-consolidation effort emanating from CSX's corporate headquarters, not discrimination or retaliation. Williams does not appeal the disposition of those claims.

That left Williams's two hostile work environment claims. As to her claim of a *sexually* hostile work environment, the district court granted summary judgment to CSX on the theory that Williams failed to exhaust her administrative remedies: she did not file a "charge" containing sufficient allegations of a hostile work environment. As to her claim of a *racially* hostile work environment (which did not require exhaustion), the district court permitted Williams to proceed to trial. At the close of Williams's case in chief, however, the district court granted judgment as a matter of law to CSX. The district court believed that Williams's evidence of a racially hostile work environment was not sufficiently "severe or pervasive" to create a jury question on that claim. Williams now appeals the district court's judgments on **[**9]** her hostile work environment claims.

**[***6] II. Sexually Hostile Work Environment**

Williams asserts her claim of a sexually hostile work environment under Title VII of the Civil Rights Act of 1964. Before a plaintiff may sue under Title VII in federal court, she must first exhaust her administrative **[*508]** remedies, one component of which is timely filing a "charge" with the EEOC. *42 U.S.C. § 2000e-5(e)*, *(f)*; *Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 362 (6th Cir. 2010)*. Williams submitted two filings to the EEOC, but the district court held that neither of them were a "charge" for her claim of a sexually hostile work environment. To determine whether the district court was correct, we must determine what a filing must contain in order to be a "charge."

Title VII does not define what constitutes a "charge." *Edelman v. Lynchburg College, 535 U.S. 106, 112, 122 S. Ct. 1145, 152 L. Ed. 2d 188 (2002)*. The statute, however, does provide at least two necessary conditions for a filing to be a charge, and those requirements are fleshed out by interpreting regulations. First, "[c]harges shall be in writing under oath or affirmation . . . ." *42 U.S.C. § 2000e-5(b)*. The EEOC regulations interpret this statutory command as requiring charges **[**10]** to be "verified." *See* *29 C.F.R. § 1601.9* ("A charge shall be in writing and signed and shall be verified."); *29 C.F.R. § 1601.3(a)* (defining "verified" as "sworn to or affirmed" or "supported by an unsworn declaration in writing under penalty of perjury"). Second, "[c]harges . . . shall contain such information and be in such form as the [EEOC] requires." *42 U.S.C. § 2000e-5(b)*. The EEOC, in turn, has promulgated a regulation that identifies five piece of information that a charge "should" contain: (1)-(2)the names, addresses, and telephone numbers of the person making the charge and the charged entity; (3) a statement of facts describing the alleged discriminatory act; (4) the number of employees of the charged employer; and (5) a statement indicating whether the charging party has initiated state proceedings. *29 C.F.R. § 1601.12(a)*. The next subsection, however, qualifies these requirements by stating that a written charge is "sufficient" if it is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of." *Id*. *§ 1601.12(b)*.

**[***7]** A recent Supreme Court opinion added an "additional requirement" for an EEOC filing to constitute a charge. **[**11]** *See* *Federal Express Corp. v. Holowecki, 552 U.S. 389, 398, 128 S. Ct. 1147, 170 L. Ed. 2d 10 (2008)*.[2] Acknowledging that more than half of

[1] The EEOC later completed for Williams a third filing, another "Charge of Discrimination," which alleged that CSX discriminated and retaliated against Williams by failing to promote her to the position of substitute yardmaster. Williams eventually sued CSX on a failure-to-promote claim, in addition to her other claims. The failure-to-promote claim went to trial, and the jury found in favor of CSX. Williams does not appeal the judgment on that claim.

[2] *Holowecki* interpreted the term "charge" as used in the Age Discrimination in Employment Act ("ADEA"), rather than in Title VII of the Civil Rights Act of 1964, and the Court began with a "cautionary preface" that lower courts should proceed with "careful and critical examination" before applying its interpretation to Title VII. *552 U.S. at 393*. However,

the filings the EEOC receives each year are mere informational inquiries rather than enforcement requests, the Court reasoned that the statutory term "charge" implies that a filing must be the latter. *Id. at 399-401*. "[I]f a filing is to be deemed a charge," the Court held, "it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and employee." *Id. at 402*. Put differently, a filing is a charge if an "objective observer" would believe that the filing "taken as a whole" suggests that the filer "requests the agency to activate its **[*509]** machinery and remedial processes." *Id. at 398, 402*. "[U]nder this permissive standard a wide range of documents might be classified as charges," which is consistent with the principle that "pro se litigants are held to a lesser pleading standard than other parties." *Id. at 402*. In *Holowecki*, the plaintiff's "Intake Questionnaire" and accompanying six-page affidavit asked the EEOC to "[p]lease force Federal Express to end their age discrimination," **[**12]** so the Court held the filing was "properly construed as a request for the agency to act" and, therefore, a charge. *Id. at 405*.

To summarize, in order for an EEOC filing to constitute a "charge" that is necessary to exhaust an employee's **[**13]** administrative remedies under Title VII, the filing (1) must be "verified" — that is, submitted under oath or penalty of perjury, *29 C.F.R. § 1601.3(a)*; (2) must contain information that is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of," *id*. *§ 1601.12(b)*; and (3) must comply with *Holowecki* ? that is, an "objective observer" **[***8]** must believe that the filing "taken as a whole" suggests that the employee "requests the agency to activate its machinery and remedial processes," *552 U.S. 389, 398, 402, 128 S. Ct. 1147, 170 L. Ed. 2d 10*.

### A. Williams's "Charge Information Form" Is a "Charge"

---

"numerous courts have applied *Holowecki* in the Title VII context because of the similarities between the statutory schemes of the ADEA and Title VII concerning exhaustion of administrative remedies." *Palmer v. Southwest Airlines Co., No. 08C6158, 2009 U.S. Dist. LEXIS 98971, 2009 WL 3462043, at *5 n.3 (N.D. Ill. Oct. 23, 2009)* (citing cases). Moreover, the regulation under the ADEA setting forth the information a filing must contain to be a charge is essentially identical to its counterpart regulation under Title VII. *Compare 29 C.F.R. § 1626.8(a)-(b)*, *with 29 C.F.R. § 1601.12(a)-(b)*. The parties here agree that *Holowecki* applies.

We conclude that Williams's first EEOC filing, the "Charge Information Form," is a charge for her claim of a sexually hostile work environment. *First*, although the district court was correct that this filing was not initially verified, the district court overlooked a pertinent federal regulation: "A charge may be amended to cure technical defects or omissions, including failure to verify the charge . . . ." *29 C.F.R. § 1601.12(b)*. The statute is silent on whether a filing may be amended to cure technical defects, and the EEOC's interpretation is reasonable under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*. **[**14]** *See Edelman v. Lynchburg College, 535 U.S. 106, 110, 114, 122 S. Ct. 1145, 152 L. Ed. 2d 188 (2002)* (giving *Chevron* deference to this same regulation). Williams signed her second EEOC filing, the "Charge of Discrimination" (discussed in more detail below), under penalty of perjury and, thus, verified it. For the technical purpose of verification, we conclude that Williams's second filing amended — and verified — her first filing. This result is only fair in light of the fact that nowhere did the "Charge Information Form" suggest that Williams needed to sign it under penalty of perjury, and Williams was proceeding pro se at the time.

*Second*, Williams's "Charge Information Form" contained information concerning a sexually hostile work environment that was "sufficiently precise to identify the parties, and to describe generally the action or practices complained of," *29 C.F.R. § 1601.12(b)*. Williams identified CSX and its employee, Jeff Wingo, as the offenders. In the course of three pages, she recounted the Wingo incident in detail: Wingo allegedly told her that "the problem with this country" was that single mothers "can't have the love of God in their hearts"; that women want equal rights "but aren't paying equally"; **[**15]** and that, as a black woman, Williams only had to submit an application to get a job.

*Third*, Williams's "Charge Information Form" satisfies the additional requirement of *Holowecki*: that an objective observer would believe that Williams **[***9]** sought the EEOC to activate its remedial machinery, rather than simply obtain information. **[*510]** After recounting the details of her employment grievance, Williams expressly stated that the Bruceton facility was "a very hostile work environment" and that she "fe[lt] that [CSX] owe[d] [her] money damages." Like the plaintiff in *Holowecki*, who asked the EEOC to "[p]lease force [the employer] to end [its] age discrimination plan," *552 U.S. at 405*, Williams's request for money damages was a request for the EEOC to act.

**B. Williams's "Charge of Discrimination" Is a "Charge"**

We also conclude that Williams's second EEOC filing, the "Charge of Discrimination," is a charge for her claim of a sexually hostile work environment. *First*, Williams signed her name at the bottom of the filing in a signature block under a declaration that she "declare[d] under penalty of perjury that the above is true and correct." Thus, the filing was verified.

*Second*, Williams's "Charge of **[**16]** Discrimination" contained information concerning a sexually hostile work environment that is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of," *29 C.F.R. § 1601.12(b)*. The filing identified CSX, and specifically the Bruceton facility, as the alleged offender. Although the second filing is a single page and only contains three short paragraphs (apparently written by EEOC employees) about Williams's employment grievance, it sufficiently indicated a sexually hostile work environment. The box for "sex" was marked. Within the field entitled "date(s) discrimination took place," the "earliest" date listed was September 2, 2004 — the date when Wingo allegedly made the sexually hostile statements to Williams — and the box indicating that the discrimination was a "continuing action" was marked. These facts strongly suggest that the second filing complained not only of discrimination and retaliation in connection with the discrete incident of Williams's dislocation to the Nashville facility, but also of a continuing sexually hostile work environment that existed while Williams worked at the Bruceton facility. Our conclusion is bolstered **[**17]** by *Holowecki's* instruction that pro **[***10]** se EEOC filings, like Williams's filings in this case, are to be liberally construed. *552 U.S. 389, 402, 128 S. Ct. 1147, 170 L. Ed. 2d 10*.

*Third*, Williams's "Charge of Discrimination" easily satisfies the additional requirement created in *Holowecki*. Unlike the "Intake Questionnaire" in *Holowecki*, everything about Williams's "Charge of Discrimination" suggests that Williams intended it to be a request for enforcement rather than an informational inquiry. CSX does not argue otherwise.

* * *

The district court erred in concluding that Williams had failed to file a charge of a sexually hostile work environment and, thus, had failed to exhaust her administrative remedies on this claim. Accordingly, we reverse the district court's grant of summary judgment to CSX on Williams's hostile work environment claim, and we remand for further proceedings.

**III. Racially Hostile Work Environment**

Williams also appeals her racially hostile work environment claim, on which the district court granted CSX judgment as a matter of law after Williams's case in chief.[3] We review judgments as a matter of law de novo. *Scotts Co. v. Cent. Garden & Pet Co., 403 F.3d 781, 788 (6th Cir. 2005)*. **[*511]** "[A] court should render **[**18]** judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)* (quoting *Fed. R. Civ. P. 50(a)*). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id. at 151*.

**[***11]** To succeed on a claim of a racially hostile work environment, a plaintiff must demonstrate that (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act. *Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1078-79 (6th Cir. 1999)*.[4] The parties agree that the first **[**19]** two elements are satisfied here; their dispute centers on the existence of a jury question on the third and fourth.

With respect to the fourth element, "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris v.*

---

[3] Williams did not have to file a "charge" for this racial claim because she asserted it under *42 U.S.C. § 1981*, which does not require the exhaustion of administrative remedies.

[4] This five-element test is usually posited for claims brought under Title VII, but we apply the same test to claims, as here, brought under *§ 1981*. *See* *Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999)* ("We review claims of alleged race discrimination brought under *§ 1981* . . . under the same standards as claims of race discrimination brought under Title VII . . . .").

Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). When analyzing that element, we must consider harassment "by all perpetrators combined," rather than "divid[ing] and categoriz[ing] the reported incidents." Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999).[5] However, the third element limits the scope of this analysis: only harassment *based on the plaintiff's race* may be considered. *See* Bowman v. Shawnee State Univ., 220 F.3d 456, 464 (6th Cir. 2000). Accordingly, we will first determine what harassment was based on Williams's race, **[**20]** then we will ask whether the totality of that harassment was sufficiently severe or pervasive to create a jury question on her claim.

**[***12] A. Based on Race**

A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace. *See* Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (approving these methods in the analogous context of sexual harassment). Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist to qualify. Clay v. United Parcel Serv., Inc., 501 F.3d 695, 706 (6th Cir. 2007).

Williams alleges, in essence, three categories of racial **[**21]** harassment: her **[*512]** supervisor Jeff Wingo's racist statements to her, the damage to her personal vehicle, and other adverse treatment at work. Wingo's racist statements are plainly based on race. Just as plainly, a reasonable jury could not find that the damage to Williams's personal vehicle was based on race. Williams has no direct evidence of racial causation. She did not witness the alleged vandalization, and she presented no evidence suggesting that CSX employees were the vandals, or even that the alleged vandalization happened while she was at work. Moreover, her comparative-evidence argument — that the vehicles of her white counterparts were not damaged — is weakened by the uncontroverted testimony of two of her coworkers that flat tires are common at the Bruceton facility.

A slightly closer question is whether a reasonable jury could find that the other adverse treatment Williams experienced at work was based on her race. Williams alleges that Ed Anderson, a supervisor, forced her to clean feces out of a urinal and off of a restroom wall; ordered her to strip a bathroom floor with an inappropriately small device and denied her request to rent a power tool; and refused to reimburse **[**22]** her for the mileage cost of driving her personal vehicle for work, even though corporate policy was to reimburse mileage and white employees received reimbursement.

Williams lacks any direct evidence that any of this adverse treatment was based on her race. None of it involved the use of racist language. Nor does Williams allege **[***13]** that Anderson, the relevant supervisor in each instance, *ever* used racist language. The mere fact that Wingo used such language does not imply that Anderson harbored the same prejudices.

Williams's comparative-evidence argument is also ultimately unpersuasive. Regarding her feces-cleaning assignment, Williams concedes that janitorial tasks fall within her job duties, and she presents no evidence that any of her white counterparts were available to clean the bathroom on that day. As for her stripping the bathroom floor, Williams presents no evidence that Anderson ever permitted a white employee to rent a power tool to complete the task. The fact that Tim Magargle, a different supervisor, once permitted a white employee to rent a power tool sheds no light on Anderson's motivations. And as for the reimbursement of her mileage, Williams admitted that every time **[**23]** she submitted the appropriate expense form, CSX reimbursed her. Accordingly, no reasonable jury could find that these other alleged instances of adverse treatment were based on Williams's race. The only race-based instances of harassment are Wingo's racially derogatory statements.

**B. Severe or Pervasive**

We must next consider whether the totality of Williams's race-based harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126

[5] Although the *Williams* case dealt with a claim of a sexually hostile work environment rather than a racially hostile work environment, this Court may draw from cases involving a sexually hostile work environment. *See, e.g.,* Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999) ("[T]he same principles that govern sexual harassment also govern claims of racial harassment.").

L. Ed. 2d 295 (1993). Factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. Significantly, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). Occasional offensive utterances do not rise to the level required to create a hostile work environment. Grace v. USCAR, **[*513]** 521 F.3d 655, 679 (6th Cir. 2008). "To hold otherwise **[**24]** would risk changing **[***14]** Title VII into a code of workplace civility, a result we have previously rejected." *Id*. (internal quotation marks omitted).

Although despicable, Wingo's alleged racist statements are not sufficiently "severe" or "pervasive" standing alone to create a jury question on Williams's racially hostile work environment claim. The statements were isolated, not pervasive: all but two occurred over a two-day period. Nor were they sufficiently "severe" for Williams to be able to prevail on a racially hostile work environment claim. Those statements — for example, calling Jesse Jackson and Al Sharpton "monkeys" and saying that black people should "go back to where [they] came from" — are certainly insensitive, ignorant, and bigoted. But they more closely resemble a "mere offensive utterance" than conduct that is "physically threatening or humiliating." Harris, 510 U.S. at 23. Accordingly, we affirm the district court's grant of judgment as a matter to law to CSX on this claim.

**IV. Admissibility of a Corporate Ethics Hotline Report**

Finally, Williams appeals the district court's decision on a collateral evidentiary issue. As mentioned above, an anonymous caller phoned the CSX ethics **[**25]** hotline shortly after the Wingo incident. CSX generated a report of the call. According to that report, the caller said that Wingo insulted Williams and "the rest of the [b]lack race," that Wingo "takes delight in harassing employees of other races," and that "Wingo does not deserve to be in a managerial role if he cannot curb his excesses." The caller, who professed to being white, also reported that "[t]he morale of employees has been affected by this uncouth behavior."

Williams sought to introduce the report into evidence, but the district court held it to be inadmissible hearsay. Williams argues on appeal that the statements were not hearsay because she offered them to prove that CSX had notice of the harassment, rather than the truth of the matter asserted, *see* Fed. R. Evid. 801(c). The fatal flaw in Williams's argument is that whether CSX had notice of that incident is irrelevant for the only claim that was submitted to the jury: her failure-to-promote claim, which she does **[***15]** not appeal. Although an employer's notice and inadequate response are necessary components of a hostile work environment claim, Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1078-79 (6th Cir. 1999), **[**26]** those issues are simply not part of the framework of a failure-to-promote claim, *see* White v. Baxter Healthcare Corp., 533 F.3d 381, 391-92 (6th Cir. 2008) (positing the four-part test for failure-to-promote claims). And Williams's racially hostile work environment claim fails for the reasons given in Part III above — that is, isolated racist remarks by a single supervisor are not "severe" or "pervasive" — irrespective of the contents of the CSX hotline report. Accordingly, the CSX hotline report was inadmissible hearsay, and the district court properly excluded it from evidence.

**V. Conclusion**

For these reasons, we **REVERSE** the district court's grant of summary judgment to CSX on Williams's sexually hostile work environment claim, and we **AFFIRM** the district court's judgment as a matter of law to CSX on Williams's racially hostile work environment claim.

**Concur by:** ROGERS; HELENE N. WHITE (In Part)

**Dissent by:** ROGERS; HELENE N. WHITE (In Part)

## Dissent

**[***16]** ROGERS, Circuit Judge, concurring in part and dissenting in part. I concur in Parts III and IV of the majority opinion but dissent from the reversal **[*514]** of the Title VII harassment claim. The claim was not properly exhausted, for the reasons given by the district court. Dist **[**27]** Ct. Order of Nov. 16, 2007, at 13-14. The unverified Charge Information Form could be amended to meet the verification requirement, as the majority points out, but the later, verified Charge of Discrimination Form neither alleged a sexually hostile work environment, nor referred to the earlier form.

Allowing such unrelated documents to constitute a charge would permit employees, without fear of sanction, to force their employers to respond to potentially frivolous harassment claims, thereby undermining the statutory scheme. As the Supreme Court explained in *Edelman v. Lynchburg College, 535 U.S. 106, 112-13, 122 S. Ct. 1145, 152 L. Ed. 2d 188 (2002)*, the verification requirement seeks "[to] protect[] employers from the disruption and expense of responding to a claim unless a complainant is serious enough and sure enough to support it by oath subject to liability for perjury."

With respect, the verified Charge of Discrimination Form cannot be read to raise Williams's gender-based ho stile-work-environment claim. The only matter discussed in the form's three short paragraphs is Williams's forced job transfer, which she says followed a verbal altercation with the Yard Master (presumably Wingo). Listing one specific action **[**28]** which Williams claims to be discriminatory does not assert a sexually ho stile-work-environment claim. Williams in fact brought separate discrimination and retaliation claims premised on the very scenario discussed in the Charge of Discrimination Form—her forced dislocation from CSX's Bruceton facility. The district court, however, granted CSX summary judgment on these claims, and Williams did not appeal the order.

**[***17]** The information contained in the "Date(s) Discrimination Took Place" box does not change the plain reading of the form's factual allegations. The "earliest" date of 9/2/2004 and the "latest" date of 11/9/2004 correspond to the verbal altercation with Wingo and to the date of Williams's forced dislocation, respectively. These two events, both of which are specifically mentioned in the form's factual allegations, are the basis for Williams's discrimination and retaliation claims. And checking a contiguous box for "continuing action" can hardly be read to give notice of a ho stile-work-environment claim.

## [***18] CONCURRING IN PART AND DISSENTING IN PART

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. I agree that Williams's gender-based hostile-work-environment **[**29]** claim was improperly dismissed before trial for failure to exhaust administrative remedies.

As to Williams's race-based ho stile-work-environment claim, I do not agree with my colleagues' affirmance of the district court's grant of judgment as a matter of law and therefore respectfully dissent.

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Hawkins v. Anheuser-Busch Inc., 517 F.3d 321, 332-33 (6th Cir. 2008)* (quoting *Mentor Sav. Bank v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)*). To prove harassment, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*.

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment **[*515]** that a reasonable person would find hostile or abusive — is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions **[**30]** of the victim's employment, and there is no Title VII violation.

*Williams v. Gen. Motors Corp., 187 F.3d 553, 566 (6th Cir. 1999)* (quoting *Harris, 510 U.S. at 21-22*). This evaluation of the work environment "must take into account the totality of the circumstances. '[E]ven where individual instances of . . . harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation.'" *Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 273 (6th Cir. 2009)* (quoting *Williams, 187 F.3d at 563*).

**[***19]** The district court acknowledged that it had to look to the totality of the circumstances in evaluating CSX's motion for judgment as a matter of law on Williams's race-based hostile environment claim. But its ruling from the bench suggests that it separated the conduct that was not overtly race-based (e.g., making Williams clean feces from the bathroom walls on several occasions, and urine all over the bathroom on a continual basis) from Wingo's blatantly race-based comments,[1] rather than looking to, as the Supreme

---

[1] After hearing argument from counsel and discussing the evidence, the district court ended by saying:

Court held in *Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)*, "the critical issue" per Title VII's **[**31]** text—"whether members of one [race] are exposed to disadvantageous terms or conditions of employment to which members of the other [race] are not exposed." *Id*. (quoting *Harris, 510 U.S. at 25* (Ginsburg, J., concurring)).

Substantial trial testimony supported that Williams was exposed to disadvantageous conditions of employment to which white clerks were not exposed. For example, Railroad Engineer Melvin Brack testified that he had worked for CSX for 34 years, and had been at the Bruceton depot approximately one to four times a week for the last 12 years, since 1997. Brack testified that after arriving at Bruceton, **[**32]** he would put his train away and go to the depot (where Williams worked) to register as off-duty and wait for a ride to a hotel, i.e., that he would "camp out" at the depot. Brack testified that typically two employees were working at the Bruceton depot, a yardmaster and a clerk. He described the depot as having three offices in the upstairs, and the downstairs as having a general locker room, sitting area for the crews and a bathroom. Brack testified:

> **[***20]** BY MR. GILBERT:
> Q Mr. Brack . . . We were talking about the bathroom conditions, and I want to ask you some questions now about once Ms. Williams was hired; okay? In other words, once she is in place as a clerk . . . . Did you have the opportunity to observe the general conditions of the bathroom once she was hired?
> A Yes, I did.
>
> **[*516]** Q Would you describe that for the jury, please.
> A The bathrooms had always been somewhat —
> MS. GALLAGHER: Objection, Your Honor.
> BY MR. GILBERT:
> Q If you would, instead of going back, let's stick with what you observed once Ms. Williams was there; okay?
>
> A The bathrooms after Ms. Williams was there became filthy, completely unusable. There was feces placed on the wall, over the urinals, over the commode, on the floor, **[**33]** on the sinks. I personally helped Ms. Williams clean the area because it was so gross. I didn't think it was right for her to have to be given those responsibilities to do.
> . . . .
> Q Let me ask you some questions about this urine. And I'm not trying to be funny here, but what if someone said it was just bad aim, someone just missed the urinal or just missed the toilets?
> A Impossible.
> Q Why?
> A Because of the magnitude, where it was. There's a difference between just normal use of someone with perhaps an upset stomach for the use of the commode versus all on the wall, on the side of it, on the sink and on the walls and floor.
> Q How many times would you say you saw urine on the walls, sinks or floors, the urine?
> A The urine was regularly.
>
> **[***21]** Q And what does regularly mean in terms of--
> A Meaning daily. The times when I was there, most of the - most times the urine was on the floor. And, again, impossible that someone could accidentally do such an act.
> MR. GILBERT: I pass the witness, Your Honor.
>
> **CROSS-EXAMINATION**
> BY MS. GALLAGHER:
> . . . .
> Q And I understand that it's your testimony that on more than one occasion you saw the restroom in this condition; is that correct?
> A Correct.
>
> Q You never filed a grievance **[**34]** with your union to complain about this restroom.
>
> A You must remember, in 34 years of railroad experience, I've seen the bathrooms in the worst deteriorated conditions over the 34 years where the railroad did not care about a bathroom. I've seen them go weeks and weeks without having been cleaned. So because of the length of time, it was acceptable — I assume the railroad thought it was

---

> Again, the court simply finds that the conduct by Mr. Wingo, as reprehensible as it might have been, was not a continuing type of conduct, as I determine. I recognize that there were some other instances that occurred, according to the plaintiff, but I simply do not find as a matter of law that these constituted a hostile work environment. I simply don't believe, based upon what I have heard from the testimony presented, that it constituted that. . . .

Trial Tr. 4/2/09 at 802.

> acceptable. *But to a point where there was feces and urine on the walls and everything, that was just too much*.

[Emphasis added.] Craig Spangler testified that he had been a CSX conductor since 1998 and had worked with Williams at the Bruceton depot. Spangler testified that when Williams was working the bathrooms were clean and the trash taken out, and when she was not working "Trash would be laying around on the tables. Garbage cans would be full. A couple of times I've walked in the bathroom and you could tell that somebody had used the floor instead of using the commode." When asked if he thought that was an accident, he responded "It looked like it was intentional. I mean you can tell when somebody misses."

**[***22]** **[*517]** Williams testified that the urinating all over the bathroom happened on a continual basis, and **[**35]** that she was required to clean feces in the Bruceton depot downstairs bathroom on two occasions, which she described:

> Q Ms. Williams . . . Was there any time when you were required to clean up feces?
>
> A I had come to work one day, and someone had decided that they were going to do in the urinal what needed to be done in the toilet, and it was feces all in the urinal there in the bathroom, and I had to clean that up that day. I reported that to Mr. Anderson, and his response was, "Well, you know we work with immature people. You just need to get it cleaned up."
>
> . . . .
>
> Q Was there a separate occasion other than the time that the feces was in the urinal that you had to clean up?
>
> A Yes.
>
> . . . .
>
> That occasion, a trainman by the name of Mr. Brack happened to be on duty there at Bruceton, and he saw the condition of the bathroom, what it was in, and he went -he told me that he was going to help me clean it . . .
>
> . . . .
>
> There was feces spread around the wall, smeared over the wall. It was coming down the toilet, the outside of the toilet. It was on the floor.

In *Betts v. Costco Wholesale Corp., 558 F.3d 461, 466 (6th Cir. 2009)* (applying Michigan law), the defendant-employer appealed the district court's **[**36]** denial of its motion for judgment as a matter of law following a jury verdict in favor of three of the plaintiffs on their race-based ho stile-work-environment claims. The defendant-employer in *Betts* argued on appeal that the harassment was not sufficiently severe or pervasive to constitute a hostile work environment, *id. at 466-67*, just as CSX successfully argued below in the instant case. Addressing whether the evidence was sufficient for the jury to find in favor of the three plaintiffs on their ho stile-work-environment claims, this court stated:

> **[***23]** Costco's lack-of-severity argument takes a divide-and-conquer approach to the employees' allegations. In other words, Costco insists that the individual allegations of [the three plaintiffs, Amour, Lewis, and Betts] must be examined in isolation in order to accurately assess the merits of each employee's claim. But Costco's approach is inconsistent with the totality-of-the circumstances test employed to determine whether there is a hostile work environment. Under this test, "the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether — taken **[**37]** together — the reported incidents make out such a case." *Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999)*. Indeed, "[t]his court's caselaw therefore makes clear that the factfinder may consider similar acts of harassment of which a plaintiff becomes aware during the course of his or her employment, even if the harassing acts were directed at others or occurred outside of the plaintiff's presence." *Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 336 (6th Cir. 2008)*.
>
> . . . .
>
> Two conflicting scenarios regarding the racial atmosphere at Costco's Warehouse 390 emerge from the record. Under the first scenario, [Warehouse 390 Manager Phil] Sullivan's tendency to **[*518]** make racially insensitive remarks is indicative of poor taste and a bad sense of humor, but the remarks were not intended to create, nor in fact created, a hostile atmosphere for black employees. The incidents that the employees identified are few and far between: Amour's claim is based on nothing more than the six comments or actions set forth in Part II. A. above[2] over a seven-

---

[2] This court summarized:

> Sullivan told Amour that he felt like he was working on a "plantation," which alluded to Costco's numerous black employees.
>
> Darrin Schaeffer, a white supervisor at the Warehouse,

month period. Lewis, in turn, testified to only the **[***24]** four points listed in Part II.A. above.[3] And Thomas's claim was based on only two remarks **[**38]** [Thomas witnessed Sullivan berate Betts, another black employee, to the point of tears, after which Sullivan said, "that girl gets under my skin;" Thomas went to a supervisor to discuss a comment Sullivan made about "hiring more white people;" Sullivan's behavior made Thomas want to move from her position in the store; and the environment once Sullivan arrived at the warehouse was like "walking on egg shells."] *See, e.g.,* *Clay v. United Parcel Serv., 501 F.3d 695, 707-08 (6th Cir. 2007)* (holding that 15 incidents over a two-year time frame did not constitute severe or pervasive conduct). Thomas's claim is further undermined by her admission that she herself did not feel harassed. Indeed, there are even fewer statements relevant to determining whether there was a racially hostile work environment because several of the allegations are not inherently racial, such as Sullivan's comments that Betts "gets under [his] skin." Under this view, a reasonable jury could find that Sullivan's conduct did not "interfere substantially with the employee's employment or create an intimidating, hostile, or offensive work environment." *See* *Downey [v. Charlevoix Cnty. Bd. of Rd. Comm'rs, 227 Mich. App. 621, 576 N.W.2d 712, 716 (1998)*.]

