UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BISHOP GEORGE BLOOMER,
and GG BLOOMER MINISTRIES,

                Plaintiffs,

                                       Case No. 22-CV-12433

vs.

                                       Honorable Nancy G. Edmunds

THE WORD NETWORK OPERATING
COMPANY, INC., CHURCH OF THE
WORD, and KEVIN ADELL,

                Defendants.
_____/

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 83)</u>

      This is a race discrimination and breach of contract case brought by Plaintiffs

Bishop George Bloomer (Bloomer) and GG Bloomer Ministries (GGB) against

Defendants The Word Network Operating Company (TWN), Church of the Word

(WNC), and Kevin Adell (Adell). Plaintiffs allege that Defendants engaged in behavior

that constituted racial discrimination, harassment, and retaliation in violation of Plaintiffs'

right to make and enforce contracts under 42 U.S.C. § 1981. Plaintiffs also assert state-

law claims for breach of contract, unjust enrichment, and quantum meruit.

      The matter is before the Court on Defendants' motion for summary judgment.

(ECF No. 83.) Plaintiffs filed a response in opposition to Defendants' motion. (ECF No.

85.) Defendants filed a reply. (ECF No. 88.) Upon a careful review of the written

submissions, the Court deems it appropriate to render its decision without a hearing

pursuant to Local Rule 7.1(f)(2). For the following reasons, Defendants' motion is GRANTED in part and DENIED in part.

<u>FACTUAL BACKGROUND</u>

I.    <u>Alleged Contractual Relationship</u>

Bishop Bloomer, who is African American, is a televangelist, pastor and author. Bloomer is the sole owner of GGB, a non-profit corporation through which Bloomer coordinates his commercial speaking engagements and sells his books. Kevin Adell, who is Caucasian, is the founder, sole owner, and CEO of TWN, touted to be the largest African American religious broadcasting network in the world. TWN is a for-profit corporation which sells airtime to ministers and has master control over its broadcast signal. Adell is also the president and CEO of WNC, a non-profit ecclesiastical organization which produces religious programming for TWN. WNC also operates a call center where viewers can call in donations or purchase religious items marketed during certain programs.

Bloomer first interacted with TWN in the early 2000s when he paid $2,000 a week for a timeslot to broadcast his self-produced Sunday morning show, *Spiritual Authority*. (ECF No. 83-5, PageID.1514-1515.) In 2011, Adell offered Bloomer the opportunity to host *Rejoice in the Word*, a show produced by WNC and aired on TWN. Adell insisted on handshake agreements and did not have written agreements with any of the on-air preachers, including Bloomer. Plaintiffs did not pay Bloomer for hosting *Rejoice in the Word* or for his work on any of the other programs. With Bloomer as host, donation revenues began to increase. Bloomer renegotiated his arrangement with Adell

2

and the parties agreed that as long as Bloomer hosted *Rejoice in the Word*, he would not be charged for airtime for *Spiritual Authority*. (*Id*. at PageID.1521-1522.)

Around this time, Adell agreed to pay Bloomer $10 for each GGB book sold through the WNC call center. (*Id*. at PageID.1521.) GGB issued an invoice to WNC for $10 per book sold, purchased the book from the publisher, and had it shipped to WNC. WNC was to pay the invoiced amount to GGB and deliver the book to the buyer. Sometimes WNC did not pay the invoices, so Plaintiffs did not ship the books until they were paid. The parties disagree whether Plaintiffs paid all the invoices issued by GGB.

In 2014, Bloomer began promoting WNC products during his shows, consisting primarily of bibles and anointed oil. (*Id*. at PageID.1523.) Bloomer contends he and Adell agreed Bloomer would be paid $10 in commission for the sale of each WNC bible and $2 for the sale of the oils. (*Id*. at PageID.1523, 1529.) Adell disputes the existence of such an agreement. *See Id*. at PageID.1524-1525.) TWN's former Operations Manager David Sheffield confirmed he had personal knowledge of a verbal agreement between Bloomer and Adell whereby Adell agreed to pay Bloomer $10 for each bible and religious books sold on the shows he hosted. (Sheffield Dec'l. ¶¶ 13, 14, ECF No. 85-9, PageID.2683.) TWN's former Data Manager and Call Center Director, Jeffrey Thurman, confirmed he personally witnessed Adell agree to compensate Bloomer for each item sold on his programs. (Thurman Dec'l. ¶ 9, ECF No. 85-8, PageID.2679.)

Unlike with sales of BBG items, Bloomer did not issue invoices for WNC products sold during his programs. Bloomer explained this was because WNC purchased the bibles directly from their publisher, so only WNC had records of orders and sales. (ECF

No. 83-5, PageID.1531.) There are no invoices or accountings documenting commissions due on the sale of WNC products. Bloomer testified he tried to collect payment by "talk[ing] to [Adell] from time to time." (*Id.* at PageID.1534.)

To calculate damages, Plaintiffs offer estimates provided by Jeffrey Thurman, who states that Bloomer sold over 100,000 copies of the Bible Experience, 50,000 to 100,000 copies of the Spiritual Warfare Bible, 40,000 to 50,000 copies of the Subject Bible, and 100,000 bottles of the anointed oil. (Thurman Decl. at ¶¶ 13-16, ECF No. 85-8, PageID.2679.) Thurman also states that Bloomer exclusively promoted the WNC Bibles. (*Id.* ¶ 12, PageID.2679.)