But **[**39]** there is a second scenario that also fits the facts. Several black employees voiced similar complaints about Sullivan's systematic racial bias. Sullivan compared Warehouse 390 to a plantation on two separate occasions. These comments reveal Sullivan's managerial philosophy with respect to his black employees: they were second-class citizens and would be treated accordingly. Indeed, Sullivan called one employee "so black and ugly he would never have her work up front," which expresses the belief **[*519]** that one's value as a cashier depends in part on the employee's skin color. Sullivan also chastised black employees but withheld criticism from white employees whose conduct was essentially the same, and moved white employees to front-end positions while relegating black employees to less desirable floor positions. He also wanted to hire more white women, implying that there were too **[***25]** many black women at Costco. If indeed Sullivan wanted more white employees, one could reasonably infer that creating a hostile atmosphere for black employees to increase their turnover rate would serve this end. Even Sullivan conceded that two Costco employees thought that he was a racist, and one of Sullivan's **[**40]** superiors, Vice President Webb, had personally heard Sullivan make a racially inappropriate remark about watermelons.

Sullivan's position as the Warehouse Manager is also a relevant consideration. He was not simply a low-level supervisor with little impact on the broader workplace. As the Warehouse Manager, Sullivan set the tone at the top. Indeed, his racially charged attitude apparently caught on: at least one other white Costco supervisor, Schaeffer, denigrated Amour in racially loaded terms, calling him "Phil's Boy," "Phil's Bitch," and "Phil's Houseboy." The racial hostility was further evidenced not only by Sullivan's treatment of Costco's employees, but also by his less-than-favorable treatment of its black customers.

---

> called Amour "Phil's Boy," "Phil's Bitch," and "Phil's Houseboy."
>
> Amour heard Sullivan say to white supervisors at the Warehouse that he (Sullivan) "wanted them to hire more white women with big breasts."
>
> Sullivan would treat white customers better than black ones.
>
> A white employee, Ann McCormick, had exactly the same number of employment infractions as another black employee who was reprimanded, but nothing was done to McCormick.
>
> Sullivan moved white employees to Front-End Cashier **[**42]** positions and relegated black employees to less desirable floor positions shortly after making the "plantation" comment.

*Betts, 558 F.3d at 464-65*.

[3] Pertaining to Lewis, *Betts* states:

> Lewis overheard Sullivan say that he thought he was working on a plantation.
>
> Sullivan called Betts a "black-widow spider." Lewis heard the comment and believed that it was racist because there was no reason to call her "black," as opposed to simply calling her a spider.
>
> Sullivan called Betts "so black and ugly he would never have her work up front." (Lewis equivocated about whether she heard the comment first hand or learned about it from a coworker.)

*Betts, 558 F.3d at 465*.

> How one sorts out these two competing racial scenarios at Warehouse 390 is not obvious, as evidenced by the deadlock of the first jury. Certain facts make the employees' claims questionable. The fact that Sullivan socialized with Amour, that Amour was offered a managerial position by Sullivan, and that Thomas conceded she was not harassed lean in favor of Costco. On the other hand, none of these considerations foreclose the possibility that Sullivan "*in fact* . . **[**41]** . created an intimidating, hostile, or offensive work environment." *See* Downey, 576 N.W.2d at 716 (emphasis added).

*Betts, 558 F.3d at 468-70*. Granted, *Betts* amalgamates the evidence from each of the plaintiffs to arrive at the determination that there was sufficient evidence to go to the jury on the race-based hostile environment claim. But Williams's evidence in the instant case is at least comparable to the plaintiffs' in *Betts* in terms of severity, and the cases are similar in that the challenged comments were few.

As in *Betts*, in the instant case, under the totality-of-the circumstances test, there are also two conflicting scenarios. The first is that Wingo, with whom Williams had worked for approximately 2 1/2 years largely without incident, made inappropriate remarks at the Bruceton depot on September 2, 2004, and that a lively discussion ensued that continued the following day. Apart from that, Wingo made several remarks over the 2 1/2 years, i.e., that Williams reminded him of Queen Latifah, that black persons should **[***26]** give their children easily-pronounced **[**43]** names, and that if Williams felt that black persons were treated so badly, they needed to go back to where they came from.

The second scenario is that Williams, the only black employee working at the Bruceton depot had the same janitorial duties as her white-clerk counterparts but, unlike them, was made to clean human feces off the bathroom walls on several occasions, and to clean on a continual basis urine outside the urinal and sink, leading one trial witness to remark that in his 34 years at CSX he had never seen such conditions. When Williams raised the bathroom conditions **[*520]** to a supervisor, she was told that "you know we work with immature people." Craig Spangler, another CSX employee that worked with Williams at the Bruceton depot, testified that when Williams was working the bathrooms were clean and the trash taken out, and when she was not working "Trash would be laying around on the tables. Garbage cans would be full. A couple of times I've walked in the bathroom and you could tell that somebody had used the floor instead of using the commode."

A reasonable fact-finder could thus have inferred that Williams's white counterparts were not made to fulfill their janitorial duties, **[**44]** while she was, regardless of how extreme and unsanitary the conditions were. Under *Oncale*, the jury was permitted to infer from this evidence that Williams was treated differently than her white counterparts because of her race. This inference, in conjunction with the evidence of Wingo's blatantly race-based comments on September 2d and 3d, 2004, and on other occasions, rendered the district court's grant of judgment as a matter of law improper. The claim should have been submitted to the jury.

I would reverse the district court's grant of judgment as a matter of law to CSX on Williams's race-based ho stile-work-environment claim and remand for further proceedings.

---

**End of Document**

# Moore v. Kuka Welding Sys.

United States Court of Appeals for the Sixth Circuit

September 24, 1998, Argued ; March 26, 1999, Decided ; March 26, 1999, Filed

No. 97-1734

**Reporter**

171 F.3d 1073 *; 1999 U.S. App. LEXIS 5294 **; 1999 FED App. 0113P (6th Cir.) ***; 79 Fair Empl. Prac. Cas. (BNA) 795; 75 Empl. Prac. Dec. (CCH) P45,809

GERALD MOORE, Plaintiff-Appellee, v. KUKA WELDING SYSTEMS + ROBOT CORPORATION and EXPERT AUTOMATION INC., d/b/a Expert KUKA, Defendants-Appellants.

**Prior History: [**1]** Appeal from the United States District Court for the Eastern District of Michigan at Detroit. No. 95-75043. Anna Diggs Taylor, District Judge.

**Disposition:** Affirmed.

**Counsel:** ARGUED: John C. Cashen, BODMAN, LONGLEY & DAHLING, LLP, Troy, Michigan, for Appellants.

ARGUED: Robert Van Cleef, Southfield, Michigan, for Appellee.

ON BRIEF: John C. Cashen, BODMAN, LONGLEY & DAHLING, LLP, Troy, Michigan, for Appellants.

ON BRIEF: Robert Van Cleef, Southfield, Michigan, for Appellee.

**Judges:** Before: MERRITT, SILER, AND GILMAN, Circuit Judges.

**Opinion by:** MERRITT

## Opinion

### [***2] [*1076] OPINION

MERRITT, Circuit Judge. Defendants KUKA Welding Systems + Robot Corporation and Expert Automation, Inc. appeal from the district court's entry of judgment against them after a jury verdict in favor of plaintiff Gerald Moore in his Title VII claims alleging hostile work environment, constructive discharge and retaliation. The jury awarded plaintiff both compensatory and punitive damages. Specifically, defendants appeal the denial of their motion for judgment as a matter of law at the close of plaintiff's case, the denial of their motion for a new trial and the award of damages, as well as an evidentiary **[**2]** hearsay question. This is a close case, but our review of the record leads us to conclude that there is no valid basis to overturn the jury's verdict.

### I.

Plaintiff Gerald Moore, an African American, worked as a friction welder for defendants KUKA Welding Systems + Robot Corporation and Expert Automation, Inc. from September 1993 to April 1996, when he quit his job. He had previously worked for Thompson Welding, beginning in 1991, but went to work for KUKA when KUKA bought Thompson Welding in September 1993. When KUKA took over Thompson Welding in September 1993, it paid plaintiff **[***3]** $ 10.00 per hour, which was considered by KUKA to be "in line with the rest of the guys" on the shop floor and was an increase of $ 1.00/hour over his pay at Thompson Welding.

**[*1077]** Plaintiff was the only black on the shop floor among 15-20 employees. Another black man was an engineer at the company, but he did not work on the floor and there was a black janitor named Melvin Gibson, who testified for plaintiff at trial. Tom McCauley, who is white, was plaintiff's supervisor at KUKA from September 1993 until shortly before plaintiff left in April 1996.

In March 1994, about six months after plaintiff **[**3]** started with KUKA, he was asked to train a new employee, Jeff Bambard, who is white. Bambard was hired as a "machine builder," a job considered more skilled than plaintiff's job as a "friction welder." In September 1994, about six months after Bambard arrived, McCauley, the supervisor, told plaintiff that Bambard was the "leader" of the production department. There was conflicting testimony at trial about the nature of the "leader" position, but "leaders" apparently supervise other employees, although they are not

formally within the management structure. Plaintiff was upset that a person whom he had trained had been made a "leader" before him.

It is undisputed from the record that plaintiff was subject to numerous racial slurs and jokes on the job and that, at least to some extent, the behavior was tolerated by the company. In June 1994, a fellow employee, Dick Lance, who is white, yelled out to plaintiff "Hey nigger, hey nigger." Lance said this in the presence of McCauley, the supervisor, who said nothing and had a "smirk" on his face and was shaking his head, according to plaintiff. Plaintiff testified that he felt "badly" about the remark and expected his supervisor to do or **[**4]** say something, but when McCauley did nothing, plaintiff went back to work.

In December 1994, someone wrote "kill all niggers" on the shop's bathroom wall. It was never determined who wrote it. Alan Marsee, a coworker of plaintiff's, saw it, cleaned it off the wall and reported it to McCauley. Marsee testified that **[***4]** upon telling McCauley about the slur, McCauley said "Gerald Moore [plaintiff] probably did it." Plaintiff was not at work that day, but heard about both the writing and McCauley's response from Alan Marsee the next day. In light of the incident, McCauley reminded the employees about the company's anti-harassment policy at the next shop floor meeting.

Plaintiff also considered it an act of racial hostility and said he was treated like a "servant" when he was asked by his supervisor to drive a fellow employee, who was white, in his car. Plaintiff testified that the supervisor told plaintiff to drive and the white man to sit in the back seat.

Plaintiff was also present when fellow employee Dick Lance told racial jokes using the word "nigger," which apparently occurred with some frequency. Lance testified that if plaintiff was present when he told a joke with **[**5]** a racial slur that he always asked plaintiff first if it was OK and plaintiff always said it was. In addition, supervisor McCauley admitted to using the word "nigger-rigging" when a job was poorly done, although he did not use the term in plaintiff's presence.

In September 1994, during plaintiff's first annual review with KUKA, plaintiff received the maximum raise for his position. Plaintiff did not see his actual evaluation, but it was satisfactory overall and noted several areas where plaintiff could improve. Plaintiff found out in November 1994 that Bambard, the person whom he had trained, was paid $ 15/hour, which was more than plaintiff's hourly wage. In December 1994, as a result of finding out about Bambard's rate of pay, plaintiff told McCauley that he would quit if he did not get a raise. McCauley arranged a meeting between himself, plaintiff and Bob Knoll, the plant manager. At the meeting plaintiff complained that he did not get paid as much as Bambard and expressed his concern that he was subject to "race words" on the job. When asked who used "race words," plaintiff refused to identify Dick **[*1078]** Lance as the person who called him "nigger" earlier in the year because McCauley **[**6]** had been there and knew who it was and had taken no action. **[***5]** Plaintiff also testified that he was "afraid" to identify specific people because he was the only black on the floor and had no one to turn to if he complained about white employees. Plaintiff did not get the requested raise and over his Christmas vacation he looked for a new job but could not find one so he returned to KUKA.

The strongest testimony concerning racial discrimination came after plaintiff filed a race discrimination complaint with the EEOC in January 1995. Plaintiff testified that a couple of weeks after he filed the complaint, his supervisor and the other employees began to avoid him and would not talk to him. Plaintiff testified that this isolation began in January 1995 and continued until he quit in 1996. For example, plaintiff and others testified that McCauley told the employees to move their tool boxes from the back of the shop, where plaintiff was located, so they wouldn't talk to plaintiff. In addition, Alan Marsee and Jeff Bambard were removed from the friction welding department, leaving plaintiff as the only employee in that department. McCauley testified that this was due to a downturn **[**7]** in work in the friction welding area.

In April 1996, plaintiff quit his job at KUKA after he found a part-time job with Ford that paid $ 12.54/hr, more than he made at KUKA, but with the reduced hours he made substantially less money and had no benefits. Plaintiff testified that he hoped that the Ford job would become full-time, but as of the date of the briefs in this case plaintiff was still working part-time. Plaintiff says that he left KUKA because he was tired of the racism and isolation.

The EEOC eventually issued plaintiff a right-to-sue letter. Plaintiff's complaint states claims of hostile work environment and racial discrimination under *42 U.S.C. §§ 1981*, *1981a*, *42 U.S.C. § 2000e* (Title VII of the Civil Rights Act of 1964) and Michigan's Elliot-Larsen Civil Rights Act, retaliation under *42 U.S.C. § 2000e-3* and

the Elliot-Larsen Civil Rights Act and a claim for constructive discharge under Michigan law. After a six-day jury trial, the jury returned a verdict for plaintiff on his hostile work **[***6]** environment claim, his constructive discharge claim and his retaliation claim. The jury rejected plaintiff's racial discrimination claim based on disparate pay. The jury **[**8]** awarded damages of $ 20,000 for economic loss after plaintiff left KUKA, $ 50,000 for noneconomic damages and $ 70,000 for punitive damages, for a total of $ 140,000 in damages.

Defendants appealed the district court's failure to grant their motions for judgment as a matter of law, for a new trial and/or remittitur.

**II.**

Denial of judgment as a matter of law is reviewed *de novo*, examining whether there is sufficient evidence to support the jury's verdict when reviewed in the light most favorable to the prevailing party. Judgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party. *See*, *e.g.*, *K & T Enterprises, Inc. v. Zurich Ins. Co., 97 F.3d 171, 175 (6th Cir. 1996)*; *Wehr v. Ryan's Family Steak Houses, Inc., 49 F.3d 1150, 1152 (6th Cir. 1995)*.

**A.*Hostile Work Environment***

Defendants contend that the jury's finding of a hostile work environment is not supported by substantial evidence. To prove that he was subject to a hostile work environment in violation of Title VII, plaintiff must prove: (1) he belongs to a protected group; **[**9]** (2) he was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment and (5) defendant **[*1079]** knew or should have known about the harassment and failed to take action. Harassment affects a "term, condition or privilege of employment" if it is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and creates an abusive working environment. *See generally Harris v. Forklift Systems, Inc., 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)*; *accord Scott v. Central School Supply, Co., 121 F.3d 709 (6th Cir. 1997)*(unpublished). In sum, the **[***7]** plaintiff's evidence must be sufficient to show that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the employee's ability to do his or her job. *Erebia v. Chrysler Plastic Prods. Corp., 772 F.2d 1250, 1256 (6th Cir. 1985)*.

Once this hostile environment is demonstrated, the plaintiff must then show that the employer tolerated the conditions. In order to hold the employer liable for the conduct of coworkers, the plaintiff must establish that the employer **[**10]** knew or should have known of the alleged conduct and failed to take prompt remedial action. *Id.*

While not overwhelming, the evidence, when viewed in its entirety, is sufficient to support the jury's finding of a racially hostile work environment. That racial slurs and jokes took place at KUKA is undisputed. The offensive conduct was not isolated -- it appears that racial slurs and offensive jokes were part of the every-day banter on the shop floor. It is also undisputed that defendants knew about the jokes and use of slurs and did little to correct this problem and in some cases took part in or implicitly condoned the conduct. For example, when plaintiff was called a "nigger" by coworker Dick Lance in front of their supervisor Tom McCauley, McCauley did nothing. When McCauley was informed about a racial slur written on the bathroom wall, he commented that plaintiff probably did it, even though plaintiff was not at work that day and there was no evidence that plaintiff had anything to do with it. There was also testimony that plaintiff was instructed to drive a white employee and the white employee was to sit in the back, presenting the appearance that plaintiff was "chauffeuring" **[**11]** the white employee. There is also testimony that Tom McCauley used the word "nigger-rigging" to refer to poor workmanship. Although apparently not used within plaintiff's hearing or even directed at plaintiff, plaintiff knew that the derogatory term was used. Although plaintiff did not directly complain to his supervisors about the problem until December 1994, McCauley, a supervisor, observed and in some instances contributed to the offensive conduct at KUKA, thereby putting defendants on notice of the conduct. **[***8]** What apparently had the greatest impact on plaintiff's inability to tolerate his work situation was his isolation from his coworkers after filing his EEOC complaint. [1] Plaintiff and

---

[1] We note that isolation from one's offensive coworkers could be viewed as remedial action by an employer to an employee's complaint about his work environment. When asked at oral argument about this defense, however, defendants stated that any isolation complained of by plaintiff was simply the nature of his job and not an affirmative response to his complaints.

others testified that plaintiff was increasingly isolated from his coworkers over time. Employees were instructed not to talk to plaintiff and to remove their tool boxes from his area so they would have no reason to go back there. The janitor was instructed not to clean plaintiff's area.

**[**12]** There is no bright line between harassment and merely rude or obnoxious behavior, but the case presents sufficient evidence to support the jury's verdict of a racially hostile work environment.

**B. *Retaliation***

Plaintiff next contends that the company retaliated against him after he **[*1080]** filed his complaint with the EEOC. Specifically he alleges that he was intentionally isolated from the other employees. He alleges that the other employees were instructed by management not to talk to him, go into his area or otherwise interact with him. Defendants counter that the isolation was simply the nature of plaintiff's job. Friction welding was not a big part of the overall operation and did not often intersect with the jobs performed by the other workers.

To establish retaliation under Title VII, a plaintiff must show (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action and (3) that the adverse action occurred because of the protected activity. *Canitia v. Yellow Freight System, Inc., 903 F.2d 1064, 1066 (6th Cir. 1990)*. The Elliott-Larsen Act, *M.C.L. § 37.2701(a)*, requires the plaintiff to demonstrate that (1) he opposed **[***9]** **[**13]** violations of the Act or participated in an activity protected by the Act and (2) his opposition or participation was a "significant factor" in the adverse employment action. The causal connection between the adverse employment action and the protected activity, here the filing of a complaint with the EEOC, may be established by demonstrating that the adverse action was taken shortly after plaintiff filed the complaint and by showing that he was treated differently from other employees. Plaintiff presented sufficient evidence that his isolation was prompted by the filing of his complaint.

The proximity in time between the increased isolation and the filing of the EEOC complaint allows an inference by the jury that the isolation was in retaliation for undertaking the protected activity of filing the complaint. *See, e.g.*, *Harrison v. Metropolitan Gov't of Nashville and Davidson Cty., Tenn., 80 F.3d 1107, 1118-19 (6th Cir. 1996)*. Other incidents that occurred after plaintiff filed the EEOC complaint were related to the jury by plaintiff and others. These include more frequent disciplinary writeups of plaintiff for trivial matters and unwarranted criticism of plaintiff's work. **[**14]** When viewed as a whole these separate incidents support the jury's finding that defendants retaliated against plaintiff.

**C. *Constructive Discharge***

Plaintiff contends that the hostile work environment and the isolation he suffered after filing his EEOC complaint caused his constructive discharge. To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit. To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined. *E.g.*, *Held v. Gulf Oil Co., 684 F.2d 427, 432 (6th Cir. 1982)*. Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions. The plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive **[***10]** discharge also. *Jenkins v. Southeastern Mich. Chapter, Am. Red Cross, 141 Mich. App. 785, 796, 369 N.W.2d 223, 229 (1985)*(applying **[**15]** Elliott-Larsen Civil Rights Act).

Like plaintiff's hostile work environment claim, this claim also presents a close question. We find, however, that the evidence is sufficient for the jury to have found that a reasonable person in plaintiff's position would have felt compelled to resign. In particular, the testimony supports a finding that plaintiff was so increasingly isolated after filing his EEOC claim that it was reasonable for the jury to infer that defendants intended for plaintiff to quit.

Day after day, week after week of isolation on the job and lack of communication would lead him to believe that he was **[*1081]** no longer wanted and would continue to receive the cold shoulder as long as he worked there.

**D. *Evidentiary Ruling Regarding "Double Hearsay"***

Defendants also argue that the district court erred in allowing testimony it characterizes as "double hearsay." The court allowed plaintiff's witness, Alan Marsee, to testify over defendants' objection that Marsee's brother-in-law, David Morris, a machine builder at KUKA, told Marsee at a social occasion at Marsee's home that Tom McCauley, plaintiff's supervisor, told Morris "some bad stuff's going to happen in the back" **[**16]** (presumably

referring to the friction welding area) and that Marsee should stay out of it unless he wanted to be fired. The district court allowed this alleged "double hearsay" under *Federal Rule of Evidence 802(d)(2)* as a statement against interest that is non-hearsay. McCauley, the supervisor, was also a witness in this case and was subject to examination by both sides.

As an initial matter there is a question about whether the statement meets the definition of hearsay: an out-of-court statement "offered in evidence to prove the truth of the matter asserted." *Fed. R. Evid. 801(c)*. The inference that the plaintiff wishes us to draw here is that the supervisor's statement to the employee shows the company's state of mind **[***11]** of retaliation against plaintiff and permits an inference that the employer felt vindictive toward plaintiff. The statement would therefore seem to be circumstantial evidence of a relevant fact -- the company's intent to retaliate against plaintiff. It is therefore arguably hearsay because it goes to prove the fact of the matter asserted - that the company impermissibly retaliated against plaintiff for filing a discrimination claim. However, we need not **[**17]** decide whether the statement meets the definition of hearsay.

*Rule 801(d)(2)*, the rule relied upon by the district court to admit the statement, governs the admissibility of party-opponent admissions. Specifically, subsection (d)(2)(D) says that a statement is not hearsay if it is a statement "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . . ." Each level of hearsay must fall within an exception to *Rule 801* to be admissible. *Fed. R. Evid. 805*.

Plaintiff argues that the statement is admissible under this exception to the hearsay rule because David Morris, who plaintiff claims is one of the ill-defined "leaders" at KUKA, was an agent of KUKA and McCauley, who in fact was a supervisor at KUKA, considered Morris his agent and instructed Morris to make the statement to Marsee.

Given McCauley's supervisory position, his statement to Morris is not hearsay under *Rule 801(d)(2)(D)* and is admissible. The second level of hearsay, that is, the statement from Morris to Marsee, is more problematic. Morris is clearly not an agent of KUKA. However, given the fact that there is testimony that McCauley **[**18]** *told* Morris to pass the message along to Marsee allows some leeway in finding that McCauley considered Morris an agent and used him as an agent of the company. Under this circumstance, even the second level statement can be viewed as non-hearsay under *Rule 801(d)(2)(D)* and therefore admissible. This is particularly true given the fact that McCauley was a witness subject to examination in court, not simply an out-of-court declarant. Defendants therefore had an opportunity to put before the jury their version of the event in question. They **[***12]** could ask McCauley his version of the facts concerning the statement and its meaning. The hearsay dangers underlying out-of-court statements offered for **[*1082]** their truth - sincerity, memory and not under oath - are not present when the declarant takes the stand as a witness. *See* E. Morgan, *Some Problems of Proof Under the Anglo-American System of Litigation* 141-68 (1956).

### E. *Motion for a New Trial*

Defendants also appeal the denial of their motion for a new trial under *Federal Rule of Civil Procedure 59*, charging that the verdict was against the great weight of the evidence.

When reviewing denial of a motion for a new **[**19]** trial, we must evaluate whether the verdict is supported by the evidence; that is, whether a reasonable juror could reach that verdict based on the facts and the law. *Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 35, 88 L. Ed. 520, 64 S. Ct. 409 (1944)*; *accord* *Bruner v. Dunaway, 684 F.2d 422, 425 (6th Cir. 1982)*. For the reasons discussed above, we cannot say that the district court erred in denying the motion.

### F. *Damages*

Under Title VII, prevailing plaintiffs may recover, in addition to compensatory damages for economic loss, compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *42 U.S.C. § 1981a (b)(3)*; *Landgraf v. USI Film Prods., 511 U.S. 244, 253, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994)*.

Under Title VII prevailing plaintiffs may also recover punitive damages under *42 U.S.C. § 1981a (b)(1)* if they demonstrate that the defendant engaged in discriminatory practices "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Something more than just intentional conduct is necessary for an award **[**20]** of punitive damages.

**[***13]** Here, plaintiff was awarded $ 20,000 for

compensatory economic loss, $ 50,000 for compensatory noneconomic loss and $ 70,000 in punitive damages.

**1.** *Compensatory Damages*. Defendants contend that the jury award for compensatory damages is not supported by substantial evidence because there was insufficient proof that plaintiff suffered any injury, such as emotional distress. In *Carey v. Piphus, 435 U.S. 247, 264, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978)*, the Supreme Court held that compensatory damages cannot be awarded absent proof of injury. *Accord Rodgers v. Fisher Body Div., Gen. Motors Corp., 739 F.2d 1102 (6th Cir. 1984)*. In *Harris v. Forklift Systems, Inc., 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)*, the Supreme Court held that a compensable injury in a hostile work environment claim need not rise to the level of affecting the psychological well-being of the victim, but there must be proof of some mental distress. *Id. at 22*.

Here, plaintiff testified that he was injured because he was "angry" and "upset" about the jokes and slurs and that he "just couldn't take it any more." Plaintiff also complained to **[**21]** his supervisors and started looking for a new job. Accepting plaintiff's narration of the facts as true, this evidence sufficiently demonstrates the requisite injury to support compensatory damages.

Furthermore, the damages must be proportional to the injury. We cannot say that the $ 70,000 award by the jury for compensatory damages is excessive when balanced against the harassment and isolation suffered by plaintiff over time. Plaintiff put up with a fairly steady stream of racial jokes and slurs during his employment, including insensitive conduct and comments by supervisors. Plaintiff **[*1083]** was also intentionally isolated from his coworkers in retaliation for filing an EEOC complaint. The totality of the circumstances supports the compensatory damage award.

**2.** ***Punitive Damages***. Defendants also contend that there was insufficient evidence to support the punitive damage award. The imposition of punitive damages is limited to cases where the plaintiff can show egregious conduct or **[***14]** willfulness, malice or reckless indifference on the part of the defendant. *Wolfel v. Bates, 707 F.2d 932, 934 (6th Cir. 1983)*.

The jury's award of punitive damages was supported by **[**22]** sufficient evidence to escape a directed verdict. The fact that defendants knew and allowed the offensive conduct to continue supports the punitive damage award here. Defendants' apparent indifference to plaintiff's plight, particularly the fact that Supervisor Tom McCauley witnessed and condoned it over a two-and-one-half-year period and even participated himself to some extent, meets the "reckless indifference" standard under the case law. The statement by McCauley to Morris adds fuel to the fire and indicates that retaliation against plaintiff was planned or at least condoned by the company.

Accordingly, we affirm the judgment of the district court.

---

End of Document

# Doe v. Henry Ford Health Sys.

Court of Appeals of Michigan

December 18, 2014, Decided

No. 317973, No. 317975

**Reporter**
308 Mich. App. 592 *; 865 N.W.2d 915 **; 2014 Mich. App. LEXIS 2557 ***

JANE DOE and ALL OTHERS SIMILARLY SITUATED, Plaintiffs-Appellees, v HENRY FORD HEALTH SYSTEM, Defendant/Cross-Plaintiff, and PERRY JOHNSON AND ASSOCIATES INC, Defendant/Cross-Defendant-Appellant, and C TECH LLC, Cross-Defendant.JANE DOE and ALL OTHERS SIMILARLY SITUATED, Plaintiffs-Appellees/Cross-Appellants, v HENRY FORD HEALTH SYSTEM, Defendant/Cross-Plaintiff-Appellant/Cross-Appellee, and PERRY JOHNSON AND ASSOCIATES INC, Defendant/Cross-Defendant, and C TECH LLC, Cross-Defendant.

**Subsequent History:** Leave to appeal denied by *Doe v. Henry Ford Health Sys., 2015 Mich. LEXIS 1995 (Mich., Sept. 16, 2015)*

**Prior History:** **[***1]** Wayne Circuit Court. LC No. 12-001649-NO. Wayne Circuit Court. LC No. 12-001649-NO.

**Counsel:** For DOE JANE/ALL OTHERS SIMILARLY SITUATED, Retained, Plaintiff-Appellee: MATTHEW TURCHYN, BLOOMFIELD HILLS, MI.

For HENRY FORD HEALTH SYSTEM, Retained, Defendant-Cross Plaintiff: JOHN M SIER, DETROIT, MI.

For PERRY JOHNSON AND ASSOCIATES INC, Retained, Defendant-Cross Defendant: JOSEPH R ENSLEN, GRAND RAPIDS, MI.

**Judges:** Before: MURRAY, P.J., and SAAD and HOEKSTRA, JJ.

## Opinion

**[*594]** **[**917]** PER CURIAM.

The present consolidated cases involve a class action concerning allegations of negligence, breach of contract, and invasion of privacy. Defendants Perry Johnson and **[**918]** Associates, Inc. (Perry Johnson), and Henry Ford Health Systems (Henry Ford) appeal by leave granted the order denying their respective motions for summary disposition and the majority of their challenges to class certification. Plaintiffs[1] have filed a cross-appeal in which they contest the trial court's decision to decertify a subgroup in the class, thereby reducing its number from 320 to 159. For the reasons explained in this opinion, we reverse the grant of class certification and we remand for entry of summary disposition in favor of Henry Ford and Perry Johnson. **[***2]**

Plaintiff and the other members of the certified class are a group of 159 patients who had doctor's visits at Henry Ford between June 3 and July 18, 2008. Perry Johnson provides transcription services involving patient records for Henry Ford, and the present case arises from an error by Perry Johnson's subcontractor, Vingspan, that led to the availability of patient records on the Internet. Specifically, Vingspan made a configuration change to their server that left certain patient records "unprotected." As a result, "Googlebot," Google's automated web crawler, indexed the information, thereby making it possible to find patient information through Google's search engine. The information made **[*595]** accessible included the patient's name, medical record number, the date of the patient's visit, the location of the visit, the physician's name, and a summary of the visit. In plaintiff's particular case, this information included diagnoses of "Cervical dysplasia secondary to HPV (Human Papillomavirus)"—a sexually transmitted disease—and alopecia, i.e., baldness.