II.     Alleged Discrimination

On September 4, 2019, Malea Howard and Denise Johnson, who both worked at TWN, showed Adell an article written about him entitled "Black Gospel Network PIMP Kevin Adell." The article contained a digitally created image (the "meme") of Adell's face superimposed on the body of a man wearing a white fur coat and standing in front of a white limousine. Adell is surrounded by four African American men, bearing the faces of Bloomer and other on-air preachers. The preachers are portrayed to be much smaller than Adell. Bloomer is depicted wearing a white tuxedo and a black bow tie.

Adell showed Bloomer the meme when they were at work. Bloomer testified that Adell considered the meme a joke and "was laughing and he was proud of it." (ECF No. 83-5, PageID.1568.) Bloomer told Adell the meme was racist and was going to be a huge problem for the network. (*Id.* at PageID.1571.) Later that day, Adell texted the meme to Bloomer with the messages: "You look like a midget", "A tattoo from fantasy

4

island", and "I didn't know they made Tuxedos that small". (ECF No. 85-15,

PageID.2716.) Bloomer responded that he did not think Adell's comments were funny

and he found the meme to be racist:

> That's not funny that has a racist connotation to it that pimp thing get rid of
> that as quickly as you possibly can it's not funny it's equivalent to a black
> face being put on a white man I'm telling you it's not funny[.]

*Id*.

Adell testified that Bloomer was bothered because he looked like a midget in the

meme, so Adell referred to Bloomer as the character Tattoo, who wore a white tuxedo

on the television show *Fantasy Island*. (ECF No. 83-3, PageID.1426.) Adell answered

Bloomer's text with a picture of Tattoo. *Id*. The following day, Adell texted Bloomer a

picture of himself with another white man whose face had been scribbled over with a

black marker. (ECF No. 85-15, PageID.2718.) Bloomer considered this photo to be a

response to his comment that the meme was the equivalent of black face on a white

man. (ECF No. 83-5, PageID.1551, 1569).

On September 11, 2019, Adell texted Bloomer a close-up of Bloomer's face from

the meme, referring to Bloomer as "Tattoo". (ECF No. 85-15, PageID.2721.) Bloomer

responded: "Not funny!!!!!". *Id*. The following day, Adell re-texted the same picture.

Bloomer responded that he considered the meme and being called Tattoo to be racist

and asked Adell to stop joking about it:

> I told you I don't like that tattoo business I told you that it was highly
> offensive I told you I would see that as being races [sic] I told you I do not
> play games with my name or my character and what you think is funny is
> not I'm going to ask you for the last time stop playing with me like that I do
> not like it!!!!!!!

5

(ECF No. 85-15, PageID.2722.) Adell responded with: "OK!!!!", "Got it", "So sensitive" and "WTF". *Id*.

Malea Howard, who is African American, said that she found Adell's remarks to Bloomer regarding the meme to be racist and offensive. (Howard Decl. at ¶ 11, ECF No. 85-13, PageID.2698.) Denise Johnson, who is also African American, found Adell's remarks to Bloomer about the meme to be racially insensitive and offensive. (Johnson Decl. at ¶ 16, ECF No. 85-14, PageID.2701.) Johnson witnessed Adell on a phone call with Bloomer wherein Bloomer objected to Adell's harassment in sending the meme and advised Adell that it was not funny. Adell responded by dismissing Bloomer's complaint and hanging up the phone. (*Id*. at ¶ 15, PageID.2701.) Johnson said she believed that Bloomer's race was a factor in the degree of disrespect he received from Adell. (*Id*. at ¶ 19, PageID.2702.)

In between the texts about the memes, the two men texted about other business issues, including Adell telling Bloomer how much money had been made selling prayer shawls. (ECF No. 85-15, PageID.2719.)

On September 15, Bloomer sent Adell a text message describing "serious problems that no one is telling you about". (ECF No. 85-15, PageID.2725.) Among the issues described by Bloomer was that booked gospel artists were telling people that the network treats them poorly; preachers were saying from the pulpit that the network is like a plantation; some customers have waited six months to receive items they bought and paid for; Bloomer himself sent out 1700 late packages at his own expense. Bloomer believed these issues were leading to low revenue and problems booking guests.

Bloomer also asked for more airtime, explaining that showing up once a month does not build followers and "consistency is going to be our key to success[.]" *Id*. Adell responded by disagreeing with Bloomer's facts and saying that his comparison of TWN to a plantation made him mad. He added that if Bloomer no longer wants to be on TWN, he should call and not use text. *Id*. Adell testified that in response to Bloomer's text, he probably asked someone to see how many slots Bloomer was given on the network, so he could take them away. He referred to restricting airtime as "the whip." (ECF No. 83-3, PageID.1435.)

Bloomer describes a phone call he had with Adell the night of September 15. Adell said he did not appreciate Bloomer's complaints about the meme. He then referred to himself as Bloomer's pimp and said that Bloomer should "bring me my money!" (ECF No. 17, PageID.283-284, ECF No. 83-5, PageID.1555.) Adell also threatened to limit Bloomer's airtime on TWN. The conversation ended with Bloomer saying, "I'm out." Adell asked Bloomer if he was going to TWN's competitor, allegedly saying, "I'll put you in my Rolls Royce and I'll drive your black ass over there." (*Id*. at PageID.284, PageID.1571.)