After Henry Ford learned **[***3]** of the problem, all information was made inaccessible on the Internet, the affected patients were notified, and steps were taken to more adequately protect patient information. Notably, there is no indication in the lower court record that the information in question was viewed by a third party on

[1] As used in this opinion, "plaintiff" refers to Jane Doe and "plaintiffs" denotes all the class members collectively.

the Internet[2] or that it was used inappropriately. Henry Ford established a "hotline" following the incident and received no report, through the hotline or otherwise, that patient information had been viewed online or used for identity-theft purposes. Plaintiff likewise conceded at her deposition that she had no indication that anyone saw, or used, any of her information that had been made visible on the Internet.

Following Henry Ford's notification to the patients, plaintiff filed the current lawsuit and sought class certification. Her suit includes three claims: (1) negligence, (2) invasion of privacy in the form of public disclosure of private facts, and (3) breach of contract under the theory that **[***4]** she was a third-party beneficiary of Henry Ford's agreement with Perry Johnson. Plaintiff's complaint sought "all damages" suffered by her and those similarly situated. When asked during discovery particularly what harm she had suffered and damages she intended to pursue, plaintiff advanced a theory **[*596]** of "presumed damages" and generally indicated that she and the others were "entitled to compensation as a result of the Defendant's invasion of their common interest in privacy." However, the only actual losses she identified were those incurred for the procurement of monitoring to guard against identity theft. In total, plaintiff's attorney paid $275 to a company **[**919]** called "LifeLock" for identity-theft protection on plaintiff's behalf. Plaintiff and her counsel both expressly acknowledged during the discovery process that they were not seeking damages for emotional distress, wage loss, or personal injury.

Over objections from Perry Johnson and Henry Ford, the trial court granted class certification. Initially the class consisted of 320 individuals, but the trial court later reduced that number to the 159 members mentioned earlier.[3] Both Perry Johnson and Henry Ford moved for summary **[***5]** disposition, and the trial court denied those motions. Henry Ford and Perry Johnson now both appeal by leave granted the denial of their respective motions for summary disposition. Also, plaintiff filed a cross-appeal, contesting the trial court's reduction of the class from 320 individuals to 159.

Appellate review of a motion for summary disposition is de novo. *Spiek v Dep't of Transp, 456 Mich 331, 337, 572 N.W.2d 201 (1998)*. A motion for summary disposition under *MCR 2.116(C)(10)* tests the factual support of the plaintiff's claim and should be granted, as a matter of law, if no genuine issue of any material fact **[*597]** exists to warrant a trial. *Id* This Court considers the pleadings, affidavits, depositions, admissions and other evidence submitted by the parties in a light most favorable to the nonmoving **[***6]** party. *Maiden v Rozwood, 461 Mich 109, 120; 597 NW2d 817 (1999)*; *MCR 2.116(G)(5)*. A material question of fact exists when, after viewing the evidence in a light most favorable to the nonmoving party, reasonable minds could differ on the issue. *Allison v AEW Capital Mgmt., L.L.P., 481 Mich. 419, 425; 751 N.W.2d 8 (2008)*.

When reviewing a trial court's certification of a class, we review the trial court's findings of fact for clear error and its discretionary decisions for an abuse of discretion. *Duncan v Michigan, 300 Mich App 176, 185; 832 NW2d 761 (2013)*. The interpretation and application of a court rule involves questions of law that this Court reviews de novo. *Id.*

On appeal, we first consider whether a material question of fact remains in regard to plaintiff's claim for invasion of privacy in the form of public disclosure of private facts. Among other arguments regarding this claim, we are asked to address whether it must be dismissed because invasion of privacy is an intentional tort and it is undisputed that the information in question became accessible on the Internet through negligence. Plaintiff, in contrast, maintains that invasion of privacy may be established without regard for whether the disclosure of information was intentional.

In basic terms, to prove invasion of privacy through the public disclosure of private facts, a **[***7]** plaintiff must show "(1) the disclosure of information (2) that is highly offensive to a reasonable person and (3) that is of no legitimate concern to the public." *Doe v Mills, 212 Mich App 73, 80; 536 NW2d 824 (1995)*. The information revealed must relate to the individual's private as **[*598]** opposed to public life. *Lansing Ass'n of Sch Adm'rs v Lansing Sch Dist Bd of Ed, 216 Mich App 79, 89; 549 NW2d 15 (1996)*. "Liability will not be imposed for giving publicity to matters that are already of public

---

[2] There is evidence that an unknown patient discovered his or her own personal medical records online, but there is absolutely no indication that records were otherwise accessed via the Internet.

[3] The additional members decertified from the class were Henry Ford patients who had information made available online relating to doctor's visits between February 23 and April 23, 2009. This availability of information was factually distinct, however, in that Perry Johnson and Vingspan were uninvolved. A different contractor, C Tech LLC, and its subcontractor, Odyssey, had responsibility for the medical records and their subsequent availability on Google.

record or otherwise **[**920]** open to the public." *Doe, 212 Mich App at 82*. Further, the "publicity" must consist of communicating that information "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Restatement, Torts 2d, § 652D, comment a*, p 384. See also *Lansing Ass'n of Sch Adm'rs, 216 Mich App at 89*.

We are not aware of a Michigan case that overtly considered whether the disclosure of private information to the public must have been done intentionally, but our review of Michigan caselaw leads us to conclude that it is in fact an intentional tort. Specifically, we find it notable that the public disclosure of private facts has been discussed by the Michigan Supreme Court as an intentional tort. See, e.g., *Smith v Calvary Christian Church, 462 Mich 679, 680, 688-689; 614 NW2d 590 (2000)*. Further, we are not aware of—nor has plaintiff presented us with—any Michigan case in which an action alleging invasion of privacy proceeded on the basis of negligent disclosure. The conduct **[***8]** involved has instead been the intentional disclosure of private facts. See, e.g., *id* (considering a pastor's announcement of a parishioner's sins during church services); *Doe, 212 Mich App at 77* (involving protestors' display of signs informing public about specific women's intentions to undergo abortions); *Winstead v Sweeney, 664, 673; 517 NW2d 874 (1994)* (discussing publication of a newspaper article detailing facts about the plaintiff's sex life). Given that no Michigan authority discusses a cause of action for invasion of privacy premised on negligent conduct, the logical conclusion is that such **[*599]** a cause of action does not exist in Michigan. Cf. *Price v High Pointe Oil Co, Inc, 493 Mich 238, 250; 828 NW2d 660 (2013)* (concluding that noneconomic damages for negligent destruction of property not available in Michigan when such damages had never before been contemplated in Michigan's caselaw). Consequently, we conclude that to establish an invasion of privacy through the disclosure of private facts, a plaintiff must show that the disclosure of those facts was intentional.[4] Because the undisputed facts in this case indicate nothing more than a negligent disclosure of private information, no material question of fact remains and summary disposition should have been granted regarding plaintiff's invasion-of-privacy claim.

Regarding plaintiff's claims for negligence and breach of contract, on appeal, the parties dispute the availability of damages to compensate for the procurement of identity-theft protection. Henry Ford and Perry Johnson both contend that, in the absence of evidence of present injury to plaintiff's person or property, such damages are not recoverable in negligence, breach of contract, or invasion of privacy.[5] Plaintiff, in contrast, maintains that the **[**921]** present injury in this case consists of the invasion of her privacy, for which she maintains she **[*600]** may recover costs associated with LifeLock's services. For the reasons described below, we agree with Henry Ford and Perry Johnson, and we hold that plaintiff's identity-theft-protection services are not cognizable damages in the absence of a present injury.

Specifically, in the negligence context, in order to establish a claim for negligence, plaintiffs must prove: "(1) that defendant owed them a duty of care, (2) that defendant breached that duty, (3) that plaintiffs were injured, and (4) that defendant's breach caused plaintiffs' injuries." *Henry v Dow Chem Co, 473 Mich 63, 71-72; 701 NW2d 684 (2005)*. Stated differently, in a negligence action, plaintiffs must show "duty, breach of that duty, causation, and damages." *Id. at 72* (quotation marks omitted). Underlying these four elements is the issue of injury, and it is well settled that, in Michigan, the injury complained of in a negligence action must be an actual, present injury. *Id. at 74-76*. "It is a *present* injury, not fear of an injury in the future, that gives rise to a cause of action under negligence theory." *Id. at 73*. Consequently, damages "incurred in anticipation of possible future injury rather than in response to present injuries" are not cognizable under Michigan law. *Id.* Thus, for example, in *Henry*, the Court determined that the plaintiffs, individuals living and working in the Tittabawassee floodplain **[***11]** , could not pursue damages for medical monitoring services when there was no indication, as of yet, that anyone had been harmed by the release of dioxin into the floodplain. *Id. at*

---

[4] This view comports not **[***9]** only with Michigan's caselaw, but with that of other jurisdictions, see, e.g., *Randolph v ING Life Ins & Annuity Co, 973 A2d 702, 711 (DC, 2009)*; *Granger v Klein, 197 F. Supp. 2d 851, 869 (ED Mich 2002)*; *Snakenberg v Hartford Cas Ins Co, Inc, 299 SC 164, 170-171; 383 SE2d 2 (1989)*, and with learned treatises, see, e.g., 77 CJS, Right of Privacy and Publicity, § 32, p 568 (stating that the tort of public disclosure of private facts "involves the *intentional* public disclosure of private facts") (emphasis added); 3 Dobbs, Hayden & Bublick, Torts (2d ed), § 581, p 368 (recognizing that disclosure must be intentional to give rise to liability).

[5] Having determined that **[***10]** no material question of fact remains regarding plaintiff's invasion-of-privacy claim, we need not address what damages would be available in relation to such a claim.

68-70.

Analogously, in this case, plaintiff has not shown that the costs for the credit-monitoring services relate to a present, actual injury. She has in fact conceded that she has no evidence that her information was viewed by anyone on the Internet or used for an improper purpose **[*601]** such as identity theft. Absent some such indication of present injury to her credit or identity, it is clear that these damages for credit monitoring were incurred in anticipation of possible future injury. See id. at 73. Because "these economic losses are wholly derivative of a *possible, future* injury rather than an *actual, present* injury," id. at 78, the costs of these credit-monitoring services are not cognizable under Michigan's negligence law.[6]

Similarly, in regard to breach of contract, a party claiming a breach must establish (1) that there was a contract, (2) that the other party breached the contract, and (3) that the party asserting breach of contract suffered damages as a result of the breach. Dunn v Bennett, 303 Mich App 767, 774; 846 NW2d 75 (2013) ). The measure of damages in relation to a breach of contract is "'the pecuniary value of the benefits the aggrieved party would have received if the contract had not been **[**922]** breached.'" Ferguson v Pioneer State Mut Ins Co, 273 Mich App 47, 54; 731 NW2d 94 (2006)(citation omitted).. "The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach." Alan Custom Homes, Inc v Krol, 256 Mich App 505, 512; **[*602]** 667 NW2d 379 (2003). Thus, in contrast, the damages "must not be conjectural or speculative in their nature, or dependent upon the chances of business or other contingencies . . . ." McEwen v McKinnon, 48 Mich 106, 108; 11 NW 828 (1882). See also Body Rustproofing, Inc v Mich Bell Tel Co, 149 Mich App 385, 390; 385 NW2d 797 (1986).

In this case, assuming arguendo that plaintiff could seek damages for breach of the contract in question, plaintiff's claim for credit-monitoring services are speculative **[***13]** insofar as they do not arise from the purported breach of contract but depend entirely on the occurrence of multiple contingencies which might or might not occur at some point in the future. That is, the alleged breach has not caused plaintiff to suffer an injury to her identity or credit. Rather, any injury is entirely contingent on the hypothetical possibility that some unknown person viewed the information and at some unknown time in the future might make use of it for nefarious purposes. Because her speculative damages derive from a possible future harm that might or might not occur, rather than directly from the breach of contract, plaintiff may not recover under contract law for the cost of credit-monitoring services. See McEwen, 48 Mich at 108. See also Hendricks v DSW Shoe Warehouse, Inc, 444 F Supp 2d 775, 780 (WD Mich 2006).

In regard to both negligence and breach of contract, plaintiff offers the assertion on appeal that, because she has suffered an invasion of privacy, injury is presumed and she may therefore recover "presumed" damages. Plaintiff's assertion is entirely unsupported given that plaintiff is required to prove "all" damages in a negligence action, Adams v Cleveland-Cliffs Iron Co, 237 Mich App 51, 72; 602 NW2d 215 (1999), and to demonstrate **[*603]** the existence of an actual, present injury, Henry, 473 Mich at 74-76. In short, setting aside that plaintiff does not have **[***14]** a viable invasion of privacy claim, damages will not be presumed in a negligence action for an alleged invasion of privacy. Cf. Amburgy, 671 F Supp 2d at 1055. Likewise, damages are not presumed in relation to contracts, in which cases a plaintiff is instead required to prove the measure of damages with "reasonable certainty." Alan Custom Homes, Inc, 256 Mich App at 512.

In sum, we will not presume damages from plaintiff's purported invasion of privacy, and plaintiff's claim for credit monitoring is not cognizable. Because plaintiff has failed to identify any other damages she wishes to pursue in relation to negligence or breach of contract,[7]

[6] This conclusion comports not only with Henry's reasoning, but with the persuasive authority of the numerous courts that have determined that credit-monitoring services may not be recovered as damages to combat an increased risk of future identity theft following a data breach when there has been no evidence **[***12]** of identity theft. See, e.g., Reilly v Ceridian Corp, 664 F3d 38, 45 (CA 3, 2011); Randolph v ING Life Ins & Annuity Co, 486 F Supp 2d 1, 7 (D DC, 2007); Pisciotta v Old Nat Bancorp, 499 F3d 629, 639 (CA 7, 2007); Amburgy v Express Scripts, Inc, 671 F Supp 2d 1046, 1055 (ED Mo 2009); Shafran v Harley-Davidson, Inc, unpublished opinion of the United States District Court for the Southern District of New York, issued March 20, 2008 (Docket No. 07 CIV 01365 (GBD)), 2008 U.S. Dist. LEXIS 22494 (2008)

[7] Plaintiff maintains that Perry Johnson and Henry Ford misstate the lower court record by suggesting that the only damages she intends to pursue relate to economic damages

she has not **[**923]** shown that a material question of fact remains and summary disposition therefore should have been granted in regard to both of these claims. *MCR 2.116(C)(10)*. See *Village of Dimondale v Grable, 240 Mich App 553, 566; 618 NW2d 23 (2000)*; *New Freedom Mtg Corp v Globe Mtg Corp, 281 Mich App 63, 69-70; 761 NW2d 832 (2008)*. As discussed, plaintiff's claim for invasion of privacy should likewise have been dismissed because no material question of fact remains regarding whether the disclosure in this case was intentional. *MCR 2.116(C)(10)*.

**[*604]** Having determined that plaintiff has no individual claims to pursue against either Henry Ford or Perry Johnson, we also conclude that the trial court's grant of class certification must be reversed. See *MCR 3.501(A)(1)*. That is, "[t]he threshold question in any proposed class action is whether the proposed class representative is a member of the class." *A&M Supply Co v Microsoft Corp, 252 Mich App 580, 598; 654 NW2d 572 (2002)*. See also *MCR 3.501(A)(1)(c)* (stating that, to merit class certification, a representative for the class must have claims typical of the class). "A plaintiff who cannot maintain the cause of action as an individual is not qualified to represent the proposed class." *Zine v Chrysler Corp, 236 Mich App 261, 287; 600 NW2d 384 (1999)*. See also *Tucich v Dearborn Indoor Racquet Club, 107 Mich App 398, 407; 309 NW2d 615 (1981)* ("[O]ne may not sue in a class action a defendant whom one could not sue individually."). It follows that, because plaintiff is not a qualified representative, the trial **[***16]** court abused its discretion by certifying the class and the order granting class certification must be reversed.[8] See *Camden v Kaufman, 240 Mich App 389, 402; 613 NW2d 335 (2000)*. We therefore reverse the grant of class certification and remand for entry of summary disposition in favor of Henry Ford and Perry Johnson.

Reversed and remanded for entry of summary disposition for Henry Ford and Perry Johnson.

/s/ Christopher M. Murray

/s/ Henry William Saad

/s/ Joel P. Hoekstra

End of Document

---

incurred for identity-theft-protection monitoring. Despite these protests, apart from the assertion of presumed **[***15]** damages (which is without merit), plaintiff does not identify what additional damages she intends to pursue. In fact, in the lower court, she specifically indicated that she would not be pursuing claims of personal injury, emotional distress, or wage loss, and we view these concessions as an abandonment or waiver of those damages. See *Braverman v Granger, 303 Mich App 587, 609; 844 NW2d 485 (2014)*. See also *Greenwood v Davis, 106 Mich 230, 235; 64 NW 26 (1895)*. In short, she has failed to identify the damages necessary to survive a motion for summary disposition.

[8] Having determined that class certification was an abuse of discretion, we find no merit to plaintiff's assertion on cross-appeal that the class size should have been larger. Plaintiff was no more qualified to represent the larger class than she was to represent the 159 individuals in question.

# *Dumas v. Auto Club Ins. Ass'n*

Supreme Court of Michigan

October 2, 1990, Argued ; July 31, 1991, Decided ; August 2, 1991, Filed

Docket No. 83982

**Reporter**
437 Mich. 521 *; 473 N.W.2d 652 **; 1991 Mich. LEXIS 1813 ***; 60 U.S.L.W. 2208; 6 I.E.R. Cas. (BNA) 1249

RICHARD DUMAS, LYNN McBRIDE, and EUGENE PASKO, et al, Plaintiffs-Appellees, Cross-Appellants, v. AUTO CLUB INSURANCE ASSOCIATION, a Michigan corporation, Defendant-Appellant, Cross-Appellee

**Subsequent History:** **[***1]** Rehearing denied *438 Mich 1202*.

Rehearing denied by *Dumas v. Auto Club Ins. Ass'n, 438 Mich. 1202, 1991 Mich. LEXIS 2050 (1991)*

**Prior History:** *168 Mich App 619; 425 NW2d 480 (1988)*.

*Dumas v. Auto Club Ins. Ass'n, 168 Mich. App. 619, 425 N.W.2d 480, 1988 Mich. App. LEXIS 259 (1988)*

**Disposition:** Reversed.

**Counsel:** *Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick* (by *Richard E. Shaw* and *Sheldon L. Miller*) for the plaintiffs.

*Fox & Grove, Chartered* (by *Kalvin M. Grove, Steven L. Gillman*, and *Allison C. Blakley*) and *Finkel, Whitefield & Selik* (by *Robert J. Finkel*) for the defendant.

Amici Curiae:

*Conboy, Fell, Stack, Lieder & Hanson* (by *Lloyd C. Fell*) for General Motors Corporation.

*Clark, Klein & Beaumont* (by *Dwight H. Vincent, J. Walker Henry*, and *Rachelle G. Silberberg*) for Michigan Manufacturers Association.

*Miller, Canfield, Paddock & Stone* (by *Diane M. Soubly*) for American Society of Employers, Motor Vehicle Manufacturers Association of the United States, Inc., Greater Detroit Chamber of Commerce, and Michigan State Chamber of Commerce.

*Mark Granzotto, Monica Farris Linkner*, and *Charles P. Burbach* for Michigan Trial Lawyers Association.

**Judges:** Dorothy Comstock Riley, J. James H. Brickley, Robert P. Griffin, JJ. Patricia J. Boyle, J., concurring. Michael F.Cavanaugh, C.J., concurring in **[***2]** the result. Charles L. Levin, J., dissenting. Justice Conrad L. Mallet, Jr., took no part in the decision of this case.

**Opinion by:** RILEY

## Opinion

**[*524]** **[**653]** Two questions are presented in this appeal. First, whether plaintiffs have actions for breach of contract on the basis that they were informed of a particular compensation system upon entering defendant's work force, and the system was subsequently changed. A subissue is whether those plaintiffs who were promised the policy would remain in force "forever" have actions for breach of contract. The second question is **[*525]** whether plaintiffs can maintain claims for unjust enrichment against defendant.

We hold that the Court of Appeals improperly determined that plaintiffs could maintain actions against defendant for breach of contract and unjust enrichment. Therefore, we reverse the decision of the **[**654]** Court of Appeals.

I. FACTS AND PROCEEDINGS

In the instant case, approximately 180 plaintiffs are suing the Auto Club Insurance Association. Plaintiffs are current and past members of defendant's insurance sales force.

Upon commencing employment, all plaintiffs were

informed that they would be paid under the "Accrued Commission Plan." Under the commission **[***3]** plan, they would receive seven percent [1] commissions on insurance policies sold and upon policy renewals. The commission amounts were tied to policy premiums. Also, for the first year of employment, new salespersons received a base salary to supplant renewal commissions which were unavailable during the first year. All sales employees were on the same compensation system with regard to the seven percent commissions.

Early in 1977, defendant realized a substantial drop in its cash reserves and decided to address the problem. In the wake of analyses by defendant's outside accounting firm, defendant concluded that the payment system for the commissioned sales force was a major contributor to its cash reserve problem.

On December 2, 1977, defendant notified its sales force in writing of its intent to change the compensation plan. Instead of commissions based **[*526]** on a percentage of the premiums, salespersons would **[***4]** be paid a flat rate for each policy sold. Though the new plan was implemented by January 1, 1978, during the period from January to July, defendant adjusted compensation so that no employees would experience a reduction in income unless their volume of business fell. The new "unit commission plan" became fully effective July 1, 1978.

On February 8, 1978, a union was certified to represent defendant's sales force. The union filed a complaint with the National Labor Relations Board in May of 1978, alleging unfair labor practices by defendant in unilaterally changing the commission system and refusing to bargain with the union. In August, 1979, the board ruled in favor of defendant, finding that the plan was instituted before the union was certified.

On May 26, 1983, plaintiffs filed a complaint in the Wayne Circuit Court, alleging breach of contract, violations of the Civil Rights Act, fraud and misrepresentation, unjust enrichment, and promissory estoppel.

On January 10, 1984, pursuant to a motion for summary disposition filed by defendant in July of 1983, the circuit court dismissed claims based on new policies, or renewals based on those policies, purchased after the date of the **[***5]** change in payment plans.

On January 18, 1984, plaintiffs filed a motion for rehearing which was denied on February 29, 1984. Subsequently, plaintiffs' application for interlocutory appeal was denied by the Court of Appeals.

On August 19, 1986, the trial court ruled on motions for partial summary disposition filed by defendant and plaintiffs respectively. For the purpose **[*527]** of clarity, the court divided plaintiffs into three groups:

*Group A* consisted of 139 plaintiffs who were informed of the seven percent commission system upon being hired. This group was not promised that the payment system would be in place for any particular duration.

*Group B* consisted of twenty plaintiffs who were told by defendant prior to or at the time of hiring that the seven percent commission plan would last "forever."

*Group C* consisted of twenty plaintiffs. Group C began employment with the same understanding as Group A, but after they began work they were told by defendant that the seven percent plan would last "forever."

With regard to Group A, the court determined that no claim for breach of contract **[**655]** existed and granted summary disposition for defendant. The court reasoned that **[***6]** defendant did not foreclose its right to change its compensation plan.

With regard to Group B, the trial court decided a factual issue existed regarding whether the word "forever" created an enforceable promise not to change the payment plan. However, the court dismissed the claims on the basis of the statute of frauds.

With regard to Group C, the court granted summary disposition for defendant because the oral promise subsequent to hiring lacked consideration.

The court also dismissed plaintiffs' claims of fraud, misrepresentation, promissory estoppel, age discrimination, and unjust enrichment. [2]

On October 3, 1986, the trial court entered the final order regarding summary disposition. Plaintiffs **[*528]** appealed, and the Court of Appeals reversed the trial court's grant of summary disposition regarding the breach of contract and unjust enrichment claims.

---

[1] Salespersons located outside the metropolitan Detroit area received 7.5 percent commissions.

[2] This appeal only concerns the claims of breach of contract and unjust enrichment.

*Dumas v Auto Club Ins Ass'n, 168 Mich App 619; 425 NW2d 480 (1988)*.

**[***7]** Defendant appealed, and this Court held *Dumas* in abeyance pending decisions in *In re Certified Question, Bankey v Storer Broadcasting Co, 432 Mich 438; 443 NW2d 112 (1989)*, and *Bullock v Automobile Club of Michigan, 432 Mich 472; 444 NW2d 114 (1989)*. On May 4, 1990, subsequent to the issuance of opinions in those cases, this Court granted leave to appeal. *434 Mich 911 (1990)*.

II

The first question to be addressed is whether plaintiffs can maintain claims for breach of contract where defendant unilaterally altered the terms upon which plaintiffs were compensated. Plaintiffs do not challenge the new system with regard to new policies purchased after the date of the change. Plaintiffs only challenge the system as it applies to renewals of old policies purchased before the change in compensation plan.

A. GROUP A

Group A was informed of the seven percent commission at the time of hiring, but defendant made no explicit promises to plaintiffs regarding the duration of the policy. In framing the breach of contract action with regard to Group A, it is important to note that because no express promises **[***8]** of permanency were made to plaintiffs, any contractual rights to that effect had to spring from the "legitimate expectations" leg of *Toussaint v Blue Cross & Blue Shield of Michigan, 408 Mich 579, 598;* ***[*529]*** *292 NW2d 880 (1980)*. [3] Thus, the threshold inquiry for Group A should be whether to extend the "legitimate expectations" leg of *Toussaint* beyond wrongful discharge disputes to cover an employer's compensation policy. [4] We choose not to extend the "legitimate expectations" cause of action to this case.

**[***9]** In *Toussaint,* this Court held that a company's written policy statements providing for dismissal for just cause may create contractual obligations if the statements give rise in the employee to legitimate expectations of dismissal for just cause. In *Toussaint,* this Court found that the plaintiff's wrongful discharge claim based on written policy statements and express oral statements could be submitted to a jury.

While *Toussaint* created a "legitimate expectations" claim in the wrongful-discharge **[**656]** setting, earlier cases held that written policy statements could give rise to contractual obligations outside the discharge context. [5] Although some of the cases dealt with compensation policies, those policies created contract rights with regard to *deferred* compensation. As Justice Ryan stated in his dissent in *Toussaint, supra, p 648*:

> **[*530]** In each of the cases cited, policy statements by the employer announced the existence of bonus, profit-sharing or pension benefits and the employer or the claimant-employee satisfied the burden of proof that *work already performed was in consideration of the announced benefit and that what was sought was* **[***10]** *merely deferred compensation.* [Emphasis added.]

In other words, a change in a compensation policy which affects vested rights already accrued may give rise to a cause of action in contract. *In re Certified Question, supra, p 457, n 17*. However, in the instant case, there were no representations made to plaintiffs with regard to deferred compensation. The right to renewal commissions depends on the **[***11]** contract between the agent and insurance company. *Stevenson v Brotherhoods Mutual Benefit, 317 Mich 575, 580; 27 NW2d 104 (1947)*. Unless otherwise provided by contract, renewal commissions or future commissions do not rest upon the sale of the original policy. Renewal contracts are separate from the originals, in part

---

[3] Plaintiffs assert that Group A received the same oral promises as Group B. However, because Group A plaintiffs have no memory that they were promised seven percent commissions "forever," and no evidence on the record supports such a promise, we find as a matter of law that no such express promises were made to Group A.

[4] The legitimate-expectations theory operates outside the principles governing unilateral contract formation. *In re Certified Question, supra, p 453*.

Further, the question whether employee expectations are legitimate is a question of law for the court. See *Bullock, supra at 507* (separate opinion of Levin, J.).

[5] *Cain v Allen Electric & Equipment Co, 346 Mich 568; 78 NW2d 296 (1956)* (severance pay), *Psutka v Michigan Alkali Co, 274 Mich 318; 264 NW 385 (1936)* (death benefits), *Gaydos v White Motor Corp, 54 Mich App 143; 220 NW2d 697 (1974)* (severance pay), *Clarke v Brunswick Corp, 48 Mich App 667; 211 NW2d 101 (1973)* (severance pay), and *Couch v Difco Laboratories, Inc, 44 Mich App 44; 205 NW2d 24 (1972)* (profit-sharing plan).

requiring additional effort and consideration by salespersons in keeping policies alive. *Id. at 581*. In the instant case, plaintiffs do not contend that their contracts provided for the vesting of renewal commissions upon the sale of original policies.

In fact, each of the cases cited in n 5 operate under traditional contract principles. For instance, in *Cain v Allen Electric & Equipment Co, 346 Mich 568, 579-580; 78 NW2d 296 (1956)*, the Court stated:

> In short, the adoption of the described policies by the company constituted an offer of a contract. This offer . . . "the plaintiff accepted . . . by continuing in its employment beyond the 5-year period specified in exhibit B . . . ."

**[*531]** While the deferred compensation cases are subject to contract law, the "legitimate expectations" **[***12]** doctrine of *Toussaint* does not follow traditional contract analysis. Therefore, it does not logically follow that *Toussaint* should be extended to the area of compensation. Also, since employees' accrued benefits are protected by the presence of traditional contract remedies, there is no need to extend the expectations rationale to compensation.

In addition to the lack of precedent extending *Toussaint* to facts similar to those presented here, policy considerations weigh in favor of containing *Toussaint* to the wrongful-discharge scenario. Were we to extend the legitimate-expectations claim to every area governed by company policy, then each time a policy change took place contract rights would be called into question. The fear of courting litigation would result in a substantial impairment of a company's operations and its ability to formulate policy. Justice Griffin's majority opinion in *In re Certified Question, supra, p 456*, discussed the nature of a business policy:

> In other words, a "policy" is commonly understood to be a flexible framework for operational guidance, not a perpetually binding contractual obligation. In the modern economic **[***13]** climate, the operating policies of a business enterprise must be adaptable and responsive to change.