The next day, Bloomer texted Adell that he was taking time off from TWN. He expressed his disappointment in how he has been treated, mentioning the late delivery of books purchased by his followers and Adell's failure to pay him commissions earned for selling thousands of WCN bibles. (ECF No. 85-15, PageID.2726.) At his deposition, Bloomer stated that he quit for many reasons but that the delay in shipping his books to purchasers, as well as the meme, were "the straw[s] that broke the camel's back." (ECF

No. 83-5, PageID.1555, 1571-1572.) Bloomer described the racist meme and the fact that Adell would not stop referring to the meme despite Bloomer's objections as "the point of no return." (*Id.* at PageID.1571.)

Bloomer states that Adell's racist treatment of him spurred a boycott petition in support of African American clergy.  After describing Adell's actions and statements regarding the meme, the petition urges the Black community to boycott TWN and cancel the network on their cable plans. (ECF No. 85-17, PageID.2745.) The Detroit Chapter of the National Association of Black Journalists sent Adell a letter condemning his "participation in the delivery of a tone deaf, racist meme that portrays ministers featured on your network in the vilest of stereotypes." (ECF No. 85-18, PageID.2748.) On November 4, 2019, Adell issued an apology to Bloomer.

In Counts I, II and III of the Complaint, Plaintiffs allege that Adell, TWN and WNC violated 42 U.S.C. § 1981 by discriminating, harassing and retaliating against them, with the purpose of denying them the right to make and enforce contracts, based on Bloomer's race. Count IV alleges breach of contract for the payment of commissions. Counts V and VI assert alternative causes of action for the recovery of commissions under equitable theories.

<u>STANDARD FOR SUMMARY JUDGMENT</u>

Federal Rule of Civil Procedure 56(a) provides, "[t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the

8

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has an initial burden to inform the court of the portions of the record "which it believes demonstrate the absence of a genuine dispute of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the non-moving party must make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322-23. Finally, the court "consider[s] all facts and inferences drawn therefrom in the light most favorable to the nonmovant." *City of Wyandotte v. Consol. Rail. Corp.*, 262 F.3d 581, 585 (6th Cir. 2001).

<u>ANALYSIS</u>

I.    <u>Request to Dismiss TWN and Adell</u>

Plaintiffs allege three separate contractual relationships in this case. The first is a verbal at-will agreement for Bloomer to host *Rejoice in the Word* and other programs. The second agreement is for commissions for the sale of BBG's books. The third agreement relates to commissions for the sale of WNC-branded bibles and anointed oil.

In their motion for summary judgment, Defendants argue that TWN cannot be liable because it was not a party to any contract, nor was it involved in any alleged discriminatory actions for purposes of 42 U.S.C. § 1981. They also argue that Adell cannot be liable in his personal capacity because he was not a party to any contracts.

A.    <u>TWN</u>

TWN's primary functions are selling airtime to ministers and exercising master control of its broadcast signal. Defendants contend that because TWN is not in the

business of producing shows or selling products, it would not have been a party to any of the three alleged agreements. However, by all accounts, Adell had the authority to make decisions on behalf of TWN and WNC. Bloomer testified that when he dealt with Adell, he believed he was interacting with the president of TWN and when he negotiated with Adell it was in his position as head of the network. (ECF No. 83-15, PageID.1824-1825.)

Following discovery, there is sufficient evidence from which the trier of fact may conclude that TWN was a party to Bloomer's alleged hosting agreement. First, Bloomer's shows aired on TWN. Second, in exchange for his hosting duties on *Rejoice in the Word*, Bloomer was given free airtime on TWN for *Spiritual Authority*. Third, Adell's insistence on not entering written agreements is the reason it is not clear whether he was acting on behalf of TWN, WNC or both.

Regarding the alleged contracts for commissions, TWN argues it is an improper party because it is not involved with WNC's operation of the call center or the fulfillment center. In response, Plaintiffs maintain that TWN and WNC are so interrelated that they constitute a single integrated enterprise such that TWN can face liability under § 1981 even if it does not otherwise meet the definition of an employer. To make this determination, "courts examine the following four factors: (1) interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control. *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993–94 (6th Cir. 1997)

(citation omitted). Not all criteria must be present to suggest an integrated enterprise.

*See Equal Emp. Opportunity Comm'n v. R&L Carriers, Inc.*, 664 F. Supp. 3d 784, 798

(S.D. Ohio 2023).

First, a reasonable factfinder could conclude there is sufficient indicia of

interrelation of operations. Both entities operate out of the same building. TWN provides

accounting, collection, billing and IT support services to WCN. WNC's obligations are

paid by checks written on WNC's bank account, but the checks are prepared by TWN's

bookkeepers. Finally, WCN produces shows to air exclusively on TWN and TWN

provides WCN with IT broadcasting support. The fact that TWN and WCN provide

exclusive services to each other is compelling evidence of interrelation of operations.

*See Swallows*, 128 F.3d at 994 (discussing cases).

Second, the two companies share common management and directors. Adell is

CEO of TWN and WNC, with control over management and authority to enter contracts

and agreements on behalf of both companies. Ralph Lameti is CFO and Treasurer of

TWN and WNC, with financial oversight and check-writing authority. Adell and Lameti

are the only members of the board of directors for WNC and TWN. Particularly given the

significance of Adell's role in managing both companies, this factor is satisfied.

Third, the evidence is sufficient to support the conclusion that Adell exercises

sole control over labor relations and personnel at both TWN and WNC. He has the

authority to hire and fire the employees and independent contractors at both entities.

The fact that WNC's workers report to the common authority figure of both companies

also favors a finding of centralized control over labor relations. See *R&L Carriers, Inc.*, 664 F. Supp. 3d at 798-99.