Our opinion in *In re Certified Question* was in furtherance of this Court's traditional reluctance to limit or second guess the decision-making ability of business management. As stated in *In re Butterfield Estate, 418 Mich 241, 255; 341 NW2d 453 [**657] (1983)*, "[a] court should be most reluctant to interfere with the business judgment and discretion of directors in the conduct of corporate affairs."

**[*532]** Much the same conclusion was reached by Justice Griffin in *Bullock v Automobile Club of Michigan, supra, pp 521-522*:

> Even if it can be said that policy considerations were sufficient to justify the *Toussaint* intervention to protect job security, it is difficult to imagine the scope of difficulties and mischief that would be encountered if *Toussaint* were to be extended beyond wrongful discharge into every facet of the employment relationship. Particularly in light of the enormous potential cost to the system that such an extension would entail, including damage to the delicate balance of the employee-employer relationship, **[***14]** I take this occasion to express the view that it would be prudent and wise to leave to the Legislature the public policy decision whether, or to what extent, *Toussaint* should be extended beyond wrongful discharge. [Griffin, J., concurring in part and dissenting in part.]

Given the traditional reluctance of courts to interfere with management decisions and the needed flexibility of businesses to change their policies to respond to changing economic circumstances, we conclude that *Toussaint* should not be extended to create legitimate expectations of a permanent compensation plan. Previous cases have not extended the legitimate-expectations theory to facts similar to these, and we decline the opportunity to extend the theory to compensation terms.

B. GROUP B

Members of Group B claim they were told before or at the time of hiring that they would receive seven percent commissions "forever" on policies sold. Group B plaintiffs argue that defendant breached the express terms of their employment **[*533]** contracts by changing the payment system to award a flat rate upon the sale of each renewal policy. We disagree. We find the claimed promise by defendant that the seven percent **[***15]** renewal commissions would last "forever" to be unenforceable under the statute of frauds.

The relevant section of the statute of frauds, *MCL 566.132(a)*; MSA 26.922(a), provides in pertinent part:

> In the following cases an agreement, contract or promise shall be void, unless that agreement, contract, or promise, or a note or memorandum thereof is in writing and signed by the party to be

> charged therewith, or by a person authorized by him:
>
> (a) An agreement that, by its terms, is not to be performed within 1 year from the making thereof.

To determine whether an agreement comes within this section, the proper inquiry is whether the contract is capable of performance within one year of the agreement. This Court discussed the rule in *Smalley v Mitchell, 110 Mich 650, 652; 68 NW 978 (1896)*:

> The mere fact that the contract may or may not be performed within the year does not bring it within the statute. The rule is that if, by any possibility, it is capable of being completed within a year, it is not within the statute . . . . [See also *Fothergill v McKay Press, 361 Mich 666; 106 NW2d 215 (1960)*.]

In *Drummey v Henry, 115 Mich App 107;* **[***16]** *320 NW2d 309 (1982)*, the plaintiff sued the defendant for sales commissions allegedly owed under an oral employment contract. The defendant countered that any such agreement could not be performed **[*534]** within one year and was unenforceable under the statute of frauds. The trial court directed a verdict for the defendant on the basis of the statute of frauds.

The Court of Appeals reversed, finding that the record was devoid of evidence showing that the agreement could not be performed within one year. The Court stated that it was possible, though unlikely, that the plaintiff would have made sales within the first year. Thus, the contract was capable of performance within one year and outside the statute of frauds.

**[**658]** Defendant argues that *McLaughlin v Ford Motor Co, 269 F2d 120 (CA 6, 1959)*, controls this case. In *McLaughlin,* the plaintiff was promised by the defendant that after he worked for one year in the cost department, he would be offered a position in general management. The plaintiff began working several days after the oral agreement was reached. After working for more than three years, and without being offered a general management **[***17]** position, the plaintiff was discharged.

The plaintiff sued the defendant for failing to uphold its promise, and, subsequently, the jury found for the defendant. On appeal, the court affirmed, finding that the agreement was invalid under the statute of frauds. The court reasoned that the parol agreement was invalid because the plaintiff could not have become a general manager until more than one year had elapsed from the time of the agreement. The agreement was not capable of performance within one year. Thus, the agreement was barred by the statute of frauds.

In the instant case, the Court of Appeals distinguished *McLaughlin* "because plaintiffs [in *Dumas*] were not seeking to enforce a promise that they would receive the renewal commissions. Instead, plaintiffs sought to enforce a promise that the **[*535]** commissions would be paid as long as plaintiffs were employed by defendant." *168 Mich App 632*.

However, we are not persuaded by the Court of Appeals attempt to distinguish *McLaughlin.* We find that plaintiffs were seeking to enforce the payment of seven percent renewal commissions as long as they were employed by defendant. Similar to *McLaughlin* **[***18]** where the plaintiff sued to enforce the agreement with regard to the general management position, in the present case plaintiffs sued to enforce agreements encompassing promised renewal commissions which could not accrue until more than one year from the time of the agreement.

Nor are we persuaded by Justice Levin's argument that *McLaughlin* is distinguishable from the present case because *McLaughlin* involves a contract for a definite term. Justice Levin states:

> The *Hodge* [*v Evans Financial Corp, 262 U.S. App DC 151; 823 F2d 559 (1987)]* court addressed the kind of contract considered in *McLaughlin,* and in the three Michigan cases on which *McLaughlin* relied, when it said:
>
> "Under the conventional view of the statute, an oral employment contract for a stated, definite term of years exceeding one year (like those alleged in *Prouty* [*v Nat'l R Passenger Corp, 572 F Supp 200 (D DC, 1983)]* and *Gebhard* [*v GAF Corp, 59 FRD 504 (DC, 1973)])* is unenforceable on the rationale that the employee's possible death within one year would 'defeat' rather than 'complete' the express terms of the contract." **[***19]** [*Post,* p 612.]

However, the contract in *McLaughlin* was clearly not one for a definite term. In *McLaughlin,* the plaintiff signed an employment agreement providing "'I understand that my employment is not for any definite term and may be terminated **[*536]** at any time . . . .'" *269 F2d 123*. Furthermore, the court stated that "[i]t will be noticed that the oral contract does not provide for a specified period of employment." *Id. at 125*.

We can certainly agree with Justice Levin that a contract for an indefinite term has traditionally been considered capable of performance within the first year. Thus, employment contracts for indefinite terms are generally outside the statute. We can also agree that the contracts involved in the instant case were of indefinite duration. However, we do not hold, as Justice Levin suggests (*post,* pp 574-575), that each plaintiff's entire employment contract is unenforceable under the statute of frauds. We simply find that the asserted promises of seven percent renewal commissions "forever" are unenforceable. Furthermore, the dissent does not focus on the kind of promise at issue in this case. **[***20]** In the *Hodge* case relied on by the dissent, the primary issue was whether the plaintiff was wrongfully discharged. Thus, the focus was on the duration of the entire employment contract. **[**659]** The instant case differs from *Hodge* because the primary focus is on one term of the entire employment contract that plaintiffs are entitled to seven percent renewal commissions permanently. The dispute here is not over duration of an entire employment contract; nor is it over an employee's discharge. [6]

**[***21]**

**[*537]** In Michigan, if the terms of a contract are not severable, and part of a contract is within and part is outside the statute of frauds, the entire contract is unenforceable. Where a portion of a contract within the statute of frauds is severable from a part of the contract outside the statute, the severable portion alone will be rendered unenforceable. *Cassidy v Kraft-Phenix Cheese Corp, 285 Mich 426; 280 NW 814 (1938)*; 73 Am Jur 2d, Statute of Frauds, § 523, p 153.

In *City of Lansing v Lansing Twp, 356 Mich 641, 658; 97 NW2d 804 (1959)*, the Court stated:

> As a general rule, a contract is entire when, by its terms, nature and purpose, it contemplates that each and all of its parts are interdependent and common to one another and to the consideration, and is severable when, in its nature and purpose, it is susceptible of division and apportionment.
>
> The singleness or apportionability of the consideration appears to be the principal test. The question **[*538]** is ordinarily determined by inquiring whether the contract embraces one or more subject matters, whether the obligation is due at the same time **[***22]** to the same person, and whether the consideration is entire or apportioned. If the consideration to be paid is single and entire, the contract must be held to be entire, although the subject thereof may consist of several distinct and wholly independent items.

In *Stevenson v Brotherhoods Mutual Benefit, 312 Mich 81, 88; 19 NW2d 494 (1945)*, the Court found that the plaintiff had been properly dismissed under a just-cause contract. The plaintiff was a field representative for the defendant insurance company, and he claimed that despite his dismissal he was entitled to commissions, including renewals, which were due at the time he was discharged. The defendant argued that the plaintiff's breach barred him from recovery of commissions

---

[6] The dissent quotes with approval the *Hodge* case:

> "Courts have specifically and consistently held that the presence of bonus or salary terms payable after one year does not bring a long-term indefinite employment contract within the statute." [*Post,* p 613.]

One of the cases cited for this proposition is *White Lighting Co v Wolfson, 68 Cal 2d 336; 66 Cal Rptr 697; 438 P2d 345 (1968)*, a case involving a percentage of annual sales payable after one year. There is a difference, however, between bonus or compensation terms payable after one year, as in *White Lighting,* and renewal commissions payable after one year. At the end of a year, the work which entitles an employee to a bonus is complete. However, in the instant case, it cannot be said that at the end of the first year, plaintiffs had completed work which legally entitled them to renewals without additional service. See *id., p 344, n 3*.

Another case cited for the proposition in *Hodge is Miller v Riata Cadillac Co, 517 SW2d 773 (Tex, 1974)*. In *Miller,* the employee was to be paid an annual bonus. The court found the statute of frauds did not bar enforcement of the contract. However, the court also noted that the bonus could have been ascertained and paid within one year.

Furthermore, there are cases which hold that a bonus payable after one year is void under the statute of frauds. In *Dickinson v Auto Center Mfg Co, 594 F2d 523 (CA 5, 1979)*, the plaintiff was hired under an oral contract providing for permanent employment. The plaintiff was promised a stock bonus to be given one year and four months after the contract was made. The court determined that the contract could not be performed within one year and was unenforceable.

In *E D Lacey Mills, Inc v Keith, 183 Ga App 357; 359 SE2d 148 (1987)*, the defendants were promised annual bonuses consisting of a percentage of profits. The court decided the promise of a bonus was not to be performed within a year of the agreement, thus it was unenforceable under the statute of frauds.

because the contract was indivisible. The Court quoted from Beach on the Modern Law of Contracts, § 731, p 887:

> "A familiar and well-settled principle of the common law is that an entire contract cannot be apportioned. The good sense and reasonableness of the particular case must always guide and govern courts in determining whether a **[**660]** contract is divisible or entire. The question depends, to some extent, upon **[***23]** the intention of the parties, and this must be discovered in each case by considering the language employed and the subject matter of the contract. No precise rule can be laid down for the solution of the question. *When the price is expressly apportioned by the contract, or the apportionment may be implied by law, to each item to be performed, the contract will generally be held to be severable.*" [Emphasis in original.]

After viewing the circumstances surrounding the **[*539]** agreement, the Court decided the contract was severable and the plaintiff could collect the commissions to which he was entitled at the time of his departure.

In the instant case, we find the provisions affording seven percent renewal commissions to plaintiffs severable from the remainder of the employment contracts. The agreements between the parties were that plaintiffs would receive a seven percent commission on each renewal of an old policy. The consideration for each renewal can be clearly and easily apportioned -- for each policy successfully renewed by an employee, the employee is paid seven percent of the premium. There is no problem apportioning the consideration with regard to promised **[***24]** renewal commissions, and the nature of the contracts are such that they are "susceptible of division and apportionment." *City of Lansing, supra at 658*.

We find the claimed promise that Group B would remain under the then-existing compensation plan "forever" fits squarely within the statute of frauds and is unenforceable. Members of Group B were allegedly promised before or at the time of hiring that seven percent renewals would last "forever." Under the "Accrued Commission Plan," the renewal commissions could not vest before one year had elapsed from the time of hiring. The agreement with regard to renewals was not capable of performance within one year because it was not possible for renewal commissions to accrue until after the first year. Thus, any promise that the renewal commission plan would last "forever" is unenforceable under the statute of frauds. [7]

**[***25]** **[*540]** Plaintiffs argue that the doctrine of part performance removes the agreement from the statute of frauds. The doctrine is explained in *Guzorek v Williams, 300 Mich 633, 638-639; 2 NW2d 796 (1942)*:

> If one party to an oral contract, in reliance upon the contract, has performed his obligation thereunder so that it would be a fraud upon him to allow the other party to repudiate the contract, by interposing the statute, equity will regard the contract as removed from the operation of the statute.

However, in support of their argument that part performance removes the case from the statute, plaintiffs only cite cases involving land. No cases are offered which apply the doctrine in an employment context.

In *Oxley v Ralston Purina Co, 349 F2d 328, 332 (CA 6, 1965)*, the court stated that "[t]he doctrine of part performance has historically been applied only to contracts involving the sale of land . . . ." Citing 3 Williston, Contracts (3d ed), § 533, p 770.

In *Ordon v Johnson, 346 Mich 38, 46; 77 NW2d 377 (1956)*, quoting Pomeroy, Specific Performance (3d ed), § 100, p 241, it was stated: **[***26]**

> "The clause relating to contracts not to be performed within a year from the making thereof, seems by its very terms, to prevent any validating effect of part performance upon all agreements embraced **[**661]** within it. As the prohibition relates not **[*541]** to the subject matter, nor to the nature of the undertaking, but to the *time of the performance itself,* it seems impossible for any part performance to alter the relations of the parties, by rendering the contract one which, by its terms, may

---

[7] The dissent argues that even if the contracts for permanent seven percent renewals would be invalid for lack of a written agreement, defendant admitted in court documents that it "'paid a seven percent commission on new sales and policy renewals.'" *Post,* p 618. Thus, the dissent argues the written admissions remove the agreements from the statute of frauds. However, just because defendant admitted it promised to pay a seven percent commission on renewals is not to say that defendant admitted that the seven percent system would be permanent. The crux of the dispute is whether the seven percent renewals were permanent terms. Clearly, defendant's statement that it "'paid a seven percent commission on new sales and policy renewals'" does not amount to an admission of permanency.

> be performed within the year." [Emphasis in original.]

We find the doctrine of part performance to be inapplicable to this case. Plaintiffs offer no support that the doctrine applies to the situation presented by this case other than cases involving land. Furthermore, past decisions of this Court have declined to recognize that the part performance doctrine operates to remove a contract from the statute of frauds section concerning contracts not to be performed within a year. *Ordon v Johnson, supra*; *Whipple v Parker, 29 Mich 369 (1874)*. [8] **[***27]** Accordingly, we decline to apply the part performance doctrine to the facts of this case. [9]

There being no enforceable agreement that plaintiffs would be paid a seven percent commission "forever," **[***28]** members of Group B find themselves in the same position as members of Group **[*542]** A, and we have already determined that members of Group A cannot maintain actions for breach of contract against defendant.

C. GROUP C

Members of Group C claim they were told at some point after they were hired that they would receive seven percent commissions "forever." Group C plaintiffs also argue that defendant breached the express terms of their employment contracts by changing the payment system to award a flat rate upon the sale of each renewal policy. Again, we disagree.

When analyzing employment contracts, it is important to keep in mind that parties begin the relationship with complete freedom. *Toussaint, supra, p 600*. An employer retains its managerial powers and prerogatives unless they are limited by contract. As Justice Griffin stated in *Bullock, supra, pp 519-520*, "[a]n employer's intention to give up permanently a right so fundamental as the ability to make changes in its method of compensation is not to be lightly inferred." (Griffin, J., concurring in part and dissenting in part.)

Our inquiry must focus on the intent of the parties and **[***29]** whether they intended to bind themselves to a seven percent renewal commission permanently. In deciding whether mutual assent existed to permanently freeze the renewal commission, we employ an objective test, "looking to the expressed words of the parties and their visible acts." *Goldman v Century Ins Co, 354 Mich 528, 535; 93 NW2d 240 (1958)*; *Stark v Kent Products, Inc, 62 Mich App 546; 233 NW2d 643 (1975)*. It is proper to consider the circumstances at the time the asserted contracts were made to determine the intent of the parties. *W J Howard & Sons, Inc v* **[*543]** *Meyer, 367 Mich 300; 116 NW2d 752 (1962)*; *Miller v Stevens, 224 Mich 626; 195 NW 481 (1923)*. This is especially true in oral contracts where the parol evidence rule does not impair consideration of extrinsic facts. *Redinger v Standard Oil Co, 6 Mich App 74; 148 NW2d 225 (1967)*.

**[**662]** Upon reviewing the circumstances of the alleged promises to Group C, we find as a matter of law that mutual assent was lacking.

At the time of hiring, members of **[***30]** Group C were in the same position as members of Group A. No promises were made regarding the duration of the commission plan, yet plaintiffs in both Groups A and C accepted employment. Group C alleges that after accepting employment, defendant made extraordinary contractual promises that the commission system would be in place "forever." However, it is not at all clear from the statements allegedly made to members of Group C that defendant intended to bargain away its right to change the method of compensation. The meaning of the statements could be interpreted in several ways falling short of a contractual commitment. The statements could have been intended to bolster morale and enhance employee pride in the company. It is also possible the statements were merely stated opinions of management representatives that the company would not change its commission rate. Another possible

---

[8] Nonetheless, Michigan cases do permit recovery under the theory of quantum meruit where a party has performed and conferred a benefit on another party under a contract within the statute of frauds. *Whipple, supra*; *Fuller v Rice, 52 Mich 435; 18 NW 204 (1884)*; *Smith v Chase & Baker Piano Mfg Co, 185 Mich 313; 151 NW 1025 (1915)*.

[9] Courts applying Michigan law have recognized exceptions to the one-year provision on the basis of theories other than part performance: *Reeck v Caloy Corp, 329 Mich 453; 45 NW2d 349 (1951)* (substantial consideration given); *Pursell v Wolverine-Pentronix, 44 Mich App 416; 205 NW2d 504 (1973)* (equitable estoppel); *McMath v Ford Motor Co, 77 Mich App 721; 259 NW2d 140 (1977)* (promissory estoppel); *Rowe v Noren Pattern & Foundry Co, 91 Mich App 254; 283 NW2d 713 (1979)* (equitable estoppel); *McLaughlin, supra* (consideration separate and apart from performance); *Oxley, supra* (equitable estoppel). Since plaintiffs only rest on their part performance and unjust enrichment arguments to avoid the statute of frauds, we do not discuss these other theories. Plaintiffs' claims of unjust enrichment are discussed in section III.

interpretation is that the statements were designed as assurances by management that in the foreseeable future, there were no rate changes planned.

Whether the statements rise to contractual obligations depends on the context and circumstances in which the statements were made. In analyzing the parties' **[***31]** intent, we note that the record does not reflect that any negotiations took place between plaintiffs and defendant. All indications are **[*544]** that the comments were isolated. Also, we find the term "forever" is inherently vague. If the parties had negotiated the duration of the compensation plan, it is unlikely they would have characterized the agreement with such a precatory expression. Furthermore, in the employment context, this Court has been reluctant to accept terms which connote permanent or lifetime employment at face value. In *Lynas v Maxwell Farms, 279 Mich 684; 273 NW 315 (1937)*, the Court determined that absent distinguishing features or consideration in addition to services to be performed, a contract for permanent employment should be interpreted to be terminable at the will of either party. Although *Lynas* deals with discharge as opposed to compensation terms, a contract which forever restricts an employer's right to change compensation has the same effect of permanently tying an employer's hands on a term of employment.

We note that nothing was offered by plaintiffs in addition to their continued employment that would **[***32]** reasonably prompt defendant to make such extraordinary contractual commitments. [10] We are persuaded that it defies logic to believe that defendant would intend to bind itself to a specified renewal commission on the basis of isolated statements when plaintiffs had already accepted employment without the benefit of durational guarantees with regard to compensation. It also defies logic that defendant would enter into these commitments after, as opposed to before, being hired. It is more reasonable to believe that defendant would legally obligate itself to such a promise before hiring in order to attract an employee or induce acceptance of employment. In the case of Group C, we can perceive no manifest reason for **[*545]** defendant to offer a permanently fixed rate on renewals.

We also find it relevant to our inquiry into mutual assent to examine the changes in the compensation and commission system **[***33]** with regard to sales representatives in the years leading up to the employment of plaintiffs. In 1940, defendant adopted a seven percent commission for all representatives. [11] In 1958, the commission for out-state salespersons was changed to seven and one-half percent. From 1962 to 1976, most salespersons were hired pursuant to the "Accrued Commission Plan," which is the system applicable to this case. In 1963, **[**663]** a merit commission plan was adopted which allowed a salesperson to earn more or less than seven percent on the basis of the individual's productivity. This plan was discontinued after nine months. In 1964, defendant established a high-risk insurance company, but rather than base commissions on the higher premiums, defendant paid commissions on the basis of the lower premiums of the standard company. However, this plan was discontinued after a short while. Throughout the 1960s and 1970s, defendant made several changes in its compensation and commission plan for membership sales.

**[***34]** These changes made throughout the years suggest that it is unlikely that defendant would permanently guarantee a particular renewal policy. The numerous recent fluctuations show the company's changing compensation program and demonstrate that it was unreasonable for members of Group C to maintain any belief that their commission plan was to be locked in permanently. For these reasons, we find that in objectively reviewing **[*546]** the circumstances of this case, there was no mutual assent to establish seven percent renewal commissions permanently. We are persuaded that defendant did not intend to bargain away its right to make adjustments in its compensation plan.

III

Plaintiffs allege that defendant was unjustly enriched as a result of changing compensation plans. The trial court disagreed and granted summary disposition for defendant. The Court of Appeals reversed the decision of the trial court.

The Court of Appeals described the basis of an unjust enrichment claim:

> The process of imposing a "contract-in-law" or a quasi-contract to prevent unjust enrichment is an

[10] We do not address, directly or indirectly, whether sufficient consideration existed to modify any earlier agreement.

[11] These undisputed facts can be found in the affidavits of Erwin Judge, who was the director of sales administration for the Automobile Club of Michigan.

> activity which should be approached with some caution. The essential elements of such a claim are: (1) receipt **[***35]** of a benefit by the defendant from the plaintiff and, (2) which benefit it is inequitable that the defendant retain. [*168 Mich App 638.*]

With regard to Groups A and C, since we have determined that defendant had the right to impose a new compensation plan, we find that defendant, as a matter of law, was not unjustly enriched. Defendant simply exercised its prerogative to change compensation. With regard to members of Group B, the statute of frauds does not bar the assertion of an unjust enrichment claim.

The *Restatement Restitution, § 1, comment c*, p 13, states in part:

> *Unjust retention of benefit.* Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it.

**[*547]** In *Hollowell v Career Decisions, Inc, 100 Mich App 561; 298 NW2d 915 (1980)*, the plaintiff sued the defendant for unjust enrichment after she was terminated from her job of vice president of an employment agency. [12] The Court ruled that summary judgment in favor of the defendant was proper under GCR **[***36]** 1963, 117.2(3) [13] because the plaintiff failed to offer any proof that the defendant benefited from her services, and she "failed to offer any proof to indicate that the value of the services she performed exceeded the compensation she received." *Id. at 571*.

In the instant case, we find that there is no genuine issue of material fact with regard to the unjust enrichment issue and that members of Group B may not maintain actions for unjust enrichment.

Under the circumstances presented, no evidence suggests that defendant has *unjustly* benefited by the change in compensation policies. There is no dispute that a worsening financial condition within the company prompted the decision to change compensation plans. Continued significant decreases in the reserves of the business **[**664]** threatened availability of insurance funds. Also, the plaintiffs were well informed **[***37]** of the compensation policies in force at any given time, and there is no evidence to indicate that plaintiffs were not paid for any sale of a membership or policy. Furthermore, plaintiffs have offered no proof which would support a finding that the value of the services they performed exceeded the compensation received in return.

The dissent states that

> **[*548]** the sales representatives are entitled to recover the reasonable value of their services in building the books of business *if* the promise to pay a seven percent commission on policy renewals of old sales was in part a promise to pay deferred compensation for making the new sale. [*Post,* pp 622-623. Emphasis in original.]

Plaintiffs do not argue that the renewals were a form of deferred compensation which vested at the time of the original sale. In fact, it is undisputed that to earn renewal commissions, plaintiffs had to continue to service and renew their policies. [14] Given the good-faith actions of the company, the fact that plaintiffs were always compensated for their sales, the lack of evidence suggesting that the compensation was not in line with the services, and the absence of an agreement providing **[***38]** that renewals are a form of deferred compensation, we find that defendant was not unjustly enriched by the change in the policy. We note further that there is no factual basis supporting plaintiffs' allegations that defendant confiscated and diminished the value of their books of business. [15]

IV. CONCLUSION

As a matter of law, we would hold that plaintiffs are unable to bring actions against defendant for breach of contract. With regard to Group A, there were no express contracts that plaintiffs would "forever" be entitled to seven percent renewal **[*549]** commissions, **[***39]** and we decline to extend the legitimate-expectations theory beyond the wrongful-discharge context. Any

---

[12] The plaintiff also brought claims for breach of contract, fraud, and slander.

[13] *MCR 2.116(C)(10)* is the current equivalent of former rule 117.2(3).

[14] This is established in the affidavit of Erwin Judge.

[15] By way of illustration of such a loss, plaintiffs present a hypothetical chart comparing plaintiffs' income under both plans for the years 1978 to 1989. The assumption underlying the hypothetical chart is that premiums increased at the rate of inflation, and the commissions under the new plan remained static for at least twelve years. Plaintiffs concede that the presentation is not factual.

promise made to members of Group B was unenforceable under the statute of frauds because the asserted agreement regarding renewal compensation was not capable of performance within one year. With regard to members of Group C, we find that the circumstances demonstrate that no mutual assent was reached on the permanency of the commission plan with respect to renewals.

Finally, we would hold that defendant was not unjustly enriched by virtue of changing its compensation scheme. The change was within the proper realm of its managerial powers with regard to members of Groups A and C. With regard to Group B, the record lacks evidence which would support a claim for unjust enrichment.

We reverse the decision of the Court of Appeals. [16]

**[*623contd]** [EDITOR'S NOTE: The page numbers of this document **[***40]** may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published documents.] APPENDIX

**[**698contd]** [EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published documents.]III. SUMMARY OF ARGUMENT

1. There was no breach of any contract with the Group A plaintiffs under either alternative prong **[*624]** of *Toussaint. First,* assuming a legitimate expectation theory, the plaintiffs did not demonstrate that the Auto Club's modification of its compensation policy contravened the criteria of *In re Certified Question.* The Auto Club provided "reasonable notice of the change . . . uniformly given to affected employees." *In re Certified Question,* 432 Mich at [457]. It acted in good faith for a legitimate business reason. *Second,* under an express contract approach, the Group A plaintiffs' contract claim similarly must fail. There was admittedly no durational term to their contract [96] and any agreement could, accordingly, be altered at will. Moreover, the Auto Club's announcement of a new compensation policy was an offer to modify any pre-existing contract which was accepted [97] when the plaintiffs thereafter worked pursuant to that new policy for five years before filing this lawsuit.

2. There **[***41]** was also no breach of any contract with the Group B and C plaintiffs. If their claim is **[*625]** analyzed under a legitimate expectation approach, the result is the same as that of the Group A plaintiffs. If, instead, the Group B and C plaintiffs' claim is determined under an express contract theory, the addition of a "forever" durational term either adds nothing or, at most, only infuses their contracts with a just cause requirement for modification. Just cause was patently present here where the compensation policy change was undisputedly motivated by legitimate business reasons. [98] The Group B

[16] This opinion responds to the latest draft of a proposed dissent circulated, but as yet not filed, by Justice Levin.

[96] This was the first reason stated in the motion for summary disposition.

The motion stated that "there is no genuine issue of material fact and that Defendant is entitled to judgment as a matter of law. In support hereof, Defendant submits the attached memorandum of law."

The attached "Memorandum in Support of Defendant's Motion for Partial Summary Disposition" stated:

> For *the* [*four*] *reasons* set forth below, the remaining part of plaintiffs' renewal commission claims should be dismissed.
>
> *First,* the deposition testimony of one hundred thirty-nine (139) of the plaintiffs demonstrates that while they were told at or around the time of hire that they would receive a seven percent (7%) commission on renewals, *there was no discussion whatsoever* regarding the term, duration, or manner of termination of this alleged "contract." Thus, under Lichnovsky v Ziebart International Corp, 414 Mich 228 [241-242]; 324 NW2d 732 (1982), to whatever extent, if any, the parties had a "contract" regarding compensation, that contract was terminable at will. [Emphasis added.]

[97] **[***43]** The question whether there was a genuine issue of material fact concerning whether the sales representatives "accepted" the new compensation system was not one of the four reasons specifically identified in the Auto Club's motion for summary disposition.