Fourth, common ownership is established where Defendants admit that Adell is the sole owner of TWN, and TWN owns WNC. (Answer ¶¶ 19, 21, ECF No. 22, PageID.319-320.) The Sixth Circuit has suggested that the fourth factor is not met when neither of the companies is a sham. *Swallows*, 128 F.3d at 995. Although Plaintiffs have not shown that either company is a sham, the absence of that showing is not dispositive. *Id*. at 994.

Considering the factors together, the Court finds that genuine issues of material fact exist as to whether TWN and WCN are "so interrelated" that they constitute an integrated enterprise. They share a prominent executive who controls management and labor relations, has authority to make business and management decisions, and has an ownership interest in both companies. On these facts, a reasonable jury could find TWN is a party to each of the alleged contracts under the integrated enterprise doctrine. The Court denies Defendants' motion to dismiss TWN as a party in this case.

B.    Kevin Adell

Third party individuals may be liable under § 1981 for claims they interfered with a party's contract rights due to racial animus. *See Inner City Contracting, LLC v. Charter Twp. of Northville, Michigan*, 87 F.4th 743, 756 (6th Cir. 2023) ("Courts have heard cases involving plaintiffs seeking to vindicate their rights under § 1981 against third parties who interfere with those rights, even if they were not party to the contract." *See, e.g.*, *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375 (1982); *Sutton v.*

12

*Bloom*, 710 F.2d 1188 (6th Cir. 1983)). While Adell cannot be liable for breach of contract as a corporate officer who executed a contract on behalf of his corporation, he can be liable in his individual capacity under § 1981. Adell is not dismissed from the § 1981 claims.

II.     42 U.S.C. § 1981 Claims

Counts I, II and III, Plaintiffs allege that Adell, TWN and WNC violated 42 U.S.C. § 1981 by discriminating, harassing and retaliating against them, thereby interfering with their contract rights, based on Bloomer's race. "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

A.     Valid Contracts

Plaintiffs must first demonstrate they had a pre-existing contractual right. *Williams v. Richland County Children Servs.*, 489 Fed. App'x 848, 851 (6th Cir. 2012). Under Michigan law, the elements of a valid contract are: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *AFT Michigan v. State of Michigan*, 866 N.W.2d 782, 804 (2015). Defendants maintain Plaintiffs have not met their burden because there is no legal consideration, mutuality of agreement, or mutuality of obligation for any of the three alleged agreements.

13

1.     Legal Consideration and mutuality of obligation

Legal consideration requires a bargained-for exchange, described as "a benefit on one side, or a detriment suffered, or service done on the other side." *Innovation Ventures v Liquid Mfg*, 499 Mich. 491, 508, 885 N.W.2d 861 (2016). Evidence of a bargained-for exchange is the important concept, rather than adequacy of consideration. *Id*. Where there is consideration, there is also mutuality of obligation supporting an agreement. *Stackpole Int'l Engineered Prods., Ltd. v. Angstrom Auto. Grp., LLC*, 52 F.4th 274, 279 (6th Cir. 2022) (citing *Hall v. Small*, 705 N.W.2d 741, 744 (2005)).

a.     Bloomer Hosting *Rejoice in the Word*

Defendants argue that because they did not pay Bloomer for hosting *Rejoice in the Word*, there is no consideration. However, the fact that Defendants did not pay Bloomer a salary for hosting, is not determinative. When Bloomer accepted the hosting position, he gained an opportunity to boost his profile. Defendants also benefited because they needed a host for their show. Once revenues began to increase with Bloomer as host, the parties renegotiated their arrangement. Defendants agreed that if Bloomer continued to host *Rejoice in the Word*, he would no longer be charged for airtime for *Spiritual Authority*. Later, Defendants agreed to pay Bloomer $10 for each of his books sold. Defendants benefited from these last two modifications of the hosting agreement by experiencing an increase in revenue.

There is adequate evidence of consideration and mutuality of obligation as to Bloomer's hosting of *Rejoice in the Word*.

14

b.    Commission for WNC Products

Plaintiffs allege that Defendants agreed to pay them $10 for each WNC product Bloomer sold during his shows and Defendants would retain the balance of the proceeds. Adell denies any agreement to pay commissions to Plaintiffs for sales of WNC products. The arrangement is not memorialized in writing, and no commissions were ever paid.

In addition to Bloomer's testimony describing the parties' agreement, Plaintiffs offer the Declarations of former TWN employees. Operations Manager David Sheffield states that he has "personal knowledge of Bishop Bloomer['s] and Kevin Adell's verbal agreements concerning the commission structure that Bishop Bloomer would receive for the products that he sold on his shows." (ECF No. 85-9, PageID.2683.) Sheffield described the commissions as $10 for each Bible sold and $10 for each religious book sold on shows Bloomer hosted. *Id*. Data Manager and Call Center Director Jeffrey Thurman states he "personally witnessed Kevin Adell agree to compensate Bishop Bloomer a certain dollar amount for each item that he sold on his shows to TWN's viewers." (ECF No. 85-8, PageID.2679.) Thurman refers to WCN bibles and anointed oil, as opposed to GGB books. For example, Thurman states, "I have personal knowledge that the Spiritual Warfare Bible, the Subject Bible, and the Bible Experience were exclusively promoted by Bishop Bloomer." (ECF No. 85-8, PageID.2679.). He also estimates how many WNC bibles Bloomer sold. *Id*. He further provides that he was aware Bloomer was to receive $2 for each bottle of anointed oil sold. *Id*.