[98] The "legitimate business reasons" were asserted in the following manner as the fourth reason:

> *Finally,* even if the claims of all of the plaintiffs are treated as arising under some integrated "just cause" employment contract, their claims are barred by collateral

plaintiffs' contract claim should additionally be barred by the Statute of Frauds. [99] Any **[**699]** contract those plaintiffs had with respect to renewal commissions could be neither performed nor breached in the first year of their employment. Moreover, their alleged contract contemplated a duration of more than one year and, in the context **[*626]** of employment contracts, as other courts have concluded, such an agreement must be in writing. The Group C plaintiffs' contract claim contains a further defect: lack of any consideration beyond the pre-existing cooperation and loyalty those **[***42]** plaintiffs had already committed to perform. [100]

3. There was no unjust enrichment as a result of the change in the compensation policy. All plaintiffs were paid in full consistent with the commission policies which they knew in advance would apply to the transaction. The conclusion reached by the Court of Appeals -- that the Auto Club confiscated the books of business that had been assigned to the sales representatives -- was erroneous. There was no confiscation of books of business occasioned by the compensation policy modification. [101]

**Concur by:** BOYLE; CAVANAGH

## Concur

**[*549contd]** [EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published documents.] Boyle, J. (*concurring*).

**[**664contd]** [EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published documents.]I agree with the reversal of the decision of the Court of Appeals and with part II(C) **[***45]** and part III of Justice Riley's opinion. [1]

Plaintiffs' proofs are insufficient to support the inference of a just-cause contract or an enforceable promise not to change the payment plan. The circumstances identified as guidelines [2] **[***46]** with regard **[*550]** to the **[**665]** intent to create a just-cause contract in *Rowe v Montgomery Ward & Co, Inc, 437 Mich 627;*

---

estoppel. The change in the commission system was previously litigated in *Automobile Club of Michigan and Michigan AAA Sales Association, Inc ("Auto Club I"),* Case No. 7-CA-15209, 7-CA-15400 (National Labor Relations Board, August 7, 1979). The Law Judge's finding that the change was motivated by legitimate business considerations and was, thus, for cause, is binding on the plaintiffs.

There was, again, an affidavit asserting that the change in the compensation system was motivated by economic need, but this was not one of the four stated reasons specifically identified in the motion for summary disposition.

[99] This was the second reason, which was stated in the memorandum attached to the motion for summary disposition as follows:

*Second,* fourteen (14) other plaintiffs testified in their depositions that at or around the time of hire they were orally told that the seven percent (7%) commission on renewals would be paid "forever," or words to that effect. However, these sales representatives could not receive any renewal commissions for at least their first year of employment. Because the alleged oral promise of a seven percent (7%) renewal commission was incapable of being performed within one year, the claims of these plaintiffs are barred by the statute of frauds.

[100] **[***44]** This was the third reason, which was stated in the memorandum attached to the motion for summary disposition as follows:

*Third,* twenty (20) other plaintiffs testified in their depositions that, sometime subsequent to their commencement of employment, they were orally told that the seven [percent] (7%) commission on renewals would be paid "forever," or words to that effect. Their claims are barred because there was no exchange of any additional consideration beyond their normal services. Absent special consideration, any post-hire reference to a seven percent commission "forever" is unenforceable as a matter of law.

[101] The factual assertions in this paragraph were not among the four reasons specifically identified in the motion for summary disposition.

[1] This opinion responds to the latest draft of a proposed dissent circulated by Justice Levin.

[2] Among the circumstances identified as objective indications of intent are clarity, specificity, and lack of ambiguity of oral statements; whether there were specific negotiations for job security; the nature of the position; and whether, if policy statements are relied on, they support or undercut a reasonable belief that a promise of job security was being extended.

473 NW2d 268 (1991), are not present. [3] Nor have we been provided with any submissions, suggestions, argument or offer of proof that the employer's statements, interpreted in the light of trade usage or course of performance, permit the conclusion that the factfinder could draw an inference of a durational term for the method of compensation. [4]

I

Assuming, arguendo, [5] **[***48]** that a termination forcause employment term would support the inference of a durational term for the method of compensation, [6] there is no basis on this record to infer **[*551]** other than employment-at-will contracts and no ground to question the employer's good faith. Plaintiffs simply suggest that **[***47]** they were told that if they worked hard in the beginning of their careers they would reap the benefits. [7] These were statements that good performance would be rewarded; they were not statements implying a restriction on employment at will, Dzierwa v Michigan Oil Co, 152 Mich App 281; 393 NW2d 610 (1986); Triplett v Electronic Data Systems, 710 F Supp 667, 673 (WD Mich, 1989). This is no more than most employees concerned with building a career hope to achieve. To allow a jury to find on these facts a term limiting termination only to just cause would substitute for the presumptive employment-at-will term a dismissal-for-cause rule in every employment arrangement in which predictions of a rosy future were made to prospective employees. Cummings v Kelling Nut Co, 368 Pa 448; 84 A2d 323 (1951).

**[***49]** Plaintiffs' commission claims, properly analyzed, assert an irrevocable right to renewal commissions on automobile insurance arising in the context of an employment-at-will relationship, [8] on the

---

[3] It is not disputed that the unit compensation plan was undertaken as a business decision after an independent investigation indicated a relationship between the company's dwindling cash reserves and a significant percentage increase in compensation costs to the commissioned sales force. The situation is not within the ambit of decisions recognizing an implied covenant of good faith and fair dealing in employment-at-will arrangements to prevent the forfeitures of benefits almost earned. Fortune v Nat'l Cash Register Co, 373 Mass 96; 364 NE2d 1251 (1977); Perritt, Employee Dismissal Law & Practice (2d ed), § 4.11, pp 191-197.

[4] I agree with Chief Justice Cavanagh that it is inappropriate to address the legitimate-expectations issue.

[5] The dissent would extend the contract prong of Toussaint v Blue Cross & Blue Shield of Michigan, 408 Mich 579, 598; 292 NW2d 880 (1980), to a compensation term and infer a good-cause term. The plaintiffs at oral argument contended that the just-cause agreement together with the compensation promise implied at least that the salary be a fair and reasonable salary.

[6] It is suggested that the just-cause question is not in issue because the defendant did not assert that there was no factual support for the claim. The Blakley affidavit raised the factual predicate for the defendants' claims, the plaintiffs countered with the policy manual, and the defendants argued that "plaintiffs who were allegedly told at the time of hire or thereafter that the percentage-based commission would never change must be treated in the same manner as the plaintiffs who admittedly were not made such a promise," memorandum in support of partial summary judgment, § 2, p 8, and there was an insufficient evidentiary basis to find other than an at-will contract, § 2(b), p 9, n 11. Moreover, plaintiffs specifically relied on the just-cause theory at oral argument contending that a just-cause term necessarily precluded the adjustment of compensation.

[7] Nor does this case raise the issue regarding whether a durational term for a reasonable period of time may be supplied to permit an employee at will to recoup an investment in time and money. See Keller, Ackland & Glad, *The evolving doctrine of wrongful termination of employment: Practical considerations regarding employment and insurance agent relationships,* 32 Fed'n Ins Couns Q 105 (1982). Further, since the plaintiffs do not rest their claims on an implied obligation to continue the agreement for a reasonable time, we have no occasion to consider whether and how such an implied-in-law "gap filler" might be appropriate when an employment agreement is silent regarding duration. Calamari & Perillo, Contracts (3d ed), § 2-9, p 59, n 17.

[8] Justice Levin takes the position that when the Auto Club "agreed that the sales representatives would be paid a seven percent commission on policy renewals of old sales, it agreed, by implication, that the sales representatives would not be deprived, as a result of discharge from employment other than for good or just cause, of the opportunity to earn the seven percent commission on policy renewals of old sales by exerting whatever additional effort, if any, might be required to obtain such renewals." *Post,* p 605. By this construction, Justice Levin seeks to avoid the underlying assumption that if the employment is at will, the terms can be modified at will. The logic of this assumption is that the employer can always terminate an employment-at-will relationship and rehire the employee with different benefit terms. Hathaway v General Mills, Inc, 711 SW2d 227 (Tex, 1986); Wakefield v Northern Telecom, Inc, 769 F2d 109 (CA 2, 1985) (applying New Jersey law). See anno: *Sufficiency of notice of modification in terms of compensation of at-will employee who continues performance to bind employee,* 69 ALR4th 1145.

basis **[*552]** of a **[**666]** promise to pay seven percent (Group A) and a promise to pay seven percent "forever" (Groups B and C).

**[***50]** II

For the reasons stated by Justice Riley in *Rowe,* [9] I would hold that plaintiffs in Group A have not alleged circumstances that would permit the factfinder to conclude that the offer of specific compensation would continue for the duration of employment (or beyond). With regard to Groups B and C, I also find that the facts alleged are insufficient to permit a factfinder to conclude that the employer was making a commitment amounting to a promise of a permanent renewal compensation plan. [10]

**[***51]** **[*553]** A

Plaintiffs' eighth amended complaint does not distinguish between old and new sales, but rather contends that the Auto Club was perpetually obligated to maintain the compensation scheme. [11] The lead opinion and the dissent agree that the durational term now claimed is limited to renewals of old sales. Even if this characterization is correct, it ought logically to follow that if renewals of old sales were intended to be a form of deferred compensation, they would be payable regardless of termination. The promises alleged are indefinite, not only in the sense that there is no durational term for renewals of "old sales," but also because there are two possible constructions of the duration of "renewal of old sales" claim -- renewals of old sales as long as employed -- and renewals of old sales whether employed or not.

**[***52]** As observed in the concurrence in *Rowe,* even under the Uniform Commercial Code's liberalized requirements of definiteness in relation to commercial contract formation, there must be a manifest intention to make a contract and a reasonably certain basis for giving an appropriate remedy. UCC 2-204(3). Thus, the issue here is not how the plaintiffs characterize their claims before this Court, but, rather, what the Court can discern regarding the parties' intentions at the time the obligations allegedly were undertaken.

To be sure, courts look to rules of construction in interpreting ambiguous terms or to supply omitted terms reflecting either the actual expectation **[*554]** of the parties, if that appears, or objective expectations. Farnsworth, Contracts, §§ 7.15-7.16, pp 517-526. Stated otherwise,

> Rules of construction serve the legitimate purpose of aiding courts in their quest to ascertain and give effect to the **[**667]** intention of parties . . . . They are not meant to be applied as a substitute for that quest. [*Burns Mfg Co, Inc v Boehm, 467 Pa 307, 313, n 3; 356 A2d 763 (1976)*.]

The difficulty with applying concepts such as an implied **[***53]** obligation to render cooperation, *post,* p 605, or trade usage to supply a term in this case, *post,* pp 602-603, is that the former principle is irrelevant in this context, [12] and the Court has not been supplied with guidance supporting plaintiffs' construction with regard to the latter. Thus, again assuming that a promise of compensation for a durational term would be enforceable, summary disposition might have been appropriate if there was a basis for the factfinder to draw an inference that the parties expected that a prevailing commercial practice obtained. [13] **[***55]** None has

[9] Plaintiffs contend that Group A claims rest on an express promise. As in *Rowe,* plaintiffs' claims rest on an express statement, and the issue is whether an omitted durational term can be supplied.

[10] The dissent in *Rowe* observes that the signers of the lead opinion in *Dumas* proceed "on the apparent premise that such a promise, if made, would be enforceable," p 694. In view of my conclusion that the facts are insufficient to permit such a finding, I need not reach the question, not decided in *Toussaint, supra,* with regard to whether, if a sufficient "promise" of permanent compensation was made, it would be enforceable on a contract theory in an at-will context. See Pettit, *Modern unilateral contracts,* 63 Boston U L R 551, 555-557 (1983).

[11] In their eighth amended complaint, para. 11, plaintiffs allege that they were "precluded from receiving their full 7.0% commission on all new policies sold and all pre-existing policies renewed." In para. 20, plaintiffs further allege that they were "promised that they would earn a 7% commission from the renewal of pre-existing clients and from all new policies sold . . . ."

[12] The duty of cooperation is imposed in all contracts that leave the particulars of performance to be specified by one party, or where one party's cooperation is necessary to, or materially affects, the performance of the other. See, e.g., the analogous provision of UCC 2-311(1), (3).

[13] The term "renewal commission" is defined in *Gram v Liberty Mutual Ins Co, 391 Mass 333; 461 NE2d 796 (1984)*, as damages measured by the annual renewal commissions payable under the compensation agreement in effect at time of

been advanced. Not even the apparent term of art "book of business," [14] that troubled us in **[*555]** *Bullock* [15] has been fleshed out for its effect on the question at issue. On the record, briefs, and argument submitted here, it is entirely speculative that trade usage or other rules of construction assist in supplying omitted durational terms or as bearing on the parties' intent. Nor, of course, can speculation that representations were made to plaintiffs with regard to "deferred compensation," *post,* p 600, create a jury submissible issue regarding the parties' intent. Unlike the benefit **[***54]** cases noted in Justice Ryan's dissent in *Toussaint v Blue Cross & Blue Shield of Michigan, 408 Mich 579, 648; 292 NW2d 880 (1980)*, in which the employer or the claimant employee "satisfied the burden of proof that work already performed was in consideration of the announced benefit and that what was sought was merely deferred compensation," plaintiffs do not characterize their claims as "deferred compensation," nor do they contend they have fully performed.

**[***56]** Viewed in a light most favorable to plaintiffs, we are left with the precatory term "forever" appended to descriptions of the compensation system, with the fact that the persons making such statements were sales managers and that the statements **[*556]** were made, in some cases, in response to concerns that commissions were low.

In order to give legal effect to these claims, we would have to conclude that a missing term central to the intent of the parties could be inferred by the factfinder, i.e., that the method of compensation would never be changed. We would, in effect, be allowing the factfinder to determine that, despite the fact that the defendant retained the right to discharge these employees when it hired them, it nonetheless intended **[**668]** to assume the risk of a drop in its cash reserves.

Both the Restatement and the UCC express a preference for finding an enforceable obligation and preventing an evasion of obligation by resort to a claim of indefiniteness. *Restatement Contracts, 2d, § 33(b)*; UCC 2-204(3). Under both the Code and Restatement, however, the parties must intend to contract, and there must be a reasonably certain basis for giving an appropriate remedy. Calamari **[***57]** & Perillo, Contracts (3d ed), § 2-9, p 66.

In this case, there is neither an objective manifestation that the employer was making a commitment that amounted to a promise nor a reasonably certain basis for giving an appropriate remedy. Aside from the precatory term "forever," there is simply no objective indication that overcomes the presumption that there was no durational term for compensation with respect to future renewals. [16]

discharge. Future premium levels and future policy changes are not included because they are speculative.

[14] The term "expirations" has a definite meaning in insurance and refers to information enabling contact with the insured to secure another contract. An agency functioning under the American Agency System which usually represents several insurance companies is the owner of records and expirations. An agency serving a direct writing contract represents a single company and must place all insurance with that company and, customarily, does not own the record in the hands of the agent. 4 Couch, Insurance, 2d, § 26A:260, pp 492-496; anno: *Rights to expirations as between insurer and insurance agent or broker, 88 ALR3d 1142*; *Woodruff v Auto-Owners Ins Co, 300 Mich 54; 1 NW2d 450 (1942)*.

[15] In *Bullock v Automobile Club of Michigan, 432 Mich 472, 483; 444 NW2d 114 (1989)*, the plaintiff alleged an oral promise of job security. The motion for summary disposition pursuant to GCR 1963, 117.2(3) was filed before any meaningful discovery. We noted the "isolation" in which the alleged promise was reviewed and the presence of factors such as the "book of business" which "may" constitute distinguishing features. *Id. at 484, n 11*. We held that whether the alleged promise was either intended by defendant (or understood by *Bullock*) as an enforceable obligation "must await further discovery and *perhaps* trial." *Id. at 483*. (Emphasis added.)

[16] Observing, as Justice Griffin did, in *In re Certified Question, Bankey v Storer Broadcasting Co, 432 Mich 438, 446-447; 443 NW2d 112 (1989)*, that unilateral contract theory poses conceptual difficulties in contracts implied in fact, Professor Perritt suggests that closer to employment law are cases of modification of benefit promises under the Employment Retirement Income Security Act, 29 USC 1001-1461, and collectively bargained individual right analyses, and that these cases suggest the following principles to guide employer modification of employment security promises in the implied-in-fact context:

> (1) The employer should be presumed to have reserved the right impliedly to modify the employment security promise any time before a termination is effected; and
>
> (2) A course of conduct involving successive employer modification is evidence that the right to modify was reserved and that employees could not reasonably expect otherwise. [Perritt, *supra,* § 4.19, p 218.]

**[***58]** **[*557]** B

In *Toussaint, supra at 613*, the Court expressly recognized a nonpromissory basis of "a situation 'instinct with an obligation'" distinct from and independent of contract analysis.

Most recently, in *In re Certified Question, Bankey v Storer Broadcasting Co, 432 Mich 438; 443 NW2d 112 (1989)*, we unanimously reaffirmed the principle that it is socially desirable to recognize the enforceability of personnel policies. In doing so, we explicitly acknowledged that policy considerations extraneous to the contract-as-promise analysis, such as stability and consistency in the work environment, were the judicial premises underlying the legitimate-expectations prong of *Toussaint.*

In this case, plaintiffs rely principally on a promissory theory of liability. Thus, we are not faced with "[t]he crucial, difficult question facing the courts in the modern cases . . . not whether to choose unilateral or bilateral contract analysis, but whether to employ any contractual analysis at all." Pettit, *Modern unilateral contracts,* 63 Boston U L R 551, 575 (1983). Because plaintiffs assert a promissory claim, we deal **[***59]** with the principles of individual autonomy on which the law of private contract is based, and focus on the promissory basis of the asserted obligation.

As Professor Pettit observes,

> Any assessment . . . of the appropriateness of modern judicial use of unilateral contract theory **[*558]** must focus on the promissory basis of the asserted obligation . . . . Are courts imposing liability because of words or actions of the defendant manifesting an intention to make a commitment, or are they using unilateral contract as a device to enforce obligations arising from some sense of community standards? . . . If the defendant's commitment-making actions do not predominate, unilateral contract is an inappropriate rationalization that allows judges to avoid confronting their true motivations. [*Id.,* pp 576-577.]

Thus, unless there is a nonpromissory basis for imposing an employer obligation, [17] **[**669]** analysis of unilateral contract claims in implied-in-fact employment cases must begin with the question whether the words or action of the defendant manifested an intention to make a commitment.

**[***60]** In the absence of a viable unjust enrichment claim, of promissory estoppel, of bad faith, or a public policy ground for a different result, we have no basis on this record to permit a jury to impose promissory liability on the defendant. Because defendant's commitment-making actions do not predominate, it cannot be truthfully said that a reasonable juror could find that the defendant assumed the obligation claimed. *Id.,* p 577.

Therefore, I agree with the lead opinion and would reverse the decision of the Court of Appeals.

Cavanagh, C.J. (*concurring in the result*).

It is **[*559]** clear that plaintiffs' claims before this Court rest solely on an express oral contract theory, not on a legitimate-expectations theory arising from defendant's policy manuals. I therefore believe that Justice Riley's discussion of the legitimate-expectations issue in part II(A) of her opinion is unnecessary dicta. [1] For reasons noted by Justice Riley in part II(A), however, see *ante,* p 529, n 3, I agree that there is simply no basis in this case for the Group A plaintiffs' express oral contract theory.

[17] The instability of employment jurisprudence, observed by Justice Riley in *Rowe* is in part a function of the fact that courts have used unilateral contract theory as a vehicle for expanding employer obligations on the basis of the courts' unarticulated nonpromissory notion of abusive employment practices. If the bar distinguishes the theories and confronts judges with the arguments for and against nonpromissory theories of liability, and if judges are willing to openly confront their true motivations, we may at least produce a forum for debate on the most "critical and difficult question" in employment law -- whether and under what circumstances it is appropriate to apply a court's sense of community standards as a basis for recognizing enforceable obligations in employment relationships.

[1] Plaintiffs have expressly abandoned before this Court any claim based on legitimate expectations. In their brief, plaintiffs explicitly state: "This cause of action rests on the 'just cause' portion of the *Toussaint* decision, not on the 'policy manual' portion." See *Toussaint v Blue Cross & Blue Shield of Michigan, 408 Mich 579; 292 NW2d 880 (1980)*. Furthermore, former Justice Archer asked plaintiffs' counsel at oral argument how they could address the holding of *In re Certified Question, Bankey v Storer Broadcasting Co, 432 Mich 438; 443 NW2d 112 (1989)*, that employers may, with adequate notice, unilaterally modify the expectations arising from policy manuals, and counsel responded that this case involves express contracts and express promises.

**[***61]** With regard to the Group B and Group C plaintiffs, and with regard to the issue of unjust enrichment, I agree with the result reached by the majority. I disagree with those aspects of Justice Riley's and Justice Boyle's analyses which draw upon Justice Riley's analysis in *Rowe v Montgomery Ward & Co, Inc, 437 Mich 627; 473 NW2d 268 (1991)*, for reasons stated in my and Justice Levin's dissenting opinions in *Rowe,* see *id. at 676-722*. In this case, however, unlike *Rowe,* the Group B and Group C plaintiffs do not allege the existence of any express oral contractual term regarding the duration of the seven percent commission system, other than the vague and precatory promise that it would last "forever." This is a far cry from the express just-cause language alleged in *Rowe and in Toussaint v Blue Cross & Blue Shield of Michigan, 408 Mich 579; 292 NW2d 880 (1980)*. For reasons noted by Justice Boyle on pp 555-556 of her **[*560]** concurring opinion, ruling in favor of the plaintiffs in this case would require too great an inferential leap from the precatory "forever" term. On the record presented **[***62]** here, I agree that summary disposition was properly granted.

Because it is evident that no single opinion in this case will command a majority of the Court, and in view of the inordinate verbiage which this case has already produced, it appears that little purpose would be served by elaborating my views at any greater length.

I concur in the result.

**Dissent by:** LEVIN

## Dissent

Levin, J. (*dissenting*).

This is not an action claiming wrongful discharge. [1] **[***63]** None of the one hundred seventy-nine **[**670]** plaintiff sales representatives were discharged. [2] It is, rather, an ordinary action claiming breach of contract for failure to pay agreed-upon compensation for services rendered and to be rendered.

The sales representatives rely solely on an express promise, concededly made before or at the time they were hired, to pay "a 7% commission on **[*561]** new sales *and policy renewals.*" They do not assert that they may recover on the basis of an implied promise arising out of "legitimate expectations."

The same rules of interpretation and construction as apply to a long-term contract to buy and sell goods *or provide services* [3] **[***64]** should be applicable. Neither a buyer nor a seller of goods *or services* is ordinarily entitled to change the terms of the contract "to respond to changing economic circumstances . . . ." [4]

The question presented does not concern the scope of *Toussaint v Blue Cross & Blue Shield of Michigan, 408 Mich 579; 292 NW2d 880 (1980)*. [5]

---

[1] The rule of construction in an employment discharge case is that employment is at will, unless the parties have otherwise agreed. See *Valentine v General American Credit, Inc, 420 Mich 256, 259; 362 NW2d 628 (1984)*.

In focusing unduly on whether the Auto Club explicitly promised to pay renewal commissions for a particular period of time, the Auto Club, the circuit court, and now the majority in this Court, are copying the mode of analysis ordinarily followed in an action claiming wrongful discharge.

[2] They all continued to work for the Auto Club after 1977 as sales representatives, and were compensated for services rendered after 1977 pursuant to a system of compensation announced by the Auto Club at the same time that it announced it would no longer pay a seven percent commission on new sales or policy renewals.

[3] See *Rowe v Montgomery Ward & Co, Inc, 437 Mich 627, 695-699, ns 34-53; 473 NW2d 268 (1991)*, and accompanying text, concerning "as-long-as" oral and written contracts to provide services.

[4] Riley, J., *ante,* p 532.

[5] To be sure, *Toussaint, supra, pp 609-612*, after reviewing "permanent" employment cases, deemed to be for an indefinite term with the result that the relationship was terminable at the will of either party, concluded that an employer's express agreement to terminate only for cause was enforceable although (i) the term of employment was for "as long as" the employee does the job and was not fixed at a definite number of months or years, and (ii) the contract of employment was unilateral, because the employee did not promise to remain in the employ of the employer for "as long as" the employee was able to do the job, and not bilateral. See Perritt, Employee Dismissal Law & Practice (2d ed), § 4.13, pp 200-202.

The signers of the lead opinion state in *Rowe*:

> [W]e do *not* suggest that a contract of employment is too indefinite to be enforced where the employee's consideration is the work performed in response to a

**[***65]** Before *Toussaint* was decided, courts were confronted with claims much like those here asserted, where the employer promised additional compensation, or an opportunity to earn additional compensation, and later asserted the "right" to, in effect, change the method of compensation, or deny **[*562]** the opportunity to earn additional compensation, after the employee had expended energy and had begun to earn the additional compensation.

At least as far back as the American Civil War, and more than 100 years before this Court decided *Toussaint,* courts have enforced promises made by employers when they sought to deprive an employee of the opportunity to earn expected compensation. Those promises have included agreements to pay compensation contingent on the happening of a certain event, and promises to pay "so long as" the employee performed certain work or remained on the job for a stated period. The courts have also enforced such promises in favor of commission salespersons.

In *Lake v Campbell,* 5 LTNS 582 (Eng, 1862), an employer promised a worker a bonus if he remained on the job until a certain date. The worker was discharged, without adequate cause, **[***66]** before that date. The court held for the worker, reasoning that the contract bound the employer to pay the bonus if the employee remained on the job *or was willing and able to do so.* Since it was the employer who had prevented the worker from fulfilling the conditions of the contract, the employer was liable for the bonus. [6]

**[**671]** Ninety years later -- twenty-five years before *Toussaint* -- the United States Court of Appeals for the Fifth Circuit reaffirmed this principle in *Coleman v Graybar Electric Co, Inc, 195 F2d 374 (CA 5, 1952)*. Graybar had adopted an "additional compensation plan" that promised yearly bonuses to employees such as Coleman as "an incentive to continuous service with the company," on condition that the employee remain at work until the **[*563]** following April. Coleman, an at-will employee, was discharged **[***67]** forty-four days before the bonus vested on April 1. Graybar contended that since Coleman was not an employee on April 1, he had not fully performed and no bonus was due. The court disagreed:

> [A] construction of the language which would permit the employer to terminate the continuity of service without any cause and as a matter of arbitrary choice, or because of a desire to evade the payment of additional compensation would be entirely inconsistent with the purpose of the plan and, in the absence of clear and compelling language, should not be adopted. [7] [*Id. at 377*.]

**[***68]** The United States Court of Appeals for the Sixth Circuit, in *Lemmon v Cedar Point, Inc, 406 F2d 94, 97 (CA 6, 1969)*, ruled -- also before *Toussaint* -- that only clear and express language would justify "the forfeiture of important rights almost earned by the rendering of substantial service," even in the face of written "at-will" provisions:

> *Coleman* is consistent with the principle that courts will strictly construe contractual provisions which authorize the forfeiture of important *rights almost earned by the rendering of substantial service.* Unless the language of the contract is so clear as to permit no other reasonable interpretation, **[*564]** such provisions will be construed to prevent arbitrary action in reliance on them. [*Id. at 97*. Emphasis added.]

The Oregon Supreme Court similarly ruled -- also before *Toussaint* -- in *Thompson v Burr, 260 Or 329, 333; 490 P2d 157 (1971)*. In that case a yearly bonus was promised to an employee, "as 'an incentive to stay on the job.'" The written bonus agreement stated that the employer was under no obligation to pay the bonus unless the employee **[***69]** was on the job on April 1 of the following year. Nonetheless, the court ruled for the plaintiff:

> [I]t was an offer to make a bonus payment to any

> unilateral offer. Nor do we depart from the concept that the presumption of employment at will is a rule of construction rather than a substantive limitation. [Riley, J., p 638. Emphasis in original.]

[6] It could not be said that the bonus was for work already performed, since the promise to pay was conditioned on the employee being on the job until the specified date.

[7] The court continued:

> In the absence of language clearly contemplating and providing for such a result, the parties should not be held to have intended such a consequence. To hold that they did, we must conclude that the parties, by the language quoted, stipulated that the employer reserved to itself the right to determine whether the additional compensation, conditionally promised it is true, should ever be received because such employer could refuse to comply with it merely by discharging the employee at its own whim. [*Id. at 377*.]

employee who "stayed on the job" and qualified for such payments, *so as to become a binding unilateral contract upon such an acceptance by such an employee and in consideration of his continued employment.* [*Id. at 334*. Emphasis added.] [8]

**[***70] [*565] [**672]** Speaking for the United States Court of Appeals for the Seventh Circuit, Judge Easterbrook wrote to provide a cause of action to a former at-will employee who claimed that he had been wrongfully deprived of the opportunity to earn profits on stock purchased through a compensation scheme designed to engender loyalty among the employees, when he resigned and sold the stock back to the company. [9] Company officials had not informed him of an impending buyout, which resulted in huge profits for stockholders. *Jordan v Duff & Phelps, Inc, 815 F2d 429 (CA 7, 1987)*.

The court held that the company had a duty to tell Jordan that by leaving when he did he would lose a considerable sum of money. The court added that to hold otherwise would give the employer the power to, in effect, say to Jordan:

> "even if you hadn't resigned, we would have fired you, the better to engross the profits of the merger **[*566] [***71]** for ourselves. So long, sucker." [10]
>
> * * *
>
> *One term implied in every written contract and therefore, we suppose, every unwritten one, is that neither party will try to take opportunistic advantage of the other.* . . . A firm may fire an employee the day before his pension vests, or a salesman the day before a large commission becomes payable. Cases of this sort may present difficult questions about the reasons for the decision (was it opportunism, or was it a decline in the employee's performance?). The difficulties of separating opportunistic conduct from honest differences of opinion about an employee's performance on the job may lead firms and their employees to transact on terms that keep such disputes out of court -- which employment at will usually does. But no one, not even Professor Epstein, doubts that an *avowedly opportunistic discharge* is a breach of contract, although the employment is at-will. [*Id. at 437-438*. Emphasis added.]

**[***72]** The court added that if the company had

---

[8] The court continued:

> There is ample authority to the effect that where the payment of a bonus is a matter of contract (as in this case), rather than a gratuity, such an agreement by an employer to pay a bonus to an employee may not be defeated by the employer by discharging the employee shortly before he has completed his eligibility for the bonus unless the discharge was for "good cause" and that if such an employee is discharged "without good cause" he is still entitled to payment of the bonus even if the employer did not act in bad faith. [*Id. at 334-335*.]

Professor Corbin tied all this together:

> The American Law Institute has approved the rule that when a promise is offered in exchange for specified action or forbearance the promise becomes binding and irrevocable as soon as *part of the requested performance* has been actually rendered or a proper tender of performance has been made. [1 Corbin, Contracts, § 63, p 262. Emphasis added.]