15

The Court concludes there is sufficient evidence from which a factfinder could conclude there was bargained-for consideration and mutuality of obligation for this alleged contract.

c.   Commissions for GGB Products

The parties appear to concur that there was an agreement for Defendants to pay Plaintiffs $10 for each GGB book sold by Bloomer during his broadcasts. This agreement was on an order-by-order basis. Documentary evidence supports Bloomer's testimony describing the commission agreement by showing that after BBG issued invoices to TWN for books sold, TWN submitted a check request for payment to GGB. (ECF No. 85-7, PageID.2676.) Defendants retained the difference between the purchase price and the commission. There is sufficient evidence of bargained-for consideration and mutuality of obligation.

2.   Mutuality of Agreement

Mutuality of agreement requires an offer and an acceptance. *McMillon v. City of Kalamazoo*, 983 N.W.2d 79, 80 (2023). There must be a meeting of the mind on all essential terms. *Kamalnath v. Mercy Mem. Hosp. Corp.*, 487 N.W.2d 499, 503 (1992). "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Id.* Whether the parties reached a meeting of the minds is a question of fact. *Global Fleet Sales, LLC v. Delunas*, 203 F. Supp. 3d 789, 817 (E.D. Mich. 2016) (citing *Calhoun Cty. v. Blue Cross Blue Shield Michigan*, 824 N.W. 2d 202, 209 (2012)). Defendants contend that there was no meeting of the minds on the essential terms of any of the agreements.

16

      a.      <u>Bloomer Hosting *Rejoice in the Word*</u>

As to the hosting agreement, Defendants argue there could be no meeting of the minds because Bloomer did not know which party he was negotiating with. Bloomer testified that he negotiated with Adell as President and CEO of "the network." Because Adell insisted on handshake agreements, there is no objective indicia as to which entity Adell was representing at any time. Adell was President and CEO of TWN and WNC and had the authority to negotiate on behalf of and bind both entities. Adell offered Bloomer the hosting position on *Rejoice in the Word*, a program that was produced by WNC and aired on TWN. Bloomer in fact hosted *Rejoice in the Word*, which is objective evidence that he came to an agreement with Adell, regardless of which company or companies Adell was representing.

There is also objective evidence to support Plaintiffs' position regarding a subsequent meeting of the minds when revenues increased with Bloomer as host of *Rejoice in the Word*. Bloomer no longer paid for his *Spiritual Authority* timeslot, and later he was paid commissions on sales of GGB books, for as long as he continued to host *Rejoice in the Word*. The parties' visible acts provide objective evidence from which a factfinder could find a meeting of the minds on the essential elements of the hosting agreement.

      b.      <u>Commissions for WNC Products</u>

Plaintiffs allege that Defendants owe them commissions for WNC products promoted and sold by Bloomer during his hosting contract. Defendants challenge that there is no meeting of the minds on all essential terms of an agreement where Bloomer

cannot identify when the agreement was made, when the commissions were supposed to start, or how the commissions were to be calculated and paid. There is also no clarity whether the commissions were due on products sold while Bloomer was on the air or anytime a WNC product was sold.

Bloomer's testimony is that around 2014, he and Adell agreed that Bloomer would promote and sell bibles purchased by WNC and Plaintiffs would earn $10 for each bible sold. (ECF No. 83-5, PageID.1523.) Over time, WNC purchased different bibles, and for each new bible, Bloomer created a program to promote and sell them on his shows. (*Id*. at PageID.1528-1529.) Bloomer testified the agreement was to last until the current product sold out and they moved to another product. (*Id*. at PageID.1529.) However, no commissions were ever paid. Bloomer describes asking Adell frequently when he was going to get paid and Adell responding that he would pay when funds come in, but he never did. (*Id*. at PageID.1530.) There are no text messages or other writings related to commissions.

Adell denies that there was ever an agreement to pay Plaintiffs commissions for selling WNC products. (ECF No. 83-3, PageID.1419.) Rather, Adell says that Bloomer sold the items so the revenue could be used to pay for the cost of producing the shows. *Id*.

Bloomer clearly had a subjective belief that there was an agreement, demonstrated by the fact he promoted and sold WNC bibles on his shows and asked Adell about paying his commissions. But there is no visible act to support Adell's objective agreement to the essential terms of a contract. Adell never paid any

18

commissions. He never directed his employees to keep track of sales so that Plaintiffs'

commission could be calculated. The closest evidence to corroborate Bloomer's version

of the agreement is Sheffield and Thurman, who state they had personal knowledge of

Bloomer "lamenting about the fact that Kevin Adell did not pay him as agreed for the

products that Bishop Bloomer sold on his shows." (Sheffield Decl. ¶ 21, ECF No. 85-8,

PageID.2680; Thurman Decl. ¶ 15, ECF No. 85-9, PageID.2683.) But the evidence

speaks to Bloomer's subjective state of mind rather than a meeting of the minds. The

fact that Bloomer continued to promote each subsequent version of the WNC bibles

even though he was never paid a commission for selling the previous bibles, is further

evidence that there was no meeting of the minds.

The Court finds there is insufficient evidence of a meeting of the minds on the

essential terms of a contract for commissions on sales of WNC products to create an

issue of material fact.

c.   <u>Commissions for GGB Products</u>

In contrast to the WNC products, there is sufficient evidence that the parties

came to a meeting of the minds on the essential terms of an agreement for

commissions on GGB products. Plaintiffs issued invoices for books sold at $10 apiece

and Defendants paid. To the extent Plaintiffs contend Defendants failed to pay all

invoices, that is an argument to be made for breach of contract.