In another section of the treatise, Corbin said:

> The case is quite different, however, when an employer has made a promise of compensation for service and the employee has *begun or has rendered such service* without having made any promise, express or implied, to begin or to continue it. In these cases, the employer is under an obligation (a legal duty), although the extent and character of that obligation are dependent on the terms of the promise that induced the service. [1A Corbin, Contracts, § 152, p 13. Emphasis added.]
>
> A part performance of the bargained-for consideration, forming a part of the expected process of acceptance, is now held to make the offer irrevocable although the duty of the offeror is conditional upon completion by the offeree. The bonus cases just referred to are of this kind. *Although the bonus* [*read: renewal commission*] *is not fully earned until the service has continued for the full time, after a substantial part of the service has been rendered the offer of the bonus cannot be withdrawn without a breach of contract.* [*Id.*, § 153, p 20. Emphasis added.]

[9] The employment contract required Jordan to resell the stock to the company when he left.

[10] The court continued:

> This would have been permissible, under our colleague's interpretation, because Jordan was an employee at will and therefore could have been fired at any time, even the day before the merger, for any reason -- including the desire to deprive Jordan of a share of the profits. [*Id. at 437*.]

*discharged* Jordan to deprive him of the stock profits from the merger, rather than merely letting him resign unknowingly, he would have had a cause of action, *especially since the purpose of stock ownership was to induce him to "stick around and work well."* *Id. at 438*. (Emphasis added.)

Clearly, the Auto Club's change in the compensation scheme was "avowedly opportunistic" even though the Auto Club claimed it was needy.

Promises to pay commissions on policy renewals have been enforced by courts in favor of at-will **[*567]** employees, and are not an "extraordinary contractual promise." [11] Massachusetts' highest court held that an at-will employee working under a contract providing for the payment of commissions on new policies and renewals may not be deprived of "identifiable, reasonably anticipated future compensation, based on his past services, that he lost because of his discharge without cause." *Gram v Liberty Mutual Ins Co, 384 Mass 659, 660; 429 NE2d 21 (1981)*.

**[***73]** Gram was an *at-will* insurance agent, discharged without cause, who claimed that he was discharged in bad faith and thereby deprived of renewal commissions and other **[**673]** compensation he would have earned if not fired. Although the Massachusetts court found "no basis for a reasonable inference that Liberty was motivated to discharge Gram by a desire to obtain the benefit of Gram's renewal commissions" and dismissed the bad-faith claim, it nonetheless said that "Gram lost reasonable ascertainable future compensation based on his past services" even though some "servicing" of clients might be necessary to obtain the renewal (*id. at 669-671*):

> Gram's contribution to Liberty's future income was not tenuous. *Liberty benefited from its discharge of Gram without cause, assuming that the normal course of the servicing of renewal business would cost less than the "forfeited" renewal commissions.* . . . Fair dealing, the other aspect of the obligation imposed on an employer, requires recognition of the agreed worth of such an employee's past service. [*Id. at 672*. Emphasis added.]

In *Hall v Farmers Ins Exchange, 713 P2d 1027, 1029 (Okla, 1985)*, the Oklahoma **[***74]** Supreme Court affirmed a jury award of $ 225,000 to an insurance agent, representing the "reasonable amount of **[*568]** future commissions from renewal premiums." [12] Quoting *Wright v Fidelity & Deposit of Maryland, 176 Okla 274, 277; 54 P2d 1084 (1936)*, the court said:

> "A contract consists not only of the agreements which the parties have expressed in words, but also of the obligations which are reasonably implied. . . . *Every contract contains implied covenants that neither party shall do anything that will destroy or injure another party's right to receive the fruits of the contract.*" [*Hall, supra at 1029-1030*. Emphasis added.]
>
> The authors of the Restatement have succinctly set down the long-standing rule that a principal may not unfairly deprive his agent of the fruits of that agent's own labor by a wrongful, unwarranted resort to a clause in the agency contract which provides for termination at will. [*Id. at 1031*.] [13]

Here, of course, there is no dispute but that the Auto Club changed the compensation plan *specifically* to deprive the sales representatives of seven percent commissions on the renewal of old policies and on future sales.

**[*569]** These are not isolated cases. [14] In *Tymshare,*

---

[11] Riley, J., *ante,* p 543.

[12] Hall, an insurance agent who was an employee at will, had received $ 42,000 in compensation from Farmers in 1978, $ 35,000 of which was from renewal commissions. *Id. at 1028*.

[13] **[***75]** In affirming the verdict, the Oklahoma court added:

> [The] evidence was limited to that which he had already sold and which both he and Farmers assumed would be renewed at a predictable, quantifiable rate during Hall's lifetime. There is uncontroverted testimony that such renewal premiums constituted the bulk of Hall's income, and throughout his association with Farmers he had anticipated this income because such was the usual and *ordinary course of events* in the insurance business and all this was well known [to] Farmers. [*Id.* Emphasis added.]

[14] See *Emerick v Mutual Benefit Life Ins, 756 SW2d 513 (Mo, 1988)*, where a discharged at-will agent was allowed to recover renewal commissions on policies he had sold during his tenure as general agent, and *Maddaloni v Western Massachusetts Bus Lines, Inc, 386 Mass 877, 879, n 2; 438 NE2d 351 (1982)*, where an at-will employee who was employed to procure charter rights from the ICC for his company recovered five percent "of the total Special and

*Inc v Covell, 234 U.S. App DC 46; [**674] 727 F2d 1145 (1984)*, the United States Court of Appeals for the District of Columbia Circuit, speaking through Judge Scalia, held that even though an employer had retained the right to retroactively **[***76]** change commission rates paid to salesmen for selling data processing services, an employee who charged that his commission rate was changed, and he was later discharged, because he was earning too much money, stated a cause of action. The court interpreted the "duty of good faith" to mean the implication into a contract of the obligation not to engage in a particular form of conduct, and to hold **[*570]** the contracting parties to their reasonable expectations.

**[***77]** The issue then became whether it was reasonable to interpret the contract to allow the employer to change commission rates for any reason at all, or to infer a limitation on that right. *The court found that it was unreasonable to suppose that the parties intended to allow the employer to use its power to change commission rates for the purpose of depriving a sales representative of reasonably contemplated compensation, and remanded the case for trial to provide the plaintiff the opportunity to prove his allegations.* The rates could be adjusted only for an "unexpectedly high volume of sales not attributable to the special efforts of the sales representative . . . ." *Id. at 57*.

In *Leonard v Louisiana Health Service & Indemnity Co, 505 So 2d 173, 176 (La App, 1987)*, the plaintiffs were employed to sell Blue Cross insurance policies. They were paid a cash "enrollment fee," a five percent commission on the sale of a new policy, and a five percent commission on renewals for the first two years the policy was in force. Blue Cross attempted to change the compensation scheme by circulating a "Subject Memorandum." Thereafter, the memorandum stated, it would pay **[***78]** the entire commission when the new policy was sold, and nothing for renewals. The plaintiffs succeeded in obtaining a five percent commission on renewals:

> Of course, the provisions of the Subject Memorandum shall govern their rights to renewal commissions with respect to policies they caused to be issued in the period extending until the earlier of termination of association with Blue Cross or termination of the Subject Memorandum. In elaboration of this point, *the Subject Memorandum shall not be construed so as to have any effect precluding **[*571]** Descant and Ordes from recovering renewal commissions payable with respect to policies they caused to be issued prior to January 1, 1979.* [Emphasis added.] [15]

I

The Auto Club Insurance Association entered into oral unilateral contracts [16] of employment with the one hundred seventy-nine plaintiff sales representatives pursuant **[***79]** to which the Auto Club agreed -- as acknowledged in affidavits filed by the Auto Club in this

---

Charter revenue income . . . paid . . . on the 15th day of each month," whether he had done anything to procure the customers or not.

See also *RLM Associates v Carter Mfg Corp, 356 Mass 718; 248 NE2d 646 (1969)* (the employer may not terminate the employment of an employee to avoid paying commissions); *Tahir ERK v Glenn L Martin Co, 116 F2d 865 (CA 4, 1941)* (the defendant may not terminate the employment of an agent to deprive him of commissions); *Fortune v Nat'l Cash Register Co, 373 Mass 96; 364 NE2d 1251 (1977)* (covenant of good faith and fair dealing requires that when a principal acts to deprive an agent of compensation by terminating an at-will contract when the agent is on the brink of successfully completing a sale that would result in a substantial commission, the salesman is entitled to recover such compensation); *Dowty v Blue Cross of LA, 410 So 2d 332 (La App, 1982)* (continued employment is not a prerequisite to the recovery of renewal commissions).

The Supreme Court of Alaska affirmed an award of future profits promised to an employee after finding that the employee was discharged to deprive him of those profits. *Mitford v Lasala, 666 P2d 1000 (Alas, 1983)*.

In *Baum Associates, Inc v Society Brand Hat Co, 477 F2d 255, 259 (CA 8, 1973)*, the plaintiff alleged that he was promised commissions *in perpetuity* should he be successful in procuring purchasers of his employer's trousers. He did, and was later discharged. The court found "relatively minor" efforts were required to service clients once procured, and the plaintiff recovered commissions from orders received from old customers after he was discharged.

[15] The case might be distinguished on the basis that the court found that the plaintiffs had no responsibility to obtain a renewal.

[16] The contracts were unilateral because the offer of the Auto Club to a potential sales representative looked for acceptance by performance, not a promise to perform. Where there is an exchange of promises, the contract is bilateral.

action [17] -- to pay the sales **[**675]** representatives "a 7% commission on new sales and *policy renewals.*"

**[***80]** Each of the one hundred seventy-nine sales representatives worked for a number of years for the Auto Club on the basis of the oral contracts. Well over two-thirds of them worked on the basis of those contracts for over ten years, some for over twenty years.

The Auto Club paid sales representatives a seven percent commission on renewals as well as **[*572]** seven percent on new policies for over twenty-five years, until early 1978. At the end of 1977, the Auto Club announced that, beginning sometime in early 1978, it would no longer compensate sales representatives on a commission basis, and would not pay a commission of seven percent either on new sales or on policy renewals of old sales. [18] The sales representatives commenced this action in the circuit court.

**[***81]** The sales representatives originally contended that the Auto Club was obliged to pay a seven percent commission on new sales after 1977, as well as on policy renewals. They no longer contend that the Auto Club was obliged to pay a seven percent commission either on new sales or on renewals of sales made after 1977. They continue to contend, however, that the Auto Club breached its contracts with them when it refused to pay a seven percent commission on renewals after 1977 of policies first written before 1978. [19]

**[***82]** **[*573]** II

One hundred thirty-nine of the one hundred seventy-nine sales representatives, identified in the lead opinion as Group A, conceded on deposition that they could not recall whether the Auto Club *explicitly* promised that the seven percent commission would be paid on renewals for any particular period of time or duration. They, nevertheless, contend that the express promise to pay a seven percent commission on policy renewals means renewals written while they remained in the employ of the Auto Club.

The one hundred thirty-nine sales representatives, and the other forty as well, assert that their interpretation of

---

[17] In connection with the motions for summary disposition, the Auto Club filed the affidavits of its field manager-administration and field manager-general agents, who asserted that they had been employed by the Auto Club for over twenty-five years and had been personally responsible for interviewing and hiring many commissioned sales representatives for the Auto Club. They stated that in their interviews before 1978 of potential commissioned sales representatives, they informed the interviewees of the Auto Club's "then-existing policy for compensating commissioned sales representatives. Specifically, I advised interviewees that the Automobile Club paid *a 7% commission on new sales and policy renewals.*" (Emphasis added.) The affiants continued that they did not represent to the interviewees that the commission paid could never be changed or would never change.

[18] A majority of the sales representatives voted to organize a labor union to represent their interests. The union and the Auto Club did not succeed in agreeing on a collective bargaining agreement. Nor was the union successful in pursuing, before the National Labor Relations Board, a charge that the Auto Club had engaged in an unfair labor practice. The union was decertified. See *Bullock v Automobile Club of Michigan, 432 Mich 472; 444 NW2d 114 (1989)*.

[19] The Auto Club contends that, by continuing to work for the Auto Club and by accepting compensation for services rendered after 1977 pursuant to the new system of compensation, the sales representatives agreed to a modification of, and to release their rights under, any earlier contracts to pay a seven percent commission on policy renewals of old sales. When the Auto Club announced the new compensation system, it did not, however, offer to modify any earlier contract. It asserted rather, as it does now, that there were no preexisting contracts to be, or that could be, modified.

In all events, the sales representatives mitigated their damages by continuing to work for the Auto Club. The Auto Club was also advantaged by retaining the services of an experienced sales force.

In *Farrell v Automobile Club of Michigan (On Remand), 187 Mich App 220, 228; 466 NW2d 298 (1991)*, the Automobile Club argued "that its imposition of a policy requiring adherence to minimum sales levels constituted an offer to modify any contrary express agreement alleged by plaintiff and that acceptance of this offer was manifested where plaintiff 'clearly continued employment thereafter, without protest.'" The Court of Appeals rejected this argument, concluding from its review of the record that "a *sufficient factual dispute* existed concerning whether plaintiff's continued employment was 'without protest.' Moreover, we agree with plaintiff that acceptance cannot be presumed from the mere fact of continued employment; otherwise, how would such an offer ever be rejected, absent one leaving employment? Rather, to the extent defendant's policy change constituted an offer to modify contrary terms of a prior express agreement, the question whether plaintiff accepted such an offer must be determined from the acts and circumstances of the parties, including their written or spoken words or by other acts or conduct." (Emphasis added.)

the express promise -- concededly made by the Auto Club -- is supported by the course of performance and evidence adduced in response **[**676]** to interrogatories propounded by the Auto Club, and additional evidence that would be adduced at trial if this Court would permit their claims to be tried on the merits.

A

The lead opinion, written by Justice Riley and signed by Justices Brickley and Griffin, holds that the one hundred thirty-nine Group A sales **[*574]** representatives, who do not claim that they were told at the time of hiring that the seven percent commission **[***83]** on renewals would continue to be paid for any particular duration, may not maintain an action "because no express promises of permanency were made" to them. [20]

The Chief Justice agrees that "there is simply no basis in this case for the Group A plaintiffs' express oral contract theory," apparently because these one hundred thirty-nine sales representatives "have no memory that they were promised seven-percent commissions 'forever,' and *no evidence on the record* supports such a promise." [21] Justice Boyle states that the Group A sales representatives' "proofs are insufficient to support the **[***84]** *inference of a just-cause contract* or an *enforceable promise not to change the payment plan.* The *circumstances* identified as guidelines with regard to the intent to create a just-cause contract in *Rowe v Montgomery Ward & Co, Inc, 437 Mich 627; 473 NW2d 268 (1991)*, are not present." (Emphasis added.) [22]

B

Twenty sales representatives, comprising Group B, claimed on deposition that they were told *"before or at the time of hiring"* that they would receive "a 7% *renewal* commission 'for as long as they were employed by the Auto Club,' or 'forever' or 'always' or words to that effect." The lead **[*575]** opinion holds that such a promise is unenforceable "because it was not possible for renewal commissions to *accrue* until after the first year" and, hence, the "agreement with regard to renewals was not capable of performance within [the] **[***85]** one year" statute of frauds. (Emphasis added.) [23]

The Chief Justice and Justice Boyle do not join in the statute of frauds [24] analysis, and join in reversal of the Court of Appeals on the basis that the sales representatives provided insufficient proofs of a promise to pay a seven percent commission on each renewal they wrote during their employment.

C

Twenty sales representatives, comprising Group **[***86]** C, claimed on deposition that they were told at some point *"after they were hired"* they would receive "a 7% renewal commission 'for as long as they were employed by the Auto Club,' or 'forever,' or 'always,' or words to that effect." The signers of the lead opinion conclude that the claimed commitment is unenforceable because "we find that the circumstances demonstrate that *no mutual assent* was reached on the permanency of the commission plan with respect to renewals." [25] (Emphasis added.)

**[*576]** The Chief Justice agrees with that conclusion, stating that "ruling in favor of the plaintiffs in this case would require too great an inferential leap from the precatory **[**677]** 'forever' term. On the record presented here, I agree that summary disposition was properly granted." [26] Justice Boyle, adverting to the analysis and approach set forth in her concurrence in *Rowe,* concludes that the sales representatives have

[20] The opinion asserts that, therefore, "any contractual rights to that effect had to spring from the 'legitimate expectations' leg of *Toussaint v Blue Cross & Blue Shield of Michigan, 408 Mich 579, 598; 292 NW2d 880 (1980)*." Riley, J., *ante,* pp 528-529.

The lead opinion also argues that the right to renewal commissions does not rest upon the sale of the original policy. *Id., p 530*.

[21] The quoted words are from the lead opinion, n 3. See Cavanagh, C.J., *ante,* p 559.

[22] Boyle, J., *ante,* pp 549-550.

[23] Riley, J., *ante,* pp 532-533, 539.

[24] The one-year statute of frauds reads:

> In the following cases an agreement, contract or promise shall be void, unless that agreement, contract, or promise, or a note or memorandum thereof is in writing and signed by the party to be charged therewith, or by a person authorized by him:
>
> (a) An agreement that, by its terms, is not to be performed within 1 year from the making thereof. [*MCL 566.132*; MSA 26.922.]

[25] Riley, J., *ante,* pp 542, 549.

[26] Cavanagh, C.J., *ante,* p 560.

not alleged facts or circumstances sufficient to permit a factfinder **[***87]** to conclude that the Auto Club's offer of specific compensation "would continue for the duration of employment (or beyond)" or that it "was making a commitment amounting to a promise of a permanent renewal compensation plan." [27]

D

I agree with Justice Boyle that the central issue in this case is doctrinally the same as that in *Rowe.* The issue is whether Mary Rowe, in *Rowe,* and the sales representatives, in the instant case, may maintain actions for breach of an *express* contract.

I further agree with Justice Boyle that resolution of this issue depends on the facts and circumstances of the particular case.

For reasons set forth in dissent in *Rowe,* and in this dissenting opinion, I believe that the signers of the lead and concurring opinions employ an incorrect standard and approach, and commit other errors in analysis and assessment of the summary disposition record in this case.

III

The signers of the lead and concurring opinions **[***88]** **[*577]** begin with an *incorrect description* of the testimony of the forty sales representatives who recalled being told or informed of a durational term for the promise to pay a seven percent commission on policy renewals.

They proceed on the basis of the *incorrect assumption* that the promise to pay a seven percent commission on policy renewals did not, as a matter of law, express a durational term. The signers of the lead opinion *misstate the issue.*

Further, they decide this case on the basis of an *issue not briefed,* the sufficiency of the evidence. Moreover, although the motion for summary disposition did not *"specifically identify,"* as provided in the court rule, as an issue the sufficiency of the evidence, they affirm the trial court's order granting summary disposition on that basis.

A

The *incorrect description* is that the forty sales representatives testified to a "vague and precatory promise" that "the seven percent commission system" "would last 'forever.'" [28]

**[***89]** The affidavit filed by the attorney for the Auto Club in support of its motion for summary disposition did not indicate whether all forty -- or only one, or more than one -- sales representative actually used the word "forever" or "always" to describe the durational term of the promise to pay renewal commissions. Because the depositions themselves were not filed, this Court is unable to determine the context in which the words "forever" or "always" were used. The signers of the lead and concurring opinions, nevertheless, state **[*578]** that *all forty sales representatives* claim the "defendant made extraordinary contractual promises that the commission system would be in place 'forever.'" [29]

*An even-handed summarization of the attorney's affidavit* [30] would recognize **[**678]** *that perhaps only one, or only a handful, of the sales representatives may have used the word "forever" to describe the durational term.*

**[***90]** It was the obligation of the Auto Club to state carefully in the affidavit relied on to support its motion for summary disposition the deposition testimony of the

---

[27] Boyle, J., *ante,* p 552.

[28] Cavanagh, C.J., *ante,* p 559; Boyle, J., *ante,* p 556; Riley, J., *ante,* pp 524, 527, 532, 539, 542, 548.

[29] Riley, J., *ante,* p 543. See n 28.

[30] Contrary to the court rule (*MCR 2.302[H]*), the Auto Club did not file the depositions of the sales representatives with the circuit court when it filed a motion for summary disposition based on the deposition testimony; I acknowledge that the Auto Club offered to do so if requested.

The Auto Club filed, rather, an affidavit prepared by an attorney for the Auto Club, stating that on review of the depositions of the one hundred seventy-nine sales representatives, it appeared that one hundred thirty-nine did not recall that they were told or informed that they would receive a seven percent commission "for as long as they were employed by the Auto Club," or "forever," or "always," or "any words to that effect." Seven, according to the affidavit, "gave contradictory and/or unclear answers," whether they were so informed, fourteen testified that they were so told before they were hired, and twenty testified that they were so told after they were hired.

The trial court and the majority have dubbed the one hundred thirty-nine sales representatives as Group A, the seven and fourteen as Group B, and the twenty as Group C.

sales representatives. It is most unlikely that all forty sales representatives said "for as long as they were employed by the Auto Club," and *also* "forever," and *also* "always."

This Court cannot, on the basis of this affidavit, properly portray these forty plaintiffs' deposition testimony as making a claim that they have not made, a claim that possibly only one sales representative may have expressed on deposition, that the promise was to pay on renewals "forever."

**[*579]** B

The *incorrect assumption* is that the Auto Club's promise to pay "a 7% commission on new sales and policy renewals" did not, as a matter of law, express a durational term [31] for the Auto Club's promise to pay a seven percent commission on "policy renewals."

Contrary to the assumption made by the signers of the **[***91]** lead and concurring opinions, the words "policy renewals" may reasonably be interpreted by the promisee, the sales representative, [32] as implicitly stating a durational term, namely, for as long as the Auto Club and the customer choose to renew the policy.

The policy renewal time frame for a particular customer is readily determinable. The period during which the Auto Club may choose to extend an offer to renew a policy, and the customer may choose to accept the offer, is the time frame for that renewal. The renewal time frame for a customer is for however long the Auto Club and the customer continue to do business on a renewal basis.

Because the trier of fact could, absent other evidence, appropriately find that a promise to pay commissions on "policy renewals" might be reasonably interpreted and understood by the promisee as having that meaning, [33] it is not, and should not be, determinative whether the sales representatives recall being told that renewal commissions would be **[***92]** paid on policy renewals "for as long as they were employed by the Auto Club," or "forever," or "always."

I ask the majority

**[*580]** -- What does the term "policy renewals" mean if not "an insurance policy issued when a customer accepts an insurer's offer to renew the policy"?

-- What does a promise to pay a seven percent commission on policy renewals mean -- absent other evidence, such as a course of performance limiting the duration to the time that the sales representative remains in the employ -- if not "a promise to pay a seven percent commission on policy renewals for as long as the insurer and the customer choose to renew an earlier policy"?

The sales representatives do not claim -- as the majority incorrectly states [34] -- that a seven percent commission would be payable "forever" or that a seven percent commission would be payable on a policy renewal written after a sales representative left the employ of the Auto Club.

**[***93]** The sales representatives recognize that they were expected to continue to provide service in respect to renewals and, accordingly, that no renewal commissions would be payable after a sales representative left the employ of the Auto Club. It further appears that the Auto Club -- which paid a **[**679]** seven percent commission on policy renewals for over twenty-five years -- did not pay any commission on policy renewals written after a sales representative left the employ of the Auto Club.

The trier of fact could reasonably find that a promise to pay a renewal commission for "as long as" the insurer and the customer choose to renew the policy and the sales representative remains in the employ of the insurer, states a durational term. The contract formed when an offer making such a promise is accepted provides a means of determining the period of time during which the insurer is obliged to pay renewal commissions, **[*581]** namely, the period during which the insurer offers to renew, the customer accepts the offer, and -- on the basis of the other testimonial evidence and the course of performance -- the sales representative remains in the employ of the insurer.

The duration of the contract **[***94]** is, therefore, determinable, and sufficiently definite, although it is uncertain how long the insurer will offer to renew, the customer will choose to renew, and the sales representative will remain in the employ of the insurer.

---

[31] Riley, J., *ante,* p 528. Boyle, J., *ante,* p 550.

[32] See n 53 and accompanying text.

[33] *Id.*

[34] See part III(A).

C

The lead opinion *misstates the issue,* and in so doing builds on the incorrect assumption that there is not a durational term for the conceded promise to pay a seven percent commission on policy renewals.

The signers of the lead opinion state that "because no express promises of permanency [35] **[***95]** were made to [the Group A] plaintiffs, any contractual rights to that effect had to spring from the 'legitimate expectations' leg of *Toussaint* . . . ." They then state that the "threshold inquiry" is "whether to extend the 'legitimate expectations' leg of *Toussaint* beyond wrongful discharge disputes to cover an employer's compensation policy. We choose not to extend the 'legitimate expectations' cause of action to this case." [36]

The Chief Justice and Justice Boyle have declined to address the "'legitimate expectations' leg of *Toussaint,*" recognizing that the claims of the **[*582]** sales representatives are based on an express, not an implied, promise. [37]

Express promises, as well as statements in an employees' manual, generally give rise to expectations -- legitimate expectations that the promise will be performed and kept. The source of the legitimate expectations, in the instant case, is an express promise.

The signers of the lead opinion confuse interpretation and implication. The central issue in this case is interpretation.

Interpretation of an express promise does not convert the express promise into an implied promise. [38] In this case, there was an express promise concerning compensation and, in particular, concerning compensation on **[***96]** policy renewals. The central issue presented concerns the interpretation and meaning of the express promise to pay seven percent on policy renewals. [39]

D

A premise of the majority's conclusion is that because the Auto Club's promise concerns compensation, and the resulting contract is an employment contract rather than, say, a contract for the sale of goods, the employer will be deemed, at least where the contract of employment is *oral,* to have reserved the right to change the compensation unless the employer explicitly stated, when entering into an oral contract **[**680]** of employment, that it does *not* reserve the right to do so.

**[*583]** The majority does not cite any authority **[***97]** for this proposition, or explain when it became a feature of the law of contracts that a promise is not enforceable unless the promisor not only promises to act in a certain manner, but additionally promises that he will not unilaterally change or renege on the commitment. [40]

Management does not, even having in mind "the **[***98]** needed flexibility of businesses to change their policies to respond to changing economic circumstances," [41] have the prerogative of reneging on a contract, whether oral or written.

The rules of contract construction are the same for written and oral contracts. The judicial preference for

---

[35] Elsewhere in the opinion, they opine that a promise of permanency is not credible. Riley, J., *ante,* p 528. Boyle, J., *ante,* pp 552 and 556.

[36] Riley, J., *ante,* p 529.

[37] Cavanagh, C.J., *ante,* pp 558-559. Boyle, J., *ante,* p 550, n 4.

[38] An implied promise is one that arises separate and apart from an express promise, such as the implied promise of an employer to pay a day worker, of a patient to pay a physician, of a client to pay a lawyer, for services rendered on request without regard to whether there was any discussion of compensation.

[39] See part IV *infra.*

[40] In *Rowe,* I review the decisions of this Court and of courts in other jurisdictions, including United States Courts of Appeal, the highest courts of New York, Massachusetts, California, Minnesota, Texas, and Wisconsin, and the United States Supreme Court, in which "as long as" contracts were found or deemed to express a durational term. *Rowe, supra,* part II(F), n 34. As I observe in *Rowe,* there is no suggestion in any of the cases "that a promisor would be permitted to terminate promissory obligations under an exclusive distribution, requirements, employment, or other 'as long as' contract except for failure of performance by the promisee." *Rowe, supra,* following n 70 (p 702).

[41] Riley, J., *ante,* p 532.

I recognize that economic necessity may justify a reduction in force, and constitute "cause" for dismissal or layoff. *McCart v J Walter Thompson USA, Inc, 437 Mich 109; 469 NW2d 284 (1991)*; *Bullock, n 18 supra; Woolley v Hoffmann-LaRoche, Inc, 99 NJ 284; 491 A2d 1257 (1985)*, modified *101 NJ 10; 499 A2d 515 (1985)*.

writings is understandable. They are tidier and, when well thought through and drafted, may make *our* task easier. The plethora of litigation over the meaning of writings suggests, however, that the course of performance, like circumstantial evidence, is sometimes the bearer of **[***99]** truth.

Be that as it may, if the Auto Club had promised *in writing* that it would pay "a 7% commission on new sales and policy renewals," it might be clear to the majority, as it is to me, that unless the Auto Club expressly reserved the right to **[*584]** unilaterally terminate the obligation to pay a seven percent commission on renewal of policies written before the announcement of a change in compensation, the Auto Club was not at liberty unilaterally to modify the compensation payable on renewals of policies written before the announcement of the change in *future* compensation.

E

This Court rules against the claims of the sales representatives in part because of an asserted insufficiency in their proofs. [42] **[***100]** The Auto Club, did not, however, in its motion for summary disposition, "specifically identify" as an "issue," as provided by the court rule, [43] that the sales representatives could not proffer at trial sufficient evidence in support of their pleaded allegation that they were promised that a seven percent commission would be paid "on each renewal that they wrote during their entire employment."

**[*585]** The motion for summary disposition asserted, rather, that one hundred thirty-nine of the one hundred seventy-nine sales representatives had stated on deposition that they had not been told or informed by the Auto Club that they would receive a seven percent renewal commission "'for as long as they were employed by the Auto Club,'" or "'forever,'" or "'always,'" or "'any words to that effect.'" Seven, it **[**681]** was asserted, "gave contradictory and/or unclear answers," whether they were so informed, fourteen testified that they were so told before they were hired, and twenty testified that they were so told after they were hired.

A court may properly grant summary disposition, on the basis that there is no genuine issue as to any material fact, only where there has been "a complete failure of proof concerning an *essential element* of the **[***101]** nonmoving party's case." [44]

Establishing that the sales representatives had been "'*told, or otherwise informed* by the Auto Club'" that the seven percent renewal commission would be paid either "'for as long as they were employed by the Auto Club,'" or "'forever,'" or "'always,'" or "'any words to that effect,'" *was not an "essential element"* of the sales representatives' case. The sales representatives, whether in Group A, B or C, could establish the alleged durational term -- "each renewal that they wrote during their *entire employment*" -- by other evidence such as the testimony of other sales representatives or persons, such as present or former employees of the Auto Club, or the course of performance.