3.   <u>Conclusion</u>

There is sufficient evidence for a factfinder to conclude the parties had a

preexisting contractual agreement for Bloomer to host *Rejoice in the Word* and for

19

Plaintiffs to earn commissions on the sale of GGB books. The Court finds there is insufficient evidence of a meeting of the minds on the essential terms of a contract for commissions on sales of WNC products. Therefore, the Court will now consider Plaintiffs' § 1981 claims based on interference with their contract rights regarding a hosting agreement and an agreement to earn commissions on Bloomer's books.

      B.    <u>Interference with Contract Rights Based on Racial Animus</u>

In addition to establishing a contractual right, Plaintiffs must ultimately prove that Defendants intentionally interfered with that right because of their race. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). The "but for" standard of causation applies to § 1981 claims. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020) ("To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."). Race must be the actual cause, as opposed to being just a motivating factor, of the loss of a contractual right. *Id*.

      1.    <u>Count I - Racial Discrimination</u>

To succeed in their race discrimination claims, Plaintiffs must prove their *prima facie* case by a preponderance of the evidence, establishing that (1) Bloomer belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) Defendants intended to discriminate against him on the basis of race; and (3) Defendants' discriminatory conduct abridged a right enumerated in § 1981(a). *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006).

First, Defendants argue that summary judgment should be granted in their favor because, as an at-will employee, Bloomer did not have contractual privileges, and even if he did, he chose to leave for reasons unrelated to racial animus. In the absence of an express contract, an at-will employee may sue for discriminatory discharge under § 1981 under the theory that the employee's ability to "make and enforce" the implied employment agreement was impaired by the discriminatory discharge. *See Ferrer v. Detroit Club Mgmt. Corp.*, No. 22-CV-11427, 2024 WL 4642754, at *8 (E.D. Mich. Oct. 31, 2024) (Recognizing that the Sixth Circuit has not directly ruled on this issue, but other Circuits, as well as district courts within the Sixth Circuit, have concluded that Congress intended the term "contract" to encompass at-will employment). Defendants' argument that § 1981 does not apply to Plaintiffs is unavailing.

The second prong of the prima facie case looks at intent, which can be established through direct evidence or circumstantial evidence analyzed under the *McDonnell Douglas* burden-shifting framework. *Amini,* 440 F.3d at 358. "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Kocak v. Cmty. Health Partners of Ohio, Inc.,* 400 F.3d 466, 470 (6th Cir. 2005). "Evidence of discrimination is not considered direct evidence unless a racial motivation is explicitly expressed." *Amini*, 440 F.3d at 359. Examples include proof of an employment policy that is discriminatory on its face or a decision maker's express statement of a desire to avoid hiring employees in the protected class. *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000).

21

In this case, Adell's use of the meme to taunt Bloomer, after Bloomer repeatedly told him the meme was racist and offensive to him, is direct evidence of racial animus. Plaintiffs also point to the text exchange where Bloomer informed Adell that other preachers were telling their parishioners that Adell's network is like a plantation. Adell admitted the next day he ""probably asked somebody to look to see how many half hours [Bloomer] was given on the network" with the intention of pulling time from Bloomer. Adell referred to this as "the whip." According to Bloomer, that night on the telephone Adell stated: "you mad about the meme… Well If I'm your pimp where's my money? Bring me my money!" Bloomer describes that at this point he told Adell, "I'm out." Adell allegedly responded, "what are you going to do now, quit, like a little b****? Where are you going to go, Impact? I'll put you in my Rolls-Royce and drive your black ass over there …"

Although Defendants dispute some of Bloomer's account of the evidence, at the summary judgment stage the Court must resolve all factual disputes in favor of Plaintiffs. Plaintiffs present evidence that Adell, the person with decision-making authority to fire Bloomer, taunted him repeatedly with the meme after being told by Bloomer that he found the meme to be racist and offensive. Adell doubled down by sending a picture of a white man with black face after Adell described the meme as the equivalent of black face. Adell then threatened to take airtime away from Bloomer, later describing his threat as "the whip," a clear reference to how masters disciplined slaves. When Bloomer said that he was "out", Adell referred to Bloomer's "black ass" while

offering to drive him to his next job. This evidence is sufficient to constitute direct evidence of discrimination based on race.

The last element requires Plaintiffs to show that the discrimination interfered with a contract right. Here, Plaintiffs say that discrimination lead to Bloomer's constructive discharge. Constructive discharge occurs when harassment is so intolerable as to reasonably cause a resignation. *Penn. State Police v. Suders,* 542 U.S. 129, 147–48 (2004); *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 887 (6th Cir. 1996).

Defendants argue that Bloomer voluntarily chose to quit for reasons unrelated to race-based animus. They refer to Bloomer's deposition testimony where he explains all the reasons that lead to his decision to quit, but then said that the "straw that broke the camel's back" was Defendants' practice of taking people's money and not delivering the products that they bought. However, elsewhere in his deposition, Bloomer testified that the racist meme, and Adell's behavior regarding the meme, was "the point of no return." To prevail at trial, Plaintiffs must prove that race discrimination was the actual cause of his termination. The description of Adell's incessant race-based comments and taunts, which continued after Bloomer plead with Adell to stop, are enough for a reasonable jury to conclude that Bloomer was forced to resign.

The burden shifts to Defendants to show they would have terminated Bloomer, or otherwise deprived him of the right to make and enforce contracts, for reasons other than race. Defendants do not offer an explanation, but rest on their argument that Bloomer never had a contract.

23

Defendants' motion for summary judgment on Plaintiffs' § 1981 racial discrimination claim is granted in favor of Defendants as to Plaintiffs' claims based on commissions for WNC products. Plaintiffs may proceed with their claim in all other respects.