That the Auto Club did not "specifically identify" the sufficiency of the evidence in its motion for summary disposition, is borne out by an examination **[***102]** **[*586]** of the brief filed by the Auto Club in this Court, which does not argue the sufficiency of the evidence.

The brief, [45] following the pattern of the motion for summary disposition, argued, rather, that the claim of the Group A sales representatives must fail because

---

42

> With regard to members of Group C, we find that the *circumstances* demonstrate that no mutual assent was reached on the permanency of the commission plan with respect to renewals. [Riley, J., *ante,* p 549. Emphasis added.]
>
> Plaintiffs' *proofs are insufficient* to support the inference of a just-cause contract or an enforceable promise not to change the payment plan. [Boyle, J., *ante,* p 549. Emphasis added.]
>
> On the *record* presented here, I agree that summary disposition was properly granted. [Cavanagh, C.J., *ante,* p 560. Emphasis added.]

43 Rule 2.116 Summary Disposition

* * *

(G) Affidavits; Hearing.

* * *

(4) A motion under subrule (C)(10) *must* specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact. [Emphasis added.]

44 Celotex Corp v Catrett, 477 U.S. 317, 323; 106 S Ct 2548; 91 L Ed 2d 265 (1986). (Emphasis added.)

45 Attached as an appendix is the summary of the Auto Club's argument set forth in its brief filed with this Court. Included in that summary are references to the four points covered in the Auto Club's motion for summary disposition.

they had acknowledged they had not been told or informed of a durational term, and the claim of the Group B sales representatives must fail, not because of insufficiency in the evidence of a promised durational term, but rather because enforcement of the promise was barred by the statute of frauds, and the claim of the Group C sales representatives must fail, not because of insufficiency in the evidence of a promised durational term, but, rather, because the Group C sales representatives claimed that they were told or informed of the durational term after they were hired, and there was a "lack of any consideration beyond the pre-existing cooperation and loyalty those plaintiffs had already committed to perform."

**[***103]** A majority of the Court does not find against the claims of the one hundred thirty-nine representatives comprising Group A *solely* on the basis that they were not so told and informed. Nor is there a majority for finding against the claims of the Group B sales representatives on the basis that their claim is barred by the statute of frauds, or for finding against the claims of the Group C sales representatives on the basis of lack of consideration.

None of the justices find against the claims of the Group C sales representatives solely on the **[*587]** basis sought by the Auto Club, either in its motion for summary disposition or in its brief filed in this Court. Indeed, none of the justices rule against the claims of the Group C sales representatives solely on the basis of lack of consideration.

All the justices comprising the majority rule against the claims of the Group C sales representatives on the basis that there is not sufficient evidence to support their claim that they were promised a seven percent commission on policy renewals "that they wrote during their entire employment." Lack of "special consideration" for the asserted post-hiring promise was only one of the factors, **[***104]** not the sole factor considered by the majority. The majority rule, in effect, and correctly so, that lack of consideration or special consideration would not alone justify dismissal of a claim relying on an express promise, even one made after hiring.

**[**682]** The fourth and fifth votes for reversal of the Court of Appeals, those of the Chief Justice and Justice Boyle, reject the claims of all the sales representatives on the basis of insufficiency of the evidence without regard to whether they are in Group A, B, or C, an issue that the Auto Club neither "specifically identified" in its motion for summary disposition nor argued in its brief in this Court.

1

In *McCart v J Walter Thompson USA, Inc, 437 Mich 109, 116; 469 NW2d 284 (1991)*, this Court ruled in favor of an employer, in part because the plaintiff had "failed to carry his burden under *MCR 2.116(G)(4)*," providing that when a motion is filed asserting that there is no genuine issue as to any material fact, "an adverse party may not rest **[*588]** upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing **[***105]** that there is a genuine issue for trial."

The same *MCR 2.116(G)(4)* further provides, however, that "[a] *motion* [for summary disposition asserting that there is no genuine issue as to any material fact] *must specifically identify the issues* as to which the moving party believes there is no genuine issue as to any material fact." (Emphasis added.)

The Auto Club's motion was carefully crafted to advert only to those "factual" matters about which there could be no dispute. The motion repeated what the sales representatives had stated on deposition in response to only one inquiry: whether they had been "told or informed" about a durational term for the promise to pay a seven percent commission on renewals, and, if so, whether this was at the time of hiring or thereafter. The Auto Club's motion did not assert the absence of a genuine issue of material fact concerning any of the following formulations or fact finding set forth in the lead opinion:

-- whether "the *circumstances* demonstrate that [there was] no *mutual assent* . . . on the permanency of the commission plan with respect to renewals" (Riley, J., *ante,* p 549, emphasis added);

-- whether the Auto Club "*intended* **[***106]** to bargain away its right to change the method of compensation" (*id., p 543*, emphasis added);

-- whether the statements to the class C plaintiffs were "*intended* to bolster morale and enhance employee pride in the company," or "*merely* stated opinions of management representatives that the company would not change its commission rate," or "were *designed* as assurances by management **[*589]** that in the foreseeable future, there were no rate changes planned" (*id., p 543*, emphasis added);

-- whether the statements to the class C plaintiffs were

*"comments"* that were *"isolated"* (*id., p 544*, emphasis added);

-- whether "[*any*]*thing was offered by* plaintiffs in addition to their continued employment that would *reasonably prompt* defendant to make such *extraordinary* contractual commitments" (*id.,* emphasis added);

-- whether the one hundred seventy-nine sales representatives were *informed before they were promised* a seven percent commission on policy renewals of "the changes in the compensation and commission system with regard to sales representatives in the years leading up to the employment of plaintiffs" described on p 545 of the lead **[***107]** opinion and, if not, which of the one hundred seventy-nine sales representatives, if any, were so informed before they were promised a seven percent commission on policy renewals;

-- whether "*significant* decreases in the reserves of the business *threatened* availability of insurance funds" (*id., p 547*, emphasis added); [46]

-- **[**683]** whether "the *value of the services* [the sales representatives] performed exceeded the compensation received in return" (*id.* emphasis added);

-- *whether* "*the renewals were a form of deferred compensation which vested* at the time of the original sale" (*id., p 548*), or whether "*representations* [*were*] *made* to plaintiffs with regard to deferred compensation" (*id., p 530*), or **[*590]** whether it was *agreed* that "renewals are a form of deferred compensation" (*id., p 548*, emphasis added);

-- whether the "actions of the company" were in *"good faith"* (*id.,* emphasis added);

-- whether the compensation paid to the sales representatives was *"in line with the services"* (*id.,* emphasis added);

-- whether the Auto Club "*confiscated and diminished* the value of their books of business" *(id.,* emphasis **[***108]** added);

-- whether the Auto Club "adjusted compensation so that *no employees would experience a reduction* in income unless their volume of business fell" (*id., p 526*, emphasis added).

Nor did the Auto Club's motion assert the absence of a genuine issue of material fact concerning any of the following formulations and fact finding set forth in Justice Boyle's concurring opinion:

-- Whether the sales representatives' *"proofs"* were sufficient "to support the inference of a justcause contract or an enforceable promise not to change the payment plan." Boyle, J., *ante,* p 549. (Emphasis added.)

-- Whether the sales representatives would be able to produce at trial "submissions, suggestions, argument or . . . *proof* **[***109]** that the employer's statements, interpreted in the light of trade usage or course of performance, permit the conclusion that the factfinder could draw an inference of a durational term for the method of compensation." *Id., p 550*. (Emphasis added.)

-- Whether "[a]ssuming, arguendo, that a termination for-cause employment term would support the inference of a durational term for the method of compensation, [the sales representatives would, **[*591]** at a trial, be able to provide a] *record* to infer other than employment-at-will contracts [or provide] ground [for] question[ing] the employer's good faith." *Id., pp 550-551*. (Emphasis added.)

-- Whether "[p]laintiffs *simply* suggest that they were told that if they worked hard in the beginning of their careers they would reap the benefits." *Id., p 551*. (Emphasis added.)

-- Whether "the *facts alleged are* []sufficient to permit a factfinder to conclude that the employer was making a commitment amounting to a promise of a permanent renewal compensation plan." *Id., p 552*. (Emphasis added.)

-- Whether "renewals of old sales were *intended* to be a form of deferred compensation, they would be payable regardless **[***110]** of termination." *Id., p 553*. (Emphasis added.)

-- Whether any *representations* were made to the sales representatives "with regard to 'deferred compensation.'" *Id., p 555*.

---

[46] While an affidavit was filed asserting that the change in the compensation system had been recommended by the accountants for the Auto Club, economic necessity was not one of the four stated reasons specifically identified in the Auto Club's motion for summary disposition. See Appendix.

-- Whether there was a "*trade usage* to supply a term in this case . . . ." *Id., p 554*. (Emphasis added.) [47]

-- Whether the *facts and circumstances* provide "meaning" for the "term of art 'book of business.'" *Id.*

-- Whether "the defendant *retained the right* to discharge these employees when it hired them," at will, or whether it *agreed* to discharge them only for "just cause." *Id., p 556*. (Emphasis added.)

-- Whether there is an "*objective manifestation* that the employer was making a commitment that amounted to a promise nor a reasonably certain **[*592]** basis **[**684]** for giving an appropriate remedy." *Id.* (Emphasis added.)

-- Whether there is an "*objective indication* that overcomes the presumption that there was no durational term for compensation with respect to future renewals." *Id.* (Emphasis added.)

**[***111]** 2

The majority, in so assessing the "context and circumstances" without any record having been made, has clearly departed from the norms of decision making for either a trial or an appellate court.

3

Dismissal of the sales representatives' claims cannot properly be justified on the basis that they concede that renewal commissions are payable only on renewals written while they remained in the employ of the Auto Club, and that their employment could be terminated at any time because they were *employees at will.*

The lead opinion does not advert to whether the oral employment contracts with the sales representatives provided that they could be dismissed at the will of the Auto Club or only for just cause. Justice Boyle proceeds on the assumption that the contracts provided for employment at will and did not include a term regarding termination only for just cause. [48]

**[***112]** **[*593]** The eighth amended complaint alleged, however, that the contracts of employment with the sales representatives provided that they could be dismissed only for just cause:

> 7. Said plaintiffs were specifically promised, as part of their employment contract, that they would not be reprimanded, suspended or fired without *just cause.* The plaintiffs herein were told, promised and guaranteed at the time of their hiring and thereafter that they would only be fired for mishandling defendant's money or for drunkenness. [Emphasis added.]

The Auto Club's motion for summary disposition did not seek to controvert the allegation of a just-cause contract, or assert that there was no factual support for the claim of a just-cause contract.

The Auto Club asserted, rather, in the accompanying memorandum of law, as the last of four specifically identified reasons, that "*even if* the claims of all of the plaintiffs are treated as arising under some integrated 'just cause' employment contract, their claims *are barred by collateral estoppel."* The memorandum further asserted that the NLRB finding [49] that the change in the compensation system was motivated by legitimate business considerations **[***113]** *collaterally estopped* the sales representatives from asserting their claims. Later in the memorandum of law, the Auto Club again expressly avoided controverting, on a factual basis, the allegation in the amended complaint that the **[*594]** employment was not at will but, rather, was governed by just-cause contracts. [50]

---

47

> On the *record,* briefs, and argument submitted here, it is entirely speculative that trade usage or other rules of construction assist in supplying omitted durational terms or as bearing on the parties' intent. [*Id., p 555*. Emphasis added.]

48

> Plaintiffs' proofs are insufficient to support the inference of a *just-cause* contract or an enforceable promise not to change the payment plan. The circumstances identified as guidelines with regard to the intent to create a *just-cause* contract in *Rowe v Montgomery Ward & Co, Inc, 437 Mich 627; 473 NW2d 268 (1991)*, are not present. [*Id., pp 549-550*. Emphasis added.]
>
> [T]here is no basis on this record to infer other than employment-*at-will* contracts and no ground to question the employer's good faith. [*Id., pp 550-551*. Emphasis added.]
>
> . . . in the context of an *employment-at-will relationship* . . . . [*Id., p 551*. Emphasis added.]

49 See n 18.

50 Assuming, *arguendo,* that the plaintiffs' "contracts" were not

The sales representatives were obliged to set forth, "by affidavits or otherwise," specific facts showing that there is a genuine issue for trial [51] only with regard to the four reasons specifically identified, none of **[***114]** which related to whether the employment **[**685]** contracts were *factually* just-cause contracts, or at-will contracts.

IV

The central issue in the instant case, and in *Rowe,* is the same, namely, whether, on the facts and in the circumstances of the particular case, may Mary Rowe in *Rowe,* and the sales representatives, in the instant case, maintain actions for breach of an express contract.

That issue turns on whether there is sufficient evidence to justify a finding by the trier of fact that a reasonable person in the position of the employee-promisee in concluding that the employer-promisor intended, in the case of Mary Rowe, to provide employment not terminable at will, but only for cause, [52] or, in the case of the sales representatives, to pay a seven percent commission on renewals written while, and for as long as, they remained in the employ of the Auto Club.

> [A] party's intention will be held to be what a **[*595]** reasonable man in the position of the other party would conclude his manifestation **[***115]** to mean. [Calamari & Perillo, Contracts (3d ed), § 2-2, p 27.] [53]

The test is, thus, objective, focusing **[***116]** on what a reasonable person in the position of the employee-promisee would understand. The subjective intent of the employer-promisor is not relevant, except insofar as a reasonable person in the position of the employee-promisee was, or possibly should have been, aware of the employer-promisor's subjective intent.

The signers of the lead and concurring opinions clearly err in focusing on whether the Auto Club actually "intended to bargain away its right to change the method of compensation," and in deciding whether there was "mutual assent" based on their assessment of the Auto Club's intent. [54]

---

at-will, then, at best, they were, "just cause" contracts, that is contracts permitting the Auto Club to make a change "for cause." The Auto Club's factual basis for changing its compensation system was, however, previously litigated. Def. Exh. D (*"Auto Club I"*). The findings of fact in *Auto Club I* collaterally estop the plaintiffs from claiming that the change was not for cause.

[51] *MCR 2.116*.

[52] *Rowe,* 687-688 (Levin, J.).

[53] By the end of the nineteenth century, the objective theory had become ascendant and courts generally accept it today. True, a party may still avoid liability by showing that he did not even intend to engage in the actions by which he appeared to manifest his assent, for example, if he was falsely told that a writing had no legal effect or was compelled to sign by such force that he was a "mere mechanical instrument." But as long as he intended to engage in those actions, there is no further requirement that he must have done so with the intention of assenting to an agreement. It is enough that the other party had reason to believe that the first party had that intention. [Farnsworth, Contracts, § 3.6, p 114.]

See also *Goldman v Century Ins Co, 354 Mich 528, 535; 93 NW2d 240 (1958)*.

See *Rowe,* ns 74 *et seq.* (Levin, J.)

[54]

> However, *it is not at all clear* from the statements allegedly made to members of Group C that *defendant intended* to bargain away its right to change the method of compensation. The meaning of the statements could be interpreted in several ways falling short of a contractual commitment. The statements *could have been intended* to bolster morale and enhance employee pride in the company. It is also possible the statements were merely stated opinions of management representatives that the company would not change its commission rate. Another possible interpretation is that the statements were designed as assurances by management that in the foreseeable future, there were no rate changes planned. [Riley, J., *ante,* p 543. Emphasis added.]
>
> We note that nothing was offered by plaintiffs in addition to their continued employment that would reasonably prompt defendant to make such extraordinary contractual commitments. *We are persuaded* that it defies logic to believe that *defendant would intend to bind itself* to a specified renewal commission on the basis of isolated statements when plaintiffs had already accepted employment without the benefit of durational guarantees with regard to compensation. It also defies logic that defendant would enter into these commitments after, as opposed to before, being hired. *It is more reasonable* to believe that defendant would legally obligate itself to such a promise before hiring in order to attract an employee or induce acceptance of employment. In the case of Group C, *we can perceive no manifest reason for defendant to offer* a permanently fixed rate on renewals. [*Id., pp 544-545*. Emphasis added.]

**[***117]** **[*596]** **[**686]** A

A number of the sales representatives asserted, in responses to interrogatories propounded by the Auto Club, that when they were employed they were told they should build books of business so that in later years they would earn a seven percent commission on policy renewals. Similar claims were advanced by sales representatives in *Bullock v Automobile Club of Michigan, 432 Mich 472; 444 NW2d 114 (1989)*, and *Farrell v Automobile **[*597]** Club of Michigan (On Remand), 187 Mich App 220; 466 NW2d 298 (1991)*. [55]

**[***118]** Bullock alleged that he was promised lifetime employment, and that "'if he worked hard and built up his "book of business," he would be able to earn large sums of money'" and "'enjoy his later working years with [the Automobile Club] by realizing commissions from the book of business'" based on the seven percent commission. [56] In *Bullock, supra, p 485*, this Court, in an opinion signed by Justices Boyle, Brickley, Cavanagh and Archer, ruled that Bullock had "pled an action for a breach of an oral contract of employment alleged to have arisen at the commencement of his employment." I concurred in a separate opinion.

Farrell similarly claimed that his branch manager "had informed him at the time he was hired that his responsibility was to sell some insurance and to make his 'book' of insurance grow. According to plaintiff, **[***119]** [the branch manager] told him at the time of his hiring that he need only handle his book of business, sell some insurance and he would be set financially for the rest of his life if he worked at it for three or four years." [57]

**[*598]** One of the plaintiff sales representatives asserted, in response to interrogatories propounded by the Auto Club, that he observed at the time he was hired that the seven percent commission was about half that paid by other insurers, and he was told that while the seven percent commission might not seem much at the time, as the years go by the number of his accounts would grow so that seven percent would begin to pyramid to provide him a very comfortable living and lifestyle as long as he worked hard and continued to increase the volume of customers.

Some sales representatives did better than others. One, employed by the Auto Club for over thirty years, claimed, **[***120]** in responding to the interrogatories, that he had 8,000 to 9,000 accounts. Six sales representatives, employed for over twenty years, claimed that they had 5,000 or more accounts. Seven claimed that they had 4,000 to 4,800 accounts. Twenty-four that they had 3,000 to 3,900 accounts. Thirty-nine that they had 2,000 to 2,900 accounts, and the balance claimed that they had less than 2,000 accounts.

B

The Auto Club has not denied the allegations in the complaint, as supplemented by the answers to interrogatories, that the sales representatives were encouraged to build books of business and were told that they would be rewarded for their efforts by earning a seven percent commission on policy renewals.

---

> These changes made throughout the years suggest that it is *unlikely that defendant would permanently* guarantee a particular renewal policy. The numerous recent fluctuations show the company's changing compensation program and demonstrate that it was unreasonable for members of Group C to maintain any belief that their commission plan was to be locked in permanently. *For these* reasons, *we find* that in objectively reviewing the circumstances of this case, *there was no mutual assent* to establish seven percent renewal commissions permanently. *We are persuaded that defendant did not intend* to bargain away its right to make adjustments in its compensation plan. [*Id., pp 545-546*. Emphasis added.]

[55] This Court remanded *Farrell* to the Court of Appeals for reconsideration in light of ***Bullock. Farrell v Automobile Club of Michigan, 433 Mich 913 (1989)***.

On remand, the Court of Appeals again ruled that the statements made to Farrell at the time of hiring were not "too indefinite as a matter of law to create an express oral contract." *Id. at 226*.

The Court of Appeals concluded that because the jury instructions failed to differentiate between Farrell's express-agreement and legitimate-expectations theories, the jury verdict should be set aside and a new trial held, and remanded for further proceedings.

Neither party filed an application for leave to appeal with this Court. We are advised that *Farrell* has been settled by agreement of the parties.

[56] He said that the ""book of business" is the accumulated memberships and policies which a commissioned salesman builds up over the years.'" *Id. at 475-476*.

[57] *Farrell v Automobile Club of Michigan, 155 Mich App 378, 383; 399 NW2d 531 (1986)*.

The Auto Club contends, rather, that because it had been advised by its accountants that it was no longer economically **[**687]** advisable or good business to pay a seven percent commission on new sales and policy renewals, that it could not only revise the commission system so that it would no longer be **[*599]** obliged to pay a seven percent commission on new sales, but could also refuse to pay a seven percent commission on policy renewals of old sales to those sales representatives who had **[***121]** built up their books of business *beyond less than 2,000 to 3,000, 4,000, or 5,000 or more accounts.*

The Auto Club states, on brief without supporting affidavit, that its position is justified because it never told the sales representatives that the "commission paid could never be changed or would never change." A number of sales representatives asserted, however, in their *answers to the interrogatories,* that that is precisely what they were told. That dispute frames an issue of fact.

The factual dispute whether particular sales representatives were told that the commission to be paid on policy renewals of prior sales would not be changed cannot properly be resolved against the claims of the sales representatives who so assert without a trial on the merits.

The signers of the lead opinion find as a fact that "there were no representations made to plaintiffs with regard to deferred compensation." They further find as a fact that "renewal commissions or future commissions do not rest upon the sale of the original policy," but rather require "additional effort and consideration by salespersons in keeping policies alive." They assert and find that, unless otherwise agreed -- **[***122]** *ignoring that the sales representatives assert that it was otherwise agreed* -- the right to renewal commissions does not "rest upon the sale of the original policy." [58]

**[*600]** A number of sales representatives do assert that representations were made to them that they would benefit from building books of business and that they would thereby earn commissions on policy renewal of old sales. Because this case has not been tried, the record is incomplete whether less effort may be required to obtain a policy renewal of an old sale than to prospect **[***123]** for new sales.

It may very well be that little or no "additional effort" need be exerted by a sales representative to obtain a policy renewal where the customer sends a check promptly after receipt of a bill for a renewal from the Auto Club. In such cases, a renewal commission might, contrary to the assertion of the majority, be a form of deferred compensation. Renewal commissions may also be a form of deferred compensation in those cases where some additional effort, although less than that of prospecting for a new sale, is required to earn the renewal commission.

In all events, the questions whether representations were, in fact, made to plaintiffs with regard to deferred compensation, and whether renewal commissions are in part deferred compensation, depend on the agreement of the parties, and cannot be decided as a matter of law without a trial on the merits. The majority's analysis begs the question whether the correct construction of the oral contracts of employment between the Auto Club and the sales representatives permitted the Auto Club to change or eliminate the seven percent commission it had agreed to pay on policy renewals of old sales.

**[*601]** C

The course of performance **[***124]** for over twenty-five years would appear to support a finding that renewal commissions were *not* payable on policies renewed after a sales representative ceased to be an employee of the Auto Club.

Forty sales representatives testified on deposition that they were told or informed, **[**688]** before or after they were hired, that they would receive a seven percent commission on renewals, *either "for as long as they were employed by the Auto Club," or* "forever," *or* "always." Their testimony, together with the other evidence set forth in the responses to the interrogatories propounded by the Auto Club, and the evidence of the course of performance for over twenty-five years, would appear to be sufficient to permit the trier of fact to conclude, were the majority to allow this case to go to trial, that the Auto Club's conceded promise to pay a seven percent commission on policy renewals was a

---

[58] Riley, J., *ante,* p 530.

See *Av-Med, Inc v French, 458 So 2d 67, 68 (Fla App, 1984)*, where the court said that although it might be necessary to "service" the clients in order to obtain renewals, a condition precedent to the receipt of renewal commissions, the plaintiffs were entitled to renewal commissions less the cost of servicing the clients.

See also *Glass v Minnesota Protective Life Ins Co, 314 NW2d 393, 396 (Iowa, 1982)*.

promise, as set forth in the complaint, to pay all one hundred seventy-nine sales representatives a seven percent commission "on each renewal that they wrote during their *entire employment.*"

D

The majority holds, in effect, that because the course of performance -- indicating that the promise **[***125]** to pay a seven percent commission applied to renewals while the sales representative remained in the employ of the Auto Club but did not apply to renewals after he ceased to be employed by the Auto Club -- was not stated to all potential sales representatives when they were interviewed and **[*602]** hired, the course of performance is not a part of the contract of employment. [59]

**[***126]** "Course of performance" is the context, the circumstances, in which a promise is made, and is generally established by evidence, often oral, separate and apart from evidence of the promissory exchange and manifestations. The enforceability of the oral employment contracts does not depend on whether the promisor explicitly stated the course of performance.

Usage is compelling evidence concerning not only the obligations of the sales representatives, but also the durational term of the Auto Club's promise to pay a seven percent commission on policy renewal of old sales. Further, it is well **[*603]** established that terms will be implied as part of the agreement of the parties where necessary to give business efficacy to a promise in a contract. [60]

**[***127]** Professor Farnsworth stated that "[c]ourts have often supplied a term calling for best efforts under exclusive dealing agreements," as in *Wood v Lucy, Lady Duff-Gordon, 222 NY 88; 118 NE 214 (1917)*. Farnsworth explained that since **[**689]** Lady Duff-Gordon's "remuneration depended entirely on [Wood's] efforts, the court supplied a term requiring that Wood use his best efforts to sell her fashions." Farnsworth continues that "[c]ourts also supply terms requiring best efforts under percentage leases. . . . If the lease is silent on the matter, the court will supply a term requiring the lessee to use best efforts, in addition to the normal obligation of good faith." [61]

This Court has implied a term requiring a lessor to supply water to a building constructed for the operation of a restaurant. *Stimac v Wissman, 342 Mich 20; 69 NW2d 151 (1955)*. [62]

---

[59] Professor Farnsworth reported:

> Even without explicit incorporation, an agreement may be fleshed out by usages to which the parties are subject, by a course of dealing between the parties prior to their agreement, or by a course of performance between them after their agreement. Indefiniteness may also be cured by the addition of such implied terms as will be supplied by law, including -- at least as to minor items -- the parties' implied obligations of good faith and fair dealing. [Farnsworth, Contracts, § 3.28, p 196.]

The Restatement of Contracts provides:

> An agreement is supplemented or qualified by a reasonable usage with respect to agreements of the same type if each party knows or has reason to know of the usage and neither party knows or has reason to know that the other party has an intention inconsistent with the usage. [2 *Restatement Contracts, 2d, § 221*, p 151.]
>
> (1) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.
>
> (2) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement. [*Id.,* § 223, pp 157-158.]

See also Farnsworth, Contracts, § 7.13, pp 508-514; Calamari & Perillo, Contracts (3d ed), § 3-17, p 178.

[60] See *Onderdonk v Presbyterian Homes of N J, 85 NJ 171, 183-184; 425 A2d 1057 (1981)*.

Professor Corbin stated:

> Promises by an employer or principal have been found by implication in cases where there is an express promise by the employee or agent to render service, the implied promise being something other than merely to pay compensation. The employer of an act or other artist who is under contract to render exclusive service may be found to have impliedly promised to afford a reasonable opportunity to act or to perform, thereby building up a reputation for artistry and skill. When a skilled workman promises that all his inventions shall become the property of his employer, for a royalty in case of use or sale, there may be an implied promise by the employer to afford facilities for invention and to market the product. [3 Corbin, Contracts, § 567, p 324.]

[61] Farnsworth, Contracts, § 7.17, pp 530-531.

[62] The New Jersey Supreme Court held that a contract between a home for the elderly and its residents implicitly obligated the home to furnish residents with financial

**[***128]** Accepting as true the pleaded allegations of the **[*604]** sales representatives, [63] as supplemented by the answers to the interrogatories, where an insurer, the Auto Club, promises to pay a seven percent commission on policy renewals of old sales and encourages its sales representatives to build books of business to pyramid their earnings, the trier of fact may properly find that the insurer has by implication agreed -- in order to give business efficacy to the promise that induces such effort -- that it will not change or eliminate the rate of commission it agreed to pay on policy *renewals* of old sales.

**[*605]** E

The sales representatives alleged in their complaint that they were promised they would not be disciplined or fired without just cause. The Auto Club denies the allegation of just-cause contracts, and contends that the contracts of employment **[***129]** are at will. The majority ignores the sales representatives' well-pleaded allegation that the Auto Club expressly agreed to just-cause contracts.

The correct construction of the contracts of employment does not depend, however, on whether the Auto Club expressly agreed that the sales representatives could only be discharged for good or just cause. Even if the Auto Club did not expressly so agree, when it agreed that the sales representatives would be paid a seven percent commission on policy renewals of old sales, it agreed, by implication, that the sales representatives would not be deprived, as a result of discharge from employment other than for good or just cause, of the opportunity to earn the seven percent commission on policy renewals of old sales by exerting whatever additional effort, if any, might be **[**690]** required to obtain such renewals. [64]

**[***130]** **[*606]** V

I conclude that the trier of fact could properly find that

-- The term "policy renewal" means an insurance policy issued when a customer accepts an insurer's offer to renew a policy.

---

accountings for monies paid in monthly charges. *Onderdonk, n 60 supra.*

In *Fashion Fabrics of Iowa v Retail Investors Corp, 266 NW2d 22 (Iowa, 1978)*, the Iowa Supreme Court implied a covenant by a sublessor to continue operating its business on premises adjacent to those leased by the sublessee.

In *Fenning v American Type Founders, 33 NJ Super 167; 109 A2d 689 (1954)*, the court held that a licensing agreement, containing no express provision for payment of minimum royalties and referring to no minimum standard of performance, nonetheless implied an obligation that the defendant would exert reasonable efforts and due diligence in marketing the licensed product.

In *Stein v Spainhour, 167 Ill App 3d 555; 521 NE2d 641 (1988)*, the court held that a percentage lease implied the obligation to continue operating the business on the premises, and therefore the lessee remained liable for rent, based on the average rent in prior years, even if the lessee terminated the business.

In *Seggebruch v Stosor, 309 Ill App 385, 389-390; 33 NE2d 159 (1941)*, the court affirmed an award of the reasonable rental value of premises, leased for use as a gas station at a rental of 1 1/4 cents per gallon sold, where the tenant opened a competing station across the street. The court said: "[I]t was clearly implied that defendant would use reasonable diligence in operating the gas station on plaintiff's premises. . . . 'What is implied in an express contract is as much a part of it as what is expressed' . . . ."

In *Baker's Aid v Hussman Foodservice Co, 730 F Supp 1209 (ED NY, 1990)*, the court implied an obligation to purchase and pay for ovens manufactured to buyers' specifications.