2.    Count II - Racial Harassment/Hostile Work Environment

Defendants argue that a hostile work environment claim under § 1981 can only be pursued by employees, so summary judgment should be entered against corporate plaintiff GGB. *See S.K. Servs. v. FedEx Ground Package Sys., Inc.*, 663 F. Supp. 2d 619, 626 (E.D. Tenn. 2009) (district court held that while an individual may show he suffered a hostile work environment, "it is hard to fathom a company succeeding on a hostile work environment claim."). Section 1981 imposes a duty on employers to provide employees with a work environment free from harassment based on the employee's race. Therefore, a company would have to show it is a member of a protected class and was subjected to unwelcome racial harassment. *Id.*

Plaintiffs counter that a company may bring a § 1981 discrimination claim if it has acquired an imputed racial identity. Plaintiffs refer to a case from the Ninth Circuit involving a corporation owned by Sikh shareholders. The corporation alleged that its employees were treated poorly based on their association with "a Sikh company," and ultimately its contract was terminated because of racial discrimination. The Ninth Circuit found the corporation acquired an imputed racial identity such that it had standing to pursue a § 1981 racial discrimination claim. *Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 770 (9th Cir. 2005). *Bains* involved a claim of discrimination

24

and is not instructive as to whether a corporation can bring a hostile work environment claim.

GGB was the entity Bloomer used to coordinate his commercial speaking engagements and sell his products. Even if GGB was found to have acquired Bloomer's racial identity, it was not subject to conduct due to racial identity that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. As such, GGB lacks standing to bring a hostile work environment claim where GGB did not have an employment relationship with Defendants. Summary judgment is granted in favor of Defendants as to GGB.

To succeed on a claim of a racially hostile work environment under § 1981, Bloomer must demonstrate that "(1) [he] belonged to a protected group, (2) [he] was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). Defendants argue that Bloomer cannot meet the severe or pervasive standard to demonstrate a hostile work environment.

In determining whether harassment is sufficiently severe or pervasive to create a hostile work environment, "the conduct in question must be judged by both an objective and a subjective standard." *Johnson v. Ford Motor Co.*, 13 F.4th 493, 505 (6th Cir. 2021) (citations omitted). Looking at the totality of the circumstances, "[t]he conduct must be severe or pervasive enough to create an environment that a reasonable person

25

would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Id*.

The Supreme Court provided some guidance on relevant considerations, "includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Id*. (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 22–23 (1993)).

Adell repeatedly referred to the meme in his communications with Bloomer, including after Bloomer told him it was racist and urged him to stop. Instead of respecting Bloomer's requests, Adell escalated his taunts and accused Bloomer of making him angry when he complained that Adell's behavior was racist. Adell even threatened to reduce Bloomer's airtime as a result. Although the conduct took place over a couple weeks of a years-long relationship, a factfinder could conclude that Adell's discriminatory humiliation and insults were sufficiently severe or pervasive that Bloomer subjectively regarded his work environment as abusive.

Bloomer must also show that Adell's conduct was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive. There is no dispute that the meme and the blackface photo are racist tropes. While the TV character Tattoo is not African American, the Tattoo reference derived directly from the meme because Adell said that the depiction of Bloomer in the meme reminded him of Tattoo. Therefore, when Adell called Bloomer Tattoo and sent him unwelcome pictures of Tattoo, Adell was evoking the meme. Bloomer's co-workers, Malea Howard and

26

Denise Johnson, stated that they found the images and Adell's treatment of Bloomer to be offensive. The boycott petition and the letter sent by the Detroit Chapter of the National Association of Black Journalists also show that others in the community found the meme and Adell's treatment of Bloomer to be racist.

Under the totality of the circumstances, a reasonable person could find Adell's conduct was severe or pervasive where the owner of the network continued to taunt Bloomer with racist tropes after Bloomer explained that it was racist and offensive and repeatedly told him to stop.

Defendants' motion for summary judgment on Plaintiffs' § 1981 hostile work environment claim is granted in favor of Defendants as to BBG and as to Bloomer's claims based on commissions for WNC products. Bloomer can proceed with his § 1981 hostile work environment claim against Defendants in all other respects.

### 3.    Count III - Retaliation

Plaintiffs' retaliation claim alleges that when Bloomer objected to the racial discrimination and harassment inflicted by Defendants, Defendants retaliated by denying them income, subjecting them to a hostile work environment and constructively discharging them. These retaliatory actions were allegedly taken because of Bloomer's race and had the purpose and effect of denying Plaintiffs the right to make and enforce contracts.

The elements of a retaliation claim under § 1981 are the same as under Title VII. *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019). They include that (1) the plaintiff engaged in protected activity; (2) his exercise of that activity was known by the

defendants; (3) the defendants thereafter took an action that was materially adverse to him; and (4) there was a causal connection between the protected activity and the materially adverse action. *Id*. Defendants argue that Plaintiffs cannot demonstrate a materially adverse action because Bloomer voluntarily made the decision to leave the relationship.

"To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). Bloomer must first show that "the working conditions under which []he labored were so difficult that a reasonable person standing in [his] shoes would have felt compelled to resign . . . ." *Logan v. Denny's, Inc.*, 259 F.3d 558, 567 (6th Cir. 2001). The Sixth Circuit considers various factors in evaluating a claim:

> Whether a reasonable person would have feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id*. (quoting and adopting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir.2000)).