In *Ohio Turnpike Comm v Texaco, Inc, 35 Ohio Misc 99; 297 NE2d 557 (1973)*, the court implied a term requiring Texaco to sell all the gasoline that drivers on the Ohio Turnpike would purchase from Texaco Service Plazas during a gas shortage.

[63] The Auto Club's motion for summary disposition did not address all the allegations of the complaint as supplemented by the answers to the interrogatories.

[64] Professor Corbin stated:

> If a contract is such that a certain performance by one party is necessary in order to earn the compensation that has been promised him, and that performance can not be rendered without the active co-operation of the other party, *a promise to render such co-operation will usually be implied.* [3 Corbin, Contracts, § 570, pp 346-347. Emphasis added.]

> In any kind of contract, if the right of one party to compensation is conditional upon the rendition of some service or other performance by him or on his behalf, it is nearly always a breach of contract for the other party to act so as to prevent *or to hinder and delay or to make more expensive the performance of the condition.* [*Id.*, § 571, p 349. Emphasis added.]

See ns 6-8 and 14 and accompanying text.

-- A promise to pay a commission on policy renewals is, therefore, implicitly a promise to pay a commission on policy renewals for as long as the insurer and the customer choose to renew an earlier policy.

-- When the Auto Club indisputably promised to pay its sales representatives a seven percent commission on policy renewals, it *expressly* promised and contracted that it would pay a seven percent commission on renewal of a policy first written before the announcement that the Auto Club would no longer pay renewal commissions, *for as long as the Auto Club and the customer choose to renew the policy,* even though a durational term for the promise was not *explicitly* stated.

-- Because the course of performance and other evidence tends to show that a renewal commission would not be payable after a sales representative left the employ of the Auto Club, the express promise to pay a seven percent commission on policy renewals meant for "as long as the Auto Club chooses to offer to renew **[***131]** the policy, the customer chooses to accept the offer, and the sales representative remains in the employ of the Auto Club."

VI

The lead opinion's reference to "the traditional reluctance of courts to interfere with management **[*607]** decisions and the needed flexibility of businesses to change their policies to respond to changing economic circumstances" [65] suggests that the construction of employment contracts is henceforth to be subject to different rules than other business contracts. [66]

If the correct construction of these contracts is that the Auto Club obligated itself to pay a seven percent commission on renewal after 1977 of policies sold before 1978, the Auto Club did not have a **[***132]** managerial prerogative to break that contract without paying damages. Nor does the "needed flexibility of businesses to change their policies to respond to changing economic circumstances" entitle the Auto Club to break a contract without paying damages.

The theme of the majority [67] appears to be that, because the business community **[**691]** generally needs to be able to change the compensation of employees **[*608]** in response to changes in the business, the economy, or competition, promises respecting compensation will be construed as reserving to the employer a power to change compensation, absent compelling evidence that the employer did not intend to reserve a power to change the compensation. This theme was expressed by Justice Griffin in dissent in *Bullock, supra at 519-520*:

> An employer's intention to give up permanently a right so fundamental as the ability to make changes in its method of compensation is not to be lightly inferred. [68]

While the sales representatives originally asserted in this action that the Auto Club had committed itself to pay the seven percent commission on new sales generated at any time while they remained in the employ of the Auto Club and, thus, was not at liberty to revise the compensation system, even for new sales, they no longer assert that the Auto Club agreed not to revise the commission system for new sales. They have now limited their claims to the assertion that the Auto Club was not at liberty to change the seven percent commission on renewals of policies sold before the announcement of the revised compensation system. [69]

---

65 Riley, J., *ante,* p 532.

66 The signers of the lead opinion express their disbelief -- "it defies logic" -- that the Auto Club "made extraordinary contractual promises that the commission system would be in place 'forever.'" *Id., pp 544* and 543. I find it extraordinary that they assume the role of trier of fact.

67

> First, whether plaintiffs have actions for breach of contract on the basis that they were informed of a *particular compensation* system upon entering defendant's work force, and the system was subsequently changed. [*Id., p 524*. Emphasis added.]
>
> Given the traditional reluctance of courts to interfere with management decisions and the needed flexibility of businesses to change their policies to respond to changing economic circumstances, we conclude that *Toussaint* should not be extended to create legitimate expectations of a permanent compensation plan. [*Id., p 532*.]
>
> We would, in effect, be allowing the factfinder to determine that, despite the fact that the defendant retained the right to discharge these employees when it hired them, it nonetheless intended to assume the risk of a drop in its cash reserves. [Boyle, J., *ante,* p 556.]

68 **[***133]** This language is quoted in Riley, J., *ante,* p 542.

69 See part I.

The sales representatives thus no longer challenge the managerial prerogative to change the rate of compensation, except insofar as the employer promised to pay commissions on renewal of old sales. Recognition of the legitimacy of the **[***134]** sales representatives' claims would not, accordingly, undermine the asserted managerial prerogative to **[*609]** change compensation, except insofar as the employee expended effort in generating sales and building a book of business in the expectation that he would have the opportunity of obtaining further compensation should the customer renew the policy and continue to do business with the employer.

VII

Turning to the statute of frauds, the Auto Club asserts, and the signers of the lead opinion and I agree, that the employment contracts were not for a fixed term of years. Indeed, it is well established that an employment contract, other than for a fixed period of time, can be performed within one year [70] because the employee may die within the year, and does not violate the one-year statute of frauds. [71]

The signers of the lead opinion justify their conclusion that the agreement to pay a seven percent **[***135]** commission on policy renewals is within the one-year statute by severing the promise to pay a seven percent commission on new sales from the promise to pay a seven percent commission on renewals, treating the latter promise as a separate and distinct contract. [72] The lead opinion then holds that this promise is within the statute because it was not "possible for renewal commissions to *accrue*" within one year. [73]

The Auto Club indisputably agreed to pay "a 7% **[*610]** commission on new sales *and* policy renewals." [74] At least some part -- if the case were tried, it might appear a very substantial part [75] -- of the compensation for a new sale is the opportunity to earn a commission on a policy renewal. It is entirely artificial to view such an employment contract, whereunder the employer concededly agreed to pay **[***136]** "a 7% commission on new sales *and* policy renewals" and which the employee accepted by generating new sales and policy renewals, as constituting two separate contracts.

**[**692]** The question whether a contract can be performed within a year depends on the *duration of the contract,* and not on the time of performance of a *particular term* of the contract. [76] Accordingly, the sales representatives' employment contracts -- not for a fixed term, and hence not within the statute because the employee may die within the year -- are not brought within the statute irrespective of whether renewal commissions could accrue within the year.

A

The lead opinion relies **[***137]** on *McLaughlin v Ford Motor Co, 269 F2d 120 (CA 6, 1959)*, where the employee was allegedly promised that after he worked for one year in the cost department, he would be offered a position in general management. The United States Court of Appeals for the Sixth Circuit found that the action could not be maintained because, among other things, the agreement was invalid under the statute of frauds.

**[*611]** According to the lead opinion, the Court "reasoned that the parol agreement was invalid because the plaintiff could not have become a general manager until more than one year had elapsed from the time of the agreement." [77]

In *McLaughlin,* the court said:

> It is clear that the *oral agreement* in the present case provided for employment *to begin* more than a year after the making of the agreement and comes squarely within the terms of the statute. *Davis v Michigan Mutual Life Ins Co, 127 Mich 559; 86 NW 1021 [1901]*; *Gudenau v Farm Crest Bakeries, Inc, 268 Mich 399;* ***[***138]*** *256 NW 462 [1934]*;

[70] See n 24 for text.

[71] See 1 ***Restatement Contracts, 2d, § 130, illustrations to*** comment a, pp 328-329.

[72]

> [W]e find the provisions affording seven percent renewal commissions to plaintiffs severable from the remainder of the employment contracts. [Riley, J., *ante,* p 539.]

[73] *Id.*

[74] See n 17.

[75] See part IV, ns 55 *et seq.*

[76] See *Hodge v Evans Financial Corp, 262 U.S. App DC 151; 823 F2d 559 (1987)*, discussed in part VII(B), *infra.*

[77] Riley, J., *ante,* p 534.

Lawton v Contract Purchase Corp, 298 Mich 712, 720; 299 NW 777 [1941]. [Id. at 124. Emphasis added.]

McLaughlin was allegedly told that if he accepted a job in the cost department "for a year," he would thereafter be given a job in general management. In the Michigan cases cited by the Sixth Circuit, the employees asserted that they had entered into oral contracts of employment for *one year,* to begin at a subsequent date. Such contracts are deemed to be for a fixed term, and are covered by the statute. [78] The contracts entered into by the sales representatives in the instant case, however, were not for a fixed term.

**[***139] [*612]** B

The traditional and correct analysis, adhered to by this Court [79] **[***140]** and courts throughout the land, [80] is set forth in a recent decision of the United States Court of Appeals for the District of Columbia Circuit, Hodge v Evans Financial Corp, 262 U.S. App DC 151, 154; 823 F2d 559 (1987), where the employee claimed he had been discharged from his position as general counsel in violation of an oral contract to employ him permanently. He argued successfully that the contract was not within the statute because "it is capable of full performance within one year if the employee were to die within the period." The court said that this "view of the statute's applicability to lifetime or permanent employment contracts has, in fact, been accepted by an overwhelming majority of courts and commentators." *Id.*

The *Hodge* court addressed the kind of contract considered in *McLaughlin,* and in the three Michigan cases on which *McLaughlin* relied, when it said:

> **[**693]** "Under the conventional view of the statute, an oral employment contract for a stated, definite term of years exceeding one year . . . is unenforceable on the rationale that the employee's possible death within one year would "defeat" rather than "complete" the express terms of the contract. [81]

The court observed that, far from asserting the existence of a contract for a fixed term, Hodge's **[*613]** employer -- like the Auto Club -- had consistently argued that the plaintiff "must be deemed to be an at-will employee precisely because he was *not* promised employment for 'any fixed period of time.'" Id. at 155. (Emphasis in original.) [82]

**[***141]** The employer had argued that the contract was within the statute because a letter from the employer [83] stated that the employee would receive a minimum bonus of $ 6,000, not payable for more than a year from the making of the contract. The court said that the letter referred only to "a particular contract term" *and was not pertinent to the question of the duration of employment:*

> Courts have specifically and consistently held that the presence of bonus or salary terms payable after

---

[78] Id., pp 534-536.

> 5. A orally promises to work for B, and B promises to employ A for *five years* at a stated salary. The promises are within the Statute of Frauds. Though the duties of both parties will be discharged if A dies within a year, the duties cannot be "performed" within a year. This conclusion is not affected by a term in the oral agreement that the employment shall terminate on A's death. [1 *Restatement Contracts, 2d, § 130, comment b, illustration 5*, p 329. Emphasis added.]

[79] See Adolph v Cookware Co, 283 Mich 561; 278 NW 687 (1938); Lynas v Maxwell Farms, 279 Mich 684; 273 NW 315 (1937); Fothergill v McKay Press, 361 Mich 666; 106 NW2d 215 (1960).

[80] See n 85.

[81] Hodge, supra, p 155.

[82] The court in *Hodge* added:

> No court or commentator has ever suggested that the possibility of the employee's death within one year would "defeat" rather than "complete" such a contract. To the contrary, courts and commentators have consistently accepted the view that indefinite permanent employment contracts such as Hodge's fall outside the statute because they are capable of full performance within one year. See, e.g., 2 Corbin, Contracts, § 446, pp 549-550 (Permanent employment contracts fall outside the statute because "[t]he word 'permanent' has, in this connection, no more extended meaning than 'for life.'"); 3 Williston, Contracts, § 495, p 582 ("A promise of permanent personal performance is on a fair interpretation a promise of performance for life, and therefore not within the Statute."). [Id. at 156.]

[83] The letter was, apparently, only a partial integration of the terms of the employment contract. The contracts of employment between the Auto Club and the sales representatives are oral, and therefore the parol evidence rule is not involved in this case.

> one year does not bring a long-term indefinite employment contract within the statute. [*Id. at 157*. Emphasis added.]

The inquiry, then, is not whether it was "possible for renewal commissions to accrue" within one year, but whether the *duration of the* **[***142]** *contract* was **[*614]** for a fixed term of one year or more. The contracts of employment with the sales representatives were not, as the Auto Club consistently argued, for a fixed term.

In *Toussaint,* p 612, n 24, this Court said that "an agreement for an indefinite term is generally regarded as not being within the proscription of the statute of frauds." In *Rowe v Montgomery Ward,* p 636, this Court said that "oral contracts for an indefinite term, *which fall outside the statute of frauds,* will be recognized only where circumstances suggest both parties intended to be bound." (Emphasis added.) [84]

**[***143]** **[**694]** C

A number of courts [85] have held that an employment **[*615]** contract that is not for a fixed term of years is enforceable although a payment obligation would not accrue until after a year had passed.

**[***144]** In *White Lighting Co v Wolfson, 68 Cal 2d 336; 66 Cal Rptr 697; 438 P2d 345 (1968)*, an employee was promised a salary, benefits, and one percent of gross sales per year. The contract did not specify a durational term. The employer claimed that the contract was unenforceable because of the statute of frauds.

The court held that "[s]ince . . . the alleged oral contract may be terminated at will by either party, it can, under its terms, be performed within one year." *Id. at 344*. Further, although the amount of the bonus could not be determined or paid until more than one year after the time of contracting, the bonus clause, as well as the salary and benefit provisions, was enforceable. The key issue was whether the contract, *in its entirety,* could be fully performed within a year. [86]

---

[84] See also *Bullock,* p 523 (Griffin, J.):

> The undisputed trend of authority has been to interpret the "one year" provision as applying only to contracts that have *no* possibility of being completed within a year, even if the parties to the contract in fact contemplated a longer period. [Emphasis added.]

Noteworthy in this connection is the *Hodge* court's remark that, while the conventional view of the statute is "legalistic," the statute itself is "widely understood as a formal legal device that shields promise breakers from the consequences of otherwise enforceable agreements." *Hodge, supra at 157*.

The New York Court of Appeals similarly noted that the statute was designed

> to prevent the enforcement of unfounded fraudulent claims. But, as Professor Williston observed: "The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly, made" (4 Williston, Contracts [3d ed], § 567A, pp 19-20). [*Morris Cohon & Co v Russell, 23 NY2d 569, 574; 245 NE2d 712 (1969)*.]

[85] *White Lighting Co v Wolfson, 68 Cal 2d 336; 66 Cal Rptr 697; 438 P2d 345 (1968)*; *Miller v Riata Cadillac Co, 517 SW2d 773, 776 (Tex, 1974)* ("the fact [that] a bonus cannot be ascertained and paid until after the year in which services were rendered does not bring the contract within the Statute of Frauds"); *Murphy v Buschman-Jennings, Inc 382 SW2d 29 (Mo App, 1964)* (the same for an agreement for an indefinite term, even though the bonus was payable after a year had passed); *Dennis v Thermoid, 128 NJL 303; 25 A2d 886 (1942)* (a year-long contract is outside the statute although a yearly bonus calculated and paid thereafter); *Finley v Aetna Life & Casualty, 202 Conn 190, 197; 520 A2d 208 (1987)* (contracts of indefinite duration "'simply excluded'" from one-year provision of statute); *Spindel v Nat'l Homes Corp, 110 Ga App 12, 15; 137 SE2d 724 (1964)* (same, even though the contract may not be performed within one year); *Weiner v McGraw-Hill, Inc, 57 NY2d 458; 457 NYS2d 193; 443 NE2d 441 (1982)* (same whether the contract was terminable at will or for just cause only); *Price v Mercury Supply Co, 682 SW2d 924, 932 (Tenn App, 1984)* (listing cases in which state supreme court holds an oral employment contract for an unspecified term outside the statute because it is capable of complete, *bona fide* performance within one year of its making should the employee die within that time).

[86] See also *Foley v Interactive Data Corp, 47 Cal 3d 654; 254 Cal Rptr 211; 765 P2d 373 (1988)* (reaffirming *White Lighting* and holding further that a *just-cause* contract is outside the statute of frauds).

A separate oral contract was reached between Wolfson and his employer, calling for White Lighting to pay Wolfson one month's severance pay and his moving expenses to Chicago, and to repurchase 5,000 shares of White Lighting stock from Wolfson for $ 15,000. The court enforced the first two promises, but not the third, which violated the section of the statute of frauds governing sales of goods for over $ 500 (rather than its one-year provision):

**[***145]** The signers of the lead opinion fail to differentiate **[*616]** between a contract that is fully performable within a year, and one that is not. Taking as true the allegations of the sales representatives, and assuming the validity of the Auto Club's contention that employment was at will, the employment contract calling for the Auto Club to pay its agents a seven percent commission on the sale of new policies and a further seven percent on renewals of those policies would be fully performed within a year should either party terminate, or any of the sales representatives die, *even if* no renewal commissions were earned.

D

The Auto Club has introduced no evidence to support a finding that the sales representatives would have entered into the employment contract had it provided only for a seven percent commission on new policies sold. The agreement to pay seven percent on renewals is not a separate and independent agreement. The employment contracts must be considered in their entirety. [87]

**[***146]** **[*617]** **[**695]** The cases cited by the lead opinion for its conclusion that the contract's terms are severable are not analogous. *Cassidy v Kraft-Phenix Cheese Corp, 285 Mich 426; 280 NW 814 (1938)*, addressed a wholly executory contract for the sale of goods over $ 100, where the Uniform Commercial Code provides that part performance will take the contract out of the statute of frauds. *City of Lansing v Lansing Twp, 356 Mich 641; 97 NW2d 804 (1959)*, dealt not with the statute of frauds, but with apportionment of costs between the two parties to **[*618]** a written construction contract. *Stevenson v Brotherhoods Mutual Benefit, 312 Mich 81; 19 NW2d 494 (1945)*, dealt with a claim for postdischarge commissions under a written employment contract.

E

Even assuming that the employment contracts violated the statute of frauds because they were not in writing, they are still enforceable because the Auto Club has acknowledged, in affidavits filed in this proceeding, that the sales representatives were hired on the understanding that the Auto Club "paid a 7% commission on new sales and policy **[***147]** renewals." [88] The Restatement of Contracts provides:

Memorandum Not Made as Such

---

> If a claimant alleges two or more promises of performance "that can easily be distinguished and separated by the court by reference to the agreement itself" (2 Corbin, Contracts, § 313, pp 127-128), only that promise of performance which falls clearly within the statute of frauds cannot be enforced. [*68 Cal 2d 345.]*

[87] In determining whether the terms of a contract are severable, courts look to the intention of the parties. (73 Am Jur 2d, Statute of Frauds, § 524, p 155; *71 ALR 475*, *Statute of frauds -- divisibility,* and cases cited therein.) Two principal factors are considered: first, "whether the two or more promises or parts of the contract are so interdependent or interwoven that the parties must be deemed to have contracted only with a view to the performance of both, and would not have entered into one without the other"; and second, whether the consideration for the several promises can be apportioned among them without doing violence to the contract or making a new contract for the parties. 3 Williston, Contracts (3d ed), § 532, p 764. However, "[e]ven though the consideration for each agreement is distinct, if the agreements are interdependent and the parties would not have entered into one in the absence of the other, the contract will be regarded . . . as entire and not divisible." *Id., p 765*.

In *Co-Operative Telephone Co v Katus, 140 Mich 367; 103 NW 814 (1905)*, an action on an unsigned writing to recover the price of a capital subscription, this Court looked to the intention of the parties to determine whether the two parts of a contract were so interdependent that neither part should be enforced. The contract consisted of the defendant's agreement to subscribe to the plaintiff's capital stock (not within the one-year statute of frauds), and his agreement to rent a telephone from the plaintiff for a period of three years (within the statute). The two agreements were held *not* severable: the defendant agreed to subscribe to the capital stock *only* because he wanted to obtain the telephone, and he would not have otherwise agreed to subscribe. Since the contract was entire and unseverable, the plaintiff could not enforce either part of the contract against the defendant.

Similarly, *Bunch v Garner, 208 Ala 271; 94 So 114 (1922)*, held a two-part oral agreement entire and therefore unenforceable. The parties agreed to form a corporation (not within the statute) and agreed that the plaintiff should serve and manage the corporation for five years (within the statute). The court found that the parts of the contract were inseparably interwoven, and could not be divided without doing violence to the intention of the parties.

The employment contracts between the Auto Club and its sales representatives provided for a seven percent commission on every new policy sold and, in the event such a policy was renewed, an additional seven percent commission. No sales representatives were eligible to receive renewal commissions on policies they had not sold originally.

[88] See n 17.

> Except in the case of a writing evidencing a contract upon consideration of marriage, *the Statute may be satisfied by a signed writing not made as a memorandum of a contract.* [1 *Restatement, Contracts, 2d, § 133*, p 345. Emphasis added.] [89]

**[***148]** **[*619]** **[**696]** This Court, [90] and other courts, [91] have so held.

**[***149]** According to the lead opinion, the Auto Club's admission that it agreed to pay the plaintiffs seven percent on new policies and renewals is insufficient to take the contract out of the statute of frauds because the Auto Club did not admit that the compensation scheme would remain in place "forever." The durational term is not relevant to proper resolution of this case. The sales representatives no longer question the Auto Club's right to change its compensation scheme at any time, but seek only to construe the contract so as to enforce the benefit of the bargain with respect to renewals of policies sold before the change.

In all events, courts in Michigan and elsewhere have held, contrary to the view taken by the signers of the lead opinion, that a writing sufficient to satisfy the statute of frauds need not state all the material terms of the contract, nor even **[*620]** the substance of controverted terms, but need only confirm that a contract was, in fact, made. [92]

---

[89] Comment (d) to this section continues:

> A written pleading, stipulation or deposition may serve as a memorandum if otherwise sufficient as to contents and signature. An oral statement before the court is treated in some states as the equivalent of a signed writing. See [UCC] §§ 2-201(3)(b), 8-319(d). Where the writing or oral statement is made under legal compulsion, it is nonetheless effective unless there is a contrary procedural policy in the state. [*Id. at 347*.]

Similarly, Professor Farnsworth stated:

> Courts agree that a writing is not insufficient as a memorandum merely because it has been made in a court proceeding, at least if the writing was made voluntarily. To the extent that the statute's function is viewed as evidentiary, it is difficult to see why the statute should not be satisfied by a written admission in a pleading, stipulation, or deposition, even though it is in the same action in which the statute is raised as a defense. [Farnsworth, Contracts, § 6.7, p 408.]

See also Calamari & Perillo, Contracts (3d ed), § 19-30(c), p 821.

[90] See *Brender v Stratton, 216 Mich 166, 176; 184 NW 486 (1921)*, where the Court found written concessions in the pleadings sufficient to satisfy the provision of the statute requiring that a trust in land be evidenced in writing.

[91] *Adams-Riker, Inc v Nightingale, 383 A2d 1042, 1044 (RI, 1978)* (the writing requirement is dispensed with when the party to be charged admits the agreement); *Wemhoff v Investors Mgmt Corp of America, 528 A2d 1205, 1207 (DC App, 1987)* (an in-court admission that the oral agreement exists, though not necessarily a complete statement of the essential terms of the contract, is adequate to bar the defense under statute); *Trossbach v Trossbach, 185 Md 47, 55; 42 A2d 905 (1945)* ("[a]dmissions of a party in testifying, though in form evidence, are in essence not mere evidence, but make evidence against him unnecessary"); *Wolf v Crosby, 377 A2d 22 (Del, 1977)* (the defendant may not admit the agreement and simultaneously assert the statute-of-frauds defense); *Smith v Boyd, 553 A2d 131, 133 (RI, 1989)* ("to allow the statute to excuse a party's performance, when such party admits all elements essential to a valid contract, does not involve a perjurious claim and would create an injustice"). See also 2 Corbin, Contracts, § 320, p 154.

[92] *Opdyke Investment Co v Norris Grain Co, 413 Mich 354; 320 NW2d 836 (1982)*, involved an alleged oral agreement to construct a sports arena in Pontiac, breached by the defendants. They asserted that letters exchanged between the parties were too incomplete to satisfy the statute of frauds since the letters did not specify a construction site for the arena, a time for its completion, or a date on which the plaintiffs were to take possession.

The Court stated that, in Michigan, a writing no longer had to be complete to satisfy the statute:

> [T]he "nothing in parol" approach to the statute of frauds has been so dishonored in this Court that it has lost any claim to legitimacy. [Michigan] cases establish the principle that extrinsic evidence may be used to supplement, but not contradict, the terms of the written agreement. In the absence of extrinsic supplemental evidence, the court may infer that the parties intended a "reasonable" or "good faith" term as part of the contract. [*Id., p 367*. Citations omitted.]

The sales representatives seek no more than to imply a "good faith" term, so that the Auto Club may not deprive them of the fruit of their labor by refusing to pay the seven percent renewal commissions on the books of business they worked so hard to build.

In enforcing the contract, the *Opdyke* Court adopted Corbin's view that only "[s]ome note or memorandum having substantial probative value in establishing the contract must exist"; 2 Corbin, Contracts, § 498, p 683. The letters satisfied this requirement.

**[***150]** **[*621]** **[**697]** F

While the signers of the lead opinion err in their assertion that the part performance doctrine may be applied to remove only contracts involving land from the statute of frauds, [93] Michigan case law does not appear to support the sales representatives' argument that their partial performance, through their sale of the original new policy, removes their employment contracts from the confines of the one-year provision of the statute. Although there is authority to the contrary, [94] resolution of this issue does not depend on overruling Ordon v Johnson, 346 Mich 38; 77 NW2d 377 (1956), and establishing a part performance exception to the statute of frauds.

**[***151]** **[*622]** G

The signers of the lead opinion state that the sales representatives cannot maintain an action to recover for unjust enrichment. They should, however, be permitted to do so if the basis of the ruling against them is that their contracts of employment were within the statute of frauds. The Restatement of Contracts provides:

> Restitution When Contract Is Within Statute of Frauds
> A party who would otherwise have a claim in restitution under a contract is not barred from restitution for the reason that the contract is unenforceable by him because of the Statute of Frauds unless the Statute provides otherwise or its purpose would be frustrated by allowing restitution. [3 *Restatement Contracts, 2d, § 375*, p 219.]

Illustration 1 to comment (a) indicates that an employment contract violative of the one-year statute is a contract for which a restitutionary or quasi-contract recovery is permitted:

> A makes an oral contract to furnish services to B that are not to be performed within a year (*§ 130*). After A has worked for two months B discharges him without paying him anything. A can recover from B as restitution the reasonable value of the services rendered during the two **[***152]** months. [Id., p 220.]

Accordingly, even assuming that the oral contracts of employment are within the statute of frauds, the sales representatives are entitled to recover the reasonable value of their services in building the books of business

---

See also Wemhoff, n 91 supra, in which a salesman of tax-sheltered annuities claimed that his employer promised to pay commissions on contributions made to the plan by his customers after he was fired. The employer admitted the employment relationship, but argued that the contract violated the statute of frauds, and denied any promise to pay commissions after discharge. Nevertheless, the court held that the admitted existence of an employment agreement was sufficient to satisfy the statute, and remanded the case for trial on the plaintiff's right to postdischarge commissions.

In Hackney v Morelite Construction, 418 A2d 1062, 1065, n 1 (DC App, 1980), the court said,

> [T]he statute . . . does not require an exhaustive, integrated statement of the agreement in writing, but only a sufficient statement to establish that there in fact *was* an agreement and that the party charged should be bound by it.

The court went on to allow parol evidence to explain ambiguous terms in the writing at issue and supply omitted terms in accordance with the usual law of contracts.

See also Haas v Cravatta, 71 Ill App 3d 325; 27 Ill Dec 414; 389 NE2d 226 (1979) (an action for specific performance of a land-sale contract; although the memorandum evidencing agreement was omitted, inter alia, closing date, due date, and requirement of clear title, the statute of frauds did not render the contract unenforceable); Buechner v Rouse, 538 P2d 117, 118 (Colo App, 1975) (a memorandum of oral agreement to employ the plaintiff "as long as he was a stockholder" was not insufficient to satisfy the statute of frauds, although it did not contain the durational term: "Parol evidence is admissible to supply terms omitted from a written agreement," citing Harmon v Waugh, 160 Colo 88; 414 P2d 119 [1966]).

Farnsworth states:

> *Omission of a term is never fatal* [*under the statute of frauds*] *if the court will supply it by implication.* [§ 6.7, p 411. Emphasis added.]

[93] Michigan cases hold that part performance takes a contract outside of the statute of frauds in cases involving the sale of goods over $ 500, Cassidy v Kraft-Phenix Cheese Corp, supra, p 431, and promises to convey land by will, Hammel v Foor, 359 Mich 392, 401; 102 NW2d 196 (1960), in addition to contracts involving the sale of land.

[94] Davies v Martel Laboratory Services, 189 Ill App 3d 694; 136 Ill Dec 951; 545 NE2d 475 (1989) (a promise of permanent employment on the condition that the plaintiff would receive an MBA degree was not violative of the statute of frauds despite the fact that attaining the degree would take two years, on the ground that the plaintiff's enrollment in an MBA program constituted part performance by her in reliance on the agreement).

*if* the promise to pay a seven percent commission on policy renewals of old sales was in part a promise to pay **[*623]** deferred compensation for making the new sale.[95] This, of course, brings one back to the underlying question whether the correct construction of the oral contracts of employment -- whether within or **[**698]** without the statute of frauds -- was that the Auto Club promised to pay the sales representatives a seven percent commission on policies first written before 1978 and renewed after 1977.

**[***153]**

End of Document

[95] See also *Oxley v Ralston Purina Co, 349 F2d 328 (CA 6, 1965)*, where the United States Court of Appeals for the Sixth Circuit, after adverting to *McLaughlin,* held that an oral agreement between a farmer and a corporation, whereby the farmer was to begin a hogleasing program on his farm, with the corporation to later take and dispose of the farmer's surplus stock, which agreement was not to be performed within a year, should be enforced against the corporation on a theory of equitable estoppel, where the farmer relied on such agreement and made extensive investments for the purpose of carrying it out. In the instant case, the sales representatives claim that they made extensive investments of time and energy in an effort to build the books of business.