The Court has already described the humiliation and insults Bloomer suffered due to the racist pictures and taunts from Adell. A reasonable person could conclude that Adell's actions taken after Bloomer told him the meme was racist could be considered "badgering, harassment, or humiliation by the employer calculated to

encourage the employee's resignation[.]" *Id*. After Bloomer advised Adell that preachers were describing the network as a plantation, Adell said he would investigate Bloomer's airtime, inferring that it would be reduced, and later describing his intent in racist terms (comparing airtime to "the whip"). Threatening to reduce airtime is another relevant factor that could cause a reasonable person to resign. Adell's racially harassing treatment of Bloomer, coupled with the threat of a reduction in airtime, is sufficient evidence for the jury to find that a reasonable person in Bloomer's position would have felt compelled to resign due to intolerable working conditions.

Plaintiffs must also present evidence to raise an issue of fact whether Defendants created these intolerable conditions with the intention of forcing Bloomer to quit. Because Adell continued to refer to the meme and other racist tropes after Bloomer told him it was racist and insisted he stop, a reasonable jury could find that quitting was a foreseeable consequence of Adell's comments. *See Moore*, 171 F.3d at 1080.

Adell's alleged behavior is also the type that "could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56–57 (2006), thereby supporting a separate basis for retaliation.

Defendants' motion for summary judgment on Plaintiffs' § 1981 retaliation claim is granted in favor of Defendants as to Plaintiffs' claim based on commissions for WNC products. Plaintiffs can proceed with their § 1981 hostile work environment claim against Defendants in all other respects.

III.   Count IV - Breach of Contract

Plaintiffs allege they entered enforceable contracts with TWN and WNC whereby Bloomer would promote and sell BBG books and WNC bibles and oils in exchange for the payment of agreed-upon commissions. In Section II, the Court concluded there is sufficient evidence from which a factfinder could find the parties entered a contract for commissions on the sale of BBG books. The Court found insufficient evidence to support a meeting of the minds on the essential elements as to commissions on the sale of WNC bibles and other WNC merchandise. Summary judgment is granted as to Plaintiffs' claim for breach of contract for commissions for WNC products and denied as to Plaintiffs' claim for breach of contract for commissions for GGB books.

IV.   Counts V and VI - Quantum Meruit and Unjust Enrichment

Under Michigan law, in the absence of an express contract, a contract may be implied in law "to enable justice to be accomplished even in a case no contract was intended." *Daimler-Chrysler Servs. v. Summit Nat'l*, 289 Fed. App'x 916, 925 (6th Cir. 2008) (quoting *Cascaden v. Magryta,* 225 N.W. 511, 512 (1929)). "A contract may be implied in law where (1) there is a receipt of a benefit by a defendant from a plaintiff; and (2) retention of the benefit is inequitable, absent reasonable compensation." *Id.* (citation omitted). "An implied contract cannot be enforced where the parties have made an express contract covering the same subject matter." *Scholz v. Montgomery Ward & Co.,* 468 N.W.2d 845, 849 (1991). Once a contract is implied-in-law, courts applying Michigan law—unlike courts in other jurisdictions—have used both the phrase "quantum meruit" and "unjust enrichment" to describe the theory of recovery. *Daimler-Chrysler*

*Servs.*, 289 Fed. App'x at 925 (citations omitted). Where the parties dispute the existence of an express contract, a plaintiff may proceed under an action for breach of contract and an action for equitable relief to prevent unjust enrichment in the alternative. *Cascade Elec. Co. v. Rice*, 245 N.W.2d 774, 77 (1976). Plaintiffs seek equitable relief as an alternative to their breach of contract claims for commissions.

Here, the factfinder will be tasked with determining whether the parties had an express contract for commissions on BBG books. Only if they determine there is no contract can the factfinder decide in the alternative whether Defendants have been unjustly enriched. As it pertains to the alleged contract for commissions on the sale of WNC bibles and oils, the Court granted summary judgment on Plaintiffs' breach of contract claim. However, there is evidence that Defendants knew Bloomer believed he was going to earn commissions on his promotion and sale of WNC products during his programs. Bloomer tailored his shows to the products he was promoting, and he repeatedly asked Adell when he was going to be paid. Despite this knowledge, Defendants did not dispel Bloomer's belief, and continued to have him sell their merchandise. The factfinder could conclude that Plaintiffs are entitled to equitable relief to prevent Defendants from being unjustly enriched.

Summary judgment is denied as to Plaintiffs' equitable claims.

<u>CONCLUSION</u>

For the reasons stated above, Defendants' motion for summary judgment is GRANTED in part and DENIED in part as follows:

- Count I - § 1981 Race Discrimination –Defendants' motion for summary judgment is granted as to Plaintiffs' claims based on commissions for WNC products. Defendants' motion is denied in all other respects.

- Count II - § 1981 Hostile Work Environment – Defendants' motion for summary judgment is granted as to Plaintiffs' claims based on commissions for WNC products and as to claims made by GGB. Defendants' motion is denied in all other respects.

- Count III - § 1981 Retaliation – Defendants' motion for summary judgment is granted as to Plaintiffs' claims based on commissions for WNC products. Defendants' motion is denied in all other respects.

- Count IV – Breach of Contract – Defendants' motion for summary judgment is granted as to Plaintiffs' claims based on commissions for WNC products. Defendants' motion is denied in all other respects.

- Count V and VI – Equitable Relief – Defendants' motion for summary judgment is denied.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: June 4, 2025

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 4, 2025, by electronic and/or ordinary mail.

s/Marlena Williams
Case Manager

32